E-FILED
Sunday, 11 March, 2018  06:45:51 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

KELLI ANDREWS, as Administrator of the )
Estate of Tiffany Ann Rusher, deceased, )
            )
            Plaintiff, )
v. )
            )
BRUCE RAUNER, THE STATE OF )
ILLINOIS, JOHN R. BALDWIN, JEFF )
SIM, HE YUAN, BRIAN RICHARDSON, )
THE ILLINOIS DEPARTMENT OF )
CORRECTIONS, and WEXFORD )
HEALTH SOURCES, INC., )

            Defendants.

Case No. 18-cv-1101

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiff, Kelli Andrews, in her capacity as administrator of the estate of Tiffany Ann Rusher, complains against the above-named defendants as follows:

### I.      NATURE OF THE ACTION

1.     In 2013, Tiffany Rusher began serving a five-year sentence at Logan Correctional Center. As the result of a disciplinary infraction, she was placed in solitary confinement. While in solitary, Tiffany's mental health deteriorated so badly that she began to engage in serious incidents of self-harm, including suicide attempts. Rather than providing the treatment she needed to get better, the defendants responded by repeatedly strapping her to a bed and placing her in an isolation cell. Instead of helping Tiffany, this exacerbated her condition—as the defendants knew it would. Then, for the last eight months of her sentence, Tiffany was kept in complete isolation, stripped of all property and clothing, given nothing

1

but a suicide smock (which doubled as a blanket), with a guard literally staring at her 24 hours a day, 7 days a week.  These months in isolation devastated Tiffany's mental health.

2.      Tiffany should have been placed in an inpatient psychiatric hospital, and indeed, at any point during her confinement the defendants had the ability to transfer her to such a facility.  The defendants did not do this, however.  Instead, they waited until her criminal sentence was over, in May 2016.  Then, knowing how badly they had damaged her, the defendants had Tiffany transferred directly from Logan to a state mental hospital, where she should have been all along.

3.      This action seeks compensation for the months of torture that the defendants inflicted on Tiffany before they finally sent her to a hospital for treatment.  Tiffany's mother Kelli Andrews, who is the administrator of Tiffany's estate, asserts the following claims to redress the egregious abuse that the defendants inflicted upon her daughter:

4.      ***Count One***—Eighth Amendment.  By placing Tiffany in extended solitary confinement rather than providing effective treatment for her mental illness, the defendants inflicted cruel and unusual punishment on Tiffany, and exhibited deliberate indifference to Tiffany's serious medical needs.  This caused extreme mental anguish, suffering, and multiple physical injuries, in violation of Tiffany's right to be free from cruel and unusual punishment under the Eighth Amendment to the United States constitution.

5.      ***Counts Two and Three***—Americans with Disabilities Act and Rehabilitation Act.  The defendants also discriminated against Tiffany because of

her mental illness, in violation of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA"). Tiffany's severe mental illnesses were disabilities protected by the ADA and the RA. While the defendants have policies to ensure that people confined to IDOC who have conventional medical needs (such as physical injuries or illnesses) receive the medical treatment they need, the defendants did not provide equivalent treatment for Tiffany's mental condition. Instead, they effectively decided that she should be tortured until her sentence was completed.

6.       In further violation of the ADA and the RA, the defendants failed to provide reasonable accommodations for Tiffany's disability. The defendants provide IDOC prisoners with a variety of programs and services. Among these is furnishing the basic human need of interaction with other persons. With reasonable accommodations to her disability the defendants could have provided Tiffany with these programs and services, but they chose not to. Instead they placed her in extreme and extended solitary confinement, with the devastating consequences described in this Complaint.

7.       Tiffany had the right to be free from cruel and unusual punishment and she had the right not to be mistreated because of her disability. By this action, Tiffany's mother seeks to vindicate those rights and to have the defendants answer for the way they treated a vulnerable young woman, first by inflicting terrific damage on her by placing her in solitary confinement, and then by failing to treat the devastating illness that they themselves had both caused and exacerbated.

