E-FILED
Monday, 04 June, 2018  06:11:34 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS**

| | | | |
|---|---|---|---|
| KELLI ANDREWS, as Administrator of the | ) | | |
| Estate of Tiffany Ann Rusher, deceased, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| -vs- | ) | No. | 18-cv-1101-SEM-TSH |
| | ) | | |
| BRUCE RAUNER et al., | ) | | |
| | ) | | |
| Defendants. | ) | | |

**ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT**

NOW COME Defendants, JOHN R. BALDWIN (in his individual capacity), BRUCE RAUNER (in his individual capacity), and DR. JEFF SIM,[1] by and through their attorney, Lisa Madigan, Attorney General for the State of Illinois, and for their answer and affirmative defenses to Plaintiff's Complaint (doc. 1), state as follows:

## I.      NATURE OF THE ACTION

1.      In 2013, Tiffany Rusher began serving a five-year sentence at Logan Correctional Center. As the result of a disciplinary infraction, she was placed in solitary confinement. While in solitary, Tiffany's mental health deteriorated so badly that she began to engage in serious incidents of self-harm, including suicide attempts. Rather than providing the treatment she needed to get better, the defendants responded by repeatedly strapping her to a bed and placing her in an isolation cell. Instead of helping Tiffany, this exacerbated her condition—as the defendants knew it would. Then, for the last eight months of her sentence, Tiffany was kept in complete isolation, stripped of all property and clothing, given nothing but a suicide smock (which doubled as a blanket), with a

---

[1] Defendants John R. Baldwin (in his official capacity), Bruce Rauner (in his official capacity), the State of Illinois, and the Illinois Department of Corrections have separately moved to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), Plaintiff's claims against them. Accordingly, no further responsive pleading on behalf of these defendants is necessary, at this time. To the extent any responsive pleading is required from these defendants, these defendants deny the claims against them and deny Plaintiff is entitled to any relief.

guard literally staring at her 24 hours a day, 7 days a week. These months in isolation devastated

Tiffany's mental health.

**ANSWER:**

**Defendants admit Tiffany Rusher started a prison sentence on March 14, 2013, at Logan Correctional Center and was released from the custody of the Illinois Department of Corrections on May 3, 2016. Defendants admit Ms. Rusher engaged in self-harm and attempted suicide on numerous occasions while in the custody of the Illinois Department of Corrections. Defendants admit medical and mental health professionals placed Ms. Rusher on crisis watch at various times.**

**Defendants deny any remaining allegations in Paragraph 1.**

2.      Tiffany should have been placed in an inpatient psychiatric hospital, and indeed, at any point during her confinement the defendants had the ability to transfer her to such a facility. The defendants did not do this, however. Instead, they waited until her criminal sentence was over, in May 2016. Then, knowing how badly they had damaged her, the defendants had Tiffany transferred directly from Logan to a state mental hospital, where she should have been all along.

**ANSWER:**

**Defendants admit Ms. Rusher was released from the custody of the Illinois Department of Corrections into the custody of the Illinois Department of Human Services on May 3, 2016.**

**Defendants deny any remaining allegations in Paragraph 2.**

3.      This action seeks compensation for the months of torture that the defendants inflicted on Tiffany before they finally sent her to a hospital for treatment. Tiffany's mother Kelli Andrews, who is the administrator of Tiffany's estate, asserts the following claims to redress the egregious abuse that the defendants inflicted upon her daughter:

**ANSWER:**

**Defendants lack knowledge or information sufficient to form a belief about the truth of whether Kelli Andrews is the mother of Tiffany Rusher and whether**

**Kelli Andrews is the administrator of Tiffany's estate; accordingly, these statements are denied.**

**Defendants deny Plaintiff is entitled to any relief and deny any remaining allegations in Paragraph 3.**

4.      *Count One*—Eighth Amendment. By placing Tiffany in extended solitary confinement rather than providing effective treatment for her mental illness, the defendants inflicted cruel and unusual punishment on Tiffany, and exhibited deliberate indifference to Tiffany's serious medical needs. This caused extreme mental anguish, suffering, and multiple physical injuries, in violation of Tiffany's right to be free from cruel and unusual punishment under the Eighth Amendment to the United States constitution.

**ANSWER:**

**Defendants deny the allegations in Paragraph 4.**

5.      *Counts Two and Three*—Americans with Disabilities Act and Rehabilitation Act. The defendants also discriminated against Tiffany because of her mental illness, in violation of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA"). Tiffany's severe mental illnesses were disabilities protected by the ADA and the RA. While the defendants have policies to ensure that people confined to IDOC who have conventional medical needs (such as physical injuries or illnesses) receive the medical treatment they need, the defendants did not provide equivalent treatment for Tiffany's mental condition. Instead, they effectively decided that she should be tortured until her sentence was completed.

