IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| Kelli Andrews, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) Case No. 18-cv-1101-SEM-TSH |
| | ) |
| Bruce Rauner *et al.*, | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR DISMISSAL OF COUNTS II AND III OF PLAINTIFF'S COMPLAINT**

In Counts II and III of her Complaint (ECF No. 1), Plaintiff claims that the Defendants placed Tiffany Rusher in solitary confinement instead of treating her mental health disorder, thereby depriving her of a variety of programs and services offered to prisoners, in violation of the Americans with Disabilities Act ("ADA") Title II and the Rehabilitation Act ("RA"). For purposes of assessing the Defendants' motion to dismiss, it is useful to organize these programs and services into three groups:

1. Access to healthcare.
2. Access to services including education, programming, recreation, and exercise.
3. Access to opportunities for human interaction.

(*See* Compl. ¶¶ 6, 55, 64.)

The Defendants' motion to dismiss these claims (ECF No. 15 ("Def. Mot.") and ECF No. 16 ("Def. Mem.")) suffers from multiple fatal flaws. ***First***, the Defendants argue that Plaintiff cannot assert an ADA/RA claim for denial of access to healthcare because this really amounts to a claim about *insufficient* healthcare, which cannot be brought under the ADA. This is wrong. For one thing, the Complaint *does* sufficiently allege a denial-of access claim, Defendants' arguments notwithstanding. For another, the Complaint additionally alleges that the Defendants

1

*discriminated* against Tiffany in the provision of healthcare. As the authorities relied upon by the Defendants make clear, even if Plaintiff's claims *were* otherwise about adequacy of care, under the ADA/RA she could still assert that the care was inadequate because of discrimination.

*Second*, the Defendants entirely ignore the Complaint's straightforward and repeated allegation that placing Tiffany in isolation deprived her of services like education, programming, recreation, and exercise. This is for good reason: it is well established that access to these programs and services is protected by the ADA. Had the Defendants acknowledged this, they would have had to concede that Counts II and III should not be dismissed.

*Third*, evidently thinking they have found a service they can pick off, the Defendants argue that access to human interaction is not a program, service, or activity protected by the ADA/RA. Unfortunately for the Defendants, courts have held otherwise, and indeed the provision of such access goes to the core of the policies motivating the ADA.

\*   \*   \*

For the foregoing reasons, which are elaborated herein, the Court should reject the Defendants' motion to dismiss. Furthermore, Plaintiff does not seek punitive damages under the ADA or the RA, so the Defendants' motion to dismiss such a claim is moot.

**I.   The Complaint's factual allegations state a program denial claim for medical services.**

In the prison context, access to medical care is among the "services, programs, or activities" covered by Title II of the ADA. *See United States v. Georgia*, 546 U.S. 151, 157 (2006). The Defendants acknowledge this. (*See* Def. Mem. at 8.) They emphasize, however, that the ADA does not create a remedy for medical malpractice, (*id.* at 7), and because Tiffany received *some* care, they argue, Plaintiff cannot claim that Tiffany was "denied access to medical

services." (*See id.* at 6-7 (quoting *Estate of Crandall v. Godinez*, No. 14-cv-1401, 2015 WL 1539017, at *7 (C.D. Ill. Mar. 31, 2015).)

This is wrong. First, the Complaint sufficiently alleges that Tiffany was denied access to outside hospitalization. Second, the Complaint additionally alleges that Tiffany was *discriminated* against in the provision of medical care, which inarguably states a claim under Title II of the ADA.

### a. The Complaint sufficiently asserts a denial-of-access claim for denial of access to hospitalization.

The Defendants' argument is this: the ADA protects *access* to medical services, but does not speak to the *quality* of those services. Thus where a plaintiff concedes that the disabled person received *some* medical care, but complains about the *quality* of that care, they are not stating a claim under the ADA or RA, but instead should make their allegations under medical laws, like malpractice. (*See* Def. Mem. at 6-7.) For this argument the Defendants rely chiefly on *Estate of Crandall*, which involved a mentally disturbed inmate who received inadequate treatment and eventually committed suicide. (*Id.*)

The Defendants make too much into *Estate of Crandall*. That case certainly bears factual similarities to this one, in that it involves a jailer's mistreatment of a mentally ill inmate who committed suicide. The claims in the two cases, however, are different. In *Estate of Crandall*, the complaint challenged the defendants' medical decision: to give the prisoner psychotropic medications, whereas they allegedly should have provided him with therapy. (Def. Mem. at 6 (explaining *Estate of Crandall* facts).) *Estate of Crandall* held that this amounted to a claim that the decedent "was not properly treated for his mental illness—[which] is distinctly different from a claim that Crandall was denied access to medical services." As such, the claim was "not cognizable under the ADA." (*Id.* (quoting *Estate of Crandall*, 2015 WL 1539017, at *7).)

