043595/19344/JNR

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

KELLI ANDREWS as Administrator of the
Estate of Tiffany Ann Rusher, deceased,

        Plaintiff,

v.

BRUCE RAUNER, STATE OF ILLINOIS,
JOHN R. BALDWIN, JEFF SIM, HE YUAN,
BRIAN RICHARDSON, ILLINOIS
DEPARTMENT OF CORRECTIONS and
WEXFORD HEALTH SOURCES, INC.,

        Defendants.

Case Number  18-cv-1101

Judge to Magistrate Eric I. Long

## MOTION FOR SUMMARY JUDGMENT

NOW COMES Defendants,  BRIAN RICHARDSON, DR. HE YUAN and WEXFORD

HEALTH SOURCES, INC., by and through their attorneys, CASSIDAY SCHADE LLP, and,

pursuant to Federal Rule of Civil Procedure 56 and CDIL-LR 7.1(D), hereby submit their Motion

for Summary Judgment, stating as follows:

## INTRODUCTION

Tiffany Rusher was a deeply troubled individual, whose suicide attempts were so numerous

and evasive of protective measures, she had to be placed on constant watch for months at a time.

The task of keeping her alive against her will, let alone providing her mental health treatment, was

monumental for the mental health staff tasked with doing it.  But through an all-hands-on-deck

approach that brought together a team of mental health professionals, medical staff, security staff,

high ranking IDOC administrators, and solicited advice from across the State, mental health staff

at Logan Correctional Center (Logan) kept Rusher from taking her life and she was released in

May 2016.[1]  Not only did they keep her alive, they provided substantial and copious treatment designed to address the reasons Rusher was so determined to die in prison.  This included various types of individual therapy, group therapy, dog therapy, music therapy, cognitive behavioral therapy, and psychiatry sessions.  The one thing Defendants could not do was arrange Rusher's removal from prison and transfer to a mental health hospital in the community.  And because they had no ability or authority to do that, they are accused of violating the United States Constitution and committing medical malpractice, a finding wholly unsupported by the law, facts, any notion of fundamental fairness.

On December 11, 2019, Plaintiff, administrator of the estate of Tiffany Rusher, filed the First Amended Complaint pursuant to 42 U.S.C. §1983.  Doc. 76.  Plaintiff alleged that in 2013 Rusher began serving a 5-year sentence in the Illinois Department of Corrections at Logan and was placed in "solitary confinement."  Doc. 76 at 1.  She said that her mental health deteriorated so badly in solitary that she engaged in serious incidents of self-harm, including suicide attempts. *Id.*  Plaintiff claimed that rather than helping Rusher, Defendants intentionally exacerbated her condition, placing her in complete isolation with no property and a guard staring at her for 24 hours a day, 7 days a week, further devastating her mental health.  Plaintiff claimed instead of putting Rusher in isolation, Defendants should have placed in an inpatient psychiatric hospital during her criminal sentence.  *Id.* at 1-2.  Plaintiff claimed that by placing Rusher in solitary confinement instead of transferring her to an inpatient psychiatric hospital, Defendants violated the Eighth Amendment to the United States Constitution through deliberate indifference to Rusher's serious medical needs.  *Id.* at 15-16.  Plaintiff further alleged that Dr. Yuan, Dr. Richardson, and Wexford were negligent under Illinois law for not providing adequate mental health treatment to Rusher.

---

[1] Less than a year after leaving Defendants' care, Rusher successfully committed suicide.  *See Andrews v. Sangamon County, et al,* CDIL No. 18-1100.

*Id.* at 21.  The facts revealed in discovery, however, show Defendants were far from negligent. They took measures beyond what could be expected of any providers to try to help Rusher.  There is no evidence to support any claim against Defendants, and Defendants are entitled to judgment in their favor.

## UNDISPUTED MATERIAL FACTS

1.  Rusher was a person in the custody of the IDOC from July 14, 2011, and May 3, 2016.  Exhibit A, Rusher IDOC living unit history, Bates 4709-47-13 (showing Rusher admitted to Dwight Correctional Center on a parole violation on July 14, 2011).

2.  Rusher's mental health diagnoses were bipolar disorder, post-traumatic stress disorder, and borderline personality disorder.  Exhibit B, Richardson deposition, pg. 109-111; Exhibit B, Yuan deposition, pg. 47.

3.  Dr. Richardson is a clinical psychologist who began working at Logan in August 2014.  Exhibit B, Richardson deposition, pg. 11-12.

4.  Among Dr. Richardson's responsibilities as a clinical psychologist at Logan, Dr. Richardson's was serving as a primary therapist for patients in Logan's inpatient unit.  Exhibit B, Richardson deposition, pg.  20.

5.  Dr. Yuan is a psychiatrist who worked at Logan between 2014 and 2016.  Exhibit C, Yuan deposition, pg. 17, 46.

6.  Dr, Yuan began providing psychiatric services to Rusher in late 2014.  Exhibit C, Yuan deposition, pg. 43.

7.  Dr. Yuan's primary responsibility as a psychiatrist at Logan was to evaluate patients and provide medication management for the patients at Logan.  Exhibit B, Richardson deposition, pg. Exhibit C, Yuan deposition, pg. 17-18.

3

8.      Rusher transferred from Lincoln Correctional Center to Logan on March 12, 2013. Exhibit A, Rusher IDOC living unit history, Bates 4713.[2]

9.      Wexford is a contractual vendor to IDOC with a contract to provide comprehensive mental health services to inmates within IDOC.  Exhibit D, deposition of Melvin Hinton, pg. 135-136.

10.     Wexford has no authority to send patients offsite for mental health treatment. Exhibit D, deposition of Melvin Hinton, pg. 136; Exhibit E, deposition of Scott McCormick, M.D., pg. 54, 68-69, 74.

11.     On March 17, 2013, Rusher was found guilty in a disciplinary proceeding of fighting and given one month of segregation.  Exhibit 7 to Exhibit F, deposition of Terry Kupers, M.D. (disciplinary card, Bates 6).

12.     Housing unit 15C is the segregation/restrictive housing living unit at Logan. Exhibit B, Richardson deposition, pg. 29.

13.     Rusher's IDOC living unit history shows she was housed in 15C from March 17, 2013, to April 6, 2013; from April 12, 2013, to April 13, 2013; and from June 23, 2014, to June 24, 2014.  Exhibit G, deposition of Norine Ashley, pg. 128 (explaining how to read living unit history); Exhibit A, IDOC living unit history, Bates 4711-4713.

14.     Housing Unit 14 at Logan was the residential treatment unit (RTU).  Exhibit B, Richardson deposition, pg. 23-25.

15.     Other than when she was housed in 15C at Logan, Rusher was housed either in housing in 14 (RTU) or the healthcare unit (HC).  Exhibit A, IDOC living unit history, Bates 4709-4713.

---

[2] The Complaint alleges only events occurring at Logan and Defendants understand the Estate's claim to concern the time Rusher was at Logan.  *See* Doc. 76 at 1, alleging Rusher began serving a five-year sentence at Logan in 2013.

16.     The mental health building/RTU at Logan was for seriously mentally ill patients who needed a high level of care.  Exhibit B, Richardson deposition, pg. 24.

17.     The mental health unit/RTU at Logan was reserved for the most seriously mentally ill patients.  Exhibit B, Richardson deposition, pg. 39.

18.     Housing unit 15C is the segregation/restrictive housing living unit at Logan. Exhibit B, Richardson deposition, pg. 29.

19.     On April 6, 2013, Rusher was placed on crisis watch for reporting suicidal ideation. Exhibit H, IDOC Medical Records Production, Bates 28.

20.     On April 6, 2013, Rusher was moved from 15C segregation to the RTU.  Exhibit A, IDOC living unit history, Bates 4712.

21.     On April 13, 2013, Rusher was placed on crisis watch for making suicidal threats and complaining of suicidal ideation in response to disturbing news about her brother.  Exhibit H, IDOC Medical Records Production, Bates 29.

22.     On April 17, 2013, Dr. Yuan saw Rusher for psychiatric consultation, noting Rusher was 23 and had been in IDOC since August 2011 and was taking Tegretol for bipolar disorder and schizophrenia, and anger with a history of inpatient and outpatient mental health treatment, including suicide.  Exhibit H, IDOC Medical Records Production, Bates 56.

23.     On April 17, 2013, Dr. Yuan prescribed Thorazine to Rusher.  Exhibit H, IDOC Medical Records Production, Bates 30-31, 56-57.

24.     On April 22, 2013, Rusher's treatment plan was to regularly meet with her mental health professional and take her medications as prescribed by her psychiatrist, and to monitor her mood, behavior, and feelings.  Exhibit H, IDOC Medical Records Production, Bates 56.

25.     On May 16, 2013, Rusher saw Dr. Yuan for psychiatric consultation.  Exhibit H, IDOC Medical Records Production, Bates 61.

26.     Dr. Yuan's note reflects that on May 16, 2013, he met with Rusher "in MHU." Exhibit H, IDOC Medical Records Production, Bates 61.

27.     On May 16, 2013, Dr. Yuan continued Rusher's medications of Tegretol, Risperdal, and Trazadone.  Exhibit H, IDOC Medical Records Production, Bates 61.

28.     On May 20, 2013, Rusher was evaluated by psychologist Dr. Pamela Hewitt Meyer, who documented that Rusher did well at Lincoln Correctional Center but declined at Loga, experiencing complaints of audio and visual hallucinations, emotional dysregulation, and suicidal ideation.  Exhibit H, IDOC Medical Records Production, Bates 46.

29.      On May 20, 2013, Dr. Meyer indicated Rusher should be placed in special housing or a special treatment setting.  Exhibit H, IDOC Medical Records Production, Bates 46.

30.     On May 28, 2013, Dr. Meyer saw Rusher, noting Rusher was "currently on N MHU."  Exhibit H, IDOC Medical Records Production, Bates 42.

31.     On May 28, 2013, Dr. Meyer noted that Rusher denied suicidal or homicidal ideation but complained of hearing voices and lamented that she could not have an audio CD to listen to but declined consideration of general population where she would be allowed to have her CD, stating "I don't want to leave North Unit because I don't to leave Calhoun."  Exhibit H, IDOC Medical Records Production, Bates 42-43.

32.     As of May 30, 2013, Rusher's mental health treatment plan noted she had been placed on 10-minute suicide watch after making a suicidal gesture with a bed sheet and that she was to reduce her suicidal ideation, depression, impulsivity, and request help from mental health staff.  Exhibit H, IDOC Medical Records Production, Bates 38-39.

33.     On May 31, 2013, Rusher was placed on crisis watch after she was found in her cell with a sheet tied around her neck and affixed to the bed railing.  Exhibit H, IDOC Medical Records Production, Bates 50.

34.     On June 6, 2013, Dr. Yuan saw Rusher in the MHU, noting she was segregation status.  Exhibit H, IDOC Medical Records Production, Bates 63.

35.     On June 6, 2013, Dr. Yuan increased Rusher's prescriptions for Risperdal and Trazadone and continued her Tegretol prescription.  Exhibit H, IDOC Medical Records Production, Bates 63.

36.     According to the mental health records, Rusher was placed on crisis watch after attempting suicide on June 26, 2013, with a neck ligature.  Exhibit H, IDOC Medical Records Production, Bates 17-18, 23-24.

37.     A note from July 23, 2013, reflects that Rusher engaged in a third suicide/self-harm attempt in two months, with the most recent one being shortly after being placed on segregation status.  Exhibit H, IDOC Medical Records Production, Bates 20-21.

38.     On September 17, 2013, Dr. Yuan saw Rusher for psychiatric consultation.  Exhibit H, IDOC Medical Records Production, Bates 70.

39.     On September 17, 2013, Dr. Yuan noted that Rusher was in C14 and reported feeling better with decreased anxiety and improved mood with no auditory hallucinations.  Exhibit H, IDOC Medical Records Production, Bates 70.