## II.        JURISDICTION AND VENUE

8.        The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a), as Plaintiff's causes of action are brought under the Eighth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983, the Americans with Disabilities Act, and the Rehabilitation Act.

9.        Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as one or more of the Defendants resides in the Central District of Illinois and the events giving rise to the claims asserted in this lawsuit arose in this judicial district.

## III.        PARTIES

10.        Kelli Andrews is Tiffany Rusher's mother, and is the administrator of Tiffany's estate pursuant to an order entered by the Circuit Court for the Seventh Judicial Circuit of Illinois, Sangamon County.  Tiffany Rusher is deceased.  Tiffany was confined at Logan Correctional Center from 2013 until May 2016.

11.        Defendant Bruce Rauner is the Governor of Illinois, and he was the Governor of Illinois during the entire time that Tiffany was in extended solitary confinement in 2015 and 2016.  He is sued in his official and individual capacities. Governor Rauner oversees both the Illinois Department of Corrections and the Illinois Department of Human Services.  Upon information and belief, Governor Rauner had actual knowledge that several severely mentally ill prisoners, among them Tiffany, were in critical need of inpatient psychiatric treatment that was unavailable at IDOC facilities.  At all relevant times Governor Rauner had the power to secure such treatment by ordering Defendant Baldwin to transfer these individuals to mental health facilities operated by the Illinois Department of

Human Services.  Despite knowing that these prisoners were in need of such a transfer, however, Governor Rauner did not seek it.

12.     Defendant John R. Baldwin is the acting director of the Illinois Department of Corrections ("IDOC").  Director Baldwin is sued in his official and individual capacities.  Director Baldwin had actual knowledge that Tiffany and several other severely mentally ill people confined to the IDOC needed inpatient psychiatric treatment that was unavailable at IDOC facilities, and at all relevant times had had the statutory power to secure the transfer these individuals to mental health facilities operated by the Illinois Department of Human Services. Despite knowing that these individuals were in need of such a transfer, however, Defendant Baldwin did not seek it.

13.     Defendant Jeff Sim was the Central Regional Psychologist Supervisor of IDOC.  Supervisor Sim is sued in his individual capacity.  At all relevant times, Sim was directly involved in Tiffany's care and personally aware of her situation, and had actual knowledge that Tiffany needed inpatient psychiatric treatment that was unavailable at IDOC facilities.  At all relevant times Sim had the power to secure her transfer to a mental health facility operated by the Illinois Department of Human Services or any other hospital providing in patient mental health treatment.  Despite knowing that Tiffany was in need of such a transfer, however, Defendant Sim did not seek it.

14.     Defendant State of Illinois operates the Illinois Department of Corrections, where Tiffany was housed.  The State of Illinois also operates the mental health facilities of the Illinois Department of Human Services.  Tiffany could

have been transferred to one of those facilities instead of being placed in extended solitary confinement at Logan Correctional Center.  The State of Illinois receives federal funding.

15.    Defendant Wexford Health Sources, Inc. ("Wexford") is a private company that is under contract to provide medical care to all persons who are incarcerated in the IDOC.  This care includes the provision of "[c]omprehensive and specialized mental health services" including "specialty and emergency care that cannot be provided on site."  Despite its contractual obligations, however, by policy and practice Wexford did not provide on-site mental health services necessary to meet the needs of someone with severe mental illnesses like Tiffany, nor did it transfer the people who needed such care to appropriate outside mental health facilities which offered the higher level of care Tiffany required.

16.    Defendant Dr. He Yuan was at the times relevant to this complaint the Chief Psychiatrist at Logan Correctional Center.  At all relevant times he was employed by Defendant Wexford.  He is sued in his individual capacity.  Dr. Yuan was responsible for Tiffany's psychiatric care and was aware that she needed inpatient psychiatric treatment that was unavailable at IDOC facilities.  At all relevant times, Dr. Yuan had the power to seek Tiffany's referral to mental health facilities outside of the IDOC.  Despite knowing that these Tiffany was in need of such a referral, however, Defendant Dr. Yuan did not arrange for the care Tiffany needed.