**ANSWER:**

**Defendants admit the Illinois Department of Corrections have policies for the treatment of offenders' medical and mental health needs.**

**Defendants deny any remaining allegations in Paragraph 5.**

6.      In further violation of the ADA and the RA, the defendants failed to provide reasonable accommodations for Tiffany's disability. The defendants provide IDOC prisoners with a variety of programs and services. Among these is furnishing the basic human need of interaction with other persons. With reasonable accommodations to her disability the defendants could have provided Tiffany with these programs and services, but they chose not to. Instead they placed her in extreme and extended solitary confinement, with the devastating consequences described in this Complaint.

**ANSWER:**

**Defendants admit offenders in the custody of the Illinois Department of Corrections are provided a variety of programs and services.**

**Defendants deny any remaining allegations in Paragraph 6.**

7.      Tiffany had the right to be free from cruel and unusual punishment and she had the right not to be mistreated because of her disability. By this action, Tiffany's mother seeks to vindicate those rights and to have the defendants answer for the way they treated a vulnerable young woman, first by inflicting terrific damage on her by placing her in solitary confinement, and then by failing to treat the devastating illness that they themselves had both caused and exacerbated.

**ANSWER:**

**Defendants admit Ms. Rusher had certain rights conferred upon her by virtue of the Eighth Amendment to the United States Constitution.**

**Defendants lack knowledge or information sufficient to form a belief about the truth of Plaintiff's reasons for filing this lawsuit; accordingly, this allegation is denied.**

**Defendants deny any remaining allegations in Paragraph 7.**

## II.      JURISDICTION AND VENUE

8.      The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a), as Plaintiff's causes of action are brought under the Eighth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983, the Americans with Disabilities Act, and the Rehabilitation Act.

**ANSWER:**

**Defendants admit the Court has jurisdiction over Plaintiff's constitutional claim brought pursuant 42 U.S.C. § 1983.**

**Defendants deny that Plaintiff has stated a viable claim under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.*, (hereinafter "ADA") or the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, (hereinafter "RA"). Defendants admit the Court has jurisdiction to determine whether Plaintiff has stated a claim under the ADA and RA.**

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as one or more of the Defendants resides in the Central District of Illinois and the events giving rise to the claims asserted in this lawsuit arose in this judicial district.

**ANSWER:**

**Defendants admit venue is proper in this Court.**

## III.      PARTIES

10.      Kelli Andrews is Tiffany Rusher's mother, and is the administrator of Tiffany's estate pursuant to an order entered by the Circuit Court for the Seventh Judicial Circuit of Illinois, Sangamon County. Tiffany Rusher is deceased. Tiffany was confined at Logan Correctional Center from 2013 until May 2016.

**ANSWER:**

**Defendants admit Tiffany Rusher started a prison sentence on March 14, 2013, at Logan Correctional Center and was released from the custody of the Illinois Department of Corrections on May 3, 2016.**

**Defendants lack knowledge or information sufficient to form a belief about the truth of any remaining allegations in Paragraph 10; accordingly, any remaining allegations in Paragraph 10 are denied.**

11.     Defendant Bruce Rauner is the Governor of Illinois, and he was the Governor of Illinois during the entire time that Tiffany was in extended solitary confinement in 2015 and 2016. He is sued in his official and individual capacities. Governor Rauner oversees both the Illinois Department of Corrections and the Illinois Department of Human Services. Upon information and belief, Governor Rauner had actual knowledge that several severely mentally ill prisoners, among them Tiffany, were in critical need of inpatient psychiatric treatment that was unavailable at IDOC facilities. At all relevant times Governor Rauner had the power to secure such treatment by ordering Defendant Baldwin to transfer these individuals to mental health facilities operated by the Illinois Department of Human Services. Despite knowing that these prisoners were in need of such a transfer, however, Governor Rauner did not seek it.

**ANSWER:**

**Defendants admit Bruce Rauner is the current Governor of the State of Illinois and that he has served in this position since January 12, 2015. Defendants admit Governor Rauner, by nature of his position, generally oversees the Illinois Department of Corrections and the Illinois Department of Human Services. Defendants admit Governor Rauner is being sued in his individual capacity.**

**Defendants deny that Plaintiff has properly sued Governor Rauner in his official capacity and deny any remaining allegations in Paragraph 11.**

12.     Defendant John R. Baldwin is the acting director of the Illinois Department of Corrections ("IDOC"). Director Baldwin is sued in his official and individual capacities. Director Baldwin had actual knowledge that Tiffany and several other severely mentally ill people confined to the IDOC needed inpatient psychiatric treatment that was unavailable at IDOC facilities, and at all relevant times had had the statutory power to secure the transfer these individuals to mental

health facilities operated by the Illinois Department of Human Services. Despite knowing that these individuals were in need of such a transfer, however, Defendant Baldwin did not seek it.