3

But *Estate of Crandall* itself emphasized that the situation would be different if the question of *access* to care was separate from questions about medical judgment or *quality* of care. *See* 2015 WL 1539017, at *6 (*citing Kiman v. New Hampshire Dep't of Corr.*, 451 F.3d 274, 284 (1st Cir. 2006) (where prison defendants failed to provide a disabled inmate with drugs that had been prescribed by a physician). Indeed in citing to *Kiman*, *Estate of Crandall* recognized an important distinction between "malpractice" claims on the one hand and ADA claims on the other.

*Kiman* involved a prisoner who challenged (1) his doctors' diagnosis and treatment of his ALS, and (2) the prison's failure to provide him with drugs that the doctors had prescribed for his ALS. In assessing these two claims, the First Circuit explained—just as did *Estate of Crandall*—that if a claim "simply [concerns] a reasoned medical judgment with which the patient disagreed," medical malpractice law or the Eighth Amendment, rather than the ADA, is the appropriate vehicle in which to bring the claim. *Kiman*, 451 F.3d at 285. However, if the challenged practice constitutes "outright denial of medical services," an ADA claim may lie. *Id*. at 287. Given this distinction, the court held that the plaintiff could not challenge his doctors' diagnosis and treatment of ALS as inadequate under the ADA, since that involved medical judgments; but he *could* assert and ADA claim for the prison's failure to provide him with prescribed ALS medications, since that act did not involve medical judgments, but rather constituted a denial of access to medical care. *Id.* at 285-87.

That distinction is critical for this case. The plaintiff in *Estate of Crandall* challenged a medical judgment—to provide a person suffering psychosis with psychotropic medications, instead of therapy. Here, by contrast, Plaintiff alleges that the Defendants refused to provide

4

Tiffany with access to medical care—outside hospitalization—that all medical professionals agreed she needed:

> Defendants Baldwin, Sim, and (on information and belief) Rauner were personally aware that there were a handful of people confined to the IDOC, which included Tiffany, who could not receive appropriate psychiatric care within the IDOC and therefore should have been transferred to the custody of the Department of Human Services. Attorneys representing Defendant Baldwin and the IDOC admitted as much during a court hearing in *Rasho v. Baldwin*, 07-cv-1298 (C.D. Ill. (Mihm, J.)), an ongoing injunctive class action against Defendant Baldwin concerning the care of mentally ill people confined to the IDOC. Despite this knowledge, however, neither Defendant Baldwin or Defendant Sim tried to have Tiffany transferred to a Department of Human Services facility before the completion of her sentence, and Defendant Rauner did not order Baldwin or Sim to effect such a transfer.

(Compl. ¶ 25(b).)

What Plaintiff alleges, in essence, is that the Defendants decided that psychotic inmates would not be given access to outside hospitalization. Instead, they decided that Tiffany would be confined to a cell inside the prison—depriving her of access to virtually all programs and services offered by the IDOC, including referral to outside hospitals. Any exercise of medical judgment, such as the decision to provide Tiffany with the "therapy" and "appointment" sessions that the Defendants highlight in support of their motion to dismiss, occurred beneath the ceiling that the Defendants' no-hospitalization, solitary-confinement decision established.

In that sense, critically, this case bears a close resemblance to *Kiman*. The plaintiff in *Kiman* was receiving *some* care for his ALS—after all, he was suing his doctors for inadequately diagnosing and treating the disease, and these doctors had prescribed him medicine. Nevertheless, the First Circuit allowed his ADA claim to proceed against the prison's failure to provide him with drugs for his ALS, because this involved a discrete, and separate, decision to deny the prisoner access to medical care. Plaintiff has alleged the same thing here: whatever the "medical" services were being provided to Tiffany within the prison, there was a discrete,

5

separate decision to place her in solitary confinement and deny her access to virtually any program or service outside of the solitary cell, including outside hospitalization.

Right now, that should be enough.  At the dismissal stage, the Court need only "ask itself *could* these things have happened, not *did* they happen."  *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) (emphasis original).  Under this standard, Plaintiff's allegations do indeed state a claim for denial of access to outside medical services, and thus state a failure-to-accommodate claim under the ADA.