40.     On September 17, 2013, Dr. Yuan continued Rusher's prescriptions for Risperdal, Tegretol, discontinued lithium, and added Benadryl at night.  Exhibit H, IDOC Medical Records Production, Bates 70.

41.     Rusher was placed on suicide watch for reporting homicidal ideations between September 21, 2013, and September 25, 2013.  Exhibit H, IDOC Medical Records Production, Bates 178.

42.     On September 23, 2013, a psychologist evaluated Rusher, placing her on crisis watch due to Rusher reporting having recently feeling suicidal.  Exhibit H, IDOC Medical Records Production, Bates 34-35.

43.     As of September 23, 2013, Rusher's mental health treatment plan included reducing impulsivity by attending groups, learning and utilizing coping skills, having individual therapy sessions, and complying with medications.  Exhibit H, IDOC Medical Records Production, Bates 36-37.

44.     On October 10, 2013, Rusher was found attempting to tighten a ligature around her neck and was placed in therapeutic restraints until October 12, 2013.  Exhibit H, IDOC Medical Records Production, Bates 181.

45.     On November 9, 2013, Dr. Yuan saw Rusher for psychiatric consultation and renewed medications of Risperdal, Tegretol, Benadryl, and Klonopin, ordering labs for medication monitoring.  Exhibit H, IDOC Medical Records Production, Bates 19.

46.     On November 25, 2013, Rusher attended Expressive Therapy Group and participated effectively.  Exhibit H, IDOC Medical Records Production, Bates 174.

47.     On December 16, 2013, an LCPC discussed with Rusher her recent ingestion of batteries, which Rusher attributed to having felt depressed.  Exhibit H, IDOC Medical Records Production, Bates 81.

48.     On December 16, 2013, Rusher was on crisis watch.  Exhibit H, IDOC Medical Records Production, Bates 81.

49.     On December 23, 2013, and December 30, 2013, Rusher attended Expressive Therapy Group and participated in the group's activities.  Exhibit H, IDOC Medical Records Production, Bates 83, 85.

50.     On December 31, 2013, Dr. Yuan saw Rusher for psychiatric consultation, noting a suicide attempt six weeks earlier by swallowing a battery.  Exhibit H, IDOC Medical Records Production, Bates 175.

51.     On December 31, 2013, Dr. Yuan ordered Rusher's medications to be Risperdal, Tegretol, and Benadryl at night and Effexor and Klonopin added.  Exhibit H, IDOC Medical Records Production, Bates 171, 175.

52.     On January 16, 2014, Rusher saw mental health after calling a crisis due to being upset at her family for not having visited her.  Exhibit H, IDOC Medical Records Production, Bates 350.

53.     Rusher's mental health treatment plan as of January 16, 2014, was to stabilize her behavior deterioration and unstable behavior while on crisis watch through interactions with her mental health providers.  Exhibit H, IDOC Medical Records Production, Bates 469-70.

54.     Mental health staff saw Rusher on January 18, 2014, and continued her crisis watch status.  Exhibit H, IDOC Medical Records Production, Bates 391.

55.     From January 25, 2014, to January 27, 2014, Rusher was placed on crisis watch on return from the hospital after swallowing a pen.  Exhibit H, IDOC Medical Records Production, Bates 393.

56.     On February 25, 2014, Rusher saw a psychiatrist for management of and adjustment to her medications of Haldol injections, Tegretol 400 mg at night, and Lamtical twice daily at 25 mg for 1 week.  Exhibit H, IDOC Medical Records Production, Bates 466.

57.     On March 18, 2014, Rusher saw her psychiatrist, who discontinued Trazadone, increased Sinequan, and added Thorazine.  Exhibit H, IDOC Medical Records Production, Bates 472-73.

58.     On April 4, 2014, Rusher saw Psychologist Pam Meyer for 35-minute mental health evaluation.  Exhibit H, IDOC Medical Records Production, Bates 474.

59.     On April 4, 2014, Dr. Meyer noted Rusher was initially tearful about bad dreams and her family but improved during the session.  Exhibit H, IDOC Medical Records Production, Bates 474.

60.     On April 4, 2014, Dr. Meyer gave Rusher an assignment to help with coping mechanisms and planned for Rusher to attend dialectical behavioral therapy (DBT) group.  Exhibit H, IDOC Medical Records Production, Bates 474.

61.     On April 15, 2014, Rusher saw her psychiatrist, who noted that Rusher had been doing well but still had insomnia and racing thoughts for which he adjusted Rusher's medication.  Exhibit H, IDOC Medical Records Production, Bates 476.

62.     On April 25, 2014, Rusher saw the psychiatrist, reporting she was feeling quite good, though she had recent insomnia with increased nightmares and flashbacks.  Exhibit H, IDOC Medical Records Production, Bates 477.

63.     On May 13, 2014, a mental health progress note indicates Rusher actively participated in DBT interpersonal effectiveness group.  Exhibit H, IDOC Medical Records Production, Bates 480.

64.     On May 14, 2014, the mental health records reflect Rusher was seen for weekly mental health contact and was doing well and not thinking about harming herself and requested

discussion of refining her treatment plan to step down off of mental health unit.  Exhibit H, IDOC Medical Records Production, Bates 481.

65.     On May 14, 2014, the mental health records reflect Rusher was to continue participation in programming on East MHI, attending groups and mental health contacts as scheduled and taking medication as prescribed.  Exhibit H, IDOC Medical Records Production, Bates 481.

66.     On May 27, 2014, Rusher saw her psychologist for weekly therapy session.  Exhibit H, IDOC Medical Records Production, Bates 628.

67.     On June 17, 2014, Rusher saw her MHP for weekly contact, reporting she was ready to move and had been compliant with her treatment plan, using coping skills of journaling, reading, and talking with others.  Exhibit H, IDOC Medical Records Production, Bates 490.

68.     Later on June 17, 2014, Rusher was put on crisis watch/segregation status for acting homicidally toward her cellmate, which lasted until June 18, 2018.  Exhibit H, IDOC Medical Records Production, Bates 492-93, 498.

69.     On June 23, 2014, Rusher had a therapy session with Dr. Meyer.  Exhibit H, IDOC Medical Records Production, Bates 499-500.

70.     On June 24, 2014, Rusher wrapped a sheet around her neck and was placed on crisis watch in three-point restraints.  Exhibit H, IDOC Medical Records Production, Bates 505-07.

71.     On June 26, 2014, Rusher reported that she was better and had been upset about her birthday and wanted to return to unit 14 from segregation when she tried to hang herself in segregation.  Exhibit H, IDOC Medical Records Production, Bates 510-511.

72.     On June 28, 2014, the records reflect Rusher attempted to bite herself in an effort to get moved off of the unit she was living on and was placed on watch in three-point restraints. Exhibit H, IDOC Medical Records Production, Bates 514-515.

73.     On July 8, 2014, Rusher saw her mental health provider for weekly individual therapy and follow-up from recent removal from crisis watch.  Exhibit H, IDOC Medical Records Production, Bates 524-252.

74.     On July 9, 2014, Rusher was placed back on crisis watch due to standing on her sink threatening to jump if she did not speak to her mental health provider.  Exhibit H, IDOC Medical Records Production, Bates 528-529.

75.     On July 14, 2014, Rusher was placed on crisis watch for tying a smock around her neck.  Exhibit H, IDOC Medical Records Production, Bates 5536-537.

76.     On July 18, 2014, Rusher was on crisis watch and in restraints after cutting her wrist and biting of a scab because she was feeling sad.  Exhibit H, IDOC Medical Records Production, Bates 542-543.

77.     On July 19, 2014, Rusher was able to cut herself while in three-point restraints, which she did because she wanted to go to the healthcare unit.  Exhibit H, IDOC Medical Records Production, Bates 547-548.

78.     On August 1, 2014, Rusher was seen for therapy and discussion included her segregation status and fact she would be allowed to go outside but per segregation regulations. Exhibit H, IDOC Medical Records Production, Bates 574.

79.     On August 2, 2014, Rusher was placed on crisis watch and in 3-point restraints on housing unit 14 after claiming to have swallowed a pen and pencil.  Exhibit H, IDOC Medical Records Production, Bates 567-570.

80.     On August 6, 2014, Dr. Meyer had a 20-minute session with Rusher, who requested to go to healthcare, which Dr. Meyer believed was motivated by secondary gain to see an inmate who was in healthcare.  Exhibit H, IDOC Medical Records Production, Bates 580.

81.     On August 7, 2014, Rusher was placed in therapeutic restraints after using something she peeled from the wall of her cell to cut herself in an attempt to get to the healthcare unit.  Exhibit H, IDOC Medical Records Production, Bates 584-585.

82.     On August 11, 2014, Rusher saw Dr. Meyer for individual counseling and stated she would not harm herself anymore to get to healthcare to be with inmate Howard.  Exhibit H, IDOC Medical Records Production, Bates 591.

83.     On August 11, 2014, Dr. Meyer continued Rusher's crisis watch on determining it was unclear whether Rusher's motivation to get to her friend in healthcare was greater than her motivation for self-care.  Exhibit H, IDOC Medical Records Production, Bates 591-592.

84.     On August 13, 2014, Rusher saw her psychiatrist in the healthcare unit where she had been placed after biting herself.  Exhibit H, IDOC Medical Records Production, Bates 600-601.

85.     On August 13, 2014, Rusher's psychiatrist adjusted her medications by discontinuing Depakote and increasing her dose of Tegretol.  Exhibit H, IDOC Medical Records Production, Bates 600-601.

86.     On August 23, 2014, Rusher saw a psychologist for counseling and expressed interest in returning to North MHU and receiving additional property.  Exhibit H, IDOC Medical Records Production, Bates 614.

87.     On August 23, 2014, the psychologist planned to move Rusher back to North MHU when a cell became available.  Exhibit H, IDOC Medical Records Production, Bates 615.

88.     On September 4, 2014, Rusher became upset and swallowed a segregation pen and cut her hand, resulting in crisis watch placement and use of therapeutic restraints.  Exhibit H, IDOC Medical Records Production, Bates 620-627, 638-639.

89.     On September 6, 2014, Rusher stuck a pen through her hand and bit herself, resulting in placement in three-point restraints.  Exhibit H, IDOC Medical Records Production, Bates 640-641.

90.     On September 8, 2014, Rusher saw her psychiatrist and her psychologist after she swallowed a pen,.  Exhibit H, IDOC Medical Records Production, Bates 645-648.

91.     On September 12, 2014, Rusher saw her psychologist again while on 30-minute crisis watch and was recommended for increase in privileges, including shower with continued monitoring for deterioration.  Exhibit H, IDOC Medical Records Production, Bates 653-654.

92.     On September 14, 2014, Rusher was discontinued from crisis watch.  Exhibit H, IDOC Medical Records Production, Bates 657-658.

93.     On September 21, 2014, Rusher was placed back on crisis watch after reporting she had swallowed a pen.  Exhibit H, IDOC Medical Records Production, Bates 659-660.

94.     On October 3, 2014, Rusher saw a psychologist, reporting she was hoping to finishing her segregation time in the next few months.  Exhibit H, IDOC Medical Records Production, Bates 669.

95.     On October 3, 2014, Rusher's psychologist noted Rusher's symptoms were under moderate control but that she continued to be a risk of harm due to her history and impulsivity but would need out of cell time and to be in dayroom with a pen so she could write as part of her coping.  Exhibit H, IDOC Medical Records Production, Bates 669.

96. On October 3, 2014, Rusher's psychologist noted Rusher's plan of care was to be seen regularly, avoid disciplinary tickets and suicide attempts, and to use coping mechanisms with the psychologist advocating for out of cell time structured to balance between indoor and outdoor time; supervised activity in the day room with access to socializing with other patients. Exhibit H, IDOC Medical Records Production, Bates 670.

97. On October 27, 2014, Rusher was placed on crisis watch in north wing of MHU after tying a thermal shirt around her neck. Exhibit H, IDOC Medical Records Production, Bates 684.