17.    Defendant Brian Richardson is a mental health professional at Logan Correctional Center.  At all relevant times, he was employed by Defendant Wexford.

He is sued in his individual capacity.  Richardson personally provided mental health care to Tiffany.  Along with Dr. Yuan, Richardson was responsible for Tiffany's mental health care and was aware that she needed inpatient psychiatric treatment that was unavailable at IDOC facilities.  At all relevant times, Richardson had the power seek Tiffany's referral to mental health facilities outside of the IDOC.  Despite knowing that these Tiffany was in need of such a referral, however, Defendant Richardson did arrange for the care Tiffany required.

## IV.    FACTS

18.    Tiffany Rusher entered the custody of the Illinois Department of Corrections in early 2013, and she was transferred to Logan Correctional Center in March 2013.  On information and belief, at the time she entered IDOC Tiffany had not been diagnosed with a mental illness.

19.    Later in 2013, Tiffany was placed in solitary confinement as the result of a disciplinary infraction.  In solitary confinement her mental health deteriorated, and she quickly began trying to harm herself.  In October 2013 she tried to strangle herself.  In December 2013 she swallowed at least five batteries.  In January 2014 she swallowed a pen. By February 2014 she asked to be placed in restraints because she wanted to hurt herself, and in May 2015 she attempted to strangle herself with a piece of elastic.  During this time Tiffany cycled between the prison's general population and stints in solitary confinement, where she would be placed as punishment for these acts of self-harm.

20.    By May 2014 prison staff had diagnosed Tiffany with a bipolar-type schizoaffective disorder, a borderline personality disorder, and post-traumatic stress

disorder.  Medical professionals who evaluated her also determined that she was at

a continued risk for harming herself, noting that in order to help Tiffany cope with

her mental health illnesses it was important for her to be given "out of cell time"

and be allowed to engage in activities like socializing and writing.  During this time

Tiffany was specifically provided with therapy and group activity in order to

address the mental illnesses with which she had been diagnosed.  At the same time,

Tiffany was repeatedly placed in solitary confinement when she tried to hurt

herself, which directly undermined the limited mental health care that she had

been receiving.

      21.     In September 2015, after another suicide attempt, Logan medical staff

ordered that Tiffany be placed on "constant watch," in a "crisis cell" within Logan's

Medical Housing Unit ("MHU").  The MHU crisis cell where Tiffany was placed is a

solitary-confinement cell that had been stripped bare except for a metal prison toilet

and a raised cement slab for a bed.  Before being placed in the crisis cell, Tiffany

was stripped naked and all her personal property was taken away.  This included

anything, like books or magazines, that she could have used to occupy her time.

The only article of clothing she was permitted was an anti-suicide "smock"—a single

piece of thick, woven nylon that cannot be folded or fashioned into a noose, with

holes for the head and arms.  A guard was stationed outside of Tiffany's cell,

monitoring her constantly, 24 hours a day.  And on information and belief, to make

monitoring more effective the lights in Tiffany's cell were never turned off.

      22.     This type of severe isolation is referred to as "constant" watch. It is an

accepted tool for mental health treatment, but it is meant for short periods of

confinement only—typically for a few hours—so that a person in a mental health crisis can be evaluated, a treatment plan can be developed, and the person can thereafter be hospitalized or returned to some form of residential or outpatient care. In the most extreme circumstances it is acceptable to keep a person in "crisis" confinement for a few days, at most. Such extended confinement typically occurs where the person's psychotropic medication regimen has been altered significantly and caregivers need to assess the results.

23.     Under all accepted medical standards, however, longer periods of crisis confinement are strictly forbidden, because it is universally recognized that isolation and solitary confinement for any significant period of time is likely to make a person suffering from mental illness even worse, creating a substantial and increased risk of harm to the patient. For example, the National Commission on Correctional Health Care Standards for Mental Health Services in Correctional Facilities, standard MH-E-07, states: "Inmates who are seriously mentally ill should not be confined under conditions of extreme isolation." The American Bar Association Treatment of Prisoner Standards, 23:6-11, similarly provides: "Prisoners diagnosed with serious mental illness should not be housed in settings that exacerbate their mental illness or suicide risk, particularly in settings involving sensory deprivation or isolation." This is to say nothing of the conditions of the bare crisis cell where Tiffany was kept, where she was not only kept alone, but was deprived of anything that she could have used to pass the time. Such stimulus deprivation compounds the effects of solitary confinement.