**ANSWER:**

**Defendants admit John Baldwin is the current Acting Director of the Illinois Department of Corrections and that he has served in this position since August 14, 2015. Defendants admit Director Baldwin is being sued in his individual capacity.**

**Defendants deny that Plaintiff has properly sued Director Baldwin in his official capacity and deny any remaining allegations in Paragraph 12.**

13.    Defendant Jeff Sim was the Central Regional Psychologist Supervisor of IDOC. Supervisor Sim is sued in his individual capacity. At all relevant times, Sim was directly involved in Tiffany's care and personally aware of her situation, and had actual knowledge that Tiffany needed inpatient psychiatric treatment that was unavailable at IDOC facilities. At all relevant times Sim had the power to secure her transfer to a mental health facility operated by the Illinois Department of Human Services or any other hospital providing in patient mental health treatment. Despite knowing that Tiffany was in need of such a transfer, however, Defendant Sim did not seek it.

**ANSWER:**

**Defendants admit Dr. Jeff Sims was the Central Regional Psychologist Administrator for the Illinois Department of Corrections from January 16, 2014, until February 15, 2017. Defendants admit Dr. Sims is being sued in his individual capacity.**

**Defendants deny any remaining allegations in Paragraph 13.**

14.    Defendant State of Illinois operates the Illinois Department of Corrections, where Tiffany was housed. The State of Illinois also operates the mental health facilities of the Illinois Department of Human Services. Tiffany could have been transferred to one of those facilities

instead of being placed in extended solitary confinement at Logan Correctional Center. The State

of Illinois receives federal funding.

**ANSWER:**

**Defendants admit Ms. Rusher was in the custody of the Illinois Department of Corrections from March 14, 2013, until her release on May 3, 2016. Defendants admit the Illinois Department of Corrections and the Illinois Department of Human Services are entities of the State of Illinois. Defendants admit the Illinois Department of Human Services operates certain mental health facilities in the State of Illinois. Defendants admit the State of Illinois receives federal funding.**

**Defendants deny any remaining allegations in Paragraph 14.**

15.     Defendant Wexford Health Sources, Inc. ("Wexford") is a private company that is

under contract to provide medical care to all persons who are incarcerated in the IDOC. This care

includes the provision of "[c]omprehensive and specialized mental health services" including

"specialty and emergency care that cannot be provided on site." Despite its contractual obligations,

however, by policy and practice Wexford did not provide on-site mental health services necessary

to meet the needs of someone with severe mental illnesses like Tiffany, nor did it transfer the

people who needed such care to appropriate outside mental health facilities which offered the

higher level of care Tiffany required.

**ANSWER:**

**Defendants admit Wexford Health Sources, Inc., is a private company that has contracted with the State of Illinois to provide certain medical and mental health services to offenders incarcerated in the Illinois Department of Corrections.**

**Defendants deny any remaining allegations in Paragraph 15.**

16.     Defendant Dr. He Yuan was at the times relevant to this complaint the Chief

Psychiatrist at Logan Correctional Center. At all relevant times he was employed by Defendant

Wexford. He is sued in his individual capacity. Dr. Yuan was responsible for Tiffany's psychiatric

care and was aware that she needed inpatient psychiatric treatment that was unavailable at IDOC

facilities. At all relevant times, Dr. Yuan had the power to seek Tiffany's referral to mental health

facilities outside of the IDOC. Despite knowing that these Tiffany was in need of such a referral,

however, Defendant Dr. Yuan did not arrange for the care Tiffany needed.

**ANSWER:**

**Defendants lack knowledge or information sufficient to form a belief about the
truth of the allegations in Paragraph 16; accordingly, the allegations in
Paragraph 16 are denied.**

17.    Defendant Brian Richardson is a mental health professional at Logan Correctional

Center. At all relevant times, he was employed by Defendant Wexford. He is sued in his individual

capacity. Richardson personally provided mental health care to Tiffany. Along with Dr. Yuan,

Richardson was responsible for Tiffany's mental health care and was aware that she needed

inpatient psychiatric treatment that was unavailable at IDOC facilities. At all relevant times,

Richardson had the power seek Tiffany's referral to mental health facilities outside of the IDOC.

Despite knowing that these Tiffany was in need of such a referral, however, Defendant Richardson

did arrange for the care Tiffany required.

**ANSWER:**

**Defendants lack knowledge or information sufficient to form a belief about the
truth of the allegations in Paragraph 17; accordingly, the allegations in
Paragraph 17 are denied.**

## IV.        FACTS

18.    Tiffany Rusher entered the custody of the Illinois Department of Corrections in

early 2013, and she was transferred to Logan Correctional Center in March 2013. On information

and belief, at the time she entered IDOC Tiffany had not been diagnosed with a mental illness.

**ANSWER:**

**Defendants admit Tiffany Rusher started a prison sentence on March 14, 2013, at Logan Correctional Center and was released from the custody of the Illinois Department of Corrections on May 3, 2016.**

**Defendants lack knowledge or information sufficient to form a belief about the truth of any remaining allegations in Paragraph 18; accordingly, any remaining allegations in Paragraph 18 are denied.**

19.     Later in 2013, Tiffany was placed in solitary confinement as the result of a disciplinary infraction. In solitary confinement her mental health deteriorated, and she quickly began trying to harm herself. In October 2013 she tried to strangle herself. In December 2013 she swallowed at least five batteries. In January 2014 she swallowed a pen. By February 2014 she asked to be placed in restraints because she wanted to hurt herself, and in May 2015 she attempted to strangle herself with a piece of elastic. During this time Tiffany cycled between the prison's general population and stints in solitary confinement, where she would be placed as punishment for these acts of self-harm.