> **b. The Counts II and III additionally assert a claim for *discrimination* in the provision of access to medical services.**

In addition to Plaintiff's denial-of-access claim discussed above, Plaintiff also alleges that Tiffany was *discriminated against* in the provision of medical care that was made available to non-disabled inmates.  This claim was repeated throughout the Complaint, but the Defendants never acknowledge it.  For good reason:  the Defendants' own authorities explain that a charge of *discrimination* in the provision of medical services states a claim under the ADA, even if the underlying claim otherwise concerns the *adequacy* of the medical care that was provided.

In dismissing the denial-of-access claim before it, *Estate of Crandall* noted that the plaintiff could have alleged "a plausible claim under the ADA if he pleaded that Defendants deprived [the disabled inmate] of access to medical services *that were available to other inmates*."  2015 WL 1539017, at *6 (emphasis added).  In this case, Plaintiff makes precisely that claim.  She alleges:

> While the defendants have policies to ensure that people confined to IDOC who have conventional medical needs (such as physical injuries or illnesses) receive the medical treatment they need, the defendants did not provide equivalent treatment for Tiffany's mental condition.

(Compl. ¶ 5.)

6

The body of the Complaint elaborates on this charge, explaining that while the IDOC routinely arranges for "prisoners suffering from injuries and 'physical' illnesses, like cancer, to be transported outside of IDOC prisons to medical facilities where they can receive the medical care they need," (Compl. ¶ 25(c)), the IDOC did not seek to have mentally ill patients like Tiffany transported offsite when *they* required outside hospitalization. (*Id*. ¶¶ 25(a) and (c).) The Complaint reiterates this allegation later, noting that while "[t]he defendants have and do make arrangements for other prisoners, who require hospitalization outside of the IDOC because of physical injuries or illnesses, to receive such outside hospitalization," no such arrangements were made for Tiffany. (*Id.* ¶¶ 53, 56-57.)

Counts II and III, in other words, state a straightforward claim for discrimination in the provision of medical care, in addition to Plaintiff's denial-of-access claim. This type of discrimination claim is specifically endorsed by *Estate of Crandall*, the primary authority on which the Defendants rely. The Defendants have had ample time to develop arguments explaining why the Complaint's discrimination allegations fail to state a claim under the ADA/RA, but their dismissal papers ignore the claim entirely. That silence is telling. Plaintiff's discrimination allegations state a valid claim under the ADA/RA. For this reason alone, the Defendants' motion to dismiss Counts II and III should be denied.

**II.     The Defendants ignore a litany of programs and services—including education, programming, recreation, exercise—whose denial is alleged in the Complaint.**

Besides asserting the Defendants denied Tiffany access to mental healthcare, the Complaint alleges that by placing her in solitary confinement, the Defendants denied her access to a variety of services offered to other inmates, including education, programming, recreation, and exercise. (*See* Compl. ¶¶ 6, 55, 64.) Although the Complaint makes these allegations repeatedly, the Defendants' motion simply ignores them.

7

It is well established that education, programming, recreation, and exercise are programs and services covered by Title II of the ADA.  *See, e.g.*, *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) (recreation and education); *Norfleet v. Walker*, 684 F.3d 688, 689-90 (7th Cir. 2012) (exercise and recreation).  What is more, it is established that confining a disabled prisoner to a cell can deprive them of such services and programs.  *See, e.g.*, *Reaves v. Dep't of Corr.*, 195 F. Supp. 3d 383, 421 (D. Mass. 2016) (quadriplegic inmate deprived of access to numerous programs and activities because the programs were offered outside of his cell, and prison officials did not provide a means for him to leave his cell).  Indeed virtually the entire panoply of programs and services that prisons offer their inmates are made available outside the inmates' cells.  Confining Tiffany to a cell for months on end deprived her of access all such programs and services, which other inmates in the prison receive.

The Defendants never acknowledge these allegations.  Instead, they recognize only the "program" they think they can pick off:  access to human interaction.  (*See* Def. Mem. at 7-8.)  The Defendants are wrong on that score, as described in Section III below.  What matters here, however, is that access to human interaction was only one in the laundry list of established programs like education, exercise, etc. that the Defendants otherwise ignored.  (*See*, *e.g.*, Compl. ¶¶ 55, 64.)  Once again, the Defendants' choice to engage in selective argument speaks volumes.  They simply have no answer for denying Tiffany access to programs like education, recreation, and exercise, that are common and established under Title II of the ADA.  Plaintiff has alleged that Tiffany's placement in solitary confinement deprived her of multiple programs and services offered by the prison to other inmates.  Those allegations alone state a claim under the ADA/RA.