98. On October 29, 2014, Dr. Yuan saw Rusher for psychiatric evaluation. Exhibit H, IDOC Medical Records Production, Bates 690-692.

99. On November 11, 2014, Dr. Yuan saw Rusher for psychiatric evaluation, finding her to be alert and oriented and free from suicidal ideation. Exhibit H, IDOC Medical Records Production, Bates 700-701.

100. On November 11, 2014, Dr. Yuan assessed Rusher as having bipolar disorder, PTSD, and personality disorder. Exhibit H, IDOC Medical Records Production, Bates 701.

101. On November 14, 2014, Rusher was placed on crisis watch after she swallowed a pen cap and could not breathe. Exhibit H, IDOC Medical Records Production, Bates 705.

102. On December 3, 2014, Dr. Yuan added Klonopin for 15 days to Rusher's medications after she complained of anxiety and difficulty sleeping. Exhibit H, IDOC Medical Records Production, Bates 714-715.

103. Rusher's December 31, 2014, mental health treatment plan goals included (1) refraining from swallowing objects; (2) improving medication compliance, and (3) decreasing

suicidal ideation and improving coping skills.  Exhibit H, IDOC Medical Records Production, Bates 741-743.

104.     Rusher's December 31, 2014, mental health treatment plan for achieving her goals was frequent mental health contacts; daily medication compliance; and using positive coping and self-calming techniques.  Exhibit H, IDOC Medical Records Production, Bates 741-743.

105.     As of January 2, 2015, Rusher was off of crisis watch.  Exhibit H, IDOC Medical Records Production, Bates 744-745.

106.     On January 9, 2015, Rusher met with a psychologist to discuss her upcoming transition to being out of segregation status.  Exhibit H, IDOC Medical Records Production, Bates 751-752.

107.     On January 9, 2015, Rusher's psychologist and therapist planned to re-introduce privileges incrementally due to prevent Rusher being overwhelmed by sudden changes.  Exhibit H, IDOC Medical Records Production, Bates 751-752.

108.     On January 13, 2015, Dr. Yuan saw Rusher for psychiatric consultation at which time Rusher expressed stress with her segregation time and difficulty sleeping.  Exhibit H, IDOC Medical Records Production, Bates 753-755.

109.     On January 13, 2015, Dr. Yuan adjusted Rusher's medications to stop Trazadone and take Klonopin at night for 10 days.  Exhibit H, IDOC Medical Records Production, Bates 753-755.

110.     On January 20, 2015, Rusher saw a mental health provider after coming off watch and completing her segregation time.  Exhibit H, IDOC Medical Records Production, Bates 762.

111.     On January 23, 2015, Rusher saw Dr. Richardson for the first time after Rusher became upset over being taunted by another inmate, encouraging Rusher to not empower bullying

inmate and to walk away from situation.  Exhibit H, IDOC Medical Records Production, Bates 777-778.

112.    On February 9, 2015, Rusher was moved MHU east unit after completing her segregation term.  Exhibit H, IDOC living unit history, Bates 4710.

113.    As of February 10, 2015, Rusher's mental health treatment plan goals were to (1) engage in healthy relationships and social activities; (2) use healthy coping skills to manage feelings; (3) keep up on daily living skills; and (4) take medications as prescribed.  Exhibit H, IDOC Medical Records Production, Bates 789.

114.    As of February 10, 2015, Rusher's mental health treatment plan goals were to be accomplished by (1) spending time doing art and in the day room; (2) reading, writing, listing to music, talking to others; (3) cleaning her room and maintaining personal hygiene; and (4) taking medications daily and attending doctor and clinic appointments.   Exhibit H, IDOC Medical Records Production, Bates 789.

115.    On February 13, 2015, Dr. Richardson saw Rusher in response to her cutting her arm due to being upset at perceived abandonment by her family and arranged for transfer to the healthcare unit on crisis watch with application of therapeutic restraints.  Exhibit H, IDOC Medical Records Production, Bates 798-799.

116.    Dr. Yuan saw Rusher for psychiatric consultation on February 26, 2015, March 5, 2015, March 19, 2015, April 2, 2015, April 16, 2015, April 23, 2015, April 30, 2015, May 7, 2015, May 14, 2015, May 21, 2015, May 28, 2015, June 4, 2015, July 9, 2015, July 16, 2015, July 23, 2015, July 30, 2015, August 6, 2015, August 13, 2015, August 20, 2015, August 27, 2015, September 3, 2015, September 10, 2015, September 17, 2015, September 24, 2015, September 30, 2015, October, 1, 2015, October 8, 2015, October 15, 2015, October 22, 2015, October 29, 2015,

November 5, 2015, November 10, 2015, November 17, 2015, November 24, 2015, December 3, 2015, December 11, 2015, December 17, 2015, December 24, 2015, January 7, 2016, January 14, 2016, January 21, 2016, January 28, 2016, February 3, 2016, February 11, 2016, February 18, 2016, February 25, 2016, March 3, 2016, March 10, 2016, March 17, 2016, March 24, 2016, and March 31, 2016 (final appointment).  Exhibit H, IDOC Medical Records Production, Bates 820-821; 831-832; 843, 879, 964-965, 973-974, 990-991, 999-1000, 1013-1014, 1024-1025, 1031-1032, 1053-1054, 1126-1127, 1142-1143, 1164-1165, 1180-1181, 1195-1196, 1220-1221, 1247-1248, 1285-1286, 1293-1296, 1306-1307, 1310-1312, 1324-1325, 1337-1338, 1352-1353, 1369-1371, 1388-1389, 1412-1413, 1426-1427, 1435-1436, 1439-1440, 1457-1457, 1479-1481, 1503-1504, 1532-5134, 1549-1551, 1563-1565, 1582-1584, 1591-1593, 1606-1608, 1620-1621, 1629-1630, 1643-1645, 1656-1658, 1669-1671, 1687-1689, 1705-1706, 1720-1722, 1738-1740, 1753-1755.

117.    While Rusher was on crisis watch, Dr. Yuan saw her weekly for psychiatric consultation.  Exhibit C, Yuan deposition, pg. 70.

118.    Dr. Richardson saw Rusher for individual therapy sessions on February 28, 2015, April 3, 2015, April 10, 2015, April 17, 2015, May 1, 2015, May 2, 2015, May 9, 2015, May 13, 2015, May 15, 2015, May 16, 2015, May 22, 2015, May 30, 2015, June 5, 2015, June 6, 2015, June 12, 2015, June 24, 2015, June 26, 2015, July 3, 2015, July 10, 2015, July 16, 2015, July 23, 2015, July 24, 2015, July 25, 2015, July 29, 2015, July 31, 2015, August 1, 2015, August 7, 2015, August 8, 2015, August 14, 2015, August 15, 2015, August 20, 2015, August 21, 2015, August 26, 2015, August 28, 2015, August 29, 2015, September 4, 2015, September 11, 2015, September 18, 2015, September 24, 2015, September 25, 2015, September 30, 2015, October 1, 2015, October 2, 2015, October 7, 2015, October 8, 2015, October 9, 2015, October 14, 2015, October 15, 2015,

October 17, 2015, October 21, 2015, October 22, 2015, October 29, 2015, October 31, 2015, November, 12, 2015, November 13, 2015, November 18, 2015, November 19, 2015, November 20, 2015, November 25, 2015, December 2, 2015, December 4, 2015, December 10, 2015, December 11, 2015, December 12, 2015, December 15, 2015, December 18, 2015 (refused); December 23, 2015, December 25, 2015, December 30, 2015, January 2, 2016, January 6, 2016, January 9, 2016, January 14, 2016,  January 15, 2016, January 20, 2016, January 21, 2016, January 27, 2016, January 30, 2016, February 3, 2016, February 4, 2016, February 5, 2016, February 10, 2016, February 12, 2016, February 26, 2016, February 27, 2016, March 2, 2016, March 4, 2016, March 23, 2016, March 24, 2016, March 25, 2016, March 30, 2016, April 1, 2016, April 2, 2016, April 8, 2016, April 9, 2016, April 16, 2016, April 20, 2016, April 21, 2016, April 22, 2016, April 27, 2016, April 28, 2016, April 29, 2016, April 30, 2016.      Exhibit H, IDOC Medical Records Production, Bates 843, 887-888, 955-956, 966-967, 992-993, 994-995, 1001-1002, 1011-1012, 1015-1016, 1017-1018, 1026-1027, 1038-1039, 1055-1056, 1057-1058, 1069-1070, 1085-1086, 1091-1092, 1110-1111, 1133-1134, 1148-1149, 1162-1163, 1169-1170, 1171-1174, 1178-1179, 1182-1183, 1184-1185, 1200-1201, 1202-1205, 1225-1226, 1227-1228, 1248-1249, 1253-1254, 1281-1282, 1287-1288, 1289-1290, 1297-1298, 1308-1309, 1313-1314, 1326-1328, 1329-1330, 1342-1343, 1350-1351, 1358-1359, 1363-1364, 1372-1373, 1376-1377, 1384-1387, 1390-1391, 1398-1399, 1405-1406, 1410-1411, 1418-1421, 1431-1432, 1450-1451, 1452-1453, 1464-1465, 1467-1468, 1471-72, 1482-1484, 1490-1491, 1512-1515, 1522-1523, 1530-31, 1535-1536, 1547-1548, 1553-1554, 1555-1556, 1561-1562, 1566-1567, 1568-1571, 1574-1577, 1578-1581, 1589-1590, 1594-1597, 1602-1604, 1605-1606, 1616-1619, 1622-1623, 1626-1627, 1631-1633, 1637-1638, 1639-1642, 1649-1652, 1672-1675, 1676-1677, 1679-1680, 1693-1696, 1727-1728, 1733-

1734, 1746-1749, 1750-1752, 1762-1763, 1765-1768, 1769-1770, 1787-1788, 1789-1791, 1797-1799, 1807-1809, 1810-1811, 1820-1825, 1826-1829, 1837-1838.

119.    When Dr. Richardson was treating Rusher, he generally would have her cell opened so he could go inside and talk to her.  Exhibit B, Richardson deposition, pg. 108.

120.    Rusher underwent weekly segregation reviews by mental health staff per IDOC's administrative directives.   Exhibit H, IDOC Medical Records Production, Bates 618-620 (September 2014); 677-679, 687-688 (October 2014); 693-695, 707-709 (November 2014); 719-721, 724-738 (December 2014); 746-748 (January 2015); 839-842 (March 2015); 970-972, 983-985 (April 2015); 996-998, 1008-1010, 1021-1023, 1028-1030 (May 2015); 1050-1052, 1063-1065, 1075-1077, 1082-1084 (June 2015); 1117-1119, 1139-1141, 1156-1158, 1175-1177 (July 2015); 1188-1190, 1208-1210, 1243-1245, 1278-1280 (August 2015); 1400-1402 (October 2015); 1834-1836 (May 2016).

121.    While under Dr. Richardson's care, Rusher received eye movement desensitization and reprocessing therapy (EMDR), group therapy, individual therapy, dog therapy, music therapy, cognitive behavioral therapy, and psychiatry sessions.  Exhibit B, Richardson deposition, pg. 118; Exhibit C, Yuan deposition, pg. 48.

122.    On March 20, 2015, Dr. Richardson performed a detailed mental health evaluation on Rusher, which included review of her legal history, mental status examination, family/abuse history, suicidality and barriers to therapeutic progress, mental health and suicide history, and differential diagnosis.  Exhibit H, IDOC Medical Records Production, Bates 854-868; Exhibit B, Richardson deposition, pg. 114-115.

123.    As of March 20, 2015, Dr. Richardson planned for Rusher to remain in the RTU but to move to Treatment Center (inpatient) when available; to continue to see her psychiatrist; to

attend RTU programming, including regular psychotherapy; and avoid crisis watch so that she can move to general population and join Wells Program before release (substance abuse program). Exhibit H, IDOC Medical Records Production, Bates 867.