24.     Shortly after placing Tiffany in a crisis cell, Logan medical staff examined her and confirmed that she suffered from an acute mental health crisis and was at severe risk of self-harm.  They also identified her as one of only a few dozen patients within the entire IDOC whose mental illnesses were so acute and dangerous that they required full inpatient level mental healthcare.

25.      There are no facilities or services within the IDOC for providing such care.  But that should not have prevented Tiffany from receiving the care she needed.  The defendants were capable of ensuring that Tiffany received appropriate mental healthcare outside the IDOC.  Nevertheless, they failed to do so:

(a)     State law empowers the director of the IDOC to have  prisoners needing intensive psychiatric care to be transferred from the IDOC to the custody of the Illinois Department of Human Services.  *See* 730 ILCS 5/3-8-5. The Department of Human Services operates multiple mental health centers for treating such people.  This includes the Andrew McFarland Mental Health Center ("McFarland") in Springfield, Illinois, where Tiffany was eventually transferred after her sentence of incarceration was completed. Defendants Baldwin, Sim, and (on information and belief) Rauner were personally aware that there were a handful of people confined to the IDOC, which included Tiffany, who could not receive appropriate psychiatric care within the IDOC and therefore should have been transferred to the custody of the Department of Human Services.  Attorneys representing Defendant Baldwin and the IDOC admitted as much during a court hearing in *Rasho v. Baldwin*, 07-cv-1298 (C.D. Ill. (Mihm, J.)), an ongoing injunctive class action

10

against Defendant Baldwin concerning the care of mentally ill people confined to the IDOC.  Despite this knowledge, however, neither Defendant Baldwin or Defendant Sim tried to have Tiffany transferred to a Department of Human Services facility before the completion of her sentence, and Defendant Rauner did not order Baldwin or Sim to effect such a transfer.  As a result, Tiffany unnecessarily endured months of solitary confinement in the Logan crisis cell.

(b)     Defendants Yuan and Richardson provided care for Tiffany. They knew about her acute mental health condition, and knew that she needed inpatient psychiatric care that was unavailable within the IDOC. They could have sought Tiffany's referral to an inpatient psychiatric facility through the "collegial review" process operated by Wexford, their employer. They did not do so, however.

(c)     Defendant Wexford was capable of having Tiffany transferred out of Logan for inpatient mental health treatment.  Wexford was and is under contract with the State of Illinois to provide both medical and mental health care to all people confined to the IDOC.  This included the provision of "[c]omprehensive and specialized mental health services" for prisoners, including off-site and hospitalization services as necessary to treat the medical and mental health needs of people confined to IDOC.  (Indeed, pursuant to this contract Wexford arranges every day for prisoners suffering from injuries and "physical" illnesses, like cancer, to be transported outside of IDOC prisons to medical facilities where they can receive the medical care

they need.) Wexford also employed doctors and mental health professionals to assess the mental condition of people confined to IDOC. Its employees and agents examined Tiffany and concluded that she was suffering from acute mental distress that required hospitalization. By policy and practice, however, Wexford had never developed such a hospitalization capacity within the IDOC's facilities, so this meant that Tiffany required off-site hospitalization. On information and belief, however, Wexford also had a policy and practice of ignoring its obligation to provide such off-site hospitalization for seriously mentally ill prisoners, and did not seek to transfer any prisoners—including Tiffany—for the off-site mental healthcare that they needed. As a result of this policy and practice, Tiffany remained in solitary confinement in a crisis cell, suffering the injuries described herein.