**ANSWER:**

**Defendants admit Ms. Rusher engaged in self-harm and attempted suicide on numerous occasions while in the custody of the Illinois Department of Corrections at Logan Correctional Center.**

**Defendants lack knowledge or information sufficient to form a belief about the truth of any remaining allegations in Paragraph 19; accordingly, any remaining allegations in Paragraph 19 are denied.**

20.     By May 2014 prison staff had diagnosed Tiffany with a bipolar-type schizoaffective disorder, a borderline personality disorder, and post-traumatic stress disorder. Medical professionals who evaluated her also determined that she was at a continued risk for harming herself, noting that in order to help Tiffany cope with her mental health illnesses it was important for her to be given "out of cell time" and be allowed to engage in activities like socializing and

writing. During this time Tiffany was specifically provided with therapy and group activity in order to address the mental illnesses with which she had been diagnosed. At the same time, Tiffany was repeatedly placed in solitary confinement when she tried to hurt herself, which directly undermined the limited mental health care that she had been receiving.

**ANSWER:**

**Defendants admit Ms. Rusher engaged in self-harm and attempted suicide on numerous occasions while in the custody of the Illinois Department of Corrections at Logan Correctional Center. Defendants admit Ms. Rusher was diagnosed with certain mental illnesses and medical conditions, and that she received treatment for these illnesses and conditions.**

**Defendants lack knowledge or information sufficient to form a belief about the truth of any remaining allegations in Paragraph 20; accordingly, any remaining allegations in Paragraph 20 are denied.**

21.    In September 2015, after another suicide attempt, Logan medical staff ordered that Tiffany be placed on "constant watch," in a "crisis cell" within Logan's Medical Housing Unit ("MHU"). The MHU crisis cell where Tiffany was placed is a solitary-confinement cell that had been stripped bare except for a metal prison toilet and a raised cement slab for a bed. Before being placed in the crisis cell, Tiffany was stripped naked and all her personal property was taken away. This included anything, like books or magazines, that she could have used to occupy her time. The only article of clothing she was permitted was an anti-suicide "smock"—a single piece of thick, woven nylon that cannot be folded or fashioned into a noose, with holes for the head and arms. A guard was stationed outside of Tiffany's cell, monitoring her constantly, 24 hours a day. And on information and belief, to make monitoring more effective the lights in Tiffany's cell were never turned off.

**ANSWER:**

**Defendants admit Ms. Rusher engaged in self-harm and attempted suicide on numerous occasions while in the custody of the Illinois Department of**

**Corrections at Logan Correctional Center. Defendants admit Ms. Rusher was placed on crisis watch at the direction of medical and mental health professionals.**

**Defendants lack knowledge or information sufficient to form a belief about the truth of any remaining allegations in Paragraph 21; accordingly, any remaining allegations in Paragraph 21 are denied.**

22.     This type of severe isolation is referred to as "constant" watch. It is an accepted tool for mental health treatment, but it is meant for short periods of confinement only—typically for a few hours—so that a person in a mental health crisis can be evaluated, a treatment plan can be developed, and the person can thereafter be hospitalized or returned to some form of residential or outpatient care. In the most extreme circumstances it is acceptable to keep a person in "crisis" confinement for a few days, at most. Such extended confinement typically occurs where the person's psychotropic medication regimen has been altered significantly and caregivers need to assess the results.

**ANSWER:**

**Defendants deny the allegations in Paragraph 22.**

23.     Under all accepted medical standards, however, longer periods of crisis confinement are strictly forbidden, because it is universally recognized that isolation and solitary confinement for any significant period of time is likely to make a person suffering from mental illness even worse, creating a substantial and increased risk of harm to the patient. For example, the National Commission on Correctional Health Care Standards for Mental Health Services in Correctional Facilities, standard MH-E-07, states: "Inmates who are seriously mentally ill should not be confined under conditions of extreme isolation." The American Bar Association Treatment of Prisoner Standards, 23:6-11, similarly provides: "Prisoners diagnosed with serious mental illness should not be housed in settings that exacerbate their mental illness or suicide risk,

particularly in settings involving sensory deprivation or isolation." This is to say nothing of the conditions of the bare crisis cell where Tiffany was kept, where she was not only kept alone, but was deprived of anything that she could have used to pass the time. Such stimulus deprivation compounds the effects of solitary confinement.

**ANSWER:**

**Defendants deny the allegations in Paragraph 23.**

24.     Shortly after placing Tiffany in a crisis cell, Logan medical staff examined her and confirmed that she suffered from an acute mental health crisis and was at severe risk of self-harm. They also identified her as one of only a few dozen patients within the entire IDOC whose mental illnesses were so acute and dangerous that they required full inpatient level mental healthcare.