### III. A prison's provision of opportunities for human interaction is a recognized program or service under the ADA/RA.

The Complaint charges that by placing Tiffany in solitary confinement, the Defendants deprived her of "the basic human need of interaction with other persons," in violation of the ADA/RA. (Compl. ¶ 6.) (*See also id.* ¶¶ 52, 55.) The Defendants argue that this does not state an ADA/RA claim. They are wrong.

The Defendants first claim that Plaintiff has pled herself out of court, because Plaintiff did allege that Tiffany was periodically sent to group therapy and had "contact" with some mental health professionals. (Def. Mem. at 7.) What the Complaint actually alleges, however, is that that the limited interactions highlighted by the Defendants were sporadic and infrequent interruptions to months of ongoing solitary confinement, during which Tiffany was deprived of all interaction with other humans. (*See* Compl. ¶¶ 27-29.) It goes without saying that other prisoners, who were not isolated in solitary confinement, suffered no such deprivation.

The Defendants next argue that even if there was such a deprivation, access to human interaction is merely "an incident of prison life," rather than a service, program, or activity under the ADA, and therefore there was no ADA/RA violation. (Def. Mem. at 7-8.) The Defendants cite no case law for this proposition, and indeed the authorities provide the opposite. In *Reaves*, for example, a quadriplegic inmate had been confined to his cell argued that prison officials "violated the ADA by not allowing him to socialize with his peers in the prisons' common areas." 195 F. Supp. 3d at 421. The court granted a preliminary injunction ordering the defendants to offer opportunities for such contact, holding that the inmate "is likely to prevail on his claim that the DOC Defendants have violated Title II of the ADA by failing to provide him opportunities to socialize with other inmates." *Id.* at 423.

9

In reaching this conclusion, *Reaves* noted that allowing disabled persons to interact with others is at the core of the rights secured by the ADA: "When enacting the ADA, Congress explained that although 'physical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society, . . . society has tended to isolate and segregate individuals with disabilities,'" *Id.* at 422 (quoting 42 U.S.C. § 12101(1), (2), (3) (ellipses original)). As such, "'[i]ntegration is fundamental to the purposes of the [ADA].'" *Id.* at 422-23 (quoting 28 C.F.R. § Pt. 35, App. B). In turn, "[a]n integrated setting is one that 'enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible.'" *Id.* at 423 (quoting 28 C.F.R. § Pt. 35, App. B). Reaves follows in the steps of *Olmstead v. L.C. ex rel Zimring*, 527 U.S. 581, 597 (1999), where the Court held that under the ADA, "[u]njustified isolation . . . is properly regarded as discrimination based on disability."

The isolation to which Defendants subjected Tiffany violated foundational principles of the ADA. And as *Reaves* explains, access to human interaction is an established program or activity under the statute. The Defendants' motion to dismiss Counts II and III should be denied for this reason alone.

**IV. Defendant's request to dismiss ADA/RA punitive damages is moot.**

The Defendants move to dismiss Plaintiff's claims for punitive damages under the ADA and RA, to the extent she raises them. Plaintiff does not seek punitive damages under these statutes, and therefore this portion of Defendant's motion is moot.

## Conclusion

For the reasons set forth herein, the Court should reject the Defendants' motion to Dismiss Counts II and III in its entirety.

Date:  June 18, 2018                    Respectfully submitted,

/s/ *Stephen H. Weil*

Stephen H. Weil – steve@weilchardon.com
Alexis G. Chardon – ali@weilchardon.com
Weil & Chardon LLC
333 S. Wabash Ave., Suite 2700
Chicago, IL 60604
312-585-7404

Alan Mills - alan@uplcchicago.org
Nicole Schult - Nicole@uplcchicago.org
Uptown People's Law Center
4413 North Sheridan Rd.
Chicago, Illinois 60640
Tel: (773) 769-1411
Fax: (773) 769-2224

Emmanuel Andre - eandre@northsidetlc.com
Northside Transformative Law Center
1543 W. Morse Ave.
Chicago, IL 60626
(312) 219-654

*Attorneys for Plaintiff*

## **CERTIFICATE OF SERVICE**

    I hereby certify that on June 18, 2018, a true and correct copy of the foregoing was filed electronically. Notice of this filing was sent by operation of the Court's ECF electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system.

                                                              /s/ Alexis G. Chardon