124.    As of April 1, 2015, Rusher's mental health treatment plan was to see Dr. Yuan weekly for medication management; 30 minutes weekly with Dr. Richardson for psychotherapy sessions; weekly activity group therapy with a behavioral health technician; and weekly relaxation group therapy.  Exhibit H, IDOC Medical Records Production, Bates 875-876.

125.    In April 2015, the psychologists at Logan were directed to prepare evaluation summaries of certain Logan patients receiving inpatient levels of care recommending the patients be transferred to a DHS hospital.  Exhibit B, Richardson deposition, pg. 50-52.

126.    These summaries were requested as part of negotiations between IDOC and DHS concerning patients DHS might take.  Exhibit G, deposition of Norine Ashley, pg. 58-61.

127.    The summaries were of patients at Logan mental health staff believed would benefit from transfer to inpatient care at DHS.  Exhibit G, deposition of Norine Ashley, pg. 65.

128.    On April 4, 2015, Dr. Richardson submitted a DHS summary on Rusher, recommending she be transferred to an inpatient facility.  Exhibit B, Richardson deposition, pg. 128; Exhibit 3 to deposition of Norine Ashley (Exhibit G), DHS Summary on Rusher.

129.    The recommendation to transfer Rusher to DHS hospital was communicated to IDOC.  Exhibit C, Yuan deposition, pg. 57.

130.    The recommendation to transfer Rusher to DHS hospital was not communicated to Wexford because Wexford cannot accomplish such a transfer.  Exhibit E, deposition of Scott McCormick, M.D., pg. 74-75.

131.    IDOC was unable to accomplish the transfer of Rusher to DHS.  Exhibit G, deposition of Norine Ashley, pg. 70-71.

132.    Wexford staff are unable to transfer a patient from IDOC to DHS.  Exhibit G, deposition of Norine Ashley, pg. 150.

133.    Dr. Richardson was informed by IDOC management that Rusher could not be transferred out of IDOC.  Exhibit B, Richardson deposition, pg. 144-45.

134.    As of April 11, 2015, Rusher's mental health treatment plan was to address mood instability by meeting for 30 minutes weekly with Dr. Yuan; reduce self-harm and develop positive coping skills by meeting for 30 minutes weekly with Dr. Richardson for psychotherapy; and address recreational deficits by attending three hours of weekly group therapy.  Exhibit H, IDOC Medical Records Production, Bates 957.

135.    Rusher's mental health treatment plan as of June 3, 2015, was to address mood instability, self abuse, recreational deficits, and inappropriate communications which was to be accomplished with 30-minute weekly sessions with Dr. Yuan and Dr. Richardson and three hours of group therapy weekly.  Exhibit H, IDOC Medical Records Production, Bates 1044.

136.    Rusher's treatment plan as of June 27, 2015, was to address mood instability by having weekly 30-minute sessions with psychiatry; reduce self-abuse through weekly psychotherapy sessions with Dr. Richardson; address recreational deficits through two-hour weekly activity group; address anxiety through weekly anxiety management group; and improve impaired self-expression through weekly creative writing group.  Exhibit H, IDOC Medical Records Production, Bates 1093-1094.

137.    Rusher's treatment plan as of August 13, 2015, was to address mood instability by having weekly 30-minute sessions with psychiatry; reduce self-abuse through weekly

psychotherapy sessions with Dr. Richardson; address and eliminate suicidal behavior through 30-minute weekly psychotherapy sessions with Dr. Richardson; address anxiety through weekly anxiety management group; and improve impaired self-expression through weekly creative writing group.  Exhibit H, IDOC Medical Records Production, Bates 1211.

138.    In 2015, IDOC enlisted Wexford's assistance in complying with a requirement in the pending case *Rasho v. Jeffreys,* CDIL No. 07-1298, for an inpatient mental health facility to take IDOC inmates.  Exhibit I, deposition of Cheri Laurent, pg. 114-115.

139.    In an effort to assist IDOC with locating a facility to provide inpatient mental health services to IDOC inmates, Wexford's executive vice president directed Wexford staff to reach out to 87 Illinois hospitals in hopes of finding ones who would take IDOC's inmates.  Exhibit I, deposition of Cheri Laurent, pg. 115-116.

140.    No outside hospitals were willing to take IDOC inmate for inpatient mental health services.  Exhibit D, deposition of Melvin Hinton, pg. 142-143.

141.    On September 4, 2015, Rusher was transferred to the healthcare unit.  Exhibit H, IDOC Medical Records Production, Bates 1540.

142.    Rusher's treatment plan as of September 5, 2015, was to address mood instability by having weekly 30-minute sessions with psychiatry; reduce self-abuse through weekly psychotherapy sessions with Dr. Richardson; address and eliminate suicidal behavior through 30-minute weekly psychotherapy sessions with Dr. Richardson; and improve impaired self-expression through weekly creative writing group.  Exhibit H, IDOC Medical Records Production, Bates 1300-1301.

143.    On September 11, 2015, Rusher was placed on constantly observed crisis watch.  Exhibit H, IDOC Medical Records Production, Bates 1540.

144.     Rusher's treatment plan as of September 23, 2015, was to address mood instability by having weekly 30-minute sessions with psychiatry; eliminate suicidal behavior and enhance rational hope through weekly psychotherapy sessions with Dr. Richardson; reduce self-harming behavior and ideation and develop positive coping skills through 30-minute weekly psychotherapy sessions with Dr. Richardson; and improve desire to live through weekly music therapy.  Exhibit H, IDOC Medical Records Production, Bates 1315-1316.

145.     On September 24, 2015, a multidisciplinary conference on Rusher was convened with Dr. Richardson, Dr. Yuan and other members of the mental health and medical staff to discuss Rusher's plan of care.  Exhibit H, IDOC Medical Records Production, Bates 1326-1327.

146.     On September 24, 2015, Rusher's multidisciplinary team planned for Rusher to remain on constant watch with 30 minutes of weekly music therapy and continued enhanced treatment plan, with psychotherapy, limited property, and nursing staff feeding Rusher.  Exhibit H, IDOC Medical Records Production, Bates 1327.

147.     The purpose of the multidisciplinary conferences was to determine why Rusher was so suicidal all the time and why treatment seemed so ineffective.  Exhibit B, Richardson deposition, pg. 61; Exhibit C, Yuan deposition, pg. 44-45.

148.     The multi-disciplinary conferences were an all-hands-on-deck response from prison staff to keep Rusher alive to her release date.  Exhibit B, Richardson deposition, pg. 87.

149.     The multi-disciplinary conferences were an in-depth examination of Rusher's treatment, its effectiveness, and what would be done next.  Exhibit B, Richardson deposition, pg.125.

150.     Rusher's treatment plan as of October 1, 2015, was to address mood instability by having weekly 30-minute sessions with psychiatry; eliminate suicidal behavior and enhance

rational hope through weekly psychotherapy sessions with Dr. Richardson; improve self-esteem with music therapy; improve social support and stress response through weekly depression and anxiety management groups; and reduce self-harming behaviors and ideation through 30 minute psychotherapy with Dr. Richardson and group therapy with behavioral health technicians.  Exhibit H,, IDOC Medical Records Production, Bates 1339-1340.

151.    Dr. Richardson's note of October 8, 2015, details Rusher's recent history while on constant watch, which included ingestion of toilet paper on October 7, 2015, which resulted in choking and emergency response, including summoning of ambulance; ingestion of Styrofoam cup and toilet paper on October 3, 2015; and a prior incident where Rusher was given five squares of toilet paper and immediately ingested it, partially obstructing her airway.  Exhibit H, IDOC Medical Records Production, Bates 1366-1368.

152.    Dr. Richardson's note of October 8, 2015, details medical and mental health staff's competing considerations in trying to balance Rusher's medical and mental health needs with preventing her from asphyxiating herself.  Exhibit H, IDOC Medical Records Production, Bates 1366-1368.

153.    Dr. Richardson's note of October 8, 2015, details a 10 point approach to Rusher that was (1) the posting of toileting procedures for security and nursing staff to see at all times; (2) continue to prevent by all means possible Rusher from attempting to asphyxiate herself; (3) auxiliary mental health staff to refrain from talking to inmate and asking about well-being, which can unintentionally reinforce her suicide behaviors, especially during clock-in and clock-out times; (4) therapeutic attention needs to confront false self "happy" persona; (5) inmate to not attend future multidisciplinary meetings for foreseeable future; (6) Dr. Sim to communicate findings to Dr. Hinton (IDOC Chief of Mental Health) about legal-practical aspects of providing appropriate

feminine hygiene care for Rusher; (7) nursing to write incident reports if constant watch staff are not doing their jobs; (8) security staff to provide female constant watch officers as much as possible; (9) Dr. Yuan to continue with medication regimen as he sees fit; and (10) music therapy conducted in a way that will be therapeutic and not group singalong.  Exhibit H, IDOC Medical Records Production, Bates 1368.

154.    On October 8, 2015, Dr. Yuan noted that Rusher "may transfer to out side mental hospital, if possible."  Exhibit H, IDOC Medical Records Production, Bates 1370.

155.    On October 15, 2015, Dr. Richardson documented that possibility of Rusher participating in dog therapy was discussed but that Rusher's segregation status would require her to remain cuffed, which would limit normal physical contact with a dog; however, Dr. Richardson noted that "Dr. Ashley has not given up on the fight to get [Rusher's] seg time eliminated to allow for enhanced and more intensive treatment" but that her staff assaults presented a barrier.  Exhibit H, IDOC Medical Records Production, Bates 1385.

156.    Rusher's treatment plan as of October 21, 2015, was to address mood instability by having weekly 30-minute sessions with psychiatry; eliminate suicidal behavior and enhance rational hope through weekly psychotherapy sessions with Dr. Richardson; improve self-esteem with music therapy; improve social support and stress response through weekly depression and anxiety management groups; and reduce self-harming behaviors and ideation through 30 minute psychotherapy with Dr. Richardson and group therapy with behavioral health technicians.  Exhibit H, IDOC Medical Records Production, Bates 1396-1397.

157.    On October 21, 2015, Dr. Richardson's note indicates Rusher had begun dog therapy in the MHU.  Exhibit H, IDOC Medical Records Production, Bates 1398-1399.

158.    On October 22, 2015, staff held multidisciplinary conference on Rusher with Dr. Richardson, Dr. Yuan and other members of the mental health and medical staff to discuss Rusher's recent history and options for her treatment.   Exhibit H, IDOC Medical Records Production, Bates 1407-1409.

159.    On October 22, 2015, multidisciplinary staff decided, among other things, that Rusher would need to remain on constant watch until she was able to go at least a month without a self-harming incident.  Exhibit H, IDOC Medical Records Production, Bates 1407-1409.

160.    On October 29, 2015, staff held a multidisciplinary conference, noting Rusher had gone 13 days since attempting to strangle herself with elastic from her underwear that had been provided due to her menstrual period.  Exhibit H, IDOC Medical Records Production, Bates 1423-25.

161.    On October 29, 2015, the multidisciplinary team planned to (1) maintain dispassionate stance with Rusher, emphasizing that constant watch restrictions are only and always for her safety to prevent the tragic loss of her life; (2) allow 4 square of toilet paper and investigate whether sergeants could supervise; (3) continue to see the chaplain for spiritual support; (4) continue with dog therapy and music therapy; (5) not pursue enforced medications; and (6) to allow Rusher to attend gym during one of the out-of-cell-time walks with security staff.  Exhibit H, IDOC Medical Records Production, Bates 1423-25.

162.    On November 12, 2015, staff held a multidisciplinary conference, noting Rusher had gone 28 days without a suicide attempt and had been taken off of segregation status in the last week but continued to be on constant crisis watch.  Exhibit H, IDOC Medical Records Production, Bates 1446-1449.