26.    Indeed, instead of trying to secure effective mental healthcare for Tiffany, for all practical purposes the defendants chose a course of conduct which placed Tiffany at an even graver risk of harm. Instead of providing her with the treatment she desperately needed, defendants chose to keep her in isolation and monitor her condition, carefully documenting her descent into madness. A staff member would come to Tiffany's cell once a day and ask Tiffany rote questions (such as, "Do you want to harm yourself today?") through the cell door. Other than this "appointment," Tiffany was interviewed once per week for 30 minutes by a psychiatrist for purposes of adjusting the levels of her various medications. Otherwise, no effort was made to provide Tiffany with the intensive psychiatric and psychological help that she required.

27.     Eventually, in response to pressure from the *Rasho* class action lawsuit, Tiffany would occasionally be allowed to leave the crisis cell for a 30-minute "group therapy" session, which occurred no more than once per week.  This was really a just a gesture at providing therapy, however, and it did not remotely resemble the intensive care that Tiffany actually needed.  The short sessions amounted to an infrequent and irregular interruption to the days and weeks on end that Tiffany was forced to spend alone in a bare cell, and to make matters worse, when she was allowed to attend the sessions, she was rarely, if ever, allowed to speak.  What is more, prison staff treated the therapy sessions as a privilege rather than as healthcare.  If Tiffany attempted to harm herself, the staff would cancel the sessions as punishment.

28.     Tiffany's placement in the bare, solitary crisis cell had a predictable and devastating impact on her mental condition.  Suffering from anguish and further decompensating, she made multiple new attempts at suicide, and in the crisis cell she cut herself, bit herself, repeatedly banged her head against a wall, and repeatedly swallowed inedible objects.

29.     It was clear, in short, that the extended isolation in a crisis cell was not curing Tiffany and was instead harming her—something that any mental health professional would have known already.  And it was clear that Tiffany remained in desperate need of inpatient mental health treatment.  This should have caused the defendants to remove Tiffany from solitary confinement and secure actual mental health treatment for her, but they did not do so.  Instead, in response to her attempts at self-harm, they allowed even more restrictions to be placed on

13

her.  For example, after Tiffany attempted to strangle herself by swallowing objects, the toilet paper was removed from her cell.  Thereafter, when Tiffany defecated, she had to ask a correctional officer for pieces of toilet paper.  Tiffany had to allow the correctional officer to watch her wipe herself, and then demonstrate to the correctional officer that she had flushed the paper down the toilet.  A multitude of similarly humiliating and dehumanizing restrictions were placed on Tiffany, including restricting her to soft foods, requiring her to sleep with her hands visible at all times, and even providing a detailed protocol for changing her menstruation sanitary pads so that guards could observe every step of this most intimate of activities.

30.     The defendants, in short, knew that allowing Tiffany to be placed in solitary confinement in a crisis cell for any meaningful length of time would be toxic to her mental health and would cause her to suffer both mental anguish and—when she attempted to harm herself as a result of that anguish—intense physical pain. They also had the ability to secure appropriate treatment for Tiffany's acute and devastating mental condition.  But even though they knew Tiffany would be devastated by solitary confinement, and even though they could have provided her with appropriate care, the defendants allowed Tiffany to remain in solitary confinement anyway.  In effect the defendants chose not to treat Tiffany but instead to incapacitate her for the remainder of her prison sentence, even though doing so amounted to torture.

31.     Finally, in May 2016, Tiffany's term of incarceration for her underlying criminal conviction ended.  However, defendants knew what damage they had

inflicted on Tiffany, and knew that she was a danger to herself.  They therefore took steps to have her involuntarily committed to a state psychiatric hospital, where she should have been all along.  Tiffany did not oppose the state's petition, and thus her admission became "voluntary" under state law.  With that, she was transferred directly from the Logan crisis cell to the McFarland mental health hospital operated by the Illinois Department of Human Services.

32.    At McFarland, Tiffany was placed in a group setting and she received the intensive psychological and psychiatric care that she had always needed.  As a result her mental health condition improved, and she was able to function in a group setting.  She was not placed in solitary confinement, and was not subject to the psychologically devastating conditions of solitary confinement.  In short, Tiffany received the treatment that the defendants should have provided for her, instead of placing her in solitary confinement for over eight months and causing the injuries and damages described herein.