**ANSWER:**

**Defendants admit Ms. Rusher was placed on crisis watch at the direction of medical and mental health professionals. Defendants admit Ms. Rusher was diagnosed with certain mental illnesses and medical conditions, and that she received treatment for these illnesses and conditions.**

**Defendants lack knowledge or information sufficient to form a belief about the truth of any remaining allegations in Paragraph 24; accordingly, any remaining allegations in Paragraph 24 are denied.**

25.     There are no facilities or services within the IDOC for providing such care. But that should not have prevented Tiffany from receiving the care she needed. The defendants were capable of ensuring that Tiffany received appropriate mental healthcare outside the IDOC. Nevertheless, they failed to do so:

        (a)     State law empowers the director of the IDOC to have prisoners needing intensive psychiatric care to be transferred from the IDOC to the custody of the Illinois Department of Human Services. *See* 730 ILCS 5/3-8-5. The Department of Human Services operates multiple mental health centers for treating such people. This includes the Andrew McFarland Mental Health Center ("McFarland") in Springfield, Illinois, where Tiffany was eventually transferred after her sentence of incarceration was completed. Defendants Baldwin, Sim, and (on information and belief) Rauner were personally aware

that there were a handful of people confined to the IDOC, which included Tiffany, who could not receive appropriate psychiatric care within the IDOC and therefore should have been transferred to the custody of the Department of Human Services. Attorneys representing Defendant Baldwin and the IDOC admitted as much during a court hearing in *Rasho v. Baldwin*, 07-cv-1298 (C.D. Ill. (Mihm, J.)), an ongoing injunctive class action against Defendant Baldwin concerning the care of mentally ill people confined to the IDOC. Despite this knowledge, however, neither Defendant Baldwin or Defendant Sim tried to have Tiffany transferred to a Department of Human Services facility before the completion of her sentence, and Defendant Rauner did not order Baldwin or Sim to effect such a transfer. As a result, Tiffany unnecessarily endured months of solitary confinement in the Logan crisis cell.

(b)    Defendants Yuan and Richardson provided care for Tiffany. They knew about her acute mental health condition, and knew that she needed inpatient psychiatric care that was unavailable within the IDOC. They could have sought Tiffany's referral to an inpatient psychiatric facility through the "collegial review" process operated by Wexford, their employer. They did not do so, however.

(c)    Defendant Wexford was capable of having Tiffany transferred out of Logan for inpatient mental health treatment. Wexford was and is under contract with the State of Illinois to provide both medical and mental health care to all people confined to the IDOC. This included the provision of "[c]omprehensive and specialized mental health services" for prisoners, including off-site and hospitalization services as necessary to treat the medical and mental health needs of people confined to IDOC. (Indeed, pursuant to this contract Wexford arranges every day for prisoners suffering from injuries and "physical" illnesses, like cancer, to be transported outside of IDOC prisons to medical facilities where they can receive the medical care they need.) Wexford also employed doctors and mental health professionals to assess the mental condition of people confined to IDOC. Its employees and agents examined Tiffany and concluded that she was suffering from acute mental distress that required hospitalization. By policy and practice, however, Wexford had never developed such a hospitalization capacity within the IDOC's facilities, so this meant that Tiffany required off-site hospitalization.  On information and belief, however, Wexford also had a policy and practice of ignoring its obligation to provide such off-site hospitalization for seriously mentally ill prisoners, and did not seek to transfer any prisoners—including Tiffany—for the off-site mental healthcare that they needed. As a result of this policy and practice, Tiffany remained in solitary confinement in a crisis cell, suffering the injuries described herein.

**ANSWER:**

**Defendants admit Section 3-8-5 of the Unified Code of Corrections states: "(a) The Department shall cause inquiry and examination at periodic intervals to ascertain whether any person committed to it may be subject to involuntary admission, as defined in Section 1-119 of the Mental Health and Developmental Disabilities Code, or meets the standard for judicial admission as defined in Section 4-500 of the Mental Health and Developmental Disabilities Code, or is an addict, alcoholic or intoxicated person as defined in**

the Alcoholism and Other Drug Abuse and Dependency Act. The Department may provide special psychiatric or psychological or other counseling or treatment to such persons in a separate institution within the Department, or the Director of the Department of Corrections may transfer such persons other than addicts, alcoholics or intoxicated persons to the Department of Human Services for observation, diagnosis and treatment, subject to the approval of the Director of the Department of Human Services, for a period of not more than 6 months, if the person consents in writing to the transfer. The person shall be advised of his right not to consent, and if he does not consent, such transfer may be effected only by commitment under paragraphs (c) and (d) of this Section.

(b) The person's spouse, guardian or nearest relative and his attorney of record shall be advised of their right to object, and if objection is made, such transfer may be effected only by commitment under paragraph (c) of this Section. Notices of such transfer shall be mailed to such person's spouse, guardian or nearest relative and to the attorney of record marked for delivery to addressee only at his last known address by certified mail with return receipt requested together with written notification of the manner and time within which he may object thereto.