163.    At the November 12, 2015, multidisciplinary conference, Dr. Richardson discussed his theory that the diagnostic difficulties in deciphering what of Rusher's presentations were real and which were inauthentic was due to Rusher having a "chameleon-like" presentation in which she mirrors those with whom she interacts.  Exhibit H, IDOC Medical Records Production, Bates 1446-1449.

164.    At the November 12, 2015, multidisciplinary conference, staff discussed that reducing contact with sympathetic staff and limiting contact to primary treatment figures—Dr. Richardson, Nurse Johnson, Ms. Wright, Ms. Mooney, and Chaplain Frontone---appeared to be working.  Exhibit H, IDOC Medical Records Production, Bates 1446-1449.

165.    At the November 12, 2015, multidisciplinary conference staff determined to keep Rusher on constant watch, while gradually increasing privileges and maintaining individual and group services.  Exhibit H, IDOC Medical Records Production, Bates 1446-1449

166.    On November 19, 2015, staff held a multidisciplinary conference on Rusher, reviewing her treatment and security efforts to keep her safe.  Exhibit H, IDOC Medical Records Production, Bates 1468-1470.

167.    At the November 19, 2015, multidisciplinary conference on Rusher, the plan was to (1) keep Rusher on constant watch; (2) offer her finger foods and have nursing staff feed her drinks from containers; (3) continue spiritual counseling; (4) continue dog therapy; (5) continue medication management with Dr. Yuan; (6) continue music therapy; (7) continue group therapy; (8) continue out of cell time on the morning and afternoon shifts; (9) blank; (10) publish Rusher's restrictions for security staff to see; (11) allow commissary purchase per approval of healthcare unit administrator, with foods minced up into small pieces so Rusher could not choke; (12) use safety smock to improve sense of dignity; (13) read a book placed on window of her door; (14)

move rooms; and (15) "tool box" developed by Dr. Richardson placed at her window that gives Rusher alternative things to think about when she was considering hurting herself.  Exhibit H, IDOC Medical Records Production, Bates 1468-1470, 1500-1502 (tool box).

168.   On November 25, 2015, staff had a multidisciplinary conference on Rusher, discussing Rusher's recent suicide gesture of swallowing a three-inch piece of celery, and a plan for treatment, security, and safety.  Exhibit H, IDOC Medical Records Production, Bates 1485-1487.

169.   On December 3, 2015, staff held a multidisciplinary conference on Rusher, reviewing her recent behavior and plan for treating her and maintaining her safety.  Exhibit H, IDOC Medical Records Production, Bates 1508-1511.

170.   At the multidisciplinary conference, it was noted by those present "transfer to a DHS hospital would be in Ms. Rusher's best interest."  Exhibit H, IDOC Medical Records Production, Bates 1508-1511.

171.   Beyond notifying IDOC that it was Wexford staff's recommendation that Rusher be transferred to DHS, Wexford staff had no further ability to accomplish Rusher's transfer. Exhibit J, deposition of Christian Gillespie, pg. 141-142, 148.

172.   A December 3, 2015, operational plan outlines the allowances and restrictions staff had undertaken in an attempt to protect Rusher, including allowable property, procedure for toilet use, dietary allowances, security during menstrual period, medication administration, group therapy, and out of cell/gym time.  Exhibit H, IDOC Medical Records Production, Bates 1498-1499.

173.   On December 10, 2015, staff held a multidisciplinary conference on Rusher's treatment, noting she had not had any incidents of self-harm in the past week and was continued

on constant watch with her group and individual therapies.  Exhibit H, IDOC Medical Records Production, Bates 1524-1528.

174.     On December 10, 2015, staff updated the operational plan for Rusher's allowances and restrictions for property, clothing, food.  Exhibit H, IDOC Medical Records Production, Bates 1528-1529.

175.     On December 15, 2015, staff held a "Grand Rounds Case Conference" on Rusher that was attended by mental health staff, Chief of Mental Health Melvin Hinton, and representatives from other correctional facilities, including Lawrence, Decatur, Pinckneyville, Stateville, Lincoln, Graham, Vandalia, Jacksonville, Danville, and Dixon Correctional Centers. Exhibit H, IDOC Medical Records Production, Bates 1537-1546.

176.     The purpose of the December 15, 2015, "Grand Rounds Case Conference" on Rusher was to (1) share knowledge gained from management of a difficult and complicated case of extreme suicidality; (2) conference with other mental health professionals to improve therapeutic approaches for extremely suicidal individuals; (3) demonstrate utility of multidisciplinary approach for therapeutic effectiveness and liability management; (4) demonstrate how severe deterioration can occur in prison setting with a young and fragile individual with an inadequately defined sense of self, as well as how a comprehensive approach can help rehabilitate that sense of self to promote internalization of psychic structure for the regulation of self-esteem, increased goal-directed activities, promotion of rational hope, enhance the ability to self-soothe, regulate mood swings, and increase capacity for enthusiasm and devotion to ideals.  Exhibit H, IDOC Medical Records Production, Bates 1538-1539.

177.    On December 23, 2015, staff held a multidisciplinary conference on Rusher's care, noting she had attempted suicide days earlier due to a "suicide pact" with another offender.  Exhibit H, IDOC Medical Records Production, Bates 1557-1560.

178.    On January 7, 2015, staff held a multidisciplinary conference on Rusher's treatment, considering whether her long interval on constant watch, although motivated by caring support would generate resentment from Rusher, necessitating consideration of stepping her down to 10-minute watch.  Exhibit H, IDOC Medical Records Production, Bates 1557-1560.

179.    At the January 7, 2015, multidisciplinary conference staff discussed changing Rusher's privileges, removing the need for a lieutenant's presence when she used the toilet, showered, moved, or ate, with the plan to further reduce restrictions while Rusher remained on constant watch before transitioning her to 10-minute watch.  Exhibit H, IDOC Medical Records Production, Bates 1585-1588.

180.    Mental health staff modified constant watch to make it less burdensome on Rusher by allowing her to attend different types of therapy sessions.  Exhibit B, Richardson deposition, pg. 139.

181.    On January 16, 2016, Rusher was placed in therapeutic restraints for banging her head on the wall and choking herself with a carrot.  Exhibit H, IDOC Medical Records Production, Bates 1598-1604.

182.    On January 21, 2016, staff held a multidisciplinary conference at which they discussed that Rusher had progressed out of her continuously suicidal phase to an episodically suicidal phase, which allowed for renewed relaxation of restrictions.  Exhibit H, IDOC Medical Records Production, Bates 1610-1612.

183.    The multidisciplinary plan on January 21, 2016, was to continue Rusher on constant watch, while continuing certain restrictions designed to protect Rusher' safety while continuing her treatment plan of individual and group therapy.  Exhibit H, IDOC Medical Records Production, Bates 1610-1612.

184.    On February 4, 2016, staff held a multidisciplinary conference at which they discussed Rusher's most recent suicide attempts of January 23, 2016, when she swallowed toilet paper and January 29, 2016, when she attempted strangulation with her bra.  Exhibit H, IDOC Medical Records Production, Bates 1634-1636.

185.    The multidisciplinary plan on February 4, 2016, was to continue Rusher on constant watch, while continuing certain restrictions designed to protect Rusher' safety while continuing her treatment plan of individual and group therapy.  Exhibit H, IDOC Medical Records Production, Bates 1634-1636.

186.    On February 18, 2016, staff held a multidisciplinary conference at which they discussed Rusher's most recent suicide attempts of February 15, 2016, when she swallowed toilet paper.  Exhibit H, IDOC Medical Records Production, Bates 1634-1636.

187.    On February 18, 2016, multidisciplinary staff determined to keep Rusher on constant watch, return her to a soft diet, continue her individual and group therapy, and continue weekly phone calls between Rusher and her mother.  Exhibit H, IDOC Medical Records Production, Bates 1662-1666.

188.    On February 18, 2016, staff held a multidisciplinary conference meeting on Rusher, noting that Rusher had improved since resuming contact with her mother, having spoken to her twice over the last three weeks.  Exhibit H, IDOC Medical Records Production, Bates 1684-1686.

189.     As of March 3, 2016, Rusher's allowance and restrictions were that she could have a mattress, mattress pad, safety blanket, and safety smock; three squares of toilet paper; showers with no towel or washcloth; supervised finger foods; two sanitary pads during menses; daily out-of-cell time of 60 minutes and morning and afternoon shifts; weekly gym time; dog therapy; chaplain time; and relaxation group therapy.  Exhibit H, IDOC Medical Records Production, Bates 1691-1692.

190.     On March 10, 2016, Dr. Richardson supervised a visit between Rusher and her mother and grandmother.  Exhibit H, IDOC Medical Records Production, Bates 1698-1699.

191.     On March 17, 2016, Dr. Richardson supervised a visit between Rusher and her mother and grandmother.  Exhibit H, IDOC Medical Records Production, Bates 1714-1716.

192.     On March 17, 2016, staff held a multidisciplinary conference on Rusher, noting that she had been free of suicidal tendencies for over a month and that easing of restrictions for her protections would be appropriate, including allowing her to have a towel, unlimited toilet paper, and television time with a plan to move from constant to 10-minute watch in two weeks if self-harm/suicidal behaviors are avoided.  Exhibit H, IDOC Medical Records Production, Bates 1729-1732.

193.     On March 24, 2016, Dr. Richardson supervised a visit between Rusher and her mother and grandmother.  Exhibit H, IDOC Medical Records Production, Bates 1735-1737.

194.     On March 31, 2016, staff held a multidisciplinary conference on Rusher, noting Rusher had made no suicide attempts since February 15, 2016.  Exhibit H, IDOC Medical Records Production, Bates 1757-1761.

195.    Due to Rusher's success in avoiding self-harm or suicide, multidisciplinary conference staff discontinued her constant watch and moved her to 10-minute crisis watch status. Exhibit H, IDOC Medical Records Production, Bates 1757-1761.

196.    On April 6, 2016, Rusher was moved from 10-minute suicide watch to constant watch due to Rusher displaying outbursts of anger and then attempting suicide by swallowing a spork, which became lodged in her esophagus, requiring hospitalization.  Exhibit H, IDOC Medical Records Production, Bates 1792-1796.

197.    On April 7, 2016, Rusher's psychiatric care was transferred to Dr. Jose Mathews. Exhibit H, IDOC Medical Records Production, Bates 1774-1782.

198.     As of April 8, 2016, Rusher's treatment plan was to address suicidality and self-destructive behaviors through weekly meetings with psychiatry and psychology and for a DHS facility to arrange for transition to life outside prison.  Exhibit H, IDOC Medical Records Production, Bates 1784-85.

199.    On April 14, 2016, staff held a multidisciplinary conference and discussed that Rusher had attempted suicide by swallowing a spork on April 6 and a toothbrush on April 13. Exhibit H, IDOC Medical Records Production, Bates 1792-1796.

200.    On April 14, 2016, multidisciplinary conference staff determined to continue Rusher on constant watch; continue psychiatry appointments; continue psychotherapy with Dr. Richardson; continue dog therapy; discontinue other groups; allow finger foods with carrots and celery to be removed by staff; no commissary coffee; allow mattress; and recommend security shackle Rusher during out-of-cell-time to prevent staff assault and access to dangerous contraband. Exhibit H, IDOC Medical Records Production, Bates 1792-1796.

201.    On April 16, 2016, Dr. Richardson submitted a written summary in support of his opinion that Rusher should be transferred to DHS upon her discharge from IDOC on May 3, 2016. Exhibit H, IDOC Medical Records Production, Bates 3912-3915

202.    On April 22, 2016, Rusher attended a civil commitment hearing at Logan to determine whether she would be sent to a DHS facility upon her release from IDOC, a move Rusher supported.  Exhibit H, IDOC Medical Records Production, Bates 1812-1815.

203.    On April 29, 2016, Rusher swallowed a 4-6-inch comb and was taken to the hospital.  Exhibit H, IDOC Medical Records Production, Bates 1826-1829.