**COUNT I: Eighth Amendment to the United States Constitution**
**Against:** Rauner (individual capacity), Baldwin (individual capacity), Sim (individual capacity), Yuan (individual capacity), Richardson (individual capacity), and Wexford

33.    Each paragraph of this complaint is incorporated as if fully restated here.

34.    Tiffany suffered from multiple severe mental illnesses that were serious medical conditions and placed Tiffany at serious risk of harm and in need of intense medical treatment.

35.    By placing Tiffany repeatedly into solitary confinement, defendants caused or aggravated Tiffany's mental illness.

36.     The defendants knew that Tiffany's serious medical needs could not be treated within Logan, and that the isolation of a crisis cell would exacerbate her condition and cause her further damage.

37.     Despite what they knew, the defendants failed to transfer Tiffany out of Logan to a facility where she could receive care for her serious mental health condition.  Instead, they allowed her to remain isolated in solitary confinement.

38.     In so doing, the defendants were deliberately indifferent to Tiffany's serious medical needs.

39.     As a result of the defendants' failure to secure proper treatment for Tiffany and their decision instead that she be incapacitated in a crisis cell, Tiffany suffered physical pain and acute mental anguish.

40.     Defendants' repeated placement of Tiffany in solitary constituted the infliction of cruel and unusual punishment in violation of the Eighth Amendment.

41.     Defendants' deliberate indifference to Tiffany's medical needs violated Tiffany's rights to be free from cruel and unusual punishment under the Eighth Amendment.

42.     As a direct and proximate result of Defendants' actions, Tiffany suffered the mental and physical injuries described herein.

**COUNT II: Americans with Disabilities Act**
**Against:** Rauner (official capacity), the State of Illinois, Baldwin (official capacity), the Illinois Department of Corrections

43.     Each paragraph of this complaint is incorporated as if fully restated here.

16

44.     Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."  42 U.S.C. § 12101(b)(1).

45.     Title II of the ADA (codified at 42 U.S.C. § 12132) states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

46.     To prevent discrimination, 28 C.F.R. § 35.130(b)(7) requires a public entity to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the services, program, or activity."

47.     The State of Illinois and the Illinois Department of Corrections are public entities as defined in 42 U.S.C. § 12131(1).

48.     At all times relevant to this Complaint, in light of her severe mental illness, Tiffany was a qualified individual with a disability within the meaning of Title II of the ADA, 42 U.S.C. § 12131(2).

49.     Due to her mental illnesses, Tiffany had a mental impairment that substantially limited one or more major life activities, including but not limited to thinking, interacting with others, and controlling her behavior.  As a result of her mental disabilities, she required intensive inpatient psychiatric therapy.

17

50.     Tiffany was wholly dependent upon Defendants Rauner, the State of Illinois, Defendant Baldwin, and the Illinois Department of Corrections for basic daily needs and appropriate accommodations.  As a state prisoner, she met the essential eligibility requirement for receipt of services or the participation in programs or activities provided by the IDOC and the State of Illinois.

51.     Under the Title II of the ADA and 28 C.F.R. § 35.130(a), Defendants Rauner, the State of Illinois, Baldwin, and the Illinois Department of Corrections are responsible for ensuring that individuals in custody with known disabilities are provided with reasonable accommodations to prevent discrimination on the basis of disability.

52.     Despite Tiffany's known and obvious disability—her severe mental illness, her repeated attempts to self-harm, and her classification among a handful of prisoners so mentally ill that they could not receive proper care within the IDOC—Defendants Rauner, the State of Illinois, Baldwin, and the Illinois Department of Corrections failed to reasonably accommodate Tiffany's disability by failing to provide her with access to human contact, rehabilitation opportunities, group therapy, and adequate mental health treatment.

53.     The defendants have and do make arrangements for other prisoners, who require hospitalization outside of the IDOC because of physical injuries or illnesses, to receive such outside hospitalization.