(c) If a committed person does not consent to his transfer to the Department of Human Services or if a person objects under paragraph (b) of this Section, or if the Department of Human Services determines that a transferred person requires commitment to the Department of Human Services for more than 6 months, or if the person's sentence will expire within 6 months, the Director of the Department of Corrections shall file a petition in the circuit court of the county in which the correctional institution or facility is located requesting the transfer of such person to the Department of Human Services. A certificate of a psychiatrist, clinical psychologist or, if admission to a developmental disability facility is sought, of a physician that the person is in need of commitment to the Department of Human Services for treatment or habilitation shall be attached to the petition. Copies of the petition shall be furnished to the named person and to the state's attorneys of the county in which the correctional institution or facility is located and the county in which the named person was committed to the Department of Corrections.

(d) The court shall set a date for a hearing on the petition within the time limit set forth in the Mental Health and Developmental Disabilities Code. The hearing shall be conducted in the manner prescribed by the Mental Health and Developmental Disabilities Code. If the person is found to be in need of commitment to the Department of Human Services for treatment or habilitation, the court may commit him to that Department.

(e) Nothing in this Section shall limit the right of the Director or the chief administrative officer of any institution or facility to utilize the emergency admission provisions of the Mental Health and Developmental Disabilities Code with respect to any person in his custody or care. The transfer of a person to an institution or facility of the Department of Human Services under paragraph (a) of this Section does not discharge the person from the control of the Department."
730 ILCS 5/3-8-5.

Defendants admit the Illinois Department of Human Services operates certain mental health facilities including McFarland Mental Health Center in Springfield, Illinois. Defendants admit Ms. Rusher was released from the

**custody of the Illinois Department of Corrections into the custody of the Illinois Department of Human Services on May 3, 2016.**

**Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 25, subparts b and c; accordingly, the allegations in Paragraph 25, subparts b and c are denied.**

**Defendants deny any remaining allegations in Paragraph 25.**

26.     Indeed, instead of trying to secure effective mental healthcare for Tiffany, for all practical purposes the defendants chose a course of conduct which placed Tiffany at an even graver risk of harm. Instead of providing her with the treatment she desperately needed, defendants chose to keep her in isolation and monitor her condition, carefully documenting her descent into madness. A staff member would come to Tiffany's cell once a day and ask Tiffany rote questions (such as, "Do you want to harm yourself today?") through the cell door. Other than this "appointment," Tiffany was interviewed once per week for 30 minutes by a psychiatrist for purposes of adjusting the levels of her various medications. Otherwise, no effort was made to provide Tiffany with the intensive psychiatric and psychological help that she required.

**<u>ANSWER:</u>**

**Defendants admit Ms. Rusher received care and treatment from medical and mental professionals.**

**Defendants deny any remaining allegations in Paragraph 26.**

27.     Eventually, in response to pressure from the *Rasho* class action lawsuit, Tiffany would occasionally be allowed to leave the crisis cell for a 30-minute "group therapy" session, which occurred no more than once per week. This was really a just a (*sic*) gesture at providing therapy, however, and it did not remotely resemble the intensive care that Tiffany actually needed. The short sessions amounted to an infrequent and irregular interruption to the days and weeks on end that Tiffany was forced to spend alone in a bare cell, and to make matters worse, when she was allowed to attend the sessions, she was rarely, if ever, allowed to speak. What is more, prison

staff treated the therapy sessions as a privilege rather than as healthcare. If Tiffany attempted to

harm herself, the staff would cancel the sessions as punishment.

**ANSWER:**

**Defendants admit Ms. Rusher received care and treatment from medical and mental professionals.**

**Defendants deny any remaining allegations in Paragraph 27.**

28.    Tiffany's placement in the bare, solitary crisis cell had a predictable and devastating

impact on her mental condition. Suffering from anguish and further decompensating, she made

multiple new attempts at suicide, and in the crisis cell she cut herself, bit herself, repeatedly banged

her head against a wall, and repeatedly swallowed inedible objects.

**ANSWER:**

**Defendants admit Ms. Rusher engaged in self-harm and attempted suicide on numerous occasions—including while on crisis watch—while in the custody of the Illinois Department of Corrections at Logan Correctional Center.**

**Defendants deny any remaining allegations in Paragraph 28.**

29.    It was clear, in short, that the extended isolation in a crisis cell was not curing

Tiffany and was instead harming her—something that any mental health professional would have

known already. And it was clear that Tiffany remained in desperate need of inpatient mental health

treatment. This should have caused the defendants to remove Tiffany from solitary confinement

and secure actual mental health treatment for her, but they did not do so. Instead, in response to

her attempts at self-harm, they allowed even more restrictions to be placed on her. For example,

after Tiffany attempted to strangle herself by swallowing objects, the toilet paper was removed

from her cell. Thereafter, when Tiffany defecated, she had to ask a correctional officer for pieces

of toilet paper. Tiffany had to allow the correctional officer to watch her wipe herself, and then

demonstrate to the correctional officer that she had flushed the paper down the toilet. A multitude

of similarly humiliating and dehumanizing restrictions were placed on Tiffany, including restricting her to soft foods, requiring her to sleep with her hands visible at all times, and even providing a detailed protocol for changing her menstruation sanitary pads so that guards could observe every step of this most intimate of activities.