204.    Rusher discharged from IDOC on May 3, 2016.  Exhibit A, Rusher IDOC living unit history, Bates 4709.

## ARGUMENT

### I.    Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  In evaluating a motion for summary judgment, the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for a trial.  If Defendants meet their burden in showing there is no evidence to support Plaintiff's claim, Plaintiff must demonstrate by affidavit, depositions, answers to interrogatories, and admissions on file, there is a genuine issue of material fact for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986).  In determining and evaluating a motion for summary judgment, the Court views the evidence in the light most favorable to the opposing party and draws all justifiable inferences in his favor.  A mere scintilla of evidence supporting Plaintiff's position cannot create a genuine issue of material facts.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Summary judgment is proper if the pleadings, answers to interrogatories, depositions, and admissions, along with affidavits, show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  An issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  In determining whether there are any genuine issues of material fact, the court must draw all inferences in the light most favorable to the non-movant.  *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 875 (7th Cir. 2002).  Yet not every conceivable inference must be drawn, only reasonable inferences.  *Bartman v. Allis-Chalmers Corp.*, 799 F.2d 311, 312-13 (7th Cir.1986).  Moreover, "when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380-81 (2007) (holding that the "[r]espondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction…").

## II.  No Jury Could Find Dr. Richardson or Dr. Yuan Deliberately Indifferent

To establish an Eighth Amendment violation by a prison official for failure to provide adequate medical care, a prisoner "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  *Estelle v. Gamble*, 429 U.S. 97, 105-106 (1976).  To prevail on an Eighth Amendment claim, a plaintiff must show that the responsible prison officials were deliberately indifferent to his serious medical needs.  *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Dunigan ex rel. Nyman v. Winnebago County*, 165 F.3d 587, 590 (7th Cir.1999).  Deliberate indifference involves a two-part test.  The plaintiff must show that (1) the medical condition was objectively serious, and (2) the state officials acted with deliberate

indifference to his medical needs, which is a subjective standard. *Sherrod v. Lingle*, 223 F.3d 605, 610 (7th Cir.2000). The required showing for deliberate indifference is "something approaching a total unconcern for [the prisoner's] welfare in the face of serious risks." *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006), quoting *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir.1992).

Deliberate indifference requires that a defendant actually know about yet disregard a substantial risk of harm to an inmate's health or safety. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). "The standard is a subjective one: The defendant must know facts from which he could infer that a substantial risk of serious harm exists and he must actually draw the inference." *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016). Emphasizing the deference owed to the professional judgment of medical providers, we have observed that "[b]y definition a treatment decision [that is] based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment." *Id.* at 805; *see also McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013); *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008). "A medical professional acting in his professional capacity may be held to have displayed deliberate indifference only if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Sain,* 512 F.3d at 895 (internal quotation marks omitted); *Rasho v. Elyea*, 856 F.3d 469, 476 (7th Cir. 2017).

Here, no jury could find the voluminous treatment and meticulous attention Dr. Richardson and Dr. Yuan paid to Rusher reflected the absence of professional judgment. First, the sheer volume of encounters Rusher had with Dr. Yuan and Dr. Richardson belies any claim she was denied mental health treatment. As to Dr. Yuan, he took over Rusher's psychiatric management in April 2013 and remained her primary psychiatrist until April 2016, approximately a month

before her release.  UMF 22, 116, 204.  Dr. Yuan saw Rusher for consultation and medication management approximately 60 times between April 2013 and March 31, 2016.  UMF 22-23, 25-27, 34-35, 38-40, 45, 50-51, 98-102, 108-109, 116.  This included weekly meetings beginning in February 2015, continuing to the end of Rusher's incarceration.  Dr. Yuan's primary responsibility was medication management.  UMF 7.  Review of his records reveals constant assessment and adjustment to Rusher's medication regimen, which demonstrates the exercise of professional judgment.  *See Boykin v. Fischer*, 2019 U.S. Dist. LEXIS 199197 at *55-56 (N.D. Ill.) (the defendants were entitled to summary judgment where they demonstrated that they have exercised their professional judgment in  prescribing certain  psychotropic medications  and  adjusted those drugs and their dosages based upon the plaintiff's experiences and feedback).

Similarly, Dr. Richardson began seeing Rusher on January 23, 2015, and provided her myriad forms of therapy at approximately 100 clinical consultations between then and April 30, 2016, including minimum weekly but frequently daily meetings with Rusher.  UMF 111, 115, 118.  He came to Logan and saw Rusher for 30 minutes on Christmas Day in 2015.  UMF 118 (Exhibit ___, IDOC Medical Records Production, Bates 1566-1567).  Dr. Richardson's notes are detailed, thorough, and reflect a mental health professional's thought process in working with an exceedingly difficult patient, determined not to survive her incarceration.  An example of Dr. Richardson's detailed and thoughtful management is contained in his note of an October 8, 2015, multidisciplinary conference:

**Objective:**

Recent suicide attempts were reviewed.   On 10-7-2015 at approximately 5:20 p.m. I/M ingested toilet paper, and began choking while under constant watch.    Nurses J. Starr and K. Smith were notified and responded. I/M's color was pink and she was awake, but quickly declining after nurses arrived. Heimlich was attempted but was unsuccessful. The suction machine was used. After several unsuccessful tries with suction tube, ambulance was called. After continuing use of suction machine they were able to dislodge the obstruction. At that point ambulance was canceled per Dr. Bautista. All vitals were normal at that time. On 10/03/2015, I/M ingested a styrofoam cup after being given a drink.   I/M was restricted from being given cups after this incident.   Earlier that day, 10/03/2015, I/M ingested 3 squares of toilet paper, but she swallowed the wad and her airway was not obstructed.   After a previous Multidisciplinary Meeting, when it was decided that I/M would be given 5 squares of toilet paper instead of 3 squares, I/M very quickly ingested toilet paper and had her airway partially blocked for 19 minutes.   It was determined that she would only be given 3 squares at a time and not given a second 3 squares

A. Due to I/M's constant attempts to asphyxiate herself with toilet paper, a new toileting policy was developed:
1. I/M to tell watch officer she needs to use the toilet, who informs security that Lt. needs to respond and I/M needs to wait before she can wipe herself.
2. Lt. comes and opens chuckhole and hands I/M only 3 squares of toilet paper
3. I/M used toilet, then must WIPE and SHOW - that is, wipe herself clean and show the constant watch officer that the toilet paper has been used, then watch officer must observe I/M drop used toilet paper in the toilet and flush..  If there is no female watch officer to observe, then a female nurse needs to observe.
4. I/M's face must always be in view of the constant watch officer.
It was decided that all concerned parties will have a copy of the current restrictions for this I/M regarding property, feeding, toileting, etc.

B. Due to I/M's gratification from the attention she gets (from MHP's concerns for her well-being), not just from QMHP Gunther and Primary Therapist Dr. Richardson, all other mental health professionals must refrain from checking in and talking with I/M, especially with clocking in and clocking out. Consideration should be given to using partitions to block the view of I/M to MHP's clocking in and out during the change of shift times.

C. Ms. Wright has done Music Therapy twice with I/M, but was concerned that these sessions became "sing-a-longs" rather than therapy sessions, so it was determined that Music therapy sessions would be given in Room 141 on HU 14.

D. I/M's pattern of making a suicide attempt after she has attended SMI meeting and Multidisciplinary Meetings in the past, it was determined that the excess attention being given to her at these times may be reinforcing her histrionic, attention-seeking suicidal behavior. Many   participant in these meetings commented on I/M's lack of veracity and reliability in her comments.

E. Lisa Johnson RN was concerned about some constant watch officers falling asleep, and AWP Charron reiterated that incident reports need to be written and it can be dealt with by her and security staff.

F. Dr. Yuan was informed that I/M is being given medications that have limited medical consequences if they were to be hoarded and taken at higher doses at once, and this includes Haldol, Prozac, and Lithium.   Dr. Yuan confirmed that I/M was being given regular Lithium blood level tests.

G. The issue of what policies need to be in place for how to attend to I/M's feminine hygiene when she has her menses was discussed at length.  No final resolution was agreed to.  The idea of handing I/M menstrual pads was dismissed as being highly dangerous, considering what she is able to do with toilet paper.  The possibility of I/M using a tampon was discussed, but even though I/M could be observed placing it in her vagina, she could transfer it to her mouth unobserved under her safety blanket.  The possibility of obtaining a "Suicide Diaper" was discussed, one that would have velcro straps.  Allowing her to shower frequently was discussed but dismissed as inadequate and impractical Dr. Sim left the meeting briefly to call Dr. Hinton about what could be done legally to provide safe feminine hygiene for this I/M during her menses.  There is a sense of urgency about this issue since nursing believes that her menstrual period may begin in about a week.

**Assessment:**

Clinical discussion regarding the ongoing reason for this I/M's suicidality was discussed.  Issues of reinforcement of her suicidal behavior emerged as a consensus strong factor:

1. I/M is being rewarded by the endorphin rush of Erotic Asphyxiation

2. I/M is being unintentionally reinforced for her suicidal behavior by extra therapeutic attention.

Therapeutic response for these concerns are to:

1. Prevent by all means possible I/M from blocking her airway to get the endorphin rush

2. Restrict therapeutic attention to crisis watches by Ms. Gunther and Individual Psychotherapy by Dr Richardson at proscribed times.  Limit extra attention over crisis concerns.  Other mental health professions should try to avoid interacting with I/M and checking in with her, especially during clock-in and clock-out times.

Concerns emerged with I/M's game-playing and lack of honesty, especially when she makes protestations that she will not try to hurt herself.  I/M needs to be told to "knock it off" when she talks this way, and not indulge her when she puts on her "happy-mask."  Telling her to "knock it off" helps her to be more real.

This possibility of dissociative dynamics was discussed, and helps to explain her child-like playful self switching to an older, darker suicidal self.  However, I/M's lack of truthfulness makes any therapeutic exploration of this issue suspect, since I/M would simply give back what she thinks the therapists wants to hear.  In any case, the false-self dynamic of I/M wearing a "happy-mask" to disguise her basic determination to kill herself while at LCC appears to be a sufficient explanation for this I/M's presentation.

What this formulation does not explain is why I/M is so determined to kill herself. I/M has proposed that parental rejection and memories of abuse as reasons why she wants to die.  She has also said that the Devil tells her to do it.  Without a healthy therapeutic alliance where I/M is honest about her inner thoughts and feelings, then the reasons why she is so motivated to die will remain unclear.  Without honesty in therapy, then any kind of psychodynamic or trauma-related treatment will be doomed to failure.  In any case, whatever the reason this I/M became suicidal, issues of behavioral reinforcement are probably sufficient reasons why these suicidal behaviors are being maintained

**Plan:**

1. Post new toiletting procedures for security and nursing staff to see at all times.  AWP Charron to get a copy of the latest restrictions

2. Continue to prevent by all means possible I/M from attempting to asphyxiate herself.

3. Auxilliary Mental Health staff to refrain from talking to I/M and asking about her well-being, which can unintentionally reinforce her suicidal behaviors, especially during clock-in and clock-out times.

4. Therapeutic attention needs to confront her false-self "happy" persona.

5. I/M to not attend future Multidisciplinary Meetings for the foreseeable future.

6. Dr. Sim to communicate findings from Dr. Hinton about legal-practical aspects of providing appropriate feminine

hygiene care for I/M.  Final deterination about the appropriate procedures for feminine hygiene care will be made after this information is obtained and communicated to Mental Health, Nursing and Security Staff.

7. Nursing to write incident reports if Constant Watch staff are not doing their jobs as required.

8. Security staff will try to provide female Constant Watch officers as much as possible.

9. Dr. Yuan to continue with medication regimen as he sees fit.

10. Ms. Wright shall do Music Therapy in HU 14 Room 141 weekly to prevent group singalongs and support an appropriate therapeutic approach.

UMF 151; Exhibit H, IDOC Medical Records Production, Bates 1366-1368.