54.     The foregoing accommodations were reasonable and would have enhanced Tiffany's quality of life, ameliorated her mental illness, and alleviated her suffering.  Instead, and precisely because of her mental illness, Defendants Rauner,

18

the State of Illinois, Baldwin, and the Illinois Department of Corrections placed Tiffany in solitary confinement and removed her access to these necessary accommodations.

55.     Due to the failure of Defendants Rauner, the State of Illinois, Baldwin, and the Illinois Department of Corrections to provide Tiffany with the reasonable accommodation of inpatient intensive psychiatric treatment, Tiffany was deprived of access to services, programs, and activities, including education, programming, recreation, exercise, human interaction, and mental health treatment and services.

56.     The effects of social isolation and dehumanization of solitary confinement on Tiffany were worsened by the Defendants' deprivation of Tiffany's access to mental health programs and services to counteract the effects of the solitary confinement.

57.     As a result of the Defendants' failure to provide reasonable accommodation for and their discrimination against her mental illness, Tiffany suffered extreme mental pain and anguish and physical harm, as described in this complaint.

### COUNT III: Rehabilitation Act of 1973
**Against:** Rauner (official capacity), the State of Illinois, Baldwin (official capacity), and the Illinois Department of Corrections

58.     Each paragraph of this complaint is incorporated as if fully restated here.

59.     At all times relevant to this Complaint, in light of her severe mental illness, Tiffany was a qualified individual with a disability as defined in Section 504 of the Rehabilitation Act of 1973.

19

60.     Due to her mental illnesses, Tiffany had a mental impairment that substantially limited one or more major life activity, including but not limited to thinking, interacting with others, and controlling her behavior.  As a result of her mental disabilities, she required intensive inpatient psychiatric therapy that was not provided for within the IDOC.

61.     The defendants have and do make arrangements for other prisoners, who require hospitalization outside of the IDOC because of physical injuries or illnesses, to receive such outside hospitalization.

62.     The State of Illinois and the Illinois Department of Corrections both receive federal financial assistance.

63.     Defendants Rauner, the State of Illinois, Baldwin, and the Illinois Department of Corrections discriminated against Tiffany by failing to provide a reasonable accommodation for her mental disabilities.

64.     By placing Tiffany in solitary confinement and depriving her from access to appropriate services, programs, and activities, including education, programming, recreation, exercise and mental health services, the Defendants discriminated against her on the basis of her disability in violation of the Rehabilitation Act.

65.     As a result of the Defendants' failure to provide reasonable accommodation for her mental illness, Tiffany suffered extreme mental pain and anguish and physical harm, as described in this complaint.

20

## V.     RELIEF REQUESTED

**WHEREFORE**, Plaintiff respectfully requests judgment against Defendants, jointly and severally, for the following:

A.     An award of compensatory, punitive, and nominal damages;

B.     An award of full costs and attorneys' fees arising out of this litigation pursuant to 42 U.S.C. § 1988(b), the Americans with Disabilities Act, the Rehabilitation Act, and;

C.     Any and other further relief this Court may deem just and appropriate.

## VI.     DEMAND FOR JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Dated: March 11, 2018                    Respectfully submitted,

> _s/ Alan Mills_____
> Alan Mills - alan@uplcchicago.org
> Nicole Schult - nicole@uplcchicago.org
> Uptown People's Law Center
> 4413 North Sheridan Rd.
> Chicago, Illinois 60640
> Tel: (773) 769-1411
> Fax: (773) 769-2224

> _/s/ Emmanuel Andre_____
> Emmanuel Andre - eandre@northsidetlc.com
> Northside Transformative Law Center
> 1543 W. Morse Ave.
> Chicago, IL 60626
> (312) 219-654

_/s/ Stephen H. Weil_

Stephen H. Weil – steve@weilchardon.com
Alexis G. Chardon – ali@weilchardon.com
Weil & Chardon LLC
333 S. Wabash Ave., Suite 2700
Chicago, IL 60604
312-585-7404


_Attorneys for Plaintiff_