**ANSWER:**

**Defendants admit Ms. Rusher engaged in self-harm and attempted suicide on numerous occasions—including while on crisis watch—while in the custody of the Illinois Department of Corrections at Logan Correctional Center. Defendants admit certain measures were put in place to prevent Ms. Rusher from engaging in self-harm.**

**Defendants deny any remaining allegations in Paragraph 29.**

30.     The defendants, in short, knew that allowing Tiffany to be placed in solitary confinement in a crisis cell for any meaningful length of time would be toxic to her mental health and would cause her to suffer both mental anguish and—when she attempted to harm herself as a result of that anguish—intense physical pain. They also had the ability to secure appropriate treatment for Tiffany's acute and devastating mental condition. But even though they knew Tiffany would be devastated by solitary confinement, and even though they could have provided her with appropriate care, the defendants allowed Tiffany to remain in solitary confinement anyway. In effect the defendants chose not to treat Tiffany but instead to incapacitate her for the remainder of her prison sentence, even though doing so amounted to torture.

**ANSWER:**

**Defendants deny the allegations in Paragraph 30.**

31.     Finally, in May 2016, Tiffany's term of incarceration for her underlying criminal conviction ended. However, defendants knew what damage they had inflicted on Tiffany, and knew that she was a danger to herself. They therefore took steps to have her involuntarily

committed to a state psychiatric hospital, where she should have been all along. Tiffany did not

oppose the state's petition, and thus her admission became "voluntary" under state law. With that,

she was transferred directly from the Logan crisis cell to the McFarland mental health hospital

operated by the Illinois Department of Human Services.

**ANSWER:**

**Defendants admit Ms. Rusher was released from the custody of the Illinois Department of Corrections into the custody of the Illinois Department of Human Services on May 3, 2016. Defendants admit Ms. Rusher consented to her admission into the custody of the Illinois Department of Human Services and that Ms. Rusher was placed at McFarland Mental Health Center in Springfield, Illinois.**

**Defendants deny any remaining allegations in Paragraph 31.**

32.        At McFarland, Tiffany was placed in a group setting and she received the intensive

psychological and psychiatric care that she had always needed. As a result her mental health

condition improved, and she was able to function in a group setting. She was not placed in solitary

confinement, and was not subject to the psychologically devastating conditions of solitary

confinement. In short, Tiffany received the treatment that the defendants should have provided for

her, instead of placing her in solitary confinement for over eight months and causing the injuries

and damages described herein.

**ANSWER:**

**Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 32; accordingly, the allegations in Paragraph 32 are denied.**

### COUNT I: Eighth Amendment to the United States Constitution
**Against:** Rauner (individual capacity), Baldwin (individual capacity), Sim (individual capacity), Yuan (individual capacity), Richardson (individual capacity), and Wexford

33.        Each paragraph of this complaint is incorporated as if fully restated here.

**ANSWER:**

**Defendants repeat and incorporate by reference their answers to Paragraphs 1–32 as if fully restated herein.**

34.　Tiffany suffered from multiple severe mental illnesses that were serious medical conditions and placed Tiffany at serious risk of harm and in need of intense medical treatment.

**ANSWER:**

**Defendants admit Ms. Rusher was diagnosed with certain mental illnesses and medical conditions that required treatment.**

**Defendants deny any remaining allegations in Paragraph 34.**

35.　By placing Tiffany repeatedly into solitary confinement, defendants caused or aggravated Tiffany's mental illness.

**ANSWER:**

**Defendants deny the allegations in Paragraph 35.**

36.　The defendants knew that Tiffany's serious medical needs could not be treated within Logan, and that the isolation of a crisis cell would exacerbate her condition and cause her further damage.

**ANSWER:**

**Defendants deny the allegations in Paragraph 36.**

37.　Despite what they knew, the defendants failed to transfer Tiffany out of Logan to a facility where she could receive care for her serious mental health condition. Instead, they allowed her to remain isolated in solitary confinement.

**ANSWER:**

**Defendants deny the allegations in Paragraph 37.**

38.     In so doing, the defendants were deliberately indifferent to Tiffany's serious medical needs.

**ANSWER:**

**Defendants deny the allegations in Paragraph 38.**

39.     As a result of the defendants' failure to secure proper treatment for Tiffany and their decision instead that she be incapacitated in a crisis cell, Tiffany suffered physical pain and acute mental anguish.

**ANSWER:**

**Defendants deny the allegations in Paragraph 39.**

40.     Defendants' repeated placement of Tiffany in solitary constituted the infliction of cruel and unusual punishment in violation of the Eighth Amendment.

**ANSWER:**

**Defendants deny the allegations in Paragraph 40.**

41.     Defendants' deliberate indifference to Tiffany's medical needs violated Tiffany's rights to be free from cruel and unusual punishment under the Eighth Amendment.

**ANSWER:**

**Defendants deny the allegations in Paragraph 41.**

42.     As a direct and proximate result of Defendants' actions, Tiffany suffered the mental and physical injuries described herein.