This note is merely an example and represents the body of Dr. Richardson's work with Rusher.

Second, beyond their individual sessions, the records reflect Dr. Yuan and Dr. Richardson delivered a comprehensive treatment plan to Rusher.  This treatment plan included eye-movement desensitization and reprocessing therapy, group therapy, individual therapy, dog therapy, music therapy, cognitive behavioral therapy, and psychiatry sessions.  UMF 121.  Rusher was allowed substantial out-of-cell time, despite being on crisis watch between September 11, 2015, and May 3, 2015.  UMF 143, 161, 189, 200.  Rusher's constantly reviewed and adjusted treatment plan is the antithesis of deliberate indifference.  *See Proctor v. Sood,* 863 F.3d 563, 568 (7th Cir. 2017) (adjusting treatment in response to prisoner's presentation suggests exercise of professional judgment).

Third, addition to their clinical encounters and treatment provided, Dr. Yuan and Dr. Richardson were constant participants in weekly multidisciplinary conferences about Rusher that represented the lengths mental health staff at Logan went to treat Rusher and keep her safe.  UMF 145-149.  These weekly meetings always included discussion of Rusher's treatment and response and solicited conversation among medical, mental health, and security staff about how to best manage Rusher.  UMF 145-147, 158-170, 173, 179-180, 182-188, 192, 194, 199-200.  Staff also conducted a "Grand Rounds Case Conference" on December 15, 2015, that included top statewide mental health officials and mental health staff from other prisons at which Rusher was discussed.  UMF 175-176.  The suggestion that Rusher's providers, including Dr. Yuan and Dr. Richardson, were not exercising professional judgment fails in the face of the exhaustive efforts and meticulous planning reflected in these meetings.

Even Plaintiff's expert concedes "[m]ental health staff in I.D.O.C. made a concerted effort to provide Ms. Rusher with safe management and with mental health treatment" and "created treatment plans and provided counseling or therapy sessions, seemingly as often as they could,

given the number of clinical staff available, institutional policies and realities, and the times Ms.

Rusher had to be in isolation and on watch."  Exhibit 3 to deposition of Terry Kupers, M.D. at 16.

In explaining this, Kupers testified:

> I believe the mental health staff had a dilemma to deal with in the Illinois
> Department of Corrections. And I don't believe that they made a vigorous enough
> effort to institute the treatment that Mrs. Rusher required. However, within the
> constraints of their employment for Wexford or IDOC, they made attempts to treat
> her.  It's just that the structural situation, both the -- well, I've listed these things in
> my report, the use of solitary confinement in its various forms, the use of
> disciplinary infractions in response to her self-harming, the housing her in one or
> another form of solitary confinement, which then makes mental health treatment
> very problematic. And the failure to transfer her to receive the inpatient psychiatric
> treatment she needed acutely. All of those were structural -- what I call structural
> impediments because, for instance, Dr. Richardson speaks eloquently about his
> opinion, clinical opinion, that she required inpatient treatment and his failure to
> effect that in the Illinois Department of Corrections.  Exhibit F, deposition of Terry
> Kupers, M.D., pg. 26-27.

Indeed, Dr. Richardson detailed his thoughts, recommending Rusher's transfer to an in

patient DHS facility in April 2015.  UMF 128.  This document was requested by IDOC as part of

ongoing negotiations between IDOC and DHS about DHS transferring IDOC patients and was

sent to IDOC administration.  UMF 125, 127-129.  The recommendation to transfer Rusher to

DHS was discussed at multidisciplinary conference with IDOC staff.  UMF 169-170.  Moreover,

there is no evidence in the record that would support that Dr. Richardson or Dr. Yuan or any

Wexford employee had the ability to actually transfer Rusher to DHS.  UMF 10.

The mental state for deliberate indifference requires a prison official act with a mental state

"approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Roasario

v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012).  However, evidence that the defendant responded

reasonably to the risk, even if he was ultimately unsuccessful in preventing the harm, negates an

assertion of deliberate indifference. *Farmer*, 511 U.S. at 844; *Peate v. McCann*, 294 F.3d 879, 882

(7th Cir. 2002); *see also Sinn v. Lemmon*, 911 F.3d 412, 423-24 (7th Cir. 2018) (holding that no

reasonable juror could infer deliberate indifference where prison officials took sensible steps to address unsafe prison conditions). Similarly, "the mere failure of the prison official to choose the best course of action does not amount to a constitutional violation." *Peate*, 294 F.3d at 882.

The evidence unequivocally shows Defendants and the other mental health professionals at IDOC tried exceedingly hard to manage Plaintiff---a point with which Plaintiff's expert agrees. That they had no personal ability to transfer Rusher out of prison provides no basis for a jury to find deliberate indifference. Instead, their treatment decisions are entitled to deference under the professional judgment standard. *See Youngberg v. Romeo*, 457 U.S. 307, 323, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982) (decisions by professionals about mental health facility's operations afforded deference and violate the Constitution only if professional judgment not exercised). Dr. Richardson and Dr. Yuan are entitled to summary judgment.

### III. A Jury Would Have No Basis to Find Wexford Maintained an Unconstitutional Policy Regarding Sending Patients Offsite for Mental Health Services

The Seventh Circuit has held that private companies that act under color of law can be liable under *Monell*, 436 U.S. at 691-92. First, a §1983 plaintiff must show "he was deprived of a federal right." *Dean v. Wexford,* 18 F.4th 214, 235 (7th Cir. 2021), quoting *First Midwest Bank v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021). Beyond that, a plaintiff must trace the deprivation to some municipal action (i.e., a "policy or custom"), such that the challenged conduct is "properly attributable to the municipality itself." *Id.* To establish municipal liability under *Monell*, a plaintiff must prove three things. First is the existence of an unconstitutional policy. This can be done by showing either: (a) an express policy that, when enforced, causes a constitutional deprivation; (b) a widespread practice that, although not authorized by written law or express policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (c) that the constitutional injury was caused by a person with final decision policymaking

authority.  *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019). Second is that the municipality

is culpable, which means the municipality's policymakers were deliberately indifferent to a known

or obvious risk that a policy or custom would lead to constitutional violations. *Board of Comm'rs*

*of Bryan County v. Brown*, 520 U.S. 397, 407 (1997); *see also*, *Dean v. Wexford Health Sources,*

*Inc.*, 18 F.4th 214 (7th Cir. 2021) (noting "the plaintiff must show that 'the policy or custom

demonstrates municipal fault,' *i.e.*, deliberate indifference").  Third, the municipality's policy must

"directly cause[] a deprivation of federal rights." *Brown*, 520 U.S. at 415. The municipality's own

actions must be the "moving force" behind plaintiff's injuries. *Id.* at 404.

### A.  Plaintiff Has No Evidence of an Unconstitutional Wexford Policy

Plaintiff's theory appears to be that Wexford violated the Eighth Amendment by not

providing a means by which Rusher could be transferred out of IDOC to an inpatient mental health

center.  In the Amended Complaint, Plaintiff alleges that Wexford's contract with IDOC requires

it to provide "'[c]omprehensive and specialized mental health services" including "specialty and

emergency care that cannot be provided on site.'"  Doc. 76, par. 16, quoting Exhibit 1 to Deposition

of Christian Gillespie, pg. 5.  Plaintiff further alleges that notwithstanding Wexford's contractual

obligations, it did not transfer patients like Plaintiff to outside mental health hospitals.   *Id.*

Plaintiff's theory is not supported by (1) the contract's plain language, (2) the parties'

understanding and performance of the contract, or (3) Illinois law.

As an initial matter, the contract between IDOC and Wexford explicitly states it creates no

rights enforceable by third parties.  Exhibit 1 to Deposition of Christian Gillespie, pg. 35 (Section

4.24 "No Third Party Beneficiary Rights"); *Knuth v. Wexford Health Sources, Inc.*, 2016 U.S. Dist.

LEXIS 200410, *11-12 (N.D. Ill.) (the plaintiff "cannot sue on the contract between the Illinois

Department of Corrections and Wexford because he is not a party to that agreement nor is he an

intended beneficiary thereof," as "explicitly stated in Paragraph 4.24 of the contract").  Plaintiff's reliance on the contract as the source of any duty is misplaced.

The plain language of the contract contradicts Plaintiff's assertion.  Section 2.2.2 of the Contract, upon which the Amended Complaint appears to rely, is a general description of Wexford's duties.  Exhibit 1 to Deposition of Christian Gillespie, pg. 5.  The contract then enumerates the details of the "Comprehensive Medical Program" and the "Comprehensive Mental Health Program."  It describes the details of the "Comprehensive Medical Program" in §2.2.3, which describes provision of offsite and hospital-based medical services.  *Id.* at 8-10.  The "comprehensive medical program" describes the process and timing by which requests for offsite consultation are handled.  *Id.* at §2.2.3.2.  By contrast, the "Comprehensive Mental Health Program" includes no description of provision of offsite services.  *Id.* at 12-16.  It specifically says, "Vendor shall deliver effective and efficient mental health services *on-site* to offenders determined to be mentally or emotionally disturbed, due to a chronic mental illness of situational stress." (Emphasis added).  *Id.* at 12.

Moreover, both IDOC and Wexford agree that transferring IDOC inmates for offsite mental health services was not one of Wexford's responsibilities in its relationship with IDOC.  In his deposition, Dr. Hinton, IDOC's 30(b)(6) corporate representative was asked these questions and gave these answers:

> Q.  Wexford Health Sources does not have the authority to transfer an inmate out of the Illinois Department of Corrections to an inpatient mental health facility; is that accurate?
> ***
> A.  Yes, that is correct.
> Q.  It was not the understanding or expectation of the department that Wexford would send mental health patients to offsite mental health hospitals during the relevant period; is that correct?
> [Objection]
> **A.**  That is correct.  Exhibit D, deposition of Melvin Hinton, pg. 136.

Wexford's 30(b)(6) representative, Dr. Christian Gillespie testified similarly to Dr. Hinton

that Wexford staff could not force the transfer of a patient but the extent of what it could do was

exactly what was done with Rusher:  advocate for the patient and provide appropriate treatment

interventions.  She was asked these questions and gave these answers:

> Q.  If a Wexford employee, during the relevant time period, thought that it would
> be in someone's best interest to be at a facility that was not -- to be at an inpatient
> facility that was not the prison they were currently in, is it Wexford's position that
> there ultimately was not anything they could do if IDOC said the person couldn't
> be transferred?
> A.  It is Wexford's position that there would be nothing that we could do to force
> a transfer.· But whether or not there's nothing that we could do at all, that is not
> Wexford's position.
> Q.  Okay.  What could Wexford do to try to get someone transferred to an outside
> facility?
> A.  Now there's the caveat to try to get them transferred, which I think is a little
> bit different than if there's anything they could do at all.
> Q.  Okay.· Well then if there's anything they could do at all?
> A.  Yes, as far as anything that we can do at all, or Wexford could do at all,
> Wexford can continue to try different interventions to stabilize the patient where
> they are.· They could continue to inform IDOC superiors or mental health --
> mental health managers about the concern and advocate for their patient.· But
> could they ultimately decide or make the decision for the transfer, no.  Exhibit J,
> deposition of Christian Gillespie, pg. 140-141.

Third, the ability to move an inmate out of IDOC custody and into a DHS facility rests

solely with IDOC per Illinois law.  Section 3-8-5 of the Unified Code of Corrections (730 ILCS

5/3-8-5) provides:

> The Department shall cause inquiry and examination at periodic intervals to
> ascertain whether any person committed to it may be subject to involuntary
> admission, as defined in Section 1-119 of the Mental Health and Developmental
> Disabilities Code [405 ILCS 5/1-119], or meets the standard for judicial admission
> as defined in Section 4-500 of the Mental Health and Developmental Disabilities
> Code [405 ILCS 5/4-500], or is an intoxicated person or a person with a substance
> use disorder as defined in the Substance Use Disorder Act [20 ILCS 301/1-1 et
> seq.]. The Department may provide special psychiatric or psychological or other
> counseling or treatment to such persons in a separate institution within the
> Department, or the Director of the Department of Corrections may transfer such
> persons other than intoxicated persons or persons with substance use disorders to
> the Department of Human Services for observation, diagnosis and treatment,

subject to the approval of the Secretary of the Department of Human Services, for a period of not more than 6 months, if the person consents in writing to the transfer. The person shall be advised of his right not to consent, and if he does not consent, such transfer may be effected only by commitment under paragraphs (c) and (d) of this Section 730 ILCS 5/3-8-5.