**ANSWER:**

**Defendants deny the allegations in Paragraph 42.**

### COUNT II: Americans with Disabilities Act
**Against:** Rauner (official capacity), the State of Illinois, Baldwin (official capacity), the Illinois Department of Corrections

**ANSWER:**

**Defendants John R. Baldwin (in his official capacity), Bruce Rauner (in his official capacity), the State of Illinois, and the Illinois Department of Corrections have moved to dismiss Count II in its entirety.**

**Since Count II is not directed to Defendants John R. Baldwin (in his individual capacity), Bruce Rauner (in his individual capacity), or Dr. Jeff Sims, no response to the allegations contained in Paragraphs 43–57 is required.**

### COUNT III: Rehabilitation Act of 1973
**Against:** Rauner (official capacity), the State of Illinois, Baldwin (official capacity), and the Illinois Department of Corrections

**<u>ANSWER:</u>**

**Defendants John R. Baldwin (in his official capacity), Bruce Rauner (in his official capacity), the State of Illinois, and the Illinois Department of Corrections have moved to dismiss Count III in its entirety.**

**Since Count III is not directed to Defendants John R. Baldwin (in his individual capacity), Bruce Rauner (in his individual capacity), or Dr. Jeff Sims, no response to the allegations contained in Paragraphs 58–65 is required.**

### V.        RELIEF REQUESTED

**<u>ANSWER:</u>**

**Defendants deny Plaintiff is entitled to any relief whatsoever.**

### VI.        DEMAND FOR JURY

**<u>ANSWER:</u>**

**Defendants respectfully request a trial by jury on all triable issues.**

### <u>AFFIRMATIVE DEFENSES</u>

**1.        Qualified Immunity**

At all times relevant to Plaintiff's Claims, Defendants charged herein acted in the good faith performance of their official duties without violating Plaintiff's clearly established constitutional rights. Defendants are, therefore, protected from liability by the doctrine of qualified immunity.

### 2.      Statute of Limitations

To the extent Plaintiff's claims for relief accrued more than two years prior to initiation of this case, they are barred by the applicable statute of limitations.

### 3.      *Rasho* Bar

To the extent Tiffany Rusher, the decedent Plaintiff represents, was a member of the class action in *Rasho v. Baldwin* (USDC C.D. Ill. 07-1298), plaintiff is barred from challenging the terms of court orders and agreements between the parties in that case.

### 4.      Recovery Barred or Limited

Plaintiff claims parties in *Andrews v. Sangamon County*, No. 18-cv-01100-SEM-TSH (C.D. Ill. Mar. 12, 2018) caused Ms. Rusher injuries. These may be the same injuries Plaintiff is claiming Ms. Rusher suffered at the hands of Defendants in this action. Plaintiff is not entitled to recover twice for the same injury. *Duran v. Town of Cicero, Ill.*, 653 F.3d 632, 642 (7th Cir. 2011).

WHEREFORE, Defendants respectfully request this honorable Court deny Plaintiff any relief whatsoever, dismiss Plaintiff's action, and enter judgment in their favor.

Respectfully submitted,

JOHN R. BALDWIN (in his individual capacity), BRUCE RAUNER (in his individual capacity), and DR. JEFF SIM,

Defendants,

Jeremy C. Tyrrell #6321649
Assistant Attorney General
500 South Second Street
Springfield, Illinois 62701
(217) 785-4555 Phone
(217) 782-8767 Fax
Email: jtyrrell@atg.state.il.us

LISA MADIGAN, Illinois Attorney General,

Attorney for Defendants,

By: s/Jeremy C. Tyrrell
    Jeremy C. Tyrrell
    Assistant Attorney General

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**

KELLI ANDREWS, as Administrator of the )
Estate of Tiffany Ann Rusher, deceased,   )
                                          )
                    Plaintiff,            )
        -vs-                              )        No.    18-cv-1101-SEM-TSH
                                          )
BRUCE RAUNER et al.,                      )
                                          )
                    Defendants.           )

## CERTIFICATE OF SERVICE

I hereby certify that on June 4, 2018, I caused to be electronically filed the foregoing

*Answer and Affirmative Defenses to Plaintiff's Complaint* with the Clerk of Court using the

CM/ECF system, which will send notification of such filing to the following:

Alexis G. Chardon:    ali@weilchardon.com
Nicole Rae Schult:    nicole@uplcchicago.org
  Stephen H Weil:     steve@weilchardon.com
       Alan Mills:    alan@uplcchicago.org
  Emmanuel Andre:     eandre@northsidetlc.com
Karen L. McNaught:    kmcnaught@cassiday.com

                          Respectfully Submitted,

                          s/Jeremy C. Tyrrell
                          Jeremy C. Tyrrell #6321649
                          Assistant Attorney General
                          500 South Second Street
                          Springfield, IL  62701
                          Telephone:    (217) 785-4555
                          Facsimile:    (217) 782-8767
                          jtyrrell@atg.state.il.us