No basis exists for a *Monell* theory of liability in which a contractual vendor implicitly accepts a constitutional duty to provide a type of service it did not contract to provide and that its client never expected it to provide. A finding otherwise would make the voluntary undertaking of services as a vendor to the State an unknowable business venture where failing to provide services outside of the contract could provide a basis for civil liability and potentially punitive damages.

**B.   Plaintiff Has No Evidence of Corporate Deliberate Indifference or Moving Force Causation**

A Plaintiff relying on a widespread custom or practice "must prove that it was obvious that the municipality's action would lead to constitutional violations and that the municipality consciously disregarded those consequences." *Dean.,* 18 F.4th at 235. When a municipality acts or directs an employee to act that facially violates a federal right, municipal fault is easily established. *Brown,* 520 U.S. at 404-05. In contrast, where the plaintiff alleges the municipality has not directly violated his rights but rather has caused an employee to do so, a "rigorous standard[] of culpability ... applie[s] to ensure that the municipality is not held liable solely for the actions of its employee." *Id.* at 405. In this situation, the plaintiff must demonstrate that the municipality's action "was taken with 'deliberate indifference'" to the plaintiff's constitutional rights. *Id.* at 407. This is a high bar. *Dean*, 18 F.4th at 235. Negligence or even gross negligence by the municipality is not enough. *LaPorta v. City of Chicago*, 988 F.3d 978, 986-987 (7th Cir. 2021). A plaintiff must prove that it was obvious that the municipality's action would lead to constitutional violations and that the municipality consciously disregarded those consequences. *Id., citing Brown,* 520 U.S. at 407.

To survive summary judgment Plaintiff must also have evidence sufficient to support a jury finding that a municipal action was "the 'moving force' behind the federal-rights violation." *LaPorta*, 988 F.3d at 987, quoting *Brown*, 520 U.S. at 404; *Dean*, 18 F.4th at 235. This "rigorous causation standard" requires "a 'direct causal link' between the challenged municipal action and the violation of [the plaintiff's] constitutional rights." *LaPorta*, 988 F.3d at 987, quoting *Brown*, 520 U.S. at 404; *see also, Dean*, 18 F.4th at 235.

Where Wexford had no duty or ability to transfer Rusher offsite it is unclear how Plaintiff would prove it deliberately indifferent. Nevertheless, Wexford's actions when notified that IDOC was looking for a solution for offsite inpatient mental health treatment for its inmates, Wexford attempted to help. Communications discussed in Wexford's 30(b)(6) depositions show that in August 2015, Wexford's Vice President of Operations, Elaine Gedman, directed Wexford staff in its corporate office to contact each of the 87 hospitals in Illinois with inpatient mental health capability to find space for IDOC inmates. UMF 139; Exhibit 3 to deposition of Cheri Laurent, Bates 3267. The email communications reflect Wexford staff undertaking Ms. Gedman's task and updating Wexford corporate policymakers on the progress. *Id.*, generally. This effort was ultimately not fruitful as no outside hospitals would take IDOC's patients. UMF 140.

There is no basis to find Wexford was deliberately indifferent to a substantial risk of serious harm it could have cured. Instead, the facts show it working with its contractual partner to address an identified need in Illinois. After not finding facilities willing to house IDOC inmates, IDOC constructed its own inpatient facility at Joliet Treatment Center, moving patients to Elgin Mental Health Center while Joliet was being built and providing an enhanced level of care for patients like Rusher. Exhibit D, deposition of Melvin Hinton, pg. 140-141, 160-161; UMF 146 referring to Rusher's "enhanced treatment plan." Wexford, though its frontline mental health staff like Dr.

48

Richardson and Dr. Yuan, carried out the provision of enhanced treatment to Rusher. No basis exists to find Wexford deliberately indifferent.

## IV.     Defendants are Entitled to Good-Faith Immunity from Damages on Count I

Notwithstanding the dispositive arguments set forth above, Defendants are nonetheless entitled to good-faith immunity from damages. In *Janus v. Am. Fed'n. of State*, the Seventh Circuit joined the Second, Third, Fifth Sixth, and Ninth Circuits in holding "while a private party acting under color of state law does not enjoy qualified immunity from suit, it is entitled to raise a good-faith defense to liability under section 1983." 942 F.3d 352, 362, 364 (7th Cir. 2019) (collecting cases). To receive the good-faith defense, a private party's allegedly violative conduct must have been taken in reasonable reliance on established law. *Id.* at 366.

As stated more fully above, Section 3-8-5 of the Unified Code of Corrections vests IDOC with the sole ability to transfer an inmate to DHS, and no mechanism exists for Wexford to accomplish such a transfer to DHS or any other offsite facility. As a practical matter, no dispute exists frontline mental health staff presented a unified and Herculean effort to care for Rusher. Dr. Richardson, Dr. Yuan, and the mental health team believed Rusher could benefit from transfer to a DHS facility and documented and communicated it to IDOC. Finding them liable for this recognition, documentation, and communication because they could not accomplish it would result in a perverse situation where mental health staff are disincentivized from properly advocating for their patients. A finding of Eighth Amendment liability because they did not provide something they recognized as beneficial but had no ability or authority to provide would be profoundly unfair and lacking any basis in existing law.

The Eighth Amendment has long been recognized to not entitle an inmate to any particular treatment or to the best care possible. *Forbes v. Edgar*, 112 F.3d 262, 267 (1997). It entitles them

49

only to reasonable measures to meet a substantial risk of serious harm. *Id.* Plaintiff's theory that because Rusher would have benefitted from inpatient hospitalization it became a constitutional mandate is inconsistent with the Eighth Amendment. Rusher received copious treatment that reflected the exercise of professional judgment of her providers. That satisfies the Eighth Amendment. A finding of liability on these facts would represent a change in the law to requiring the most beneficial treatment as a matter of Constitutional law. Wexford, Dr. Yuan, and Dr. Richardson should have good-faith immunity from any such change in the law.

**V.    Plaintiff Has Not Disclosed Expert Testimony on Breach of the Standard of Care**

In Count IV, Plaintiff alleges medical negligence against Dr. Richardson, Dr. Yuan, and Wexford. Doc. 76 at 21. Under Illinois law a medical malpractice claim requires expert testimony about the appropriate standard of care "'[u]nless the physician's negligence is so grossly apparent or the treatment so common as to be within the everyday knowledge of a layperson.'" *Davis v. Kayira*, 938 F.3d 910, 916 (7th Cir. 2019), quoting *Sullivan v. Edward Hosp.*, 209 Ill. 2d 100, 806 N.E.2d 645, 653, (2004). Moreover, the Seventh Circuit has required plaintiffs to comply with Illinois' healing art malpractice statute by providing a "certificate of merit," a written report by a health professional attesting there is a "reasonable and meritorious cause for the filing." 735 ILCS 5/2- 622(a); *Young v. United States,* 942 F.3d 349 (7th Cir. 2019).

Here, Plaintiff disclosed Dr. Terry Kupers, a psychiatrist, who provided a written report. Exhibit 3 to deposition of Terry Kupers, M.D. Kupers' only mention of the standard of care is his statement is "[t]he standard of care in the medical community requires that before seclusion or restraint is instituted all other less restrictive measures must be tried and deemed a failure, and then a physician must first examine the patient and write an order for the seclusion or restraint, and then examine the patient and re-write the order in a matter of a few hours." *Id.* at 17-18. Kupers says

"in correctional settings, too often, as in Ms. Rusher's case, custody staff consign prisoners to solitary confinement as punishment for rule infractions, or the solitary confinement is rationalized as "suicide observation" or "watch," as is the case in the I.D.O.C." *Id.*

Dr. Kupers does not state in his report Dr. Yuan or Dr. Richardson deviated from any standard of care. He does not mention Dr. Yuan in his report. Dr. Kupers does not criticize Dr. Richardson in the "opinions" section of his report. In fact, he relies on Dr. Richardson's April 2015 DHS summary as evidence Rusher should have been transferred to DHS. *Id.* at 12. But this is far from a criticism of Dr. Richardson. Kupers' criticism is of the system he says placed Rusher in "solitary." Because Plaintiff has not provided standard of care testimony to support a medical malpractice claim against Dr. Yuan or Dr. Richardson, these claims fail. Because the individuals are entitled to summary judgment on Count IV, the *respondeat claim* against Wexford fails. *See Smith v. Chicago Limousine Service, Inc.,* 109 Ill. App. 3d 755, 760-61, 441 N.E.2d 81 (1st Dist. 1982) (there can be no liability by a principal under the application of the *respondeat superior* doctrine unless the agent is also held to be liable).

## CONCLUSION

The mental health records establish that Rusher received extraordinary efforts from her mental health team at Logan, which prevented her suicide and allowed her release at completion of her IDOC sentence. Plaintiff's theory that Rusher should have been in a different setting outside of IDOC due to her mental health problems is emblematic of the difficulties inherent in the intersection of the criminal justice system with the seriously mentally ill. Certainly, Rusher's needs were recognized, and enormous efforts were made to meet them until the institutional structure caught up with evolving attitudes in this area and IDOC constructed its own inpatient hospital for patients like Rusher. That it did not exist when Defendants treated Rusher provides

no basis for constitutional or state-law liability against them. Defendants are entitled to summary judgment.

WHEREFORE, for the above reasons, BRIAN RICHARDSON, DR. HE YUAN and WEXFORD HEALTH SOURCES, INC., respectfully request this Honorable Court grant their Motion for Summary Judgment and grant such further relief as deemed appropriate.

Respectfully submitted,

CASSIDAY SCHADE LLP

By: /s/ Joseph N. Rupcich
    One of the Attorneys for Defendants, BRIAN
    RICHARDSON, DR. HE YUAN and
    WEXFORD HEALTH SOURCES, INC.

Joseph N. Rupcich
ARDC No. 6283899
CASSIDAY SCHADE LLP
2040 W. Iles Avenue, Suite B
Springfield, IL 62704
(217) 572-1714
(217) 572-1613 (Fax)
jrupcich@cassiday.com

## CERTIFICATE OF SERVICE

     I hereby certify that on July 8, 2024, I electronically filed the foregoing Motion for Summary Judgment with the Clerk of the Court using the CM/ECF system. The electronic case filing system sent a "Notice of E-Filing" to the following:

Emmanuel Andre
Northside Transformative Law Center
1543 W. Morse Avenue
Chicago, IL 60626

Emily Hirsch, Nicole Schult
Alan Mills
Uptown People's Law Center
4413 North Sheridan
Chicago, IL 60646
nicole@uplcchicago.org
emily@uplcchicago.org
alan@uplcchicago.org

Stephen Weil
Loevy & Loevy
2071 North Southport Avenue, Suite 205
Chicago, IL 60614
weil@loevy.com

Jennifer Powell, Robert Shultz.
Illinois Attorney General
201 West Point Drive, Site 7
Swansea, IL  62226
jennifer.powell@ilag.gov
robert.schultz@ilag.gov

Brent Salsbury
Charles Vaughn
Wiedner & McAuliffe, Ltd.
101 S. Hanley, Suite 1450
St. Louis, MO  63105
blsalsbury@wmlaw.com
czvaughn@wmlaw.com

Under penalties as provided by law pursuant to 735 ILCS 5/1-109, I certify that the statements set forth herein are true and correct:

/s/ Joseph N. Rupcich

11923693