LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA



**EXHIBIT**
**G**

# NO. 18-CV-1101-SEM-TSH

## KELLI ANDREWS

### V.

## BRUCE RAUNER, ET AL.

### DEPONENT:

## NORINE ASHLEY

### DATE:

## October 15, 2021


a courtroom **powerhouse**

✉ schedule@kentuckianareporters.com
☎ 877.808.5856 | 502.589.2273

www.kentuckianareporters.com

IN THE UNITED STATES DISTRICT COURT FOR THE

CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

NO. 18-CV-1101-SEM-TSH

KELLI ANDREWS,

Plaintiff

V.

BRUCE RAUNER, ET AL.,

Defendants

DEPONENT:  NORINE ASHLEY

DATE:      OCTOBER 15, 2021

REPORTER:  CHLOE GILBERT



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
— COURT REPORTERS —

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1:18-cv-01101-SEM-DJQ   # 181-13   Filed: 07/08/24   Page 3 of 64
The Deposition of NORINE ASHLEY, taken on October 19, 2021
2..5

Page 2

```
 1                    APPEARANCES

 2

 3   ON BEHALF OF THE PLAINTIFF, KELLI ANDREWS:

 4   Stephen H. Weil

 5   Loevy & Loevy

 6   311 North Aberdeen

 7   Third Floor

 8   Chicago, Illinois 60607

 9   Telephone No.: (312) 243-5900

10   E-mail: weil@loevy.com

11   (Appeared via videoconference)

12

13   AND

14

15   Bridget Geraghty

16   Uptown People's Law Center

17   4413 North Sheridan Road

18   Chicago, Illinois 60640

19   Telephone No.: (443) 769-1411

20   E-mail: bridget@uplcchicago.org

21   (Appeared via videoconference)

22

23

24

25
```

Page 4

```
 1               APPEARANCES (CONTINUED)

 2

 3   ON BEHALF OF THE DEFENDANT, DR. RICHARDSON:

 4   Brent Salsbury

 5   Wiedner McAuliffe

 6   101 South Hanley

 7   Suite 1450

 8   St. Louis, Missouri 63105

 9   Telephone No.: (314) 721-3400

10   E-mail: blsalsbury@wmlaw.com

11   (Appeared via videoconference)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

```
 1               APPEARANCES (CONTINUED)

 2

 3   ON BEHALF OF THE DEFENDANTS, NORINE ASHLEY AND IDOC

 4   DEFENDANTS:

 5   R. Brandon Shultz

 6   Rachel D. Schwarzlose

 7   Office of the Attorney General

 8   100 West Rudolph Street

 9   Chicago, Illinois 60601

10   Telephone No.: (312) 814-3276

11   E-mail: robert.shultz@ilag.gov

12   E-mail: rachel.schwarzlose@ilag.gov

13   (Appeared via videoconference)

14

15   ON BEHALF OF THE DEFENDANT, WEXFORD HEALTH SOURCES:

16   Rachael Hayes

17   Joseph Rupcich

18   Cassiday Schade, LLP

19   3100 Montvale Drive

20   Springfield, Illinois 62704

21   Telephone No.: (217) 572-1714

22   E-mail: rhayes@cassiday.com

23   E-mail: jrupcich@cassiday.com

24   (Appeared via videoconference)

25
```

Page 5

```
 1                        INDEX

 2                                             Page

 3   PROCEEDINGS                                 7

 4   DIRECT EXAMINATION BY MR. WEIL              9

 5   EXAMINATION BY MS. GERAGHTY                122

 6   CROSS EXAMINATION BY MS. HAYES             149

 7

 8                     EXHIBITS

 9   Exhibit                                    Page

10   1 - E-mail from Dr. Ashley to Dr. Hinton    66

11   2 - Rusher v. Rauner - 029108-029136        73

12   3 - E-mail with attachments - 40813-040819  78

13   4 - E-mail from Dr. Hinton to Dr. Ashley,

14       Discussion of Mr. Davilla -

15       28802-28805                             84

16   5 - E-mail from Dr. Ashley to Dr. Hinton -

17       042015-042019                           97

18   6 - E-mail from Dr. Ashley to Dr. Sim -

19       040318-040320                          118

20   7 - Diagram of Housing Unit 14            123

21   8 - Set of Photos of Gym Space -

22       006853-006905                          124

23   9 - Housing Unit History - 004709-4710    128

24   10 - Photos of Facility - 6906-6939       133

25   11 - Photos of Facility - 6940-6978       140
```



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 6

```
1                    STIPULATION
2
3    The video deposition of NORINE ASHLEY was taken at
4    Kentuckiana Reporters, 30 South Wacker Drive, 22nd
5    Floor, Chicago, Illinois 60606, via videoconference in
6    which all participants attended remotely, on FRIDAY the
7    15TH day of OCTOBER 2021 at 11:01 a.m.; said video
8    deposition was taken pursuant to the FEDERAL Rules of
9    Civil Procedure. The oath in this matter was sworn
10   remotely pursuant to FRCP 30. It is agreed that CHLOE
11   GILBERT, being a Notary Public and Court Reporter for
12   the State of KENTUCKY, may swear the witness.
13   .
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

```
1                    PROCEEDINGS
2
3         COURT REPORTER:  We are now on the record.  My
4    name is Chloe Gilbert.  I'm the video technician and
5    court reporter today.  Today is the 15th day of
6    October 21 -- 2021, and the time is now 10:02 a.m.
7    We are convened by videoconference to take the
8    deposition of Norine Ashley, in the matter of Kelli
9    Andrews versus Bruce Rauner, et al., pending in the
10   United States District Court, Central District of
11   Illinois, Springfield Division, Case number
12   18-cv-1101-SEM-THS. Will counsel please identify
13   themselves for the record, state your appearance how
14   you are attending and your location?
15        MR. WEIL:  Stephen Weil, W-E-I-L, representing
16   the Plaintiff.  I'm attending from Chicago.
17        MS. GERAGHTY:  Bridget Geraghty also on behalf
18   of the Plaintiff, attending via video from Chicago.
19        MR. SHULTZ:  Brandon Shultz on behalf of the
20   deponent and IDOC defendants, attending via video
21   from Glen Carbon, Illinois.
22        MS. SCHWARZLOSE:  Rachel Schwarzlose, also on
23   behalf of the deponent and the IDOC defendants from
24   the Attorney General's office by video from Saint
25   Louis, Missouri.
```

Page 8

```
1         MS. HAYES:  Rachel Hayes appearing on behalf of
2    all Wexford Health Sources, Inc. defendants and
3    Cassiday Schade appearing on be -- appearing via
4    video from Springfield, Illinois.
5         MR. SALSBURY:  Brent Salsbury on behalf of
6    Dr. Richardson, appearing via video from Saint
7    Louis, Missouri.
8         COURT REPORTER:  Ms. Ashley, will you please
9    state your full name for the record?
10        THE WITNESS:  Norine Ella Ashley.
11        COURT REPORTER:  And do all parties agree that
12   the witness is, in fact, Norine Ashley?
13        MS. GERAGHTY:  Yes.
14        MR. WEIL:  Plaintiff stipulates.  Yes.
15        COURT REPORTER:  Sorry.  Go ahead.
16        MR. SHULTZ:  I said Brandon Shultz.  I
17   stipulate.
18        MR. SALSBURY:  Brent Salsbury.  I stipulate.
19        COURT REPORTER:  Ms. Ashley, will you please
20   raise your right hand?  Do you solemnly swear or
21   affirm that the testimony you are about to give will
22   be the truth, the whole truth, and nothing but the
23   truth?
24        THE WITNESS:  I do.
25        COURT REPORTER:  Thank you.  You may begin.
```

Page 9

```
1                DIRECT EXAMINATION
2    BY MR. WEIL:
3         Q    Good morning, Dr. Ashley.  As I just
4    introduced myself, my name is Steve Weil.  I represent
5    the Plaintiff in this case.  First question is just,
6    what sort of device are you using to appear on this
7    deposition?  Are you on a laptop or a desktop computer
8    or what have you?
9         A    And this is a laptop.
10        Q    Okay.  Have you participated in other Zoom
11   conference calls on a laptop?
12        A    Yes.
13        Q    Have you been able to read documents presented
14   to you on Zoom conference calls on a laptop?
15        A    Yes.
16        Q    Okay.  I want to show you a document just sort
17   of as a test.  This should be a lot simpler than it's
18   turning out to be.  Okay.  Dr. Ashley, I'm going to show
19   this to you.  I'm going to share my screen.  Now, I've
20   shared a document with you, and I just want to know
21   whether that's easy for you to read or hard for you to
22   read.
23        A    The size is rather small, but I can read it.
24        Q    Okay.  Let me see if this works any better.
25   Let's do it again.  Now, is that any better, Dr. Ashley,
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1:18-cv-01101-SEM-DJQ # 181-13 Filed: 07/08/24 Page 5 of 64
The Deposition of NORINE ASHLEY, taken on October 19, 2021
10..13

Page 10

1  in terms of --
2      A    That is much better.
3      Q    Okay.  Okay.  That's helpful.  Thank you.  I'll
4  -- that helps me pick which screen I'm going to use to
5  share with you.  With that out of the way, Dr. Ashley,
6  how many times have you been deposed before, if any?
7      A    Six.  Five, six times.  Yeah.
8      Q    When was the last time you were deposed?
9      A    A couple of weeks ago.
10     Q    All right.  Well, you'll be fairly fresh on
11 the rules then.  I assume a lawyer sort of went through
12 the procedure of a deposition with you in preparing to
13 have you answer questions?
14     A    Yes.
15     Q    Okay.  I won't belabor it too much.  I -- just
16 a couple requests I'll make.  As you know, the testimony
17 you're taking down is being recorded by a court reporter
18 who's typing out what you say and what I say as the
19 deposition goes along.  You understand that?
20     A    Yes.
21     Q    That means that our conversation will be a
22 little different, only in a sense that we should be both
23 be very careful about trying to wait until one person
24 stops talking before the other person answers or asks
25 the following questions so that the court reporter can

Page 11

1  take down our questions and answers while we're not
2  talking over each other.  Does that make sense?
3      A    Yes.
4      Q    This is my one chance to ask you questions
5  before trial.  And so while I can't ask you to
6  speculate, I would like your best recollection and your
7  best estimate in any answer.  Does that make sense?
8      A    Yes.
9      Q    I will try to be as clear as I can in asking
10 questions.  If you don't understand the question, or you
11 don't understand the context or have something else you
12 need to clear up, please ask, and I'll do my best to
13 clear that up.  Does that make sense?
14     A    Yes.
15     Q    The corollary is that if I ask you a question
16 and you don't ask for clarification, I'll assume that
17 you understand what I'm asking.  Does that make sense?
18     A    Yes.
19     Q    Okay.  If you want to take a break, you can do
20 so at any time.  This is not an endurance contest or
21 anything of the sort.  I would only ask that you not
22 take a break while a question is pending.  Does that
23 make sense?
24     A    Yes.
25     Q    Can you explain, just in the thumbnail sketch,

Page 12

1  your educational professional background?
2      A    I have a degree -- a doctorate degree in
3  Clinical Psychology.  My working history is mostly with
4  corrections, originally at Logan Correctional Center
5  since December of 2007.  I recently accepted a
6  promotion, and I now am the Assistant Warden of Programs
7  at Lincoln Correctional Center, which is a male
8  facility.  And that was as of March of '21.
9      Q    Let me go into a bit more detail.  You
10 attended college, it sounds like.
11     A    That's correct.
12     Q    When was that?
13     A    I graduated with my doctorate in 2003.
14     Q    Okay.  And in terms of an undergraduate
15 education, when did you complete your undergraduate
16 education?
17     A    My undergraduate education.  I had both a
18 bachelor's and a master's, both in Clinical Psychology
19 as the major.  The masters was completed in, oh, my
20 gosh, I want to say it was '99, 1999, and the bachelor's
21 would've been like '96, '95, somewhere along there.
22     Q    All right.  Given that timeline, it sounds
23 like you went -- you got your bachelor's, went and got a
24 masters, and went and got a PhD in fairly immediate
25 succession.  There were big brakes for work in between

Page 13

1  those times?
2      A    No.  There were no work breaks.
3      Q    Okay.  And after 2003, between 2003 and 2007,
4  what did you do professionally?
5      A    I did a post-doctorate in Arizona with the
6  White Mountain Apache Tribe as a clinical supervisor
7  over the youth substance program and eventually was
8  promoted to be the clinical director and CAO for the
9  Apache Behavioral Health Services in White River,
10 Arizona.  I left from that position and came back to
11 Illinois and started working at DLC at -- at Logan.
12     Q    Where did you get your PhD, at what
13 institution?
14     A    It's a PsyD, and it was from the Illinois
15 School of Professional Psychology in Chicago.
16     Q    In the SID, it's -- that's a doctor in
17 psychology or -- is that right?
18     A    Yes.
19     Q    Okay.  And is there a specialty within that at
20 all?  That kind of thing?
21     A    It is a clinical psychology degree.
22     Q    So you graduated from the Chicago School of
23 Professional -- Illinois School of Professional
24 Psychology in 2003, and then you worked in Arizona from
25 2003 to 2007; is that right?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 14

1    A    Yes.
2    Q    And then you came back in 2007 to Illinois; is
3  that correct?
4    A    Yes.
5    Q    And did -- upon coming back, was your job --
6  did you start working in the Department of Corrections,
7  or did you have any other job?
8    A    I started working in the Department of
9  Corrections.  At that time, I was employed by Wexford as
10  a contract psychologist.
11    Q    What were the -- what was the period of your
12  employment by Wexford?
13    A    That was from December of 2007 until June of
14  2013.
15    Q    And were you at Logan that entire time?
16    A    Yes.
17    Q    And were you a contract psychologist that
18  entire time?
19    A    Yes.
20    Q    What does that mean contract psychologist?
21    A    Basically that we are contracted.  We are
22  employed by Wexford, but contracted by the Illinois
23  Department of Corrections to provide mental health
24  services to the individuals that are incarcerated at
25  that facility.

Page 15

1    Q    Okay.  So the contract simply refers to the
2  fact that Wexford is contract -- if you know, obviously.
3  You may not know exactly what the term means, but if --
4  as I understand it, it means that you -- Wexford has a
5  contract to provide mental healthcare and you provide
6  that care under the contract.  Is that your
7  understanding of the term means?
8    A    Yes.
9    Q    Okay.  And was that a -- during your tenure as
10  a contract psychologist -- you said it lasted until
11  2013; is that right?
12    A    Yes.
13    Q    Do you remember when in 2013?
14    A    I believe it was March.  No.  It was June --
15  it was June.  My annual -- my annual date, anniversary
16  date in DLC is June of 2013.
17    Q    Okay.  And your role of contract psychologist,
18  that was -- were you in a supervisory role or sort of a
19  line healthcare provider role, or what was your job?
20    A    At that time, I was the only mental health
21  provider at Logan until shortly before I started working
22  for IDOC, as we were expanding the department, beginning
23  a vast hiring of mental health professionals because we
24  had changed the population from all male to all female.
25  So that required more staff.  And also, because of the

Page 16

1  Rasho lawsuit, there were requirements that we increased
2  our mental health staff.
3    Q    Do you remember when these increases occurred?
4    A    They started happening, I want to say maybe in
5  January of two -- maybe around January of 2013.
6    Q    And what was the change?  What sort of staff
7  were hired?
8    A    We hired doctoral level clinical psychologist.
9  We also hired masters level mental health professionals,
10  licensed clinical social workers, licensed clinical
11  professional counselors, LSWs, basically social workers
12  without the clinical licensure, and LPCs, professional
13  counselors without the clinical designation.  At some
14  point we also started hiring behavioral health
15  technicians as well as a number of staff assistants.
16    Q    Between 2007 and January 2013, your -- what
17  sort of -- what was your day-to-day job like before
18  these other people were hired?
19    A    I provided basically all of the mental health
20  services for Logan.  That included any assessing any new
21  intakes, providing individual direct care, group direct
22  care, crisis care, basically any mental health services
23  that were needed, I provided those.
24    Q    Why did you change your employer from Wexford
25  to IDOC in 2013?

Page 17

1    A    With the transition from the male facility to
2  the female facility, Logan was going to basically assume
3  the role as the mental health provider, a higher level
4  of mental healthcare for the female population since the
5  Dwight Correctional Center used to be the facility that
6  had the mental health department that took care of those
7  patients.  Dwight was being closed, so they were
8  combining the population from Dwight with the female
9  population from Lincoln.  All of them were being brought
10  to Logan.  Because of that, the -- it required that
11  there be a psychologist administrator from the state to
12  oversee that department, and so I applied for and was
13  given that position.
14    Q    That was my next question.  What was -- so
15  what was -- when you transition from working for Wexford
16  to IDOC, it sounds like your role changed.  Can you
17  describe that?
18    A    Yes.  As the state psych administrator, my
19  role then changed to overseeing the contract with
20  Wexford, since Wexford had their own line supervisors
21  that were hired to manage the dated they mental health
22  staff.  So my role was then to oversee the contract and
23  monitor it to ensure that Wexford was providing services
24  according to that contract with IDOC.
25    Q    Why did you want to change from working for



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 18

1  Wexford to work for IDOC?
2      A    Practical reasons. Number one, the benefits,
3  the changed the pension system as well as the ability
4  then to also do as I have done in advance through IDOC
5  to higher positions. Also, there was -- well, I think
6  that was pretty much so it, just the benefit of being
7  able to advance my career within IDOC and the state.
8      Q    When you said "also" a minute ago, did you
9  have another thought in your mind about another reason?
10     A    No. That's why I stopped.
11     Q    What is -- how do you in -- so the psychology
12  -- you said a psychologist administrator; is that right?
13     A    Yes.
14     Q    Okay. And that was at Logan? That was the
15  role you went into in June of 2013?
16     A    Yes.
17     Q    How long were you in that role?
18     A    I was in that role until March of 2021.
19     Q    Okay. So until just recently, in other words,
20  right?
21     A    Yes.
22     Q    Can you -- you said part of your job was
23  overseeing the contract with Wexford?
24     A    Yes.
25     Q    Where -- did you have other components of your

Page 19

1  job?
2      A    I did participate with the Wexford staff for
3  certain things, of course. They consulted with me if
4  there were any questions in regards to operations within
5  Logan itself. So kind of as bridge between the mental
6  health staff and the department in the operations, the
7  security side of Logan. Also, I held monthly department
8  meetings with them which consisted of bringing to their
9  attention any announcements specific to the operations
10  of the department and sometimes enrolling out new
11  policies and procedures for the mental health department
12  as those were updated by IDOC. I would sit in, not in a
13  supervisory capacity, but just, again, monitoring some
14  of the treatment plan meetings that were held with staff
15  as well as, like I said, day-to-day being available to
16  answer any questions for clarification of DOC policies.
17     Q    Okay. Anything else come to mind besides
18  those several things you listed?
19     A    And of course I carried out various reports
20  and audits of the work that was being done by Wexford
21  staff.
22     Q    I may be trending over -- what -- so the
23  entire time you've been a psychological -- psychologists
24  administrator, you've been at Logan; is that right?
25     A    Yes.

Page 20

1      Q    Okay. And you -- I take it then that you were
2  overseeing the contract and performing the other
3  functions we just talked about specifically with respect
4  to the care being provided at Logan; is that right?
5      A    Yes.
6      Q    Okay. Since March of two tho -- the -- of
7  this year, what -- you said you have a new role now?
8      A    Yes. I am the assistant warden of programs at
9  Lincoln Correctional Center.
10     Q    Okay. And that's a men's prison; is that
11  right?
12     A    Yes.
13     Q    Do you have any oversight role at Logan
14  anymore?
15     A    No.
16     Q    What are you doing at Lincoln?
17     A    At Lincoln, as the assistant warden, I'm
18  responsible for oversight of multiple departments. That
19  would include our mental health department, clinical
20  services, chaplaincy, leisure time services, record
21  office. I think that's all of them at this point. So
22  its -- it's various departments. Each department has
23  their own department head, but they all report directly
24  to me.
25     Q    Returning to your role as psychologist

Page 21

1  administrator at Logan, I want to sort of walk through
2  some of the roles that you described, or tasks you
3  described. You -- first you talked about overseeing the
4  contract with Wexford. How would you do that?
5      A    On a monthly basis, we prepared reports that
6  were submitted to central office in regards to the
7  number of patients who were seen, what was the status of
8  those patients, reporting any crisis watches. So there
9  -- there is statistics that the department is tracking.
10  In addition to that, there was a bi-monthly detailed
11  audit of documentation that staff were doing in addition
12  to the documentation, but making sure that as patients
13  were being seen according to the guidelines that DOC had
14  set out.
15     Q    Anything else?
16     A    As far as statistical monitoring, no.
17     Q    As far as I -- I'm sorry, Doctor. I mean as
18  far as overseeing the contract with Wexford.
19     A    Same difference. Overseeing the contract is
20  this, you know, recording what their activity was, how
21  many patients they were seeing, how frequently they were
22  seeing those patients according to policy and procedure,
23  those type of duties. As well as, like I said, being
24  available day-to-day to answer any questions that might
25  come up. And I would say, primarily, the majority of my

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1:18-cv-01101-SEM-DJQ # 181-12 Filed: 07/08/24 Page 8 of 64
The Deposition of NORINE ASHLEY, taken on October 19, 2021
22..25

Page 22

1  time would've been spent outside of those reporting
2  duties and answering questions from staff, just
3  clarifying policy.
4  Q    Who would you report to the -- in the reports
5  that you prepared in your oversight role?
6  A    Who would I personally -- who was my
7  supervisor?
8  Q    I -- is it -- an awfully asked question. You
9  mentioned preparing reports, the monthly reports, and I
10 guess you'd also conduct a bi-monthly review. So the
11 first question will be, regarding the monthly reports,
12 who would you send those reports to, or how would you
13 prepare them?
14 A    Those reports would be sent to the department
15 of mental health management services that was run under
16 Chief Hinton, who was the chief of all mental health
17 services.
18 Q    And those reports would cover what exactly?
19 A    That would have been the data I outlined for
20 you how many patients were seen, when they were seen,
21 frequency of being seen, crisis watches that were held,
22 duration of those watches, as well as reports for the
23 ratio monitor that was required on a certain frequency.
24 Q    What were the reports for the ratio monitor?
25 What did they contain?

Page 23

1  A    Oh, gosh. Lots of data. There were a -- the
2  -- the some of the main things that the ratio monitor
3  was interested in was restrictive housing. So there was
4  data on, you know, number of SMI, seriously mentally ill
5  patients who were placed in restrictive housing, how
6  long they were in restrictive housing, what services did
7  they receive in restrictive housing, how much of that
8  was structured, how much was unstructured, how many
9  times they received visits from mental health. Then, on
10 a quarterly basis, there was an overall compliance
11 report that we had to complete with, you know, again,
12 covering all of those areas that IDOC and the federal
13 monitor had agreed upon -- upon, things that we were
14 supposed to do according to the settlement. And I can't
15 even begin to, you know, itemize what all those were at
16 this point.
17 Q    You also mentioned bi-month review of
18 documentation?
19 A    Yes. That would have been the crisis -- not
20 crisis. The quality improvement audit. Those were
21 completed, and again, here we were looking at the
22 specific administrative directives that covered certain
23 areas for mental health, either general policies or
24 policies related to crisis watch, suicide
25 prevention/intervention, psychiatry, and basically

Page 24

1  reviewing all of the documents within that period. What
2  we would get would be instructions from the quality
3  improvement manager or coordinator stating you're going
4  to review these topic areas. So we would randomly
5  select a number of medical records that we would review
6  for that specific administrative directive and make sure
7  that that document complied with what DOC required.
8  Q    So it sounds like your quality reviews in
9  terms of assessing quality were directed at compliance
10 with the administrative directives that the DOC
11 promulgated; is that right?
12 A    Yes.
13 Q    Okay. Aside from oversight, you also
14 mentioned participating with Wexford staff, and I think
15 he talked about that a little. I think you said,
16 "participating with them in certain things." How would
17 you work with Wexford staff in your psychology
18 administrative role?
19 A    Wexford had a series of managers that were
20 hired to provide direct supervision to staff. There was
21 a psych services manager who was the one that I
22 primarily worked closest with. This individual
23 supervisor basically was the manager for all of the
24 Wexford mental health staff, but then under that
25 manager, were a series of unit directors. There was a

Page 25

1  unit director for the residential treatment unit. There
2  was a unit director for outpatient care. I want to say
3  at one point we had a unit director maybe for
4  restrictive housing services. So there were a series of
5  three unit directors and then the site services director
6  who oversaw all of them. So my engagement on a day-to-
7  day basis was closest with that site services director
8  for Wexford.
9  Q    Would you also work with the unit directors?
10 A    In any point they -- they were not restricted
11 from working with me. They could, absolutely.
12 Q    In terms of just your general role, you were
13 working with the site services manager to do what?
14 A    If there was something, for example, that I
15 found in an audit, or some issue that might have been
16 raised by someone else at Logan, perhaps from security,
17 something that needed to be corrected or clarified with
18 Wexford staff, I would discuss that with the site
19 services director so he could -- or she could in turn
20 provide that guidance to their staff.
21 Q    And how about the unit directors? How would
22 you end up working with them?
23 A    If they had a question, particularly in -- in
24 terms of things that might have happened in outpatient,
25 if there were problem with security staff while they're



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1:18-cv-01101-SEM-DJQ #181-13 Filed: 07/08/24 Page 9 of 64
The Deposition of NORINE ASHLEY, taken on October 19, 2021
26..29

Page 26

1 doing their job or their staff are doing their jobs in
2 outpatient, they could come to me with those concerns,
3 and I would be sort of the buffer in between them and
4 security at Logan. If there were questions about
5 certain procedures, again, according to the
6 administrative directive from DOC, they would sometimes
7 call me on that as well.
8  Q  Do you have any -- were there any other tasks
9 you'd typically perform when working with Wexford staff?
10  A  Not outside of what I had outlined, because we
11 have pretty firm what we call boundary for dual
12 employment. In other words, state IDOC staff do not
13 supervise directly any of the Wexford staff, and we
14 respect that boundary. That was initiated through their
15 contract. So anything in terms of discipline or how
16 something that needed to be addressed with staff, went
17 usually -- like I said, I went through that particular
18 process of working with those unit managers, and they,
19 in turn, would address those issues with the staff.
20  Q  So in term -- if you had a concern about a
21 line stuff, you would work to the Wexford chain of
22 command; is that right?
23  A  That is correct.
24  Q  Were there any IDOCs mental health staff at
25 Logan during your tenure?

Page 27

1  A  No -- no.
2  Q  And so it was all Wexford and you in terms of
3 the mental health people providing and overseeing mental
4 health services?
5  A  Yes.
6  Q  Okay. You mentioned as well monthly meetings.
7 Can you describe that in a bit more detail and what was
8 covered in those meetings and what the purpose was?
9  A  DOC requires that department heads and this
10 goes from the wardens down to the individual
11 departments, have monthly meetings, kind of as a
12 check-in section -- session, and also to provide any
13 changes or directives that are coming down from the
14 central office. So what would happen is our warden
15 would have a meeting each month with all of the IDOC
16 department heads. From that meeting, we would get
17 information that we would then in turn take back and
18 share with our individual departments. So when we had
19 our monthly meeting, I would share that information with
20 staff that was given to me from the wardens meeting.
21 But also, if there were any changes or direction from
22 mental health services from Chief Hinton's office that
23 needed to be passed along to mental health staff, I
24 would also include that in those meetings.
25  Q  Who would attend the monthly meetings?

Page 28

1  A  That would be all of the staff were required
2 to attend.
3  Q  Okay. So this is a large gathering of all
4 staff, not just a gathering of the managers?
5  A  That is correct.
6  Q  You also talked about sitting in and
7 monitoring treatment plan meetings.
8  A  Yes.
9  Q  How often would you do that?
10  A  That was on a sporadic basis. We had
11 treatment plans for the residential treatment unit, but
12 then we also had treatment plan meetings for those that
13 what we called in our PIAP unit, P-I-A-P, those were the
14 pre inpatient, those who we were considering sending to
15 our Elgin facility who needed a higher level of care. So
16 any one of those treatment team meetings, on a sporadic
17 basis, I would attend.
18  Q  You mentioned of Elgin raises point that I
19 should clarify. Are you -- maybe we'll backup. What
20 did you do to prepare for this deposition, if anything?
21  A  I was sent a document from the state's
22 attorney, and I was also sent some files yesterday
23 evening from state's attorney. I reviewed those, I
24 reviewed the -- the actual filing.
25  Q  The complaint?

Page 29

1  A  Yes.
2  Q  Okay.
3  A  To see what all the charges were. I also
4 reviewed the psych autopsy that had been conducted at
5 one point with Ms. Rusher, and I think that's about it.
6  Q  Okay. So you understand that this case
7 concerns a woman named Tiffany Rusher; is that right?
8  A  Yes.
9  Q  And do you recall Ms. Rusher?
10  A  Yes.
11  Q  Okay. As you know, Ms. Rusher left the IDOC,
12 I believe it was in May of 2016. Is that consistent
13 with your recollection?
14  A  Sounds about right, yes.
15  Q  All right. So to backup very quickly, you've
16 been describing your role as psychologists administrator
17 at Logan. Were the things that -- were the things you
18 described generally true for the time that Ms. Rusher
19 was a prisoner at IDOC?
20  A  Yes.
21  Q  Okay. The Elgin facility that you just
22 mentioned, prompted me, did that exist at the time Ms.
23 Rusher was a prisoner in IDOC?
24  A  I -- honest, I don't remember. I'm horrible
25 with dates. And I'm not quite -- I'm not remembering



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 30

1  when exactly Elgin came online as a place that we could
2  transfer some of our patient's to.
3      Q   Okay.  It was some point during your tenure as
4  psychologist administrator, meaning that when you
5  started it didn't exist, but before you left it did; is
6  that --
7      A   That is correct.
8      Q   Okay.  Going real quickly to the files that
9  you reviewed.  You said you reviewed the complaint in
10 the case, right?
11     A   Yes.
12     Q   And is that what you referred to when you said
13 you reviewed a document?
14     A   Yes.
15     Q   Okay.  And in the files, I believe you said
16 you reviewed a psychological autopsy; is that right?
17     A   Yes, I did say that, but I think I may be
18 thinking of my past deposition.  I don't think there was
19 a psychological autopsy for Ms. Rusher, so I'd like to
20 correct that.
21     Q   About how many documents did you review?  You
22 said you were sent some files last night; is that right?
23     A   Yes.
24     Q   How many documents were those?
25     A   Those were pictures.

Page 31

1      Q   They're photographs?
2      A   Yes.
3      Q   Okay.  So you read the complaint and various
4  photographs; is that right?
5      A   Yes.  And there was -- there was another
6  document with Ms. Rusher that I reviewed.  It may have
7  been her evaluation that was done, I believe, by
8  Dr. Richardson.
9      Q   Okay.  When did you review that?
10     A   That would've been several days ago.
11     Q   All right.  So you reviewed a -- you reviewed
12 the complaint.  Like -- why don't we just backup real
13 quickly, just so we make sure we understand what you
14 reviewed and when you reviewed it.  You said -- we've
15 established you reviewed a complaint in the case.  And
16 then you also reviewed -- when did -- well, let's just
17 start there.  When did you review the complaint?
18     A   I reviewed the complaint, I'm going to say it
19 was last week.
20     Q   Okay.  And what other documents do you review
21 besides the complaint?
22     A   There was a document that I was sent, I
23 believe it was the discharge from Ms. Rusher from
24 McFarland.
25     Q   The discharge of Ms. Rusher from McFarland?

Page 32

1      A   Yes.
2      Q   Okay.  When did you review that?
3      A   That would've been last week as well.
4      Q   And Ms. Rusher was only at McFarland after she
5  left the IDOC; is that right?
6      A   That is correct.
7      Q   Okay.  And so that discharge is -- that
8  discharge postdated her time at IDOC, the discharge
9  paper that you reviewed; is that right?
10     A   Yes.
11     Q   Okay.  Besides the discharge papers in the
12 complaint, did you -- and we'll set aside the photos for
13 a second.  Did you review any other documents?
14     A   That would have been her assessment.
15     Q   Assessment?  Okay.
16     A   Yes.
17     Q   What was that?
18     A   When patients come into DOC, if they have a
19 mental health history, one of the requirements is that
20 there is a psychological assessment that is completed.
21 So that was Ms. Rusher's assessment that I reviewed.
22     Q   Okay.  And when did you review that?
23     A   That would have been last week as well.
24     Q   Okay.  So last week you reviewed the
25 complaint, the McFarland discharge, and the assessment;

Page 33

1  is that right?
2      A   Yes.
3      Q   And I believe you said you reviewed a document
4  prepared by Dr. Richardson as well?
5      A   That would've been the assessment.
6      Q   Okay.  That would've been the assessment.
7  Okay.
8      A   Yes.
9      Q   And you said that you believe that assessment
10 was made when Ms. Rusher came into the IDOC?
11     A   When she came into Logan, yes.
12     Q   When she came into Logan?
13     A   Yes.
14     Q   When -- you mentioned Logan transferring from
15 a male to a female facility.  Do you remember when that
16 occurred?
17     A   That would've been March of 2013.
18     Q   Okay.  And is that when Ms. Rusher came to
19 Logan?
20     A   I'm not sure.  It had to have been -- I
21 believe she was at Lincoln at that time, and we received
22 the women from the Dwight facility first, and then the
23 Lincoln females came a little later.  So it would've
24 been somewhere around that time, I do believe.
25     Q   And if I understand correctly, in March of

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1:18-cv-01101-SEM-DJQ    #181-13    Filed: 07/08/24    Page 11 of 64
The Deposition of NORINE ASHLEY, taken on October 05, 2021
34..37

Page 34

1  2013, all female IDOC prisoners were housed at Logan; is
2  that right?
3      A    They were -- yes, they were all brought to
4  Logan.
5      Q    And so you believe their -- the assessment by
6  Dr. Richardson would've occurred sometime around March
7  of 2013; is that right?
8      A    It could have been then or later.  And I'm
9  sorry, I don't recall the date that was on the
10  assessment.
11      Q    Any other documents besides the ones we --
12  that we reviewed?
13      A    I did review her civil commitment papers.
14      Q    And that was in preparation for this
15  deposition?
16      A    Yes.
17      Q    Okay.  Anything else?
18      A    That's it.
19      Q    Okay.  You said that you recall Ms. Rusher.  Is
20  that independent of your preparation for this
21  deposition?
22      A    Yes.
23      Q    Okay.  What do you recall about her?
24      A    Ms. Rusher was severely mentally ill.  She was
25  extremely high maintenance in terms of the amount of

Page 35

1  care that we had to provide for her.  She did a lot of
2  self-harm.  She spent an inordinate amount of time on
3  crisis watch status, some of that in restraints for
4  mental health purposes.  She ingested foreign objects,
5  obviously not food objects, which required her being
6  sent out to a hospital on a couple of occasions.  But
7  just basically, she was a very, very sick young woman
8  who was in our system during that time.
9      Q    Did you have personal interaction with Ms.
10  Rusher?
11      A    I did talk to Ms. Rusher, yes.
12      Q    And we went over your roles that you had in --
13  at Logan.  In what capacity -- or in what function were
14  you actually interacting with Ms. Rusher?
15      A    As I said, I did sit in on those treatment
16  team meetings.  When Ms. Rusher was on a crisis watch,
17  they -- I would go through the wings and talk to some of
18  the individuals who we had in custody at that time, and
19  if somebody was on watch, on occasion, I would go by
20  and, you know, speak to them, inquire about their health
21  in general, if they had any complaints, anything of that
22  nature.
23      Q    What was the purpose of doing that?
24      A    Couple of things.  One, the patients are all
25  aware and they are very astute when it comes to who they

Page 36

1  perceive as in charged.  So even though I did not
2  provide their day-to-day care, everyone was aware that
3  there was a Dr. Ashley and that Dr. Ashley was over
4  mental health services.  So I always tried to be visible
5  in a way so that, if there were concerns that patients
6  had that they did not feel comfortable approaching their
7  therapist or one of the other Wexford staff, I wanted to
8  be available for those comments from the individuals.
9      Q    Did you consider that to be part of your
10  oversight role for the Wexford contract?
11      A    Yes.
12      Q    Meaning that you were assessing whether
13  Wexford was complying with the contract by -- impart by
14  conducting these rounds?
15      A    Yes.
16      Q    In a -- well, did -- let me just ask a few
17  more questions about Ms. Rusher.  Did she stand out as a
18  mental health patient?  Well, let me backup.  I'm
19  assuming you have a lot -- in that role, you encountered
20  quite a few mental health patients in your role as
21  psychologists administrator.
22      A    Yes.
23      Q    Did Ms. Rusher stand out among those in terms
24  of the severity of her illness or her symptoms?
25      A    Sadly, no, she did not.

Page 37

1      Q    Okay.  What do you mean by that?
2      A    We have a number of patients who were severely
3  mentally ill who -- and who equally spent an inordinate
4  amount of time on a crisis watch, she was self-
5  injurious, made numerous suicide attempts, required
6  external hospitalizations, so she did not stand out in
7  that regard.
8      Q    Okay.  When you say you had a number, can you
9  ballpark what you're -- what you mean by that?
10      A    I would say probably 20 or less, so it was a
11  good number, but you know, for the size of Logan and
12  Logan staff, it was a sizable number for the staff to
13  manage that level of severity.
14      Q    And by that -- by 20 or less, do you mean at
15  any one time there'd be about 20 or so people with that
16  level of mental illness?
17      A    Yes.
18      Q    Okay.  And was that true throughout your
19  tenure at Logan, or are you referring to a particular
20  time period?  And I'm referring to your role as
21  psychologist administrator.
22      A    During the time that the females were there,
23  yes.
24      Q    Okay.  And you said that people with that
25  severity required hospitalization.  What did you mean by



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 38

1  that?
2      A    If they self-injured, sometimes our healthcare
3  would send them out for emergency care.  If they
4  swallowed objects, they were sent out for emergency
5  care.
6      Q    Okay.  Got it.  By that you mean literally you
7  got physical -- I guess I'm distinguishing between
8  mental healthcare and physical healthcare.  You're
9  saying sort of a -- they would have a physical injury or
10 physical problem that require outside hospitalization.
11 Is that what you're saying?
12     A    Yes.
13     Q    Okay.  Do you have an understanding -- and
14 again, I'm referring here to the time that Ms. Rusher
15 was at IDOC, or at least between, let's say, when you
16 took over the role of psychologist administrator through
17 May of 2016, did the term inpatient level of care have a
18 meaning during that time?
19     A    Yes.
20     Q    What was it?
21     A    These were patients who we had identified as
22 being severely mentally ill and who would qualify for
23 inpatient level of care of -- on a number of things.  One
24 being if we were to discharge them and they did not have
25 adequate family support, those were people who we would

Page 39

1  petition the court to civilly commit them into DHS
2  system.  We also were looking at -- at some time within
3  that period, we were exploring.  And when I say "we,"
4  I'm talking the -- the department IDOC, not me
5  personally.  I'll say the department was exploring
6  whether or not we could have patients who still had time
7  to serve on their sentence if there was a way for the
8  two systems to work together so that that patient could
9  be placed in a DHS facility even though they still had
10 time to serve.  Because typically we could not get them
11 into a DHS hospital until they discharge from the care
12 of -- of IDOC.  So, to me, that's what that inpatient
13 meant during that period.
14     Q    You just mentioned two systems.  The two
15 systems you're referring to are IDOC and DHS; is that
16 right?
17     A    Yes.
18     Q    And during that time, why were you looking to
19 get -- you know, these -- I'm -- I understand the civil
20 commitment, these are people who completed their
21 sentences.  You also said, I believe, that you were
22 trying to get folks who had not completed their
23 sentences, or are looking at or considering or trying to
24 get folks who had not completed their sentences into
25 DHS; is that right?

Page 40

1      A    Yes.
2          MR. SHULTZ:  I want to object -- I want to
3      object, because it's missing a prior testimony.  She
4      clarified that it was the department that was
5      looking for that, not her personally.
6          MR. WEIL:  Perfectly good clarification.  So
7      that's -- thank you, Brandon.
8  BY MR. WEIL:
9      Q    So the department was looking at trying to get
10 some people who had time on their sentence into DHS, the
11 DHS facility, right?
12     A    That's correct.
13     Q    Do you have an understanding of why the
14 department --
15     A    Could you repeat that?  You kind of --
16     Q    Yeah.
17     A    -- fuzzed out at the end.
18     Q    Electronic interference, I think.  Do you have
19 an understanding of why the department was trying to do
20 that?
21     A    I think part of that may have been a request
22 as a result of the Rasho lawsuit, and also because of
23 some of the severity of patients that we had that we
24 wanted to -- I think the department wanted to explore if
25 that could be done, if we could send those patients to

Page 41

1  DHS for care for a period of time while they still had
2  time on the books.
3      Q    Can you talk about that a little more?  Why
4  would you want to send severely mentally-ill patients to
5  DHS as opposed to keeping them in IDOC?
6      A    Like I said, I think that was a -- part of
7  that was in response to the Rasho lawsuit, which was
8  still heavily in court at that time.  Also, because of
9  -- I think just in general, for some of those patients
10 who really did a lot of self-harming behaviors which are
11 difficult to monitor for safety and a correctional
12 system.  So it was just looking for another means of
13 stabilization for those patients, and then they could be
14 brought back to the facility, which is essentially what
15 we ended up doing with opening the Elgin facility within
16 DOC.
17         MR. WEIL:  Okay.  We've been going about an
18     hour.  Why don't we all just take a quick
19     five-minute break.
20         THE WITNESS:  Okay.
21         MR. WEIL:  That works for you, Dr. Ashley?
22         THE WITNESS:  Yes.
23         MR. WEIL:  Okay.  Great.  How about we come
24     back at, say, 11:05?
25         THE WITNESS:  Okay.  Great.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 42

1   MR. WEIL:  Okay.  Great.
2   MR. SHULTZ:  Sounds good.
3   COURT REPORTER:  Off record at 10:58.
4   (OFF THE RECORD)
5   COURT REPORTER:  We're back on record.
6   MR. WEIL:  I wanted to, before we begin ask
7   some questions again real quickly, get -- just see
8   if we can get a stipulation from defense counsel.
9   As you know, there were some very recent production
10  of photos of Logan that were taken during the tour.
11  We were asking for them for some time.  I haven't
12  had a time to complete -- you know, given how
13  recently they were produced, I haven't had time to
14  educate myself on them. And we'd like to ask Dr.
15  Ashley a couple of questions about them, but just to
16  facilitate that, I would like Bridget Geraghty,
17  who's my co-counsel in this case, to ask the
18  questions.  It would amount to two lawyers asking
19  questions, but that I -- I'm just -- I know that
20  there are some rules surrounding that, but I just
21  was hoping to get a stipulation from defense counsel
22  that that would be okay in this instance.
23  MR. SHULTZ:  I don't have an objection to it,
24  you know, since Bridget was there during the tour.
25  And the photos that Dr. Ashley reviewed were the

Page 43

1   photos that were produced from the tour, so she has
2   seen them already too, so...
3   MR. WEIL:  Great.  I appreciate it.  Any
4   problems from anyone else?  Any --
5   MS. HAYES:  No objections.
6   MR. WEIL:  Okay.  Great.
7   MR. SALSBURY:  No objections for me either.
8   Thank you.
9   MR. WEIL:  We won't do that right now, but
10  we'll do that after the next break or so.  So I
11  appreciate the accommodation.
12  BY MR. WEIL:
13  Q   Dr. Ashley, just returning to what we were
14  discussing when we went on break, we were talking about
15  inpatient level of care and what we -- and the facts
16  surrounding that.  Can you describe what it means to --
17  what does a level of care in the -- in that term, the
18  term inpatient level of care?
19  A   There are several levels of care in any
20  facility that has mental health patients.  There's the
21  outpatient level of care.  That would be all patients
22  who reside in the general population.  There will be the
23  RTU level of care, residential treatment unit.  So these
24  are patients who require a higher level of care, and
25  essentially, they reside together in a separate unit

Page 44

1   from other individuals who are in custody.  And then
2   there is the pre-inpatient level of care.  Those are the
3   ones who are being considered for inpatient level of
4   care.  And then there's crisis level of care, those who
5   are currently on crisis watch status.
6   Q   Okay.  And in terms of level of care, what
7   does that refer to in terms of the care being provided
8   at the inpatient level of care here?
9   A   Inpatient level of care, those patients are
10  seen more frequently by mental health providers.  They
11  are seen at minimum of a weekly basis by the treating
12  psychiatrist and the psychologist who is assigned to
13  that unit.  They're provided more opportunities for
14  group treatment and activities while they are on that
15  unit, and again, they are kept separate from the general
16  population.
17  Q   We want to backup real quickly and talk about
18  these -- the different levels of care you provided.  And
19  I think you said outpatient, residential treatment,
20  inpatient, and then crisis; is that right?
21  A   Yes.
22  Q   Do those mirror the levels of care that would
23  be recognized in civilian world as well, or are they
24  unique to the correction system?
25  A   Actually, they fairly closely mirror what's

Page 45

1   out in society.  I mean, for mental health treatment,
2   primarily, that is done on an outpatient basis, where
3   you go see your provider on whatever frequency as
4   established, to a residential level of care, so it's not
5   quite as intense as being in a psychiatric hospital
6   setting, but still, it's in a controlled environment
7   with like patients who are there for treatment and
8   usually live together.  And then, of course, the
9   inpatient level of care, which is the psychiatric
10  hospitalization, and then, of course, the crisis level
11  of care, which can happen with either of those three
12  levels.  So somebody can be outpatient, and for whatever
13  reason, requires a crisis level of care, crisis
14  intervention, for a period of time.  And yeah, they're
15  pretty much some mirrors what happens out in society.
16  Q   All right.  So to help this laymen walk
17  through it, the inpa -- the outpatient levels of care
18  would be something like I have appointments with the
19  psychologist or I see a psychiatrist or even, I guess
20  it's possible, a general practitioner for prescriptions,
21  and that would be, I would have appointments, and
22  otherwise go about my life on the outside world, right?
23  A   Yes.
24  Q   And then the second, the residential treatment
25  unit, is there -- what would be sort of the civilian



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1:18-cv-01101-SEM-DJQ    #181-13    Filed: 07/08/24    Page 14 of 64
The Deposition of NORINE ASHLEY, taken on October 05, 2021
46..49

Page 46

1  world analog to that?
2      A    Group homes that are -- well, therefore used
3  more frequently for youth, but there are also a few of
4  them for adults who are seriously mentally ill and
5  really are not capable, at that point, of living
6  independently or with their families, so they're within
7  a group home setting with other individuals who have
8  similar type of issues.  So that would be more
9  equivalent to the residential treatment unit level of
10 care.
11     Q    Understood.  And then the inpatient level of
12 care, would that be something like the service is
13 provided at a place like McFarland Mental Health Center?
14     A    That is correct.
15     Q    And that's a psychiatric hospital, right?
16     A    That is correct.
17     Q    Okay.  And what distinguishes an inpatient
18 level of care from a residential treatment unit level of
19 care in terms of its intensity?
20     A    Usually there is quite a bit more restriction
21 in a psychiatric hospital.  I mean, most of them are
22 locked facility, so the patient does not have the
23 ability to come and go at will.  The level of treatment
24 and interaction that they have with staff is more
25 intense that's -- than at a group level.  And typically,

Page 47

1  in that residential level, most of the engagement with
2  patients is typically on a group basis, whereas psychi
3  -- in a psychiatric hospital, it's more on an individual
4  level.  Yes, they do participate with groups, but it's
5  more heavily focused on that individual care.
6      Q    And just the last category would be crisis.
7  You mentioned that.  What is the civilian analog to that
8  -- to a crisis level of care in civilian analog?
9      A    That would be, for example, say I'd become
10 suicidal and eminently a threat to myself, so I can be
11 committed into a psychiatric ward at any hospital.
12 Typically not DHS.  Usually these are just a regular
13 hospital in the neighborhood for a period of time for
14 stabilization, and then return back to community.
15     Q    Do you know in the civilian world how long the
16 crisis level of care typically lasts?
17     A    I do not.
18     Q    Okay.  What's the basis of your knowledge for
19 what you just told him about crisis level of care and
20 how it works in a civilian world?
21     A    During my training to become a
22 psychologist, part of that, you worked several different
23 what we call practicum prior to become fully licensed,
24 and typically, we will work in situations like that
25 during that part of our training.  So for me personally,

Page 48

1  I did a diagnostic practicum at the -- at the time it
2  was called the Christian Industrial Services, I want to
3  say, and it was a -- basically it was a homeless
4  shelter, but it was run very similar to, like, a group
5  home setting where various populations were separated
6  from each other, but there was a portion that was for
7  mental health patients who needed more assistance, and
8  they lived together, participated in group or giving,
9  you know, job training, skills, that type of thing.
10 During that time, at any point, we would have patients
11 who -- or, you know, persons who live there who needed a
12 higher level of care than what we can provide.  And so
13 if it was a imminent crisis situation, they would be
14 sent to a hospital to be stabilized.  So my knowledge of
15 those different levels is practical from experience.
16     Q    Was -- before the Elgin Facility opened for
17 the DOC, was there a location within the DOC providing a
18 level of care at the level of McFarland Mental Health
19 Center?
20     A    No.
21     Q    Was there a location within the IDOC providing
22 an inpatient level of care?
23     A    What we had was what we call pre-inpatient.  So
24 we mimicked as best we could within the prison the level
25 of care that they would get if they were at Elgin.  Of

Page 49

1  course they did not have the movement capabilities or,
2  you know, the general milieu, so to speak, that Elgin
3  had because of the nature of prison and the security.
4      Q    Can you describe that a bit more?  What do you
5  mean by pre-inpatient?
6      A    I'm sorry.  Can you repeat that?
7      Q    Sure.  You said it's a pre-inpatient, and
8  you'd mimic as best you could, I guess, the services
9  that would be provided a place like McFarland; is that
10 right?
11     A    Like McFarland or at our Elgin facility.  And
12 what that entailed is, as I said, that more frequent
13 contact with your psychiatric provider, the
14 psychologist, as well as the multiple groups that are
15 offered.  So you basically engage with mental health
16 providers more often than you do at those other levels
17 of care.
18     Q    Okay.  You said you'd -- "we'd mimic it as
19 best we could."  What do you -- what did you mean by
20 that?
21     A    For example, programming or treatment at Elgin
22 -- at our Elgin facility entails that more frequent
23 contact with the psychiatrist only imports -- I believe
24 there psychiatric -- psychiatric time contacts are more
25 frequent than a week, which is what we provided as well

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1:18-cv-01101-SEM-DJQ #181-13 Filed: 07/08/24 Page 15 of 64
The Deposition of NORINE ASHLEY, taken on October 05, 2021
50..53

Page 50

1 as --
2     Q   Because I -- I think I'm asking a bad
3 question, and you're giving an answer that might -- we
4 might not be the -- either here or there. So I'm
5 referring again to the time before you -- before Elgin
6 opened up. And your answer may have been -- may have
7 understood that, but I just wanted to make that clear.
8 As I understood what you were saying, you said you --
9 doe -- well, let me back up and ask you this. Does
10 Elgin provide an inpatient level of care now?
11     A   Yes.
12     Q   Okay. And so what you're referring to as --
13 and again, I didn't mean to interrupt unnecessarily, but
14 when you're talking about pre-inpatient, that was the
15 level -- or that was the care you were able to provide
16 before Elgin opened up; is that right?
17     A   Yes.
18     Q   Okay. And -- okay. And so, with that
19 clarification, you -- it sounds like your answer was --
20 we were on the same page. So when you said, as best we
21 could, you were talking about the global -- the care you
22 were able to provide before Elgin gave the IDOC the
23 ability to provide an inpatient level care; is that
24 correct?
25     A   Yes.

Page 51

1     Q   Okay. Again, didn't mean to interrupt just
2 unnecessarily. If you would just continue just
3 describing what you meant by "as best we could," please
4 do.
5     A   Okay. In Elgin, the amount of group
6 interaction on a day-to-day basis, the activities that
7 are provided, as well as even the difference in the
8 environment, we were not able to mimic, obviously
9 because we are a correctional facility. But what we did
10 is we increase those patient contacts, we increase the
11 patient's opportunities to participate in the groups. We
12 put those patients in an area where they were kept
13 separate from the general population so that they were
14 with persons like themselves. They had a bit more
15 freedom than your typical incarcerated person, but still
16 of course, being in a locked, controlled setting. The
17 frequency of the contact with mental health staff is
18 really the key issue in terms of treatment for the pre-
19 inpatient level of care.
20     Q   Okay. And then in what ways did the pre-
21 inpatient level of care differ from an inpatient level
22 of care?
23     A   Well, here I'm speaking to, like, a DHS
24 facility, correct?
25     Q   I guess you have to tell me what you -- if a

Page 52

1 patient needs an inpatient level of care, and you're
2 providing a pre-inpatient level of care, what is the
3 difference between a pre-inpatient level of care and an
4 inpatient level of care?
5     MS. SCHWARZLOSE: Can we pause for just a
6 second? Brandon was having some technical
7 difficulties. I think he's still trying to connect
8 back to the audio, so I don't know if he can hear.
9     MR. WEIL: Absolutely, I see -- we'll just wait
10 a minute. That's fine.
11     MS. SCHWARZLOSE: Thank you so much.
12     COURT REPORTER: Do you want to go off the
13 record while we wait?
14     MR. WEIL: Sure.
15     MS. SCHWARZLOSE: Do you mind? I think he's
16 frozen.
17     MR. WEIL: Yeah. He does look very still, at
18 least.
19     (OFF THE RECORD)
20     COURT REPORTER: We're back on record.
21 BY MR. WEIL:
22     Q   Dr. Ashley, we had an interruption. I want to
23 backtrack a little bit. I just want to show you, and I
24 guess we can introduce this as an exhibit, but I think
25 it'll just be simpler as something to jog your memory.

Page 53

1 So I'm going to share my screen with you. So this is
2 just -- this is pulled up from the IDOC's website, and
3 it's the Elgin treatment center. Are you able to read
4 that, Dr. Ashley?
5     A   Yes.
6     Q   Okay. And it says, "Opened April of 2018." Do
7 you see that?
8     A   Yes.
9     Q   Okay. Does that refresh your recollection at
10 all as to when the Elgin facility opened?
11     A   Yes. It does.
12     Q   Does that sound right that it opened in April
13 of 2018?
14     A   Yes.
15     Q   All right. Returning to -- we were describing
16 when Mr. Shultz got frozen out of this -- the
17 deposition, the difference between a pre-inpatient level
18 of care and an inpatient level of care. And if you
19 would just explain that again. I don't exactly know
20 where Mr. Shultz cut out, but I -- if you just explained
21 that, then that would be helpful.
22     A   With the pre-inpatient level of care, we try
23 to mimic as best we can what -- what happened in an
24 inpatient setting until such time, if ever -- obviously,
25 it wasn't available during Ms. Rusher's time -- when



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 54

1  they would be able to go to a inpatient setting.  So
2  that entails getting more frequent contact with the
3  psychiatric provider, with the psychologist, as well as
4  with other mental health staff who would be providing
5  various groups and activities with that patient, which
6  they typically would not get in the other levels of
7  care.  There's a difference in the lev -- amount of
8  treatment that they receive.
9      Q    How did the pre-inpatient level of care differ
10  from the inpatient level of care?
11     A    In inpatient level of care -- and if you like,
12  I can refer to DHS inpatient, or were we still talking
13  about Elgin?
14     Q    It would be what you understand the level of
15  care -- you know, an inpatient level of care to mean.  So
16  it's, you know, your understanding of what that means
17  and what you were trying to mimic and then where that
18  mimicking -- you know, you were saying you're trying to
19  mimic as best you could.  And so my understanding is in
20  some senses, you fell short or were unable to completely
21  provide that level of care, so I'm just trying to
22  understand what was missing.
23     A    One of the major components of that inpatient
24  level of care versus what we were able to do at a -- at
25  Logan is the environment itself.  In a psychiatric

Page 55

1  hospital setting, which I can speak to, as I did do my
2  internship at Chicago Reed Mental Health Center, which
3  is a part of DHS, you don't have the bars.  You know,
4  you're not in prison.  You're not around a lot of other
5  persons who are in prison.  You are seen as a patient,
6  not as an inmate.  So that in and of itself has a huge
7  psychological impact on a patient.  But the other
8  difference is that there is more movement that is
9  allowed.  You're not going through the other structured
10  activities of a prison system.  For example, the way we
11  run our dietary lines, you know, we have to line up and
12  basically, like any other inmate, you are monitored by
13  security as you go to have your meal, you're given a
14  certain amount of time to enjoy that meal, and then
15  you're brought back to the facility where, depending on
16  what the schedule is for that particular unit, you're
17  either expected to be locked back in your cell or you
18  might be able to spend time in the day room or if you
19  have an activity or group that is on your schedule that
20  you can attend to.  But you don't have the level of
21  freedom that you would have in a inpatient hospital
22  setting.
23     Q    When you say there's "more movement," what do
24  you mean?
25     A    For example, in the hospital setting,

Page 56

1  patients, number one, they can enter and exit their
2  rooms at will.  You can't do that in the prison.  The
3  cell doors are locked.  If you want to be released, a
4  security officer has to unlock that cell.  And the
5  outpatient, if you want to basically participate in some
6  kind of activity off the unit, you are free to do that.
7  Obviously in prison, you cannot.  You're pretty much so
8  restricted to that unit unless it's a specific activity
9  that is taking place as part of your treatment with a
10  mental health professional or if you're being given gym
11  time, if it was available.  In the hospital, your day
12  schedule is much more filled with in -- interaction with
13  the staff in the hospital.  You're going to have that
14  contact with your psychiatrists on a more frequent
15  basis, almost on a daily basis within inpatient
16  psychiatric unit.  The psychologist is on the unit every
17  day and available to patients.  You have other various
18  levels of providers who are on that unit, those who are
19  activity therapists who can get you involved with other
20  things recreationally, that, you know, typically there
21  are different types of therapy -- art therapy -- that
22  are not available within a correctional facility.  So
23  there's just more variety and availability of treatment
24  in an inpatient setting than it is in the prison.
25     Q    So in -- when you talk about that, it sounds

Page 57

1  like you said that, you know, you're able -- in an
2  inpatient setting, you are able to enter and leave your
3  room at will, right?
4      A    Yes.
5      Q    Why is that important for providing mental
6  healthcare in an inpatient level of care?
7      A    The psychological benefit to the patient is
8  that they're not in prison.  Plain and simple.  They're
9  not locked away in prison.
10     Q    So they're not isolated from other people?
11     A    That too, yes.
12     Q    And they're not locked away in a cell?
13     A    Yes.
14     Q    And you said that you'd have to ask a guard to
15  let you out.  Were prisoners that -- people who need a
16  pre-inpatient level of care to be able to leave their
17  cells whenever they asked a guard to unlock the door?
18     A    They were able to do so on a fairly regular
19  basis, but again, they could not just, you know, walk
20  out of their cell with will.  Someone had to unlock the
21  door.  And because of the number of patients that were
22  on that unit at any given point in time, they may not
23  have been able to come out of their cell at that time.
24  Say if it was not their time for day room, they could
25  not come out of the cell --



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Kentuckiana
COURT REPORTERS

Page 58

1    Q    Okay.  So -- I'm sorry, I didn't mean
2  interrupt you.  Go ahead.
3    A    If they were not scheduled for a group, they
4  could not, you know, come out of that cell if it was not
5  their day room time.  So no, they did not have the
6  amount of freedom that a inpatient psychiatric patient
7  would have.
8    Q    So they -- if they couldn't -- if they could
9  get out -- if they had schedule for day room, they could
10 get out of there cell, right?
11   A    Yes.
12   Q    And if they had some sort of scheduled
13 activity, they could get out of their cell, correct?
14   A    Yeah.  Yes.
15   Q    Otherwise, they'd be locked in their cell?
16   A    Yes.
17   Q    And was that psychologically harmful to
18 someone who needed an inpatient level of care?
19   A    Yes.
20   Q    You mentioned that IDOC was working or
21 considering moving folks into DHS -- or certain people
22 into DHS.  Do you remember talking about that?
23   A    Yes.
24   Q    Okay.  And that was around the time that
25 Ms. Rusher was incarcerated, to the best of

Page 59

1  recollection?
2    A    I believe so.  Yes.
3    Q    And in terms of that process, what do you know
4  about how that occurred or what the -- those
5  conversations were, how that worked in terms of
6  considering moving people into DHS?
7    A    I am aware that there were negotiations taking
8  place between both the chief of mental health in IDOC as
9  well as the directors of DHS and of course the legal
10 departments of both departments were involved with those
11 discussions.  In preparation for that, we were required
12 to provide a case summary of patients who we felt could
13 benefit from being in an inpatient level of care, and
14 that's how in fact that we had knowledge that these
15 negotiations were going on, because we were asked to
16 prepare those summaries of those patients who would
17 benefit from inpatient level of care.
18   Q    Okay.  You said that there were negotiations
19 between the director.  I just -- I want to unpack some
20 of what you said just now.  So there were negotiations
21 going on between the director of mental health and DHS,
22 I believe you said?
23   A    Yes.
24   Q    So that'd be the director of mental health for
25 IDOC, right?

Page 60

1    A    Yes.
2    Q    And that was Dr. Hinton at the time, I
3  believe; is that correct?
4    A    Yes.
5    Q    Okay.  And so you learned through -- how did
6  you learn about this again?
7    A    We were requested to provide a list of those
8  patients who we felt should be pre in inpatient level of
9  care, as well as providing case summaries for those
10 patients.
11   Q    Do you have a memory of specifically how you
12 learned about that?  Like, was it an e-mail or
13 conversation, a meeting?
14   A    It was an e-mail.
15   Q    Okay.  And do you remember roughly when you
16 got that e-mail?
17   A    I can't tell you what year it was.  I know it
18 was old enough that it's not in my current e-mail file,
19 it's in the archives.  It's archived.
20   Q    (Inaudible) come from Dr. Hinton?
21   A    Yes.
22   Q    Okay.  Do you -- in substance, do you remember
23 what it said?  I mean, I'm sure you don't remember the
24 specific wording or whatever, but in substance, do you
25 remember what it said?

Page 61

1    A    Basically that, that we needed to provide him
2  with a list of those patients who should be inpatient as
3  well as the case summary, and we had a particular
4  deadline to provide that information to him.
5    Q    Okay.  And did he explain why he wanted that
6  information?
7    A    I don't think that was in the e-mail, but
8  verbally we were told.  And either that via a conference
9  call, or it may -- that information may have been passed
10 down through the regional psychologist administrator.
11   Q    What's your best recollection of what you were
12 told about the why of preparing the summaries?  Who told
13 you --
14   A    That they -- that they were discussion with
15 DHS for taking these patients while they still had time
16 to serve.
17   Q    And it sounds like you think you may have
18 learned that from Dr. Hinton; is that right?
19   A    Either from Hinton or from the psych
20 administra -- the regional psych administrator.  The
21 request for the list did come from Dr. Hinton.
22   Q    Okay.  And is the regional psych administrator
23 Dr. Sim?
24   A    Yes.
25   Q    Okay.  And so you think it would be either



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1:18-cv-01101-SEM-DJQ   #181-13   Filed: 07/08/24   Page 18 of 64
The Deposition of NORINE ASHLEY, taken on October 05, 2021
62..65

Page 62

1  Dr. Sim or Dr. Hinton who told you about why this -- you
2  needed to prepare this list?
3      A    Yes.
4      Q    How did you go about preparing the list?
5      A    I relayed this information to the Wexford site
6  services director, that we need to compile this list
7  based on those patients who would best be served in a
8  inpatient setting, and so the Wexford site services
9  director, of course, then assigned it to the
10 psychologist of those times to provide the list of names
11 as well as to work on those summaries.
12     Q    Okay.  So you were told that this -- you got
13 this directive to a prepare list and then you
14 (Inaudible) care providers themselves to gather the
15 information necessary for the list?
16     A    That is correct.
17     Q    But prior to that time, had you -- were you
18 aware of -- were there any -- to the best of your
19 knowledge, of course, were there any current IDOC
20 prisoners who'd been transferred to DHS custody in the
21 sense of folks who were still on their sentences but
22 were -- had been transferred over?
23     A    Not to my knowledge.  No.  Actually, let me
24 change that.  When the women transferred to Logan, we
25 had one patient, whose name escapes me now, who was

Page 63

1  currently in DHS, and I'm not sure if she was there as
2  -- for fitness for trial, or if she were there because
3  of our placing her there because of her level of mental
4  illness.  I found out about this later because after we
5  had received all the women, one day out of the blue, I
6  received a call from DHS saying that "We're returning
7  this patient to you," and that's how I found out about
8  that.
9      Q    Okay.  Let me see.  Were -- aside from the
10 need for the request, and obviously, you were told that
11 these -- the request for these summaries were made
12 pursuant to negotiations.  Were you told why the
13 summaries were needed in order to -- as part of the
14 negotiation?
15     A    I was not told specifically as to why the
16 summaries were needed, and I don't want to assume as the
17 reason that it was requested, but I'm sure the number of
18 patients and the type of patients may have been part of
19 that discussion.
20     Q    What do you mean by that?
21     A    In terms of -- for example, they're talking
22 about taking how many -- how many patients will DOC be
23 sending to DHS and what is -- what are the diagnoses and
24 particular mental health issues with that particular
25 patient likely wasn't part of those discussions.

Page 64

1      Q    Okay.  Were you ever involved in any of those
2  discussions?
3      A    No, I was not.
4      Q    Did you ever have any contact with folks at
5  DHS regarding this issue?
6      A    For that particular case, no.
7      Q    What do you mean that particular case?
8      A    There was a time, and this was after
9  Ms. Rusher, that we did, in fact, get a patient to DHS
10 who had not completed her sentence.
11     Q    And at that point, you did have discussions
12 with folks at DHS about that transfer?
13     A    Yes, I was working directly with the facility.
14 In fact, it was Chicago re -- Mental Health Center.  So
15 I worked directly with their director of mental health
16 in facilitating that patient transfer.
17     Q    Did anybody talk to you about what information
18 needed to be put in the summaries, or what substance
19 those summaries needed?
20     A    We would have received some broad guidelines,
21 but typically, for a psychologist, when we do a case
22 summary, we're going to include demographic information
23 bio -- you know, bio-psychosocial, as we call it, some
24 social history, some demographic history, the mental
25 health history, obviously, any particular challenges,

Page 65

1  and of course the diagnoses and what their current
2  mental status is.  All of that would be included in a
3  case summary.
4      Q    As I understand it, these summaries -- the
5  summaries you were asked to prepare are summaries that
6  you or the medical professionals believed needed to be
7  transferred.  So you weren't offering a summary of
8  someone psych -- well, this person isn't that bad, they
9  don't need to be transferred, right?  So the summaries
10 will be people who you-all had determined needed to be
11 transferred or would benefit from a transfer; is that
12 right?
13     A    That is correct.
14     Q    Okay.  And so it was folks who, in the
15 clinical opinion of the mental health providers at
16 Logan, needed a higher level of care than Logan was able
17 to provide; is that right?
18     A    That is correct.
19     Q    I want to show you a document.  We can mark
20 this as our first exhibit if I get it right.  Okay.  So
21 this may not have a Bates number, and I will obviously
22 provide it to everybody.  It's part of the exhi -- this
23 is an e-mail, looks like from -- it doesn't have a Bates
24 numbers, so this is what we gathered from an ESI
25 production.  It's an e-mail from you to Dr. Hinton with



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 66

1  an attachment dated April 10, 2014.  Are you able to
2  read that okay, Dr. Ashley?
3       (EXHIBIT 1 MARKED FOR IDENTIFICATION)
4       A    Yes.
5       Q    Okay.  I apologize.  I'm just going to take a
6  note here of what I'm introducing.  Okay.  It says, "We
7  have added several more to the inpatient since your
8  report."  Do you see that?
9       A    Yes.
10      Q    Do you have a recollection of what report him
11  -- he -- you might've been referring to there?
12      A    I don't recall what report that is, because we
13  did so many reports where we could have included this
14  information.
15      Q    Okay.  And it says, the subject is "SMI with
16  inpatient LOC."  Do you see that?
17      A    Yes.
18      Q    And that would be seriously mentally ill with
19  inpatient level of care, correct?
20      A    Yes.
21      Q    Okay.
22           COURT REPORTER:  I'm sorry.  Can we pause for a
23  moment?  Looks like Mr. Shultz has popped off again.
24           MR. WEIL:  Oh, okay.  Sure.
25           MS. SCHWARZLOSE:  Thank you.  I didn't see

Page 67

1  because we were in the share screen mode, so...
2           MR. WEIL:  Yeah.  Sure.  Let's -- we can go off
3  the record again.
4           (OFF THE RECORD)
5           COURT REPORTER:  And we are back on record.
6  BY MR. WEIL:
7       Q    All right.  So we -- Dr. Ashley, we were
8  looking at an exhibit, and I'll pull it up again.
9           MR. WEIL:  Brandon, how much did you miss?
10          MR. SHULTZ:  Only like a minute or so at the
11  end.
12          MR. WEIL:  Okay.  So had we pulled this up
13  already?
14          MR. SHULTZ:  You were just about to.
15          MR. WEIL:  Okay.  So this is just for you,
16  Brandon.  It says there's no Bates number on this,
17  we pulled it off the DSI, DSI production, which was
18  not Bates stamped.  I will send it around to counsel
19  when this is over.  It's an e-mail dated April 10,
20  2014 from Dr. Ashley to Dr. Hinton.  And we just
21  discussed the first sentence.  Dr. Ashley did not
22  remember what she meant by your report in the e-
23  mail.
24  BY MR. WEIL:
25      Q    But going down to this list, Dr. Ashley, with

Page 68

1  the attachment here, would this be -- had been a
2  spreadsheet that you prepared?  Again, I don't expect
3  you remember this particular e-mail, but just your --
4  bearing in mind your general practice.
5       A    I'm sorry.  Can you repeat that?
6       Q    Sure.  You see up here in the e-mail that
7  there is an attachment says, "SMI with inpatient LOC,"
8  and it looks like a Excel spreadsheet?
9       A    Yeah.
10      Q    Okay.  My question is, would've -- would it
11  have been your practice to prepare something like this,
12  or did you have somebody else prepare it?
13      A    Usually, I would have someone else to prepare
14  it.
15      Q    Okay.  And who would that be, typically?
16      A    That would be a combination of these Wexford
17  site services director in consultation with the treating
18  mental health providers.
19      Q    Turning down to the Excel spreadsheet, it says
20  down here, "SMIs with inpatient level of care, LOC,
21  needed in order of highest need to lowest."  Do you see
22  that?
23      A    Yes.
24      Q    I -- as I understand your role, would you have
25  been making the assessment of highest need to lowest, or

Page 69

1  would that be someone else making that assessment?
2       A    That would probably be a group assessment.
3  Again, like I said, with -- would I participate in that
4  discussion?  Yes, but that would be with the site
5  services director and the actual mental health
6  providers, which I believe, at this time, were primarily
7  cli -- licensed clinical psychologist.
8       Q    Okay.  So obviously, you know, people have to
9  compare notes to come up with this list because they
10  have to rank the various patients in terms of the care
11  they need, right?
12      A    Yes.
13      Q    Okay.  Do you have an understanding of why
14  this type of list with a ranking would be provided to
15  Dr. Hinton in 2014?
16      A    I cannot say specifically, other than it may
17  have been in conjunction with those talks that they were
18  having with DHS.
19      Q    Did Dr. Hinton or anyone else tell you about
20  how -- ever tell you about how those negotiations were
21  going?
22      A    As far as progress they were making, I do
23  believe I recall when it basically was decided that we
24  could not do it at that time.  But as far as reports on
25  how the negotiation or talks were going, no, we did not

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1:18-cv-01101-SEM-DJQ    #181-13    Filed: 07/08/24    Page 20 of 64
The Deposition of NORINE ASHLEY, taken on October 05, 2021
70..73

Page 70

1    get updates.
2        Q    When did you learn that -- and when you say
3    you could not do it, do you mean you -- IDOC could not
4    transfer mental prisoners to DHS?
5        A    Yes.
6        Q    Okay.  And do you remember when you learned
7    that?
8        A    I don't recall.
9        Q    Okay.  Do you have a ballpark date at all for
10   when you learned that?
11       A    No.  I'm sorry, I can't give you a date.
12       Q    In terms of -- setting aside the date, were
13   you told why it had been determined that you wouldn't be
14   able to make the tra -- the IDOC wouldn't be able to
15   make the transfer?
16       A    I don't recall if I was or I was not told what
17   the why, what the reason was that we could not do those
18   transfers.
19       Q    Did you ever learn, or did you ever receive
20   from anybody any information about why you couldn't do
21   it?
22       A    No, I did not, At least not during that time.
23   After the time of Ms. Rusher, we did, or at least I did,
24   this time from on -- the part of Logan, we did question
25   DOC legal if it would be possible to do that, and we

Page 71

1    were given a -- you know, a no answer.
2        Q    And were you told why?
3        A    No.
4        Q    Okay.  And I guess in terms of DOC, were you
5    just -- you were asking whether it was legally possible
6    to transfer someone over?
7        A    Yes.
8        Q    Okay.  And you were just told it was not?
9        A    That is correct.
10       Q    And you're saying that that was after the time
11   that Ms. Rusher was at IDOC?
12       A    Yes.
13       Q    Okay.  Do you have any understanding, sitting
14   here today, why those transfers were not allowed between
15   IDOC and DHS?
16       A    No.  I don't.
17       Q    In terms of that ranking that we just looked,
18   was there -- was that -- again, I don't expect you to
19   remember that particular document, but was the ranking
20   to determine the highest priority of transfer or
21   desirability of transfer to DHS?  Were you doing
22   rankings like that to figure out who had the most need
23   of transfer to an inpatient level of care?
24       A    It would have been related to the level of
25   severity of the mental illness and their mental status

Page 72

1    at that time.
2        Q    Okay.  Was -- were you involved in any other
3    discussions about how to provide an inpatient level of
4    care to those persons who had been determined to need
5    it?
6        A    As far as discussions of how to do it, no.
7    They -- basically the way IDOC is run is Chief Hinton's
8    department, in conjunction with legal, determines what
9    services we will provide.  The guidelines for how we do
10   that is indicated in the administrative directive that
11   specifies what mental health staff are required -- a
12   bare minimum to do.  We also have a standard operational
13   procedure manual that is produced by Chief -- Chief
14   Hinton's department that is sent to us, and for the most
15   part, we follow those instructions.
16       Q    I -- just to backup very quickly, just an
17   overview.  The document we looked at just now was dated
18   April 10, 2014.  Do you have -- well, before we get
19   there, let me show you -- make this Exhibit 2 --
20   unsuccessful.
21            COURT REPORTER:  Real quick, Mr. Weil.  Did you
22   not want to represent Exhibit 1 as the IDOC web page
23   earlier in this deposition?
24            MR. WEIL:  No.  That's fine.  It was just a
25   jog.  Dr. Ashley's recollection, so there's no need.

Page 73

1            COURT REPORTER:  Okay.  Perfect.  I just wanted
2    to confirm that with you.
3            MR. WEIL:  Sure.  So this will be Exhibit 2,
4    and it is Rusher v. Rauner, stamped by P.L. 02918,
5    and it runs through 029136.
6            (EXHIBIT 2 MARKED FOR IDENTIFICATION)
7            MR. SHULTZ:  What was the first number again,
8    108?
9            MR. WEIL:  Hold up there.  So 029108.
10           MR. SHULTZ:  Okay.
11           MR. WEIL:  And it's dated April 9, 2015.  So
12   almost exactly a year after the Exhibit 1 that we
13   just looked at.
14   BY MR. WEIL:
15       Q    It -- this refers to, I'll let you take as
16   long as you like to look at it, but it looks -- so let
17   me just scroll through real quickly.  So there's an e-
18   mail, I believe, with a bunch of attachments to it and
19   summarizes several individuals and each of the --
20   there's several reports attached to it.  And so I'm --
21   and -- does this -- again, I can scroll through it --
22   the whole thing, Dr. Ashley, but is this document
23   familiar to you, this e-mail with attachments?
24       A    Yes.  This would have been some of the
25   summaries that I discussed earlier that chief had



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 74

1  requested that we provide to him.
2      Q    Okay.  And these were the summaries that you
3  were preparing as part of the negotiations between DOC
4  and DHS about transferring certain prisoners over; is
5  that right?
6      A    Yes.
7      Q    And again, the document we looked at before
8  was dated, you know, a year before this one.  Is there a
9  -- wha -- in terms of the time that these negotiations
10  were going on, do you have any recollection of that?
11      A    I do not.
12      Q    Okay.  Were you being asked to provide
13  information pursuant some negotiations for a period
14  lasting more than a year?
15      A    I can't say.
16      Q    Okay.  What's your best recollection about how
17  long the negotiations went on?  Obviously, you don't --
18  I understand that you weren't privy to them, but in
19  terms of the information you were receiving about them,
20  do you have a recollection about how long it lasted?
21      A    I really don't now, and I -- I -- no, I just
22  don't know.
23      Q    Okay.  Were -- again, I'm just trying to get
24  it to your best estimate here.  What -- did they lasted
25  -- sounds like the lasted more than a month, but did

Page 75

1  they last more than a year?  The best ballpark you can,
2  if you would.
3          MR. SHULTZ:  Objection.  Answer.  She said she
4      didn't know.  Go ahead and answer if you can, Dr.
5      Ashley.
6      A    I mean, it's certainly possible that it lasted
7  more than a year, but I cannot specifically say that it
8  did last that long.
9  BY MR. WEIL:
10      Q    Okay.  Do you recall how long you were -- what
11  period of time you were being asked to provide
12  information pursuant to those negotiations?
13          MR. SHULTZ:  Objection.  Asked and answered.
14      She said she didn't know.  Go ahead and answer,
15      Dr. Ashley.
16          MR. WEIL:  Mr. --
17      A    I don't know and would not be able to tell
18  except by, you know, looking at the records.
19          MR. WEIL:  Okay.  I would ask Counsel to please
20      confine themselves to form objections, unless you're
21      going to instruct the witness not to answer.
22  BY MR. WEIL:
23      Q    So you'd have to look at records, did you say,
24  Dr. Ashley?
25      A    I said other than looking at records like

Page 76

1  this, I would not know.
2      Q    Okay.  In this e-mail here that we're looking
3  under Exhibit 2, it says, "I have four more that require
4  a few tweaks and hope to get them to you before the end
5  of shift on Monday the latest."  Do you see that?
6      A    Yes.
7      Q    Okay.  And do you -- were the tweaks that you
8  were talking about, were you editing these summaries as
9  they were being sent to Dr. Hinton and Dr. Sim?
10      A    I did not -- well, yes, I guess you could say
11  I proof read them, and if I saw a problem, I would
12  return it to the provider and have them to make those
13  changes.
14      Q    The next sentence is -- says, "We have three
15  medical records staff assistance working on the MARs
16  project, and I have located a super scanner that was in
17  our record department."  Do you see that?
18      A    Yes.
19      Q    Do you know what you're referring to there?
20      A    Yes.  We were -- in addition to providing the
21  summaries, we were providing patient records as well, so
22  they were pretty substantial.  And our process for
23  sending those electronically, because they did not want
24  us to send paper record, is to scan them to a PDF file
25  and have those sent to him.  And we were having

Page 77

1  difficulty just because of the sheer volume of getting
2  those records sent over, do that was my comment on
3  locating the super scanner.
4      Q    This MARs project, was it part of the -- was
5  it being done in conjunction with the report summaries
6  that are being attached here?
7      A    I believe so.  Yes.
8      Q    So it was part of gathering records to provide
9  to DHS as part of these negotiations; is that right?
10      A    Yes.
11      Q    Did you ever receive any information from Dr.
12  Hinton or anybody else that DHS either basically
13  disagreed with the clinical assessment that these
14  patients needed an inpatient level of care or wanted
15  more medical information about these patients?
16      A    No, I do not recall ever getting any comments
17  back from -- relayed back from DHS in terms of the
18  quality of the summaries that were sent.
19      Q    Okay.  The last sentence here -- well, it
20  says, "We may be in better shape than I thought," and I
21  assume that refers to the MARs project; is that right?
22      A    Yes.
23      Q    Okay.  And then you have this line, "rumor has
24  it we're having a visitor."  Any idea of what you were
25  referring to there?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 78

1    A    Likely I was referring to the director
2  visiting Logan.
3    Q    Okay.  The -- and that'd be the director of
4  the IDOC?
5    A    Yes.
6    Q    Mark this as Exhibit 3.  And this is a e-mail
7  dated April 10, 2015, and it is Bates number -- stamped
8  by PL Rusher v. Rauner, 040803 through 040819.  And Dr.
9  Ashley, this looks to be somewhat similar to the e-mail
10 we just reviewed.  Oh, I'm sorry.  I did not -- I
11 haven't shared the screen with you.  My apologies.  Okay.
12 So here's Exhibit 3, I just described it.  And it says,
13 "Here are four more summaries."  Do you see that?
14          (EXHIBIT 3 MARKED FOR IDENTIFICATION)
15   A    Yes.
16   Q    I will scroll through really quickly.  You see
17 the attachments as their titles -- titled -- it's -- and
18 the e-mail contains a variety of attachments.  And so
19 does this look to you -- and I'm happy to scroll through
20 as much as you need.  Does this look to you like the
21 summaries we just discussed in that April 9th e-mail?
22   A    Yes.
23   Q    Okay.  And so were these summaries being done
24 for the same purpose as the summaries in the April 9th
25 e-mail to assist with the DHS negotiations?

Page 79

1    A    Yes.
2    Q    Okay.  And again, as I understand your role in
3  preparing these summaries, it would have been to --
4  after you've received the information that these
5  summaries were needed, you would've contacted the folks
6  within the Wexford chain of command to get them done, in
7  that chain of command and we discussed earlier?
8    A    Yes.
9    Q    Okay.  One of these summaries contains the
10 summary for Ms. Rusher, and it begins on Bates 40813,
11 Dr. Ashley, you -- so they reviewed a summary for Ms.
12 Rusher in preparation for this deposition.  It -- taking
13 a look at the summary, and I'm going to show you a much
14 as you possibly need.  Is this the summary you reviewed?
15   A    Yes.
16   Q    Okay.  And so this summary, having been
17 prepared -- well, this summary looks like it was
18 prepared -- again, just looking at the e-mail here, it
19 was prepared in April of 2015, right?
20   A    Yes.
21   Q    I believe, when you testified earlier today,
22 you said that, you know, there was something called an
23 intake summary, or something along those lines, that
24 would've been prepared when Ms. Rusher entered Logan in
25 2013; is that right?

Page 80

1    A    That would be her mental health assessment.
2    Q    Okay.  Is that different than the summary that
3  -- and again, we'll get back to that document, but the
4  summary here?
5    A    Yes.
6    Q    Okay.  So you read this summary as well as the
7  mental health assessment prepared for Ms. Rusher in
8  2018?
9    A    Yes.  I'm sorry, yes.
10   Q    Okay.  And in terms of your role in preparing
11 these reports, to return to that, you would contact the
12 Wexford chain of command that we discussed earlier, and
13 these -- and you understood that they were preparing
14 these summaries?
15   A    Yes.
16   Q    Okay.  And then, what was your role after the
17 summaries were prepared?  We saw the e-mail a moment ago
18 about needing to tweak them, and I said -- I think that
19 you said that you might offer edits.  But can you just
20 describe your role a bit in terms of going over these
21 summaries or what have you?
22   A    Yeah.  Basically, I reviewed the summaries.  If
23 there were any issues with it, I would return those to
24 the provider to make corrections; typographical errors,
25 omissions from the report that say if something did not

Page 81

1  flow, that did not -- was not completed and have them to
2  make those corrections.  And basically, I was the
3  repositor for gathering all the data and then sending
4  them onto Chief Hinton.
5    Q    Were you reviewing the reports at all to
6  assess whether the clinical assessment was correct in
7  the sense of, if there were making a clinical assessment
8  of what have you, that it was supported by the narrative
9  that they provided?
10   A    No, that was not part of that reason I was
11 reviewing them, no.
12   Q    Okay.  Did you see any reports that you
13 disagreed with or somebody or summary --
14   A    I don't -- no.  I don't recall seeing any I
15 disagree with.
16   Q    Okay.  But -- this is Mr. Rusher summary, and
17 again, we're on page 40813, and it has this "Purpose of
18 summary report."  Do you see that?
19   A    Yes.
20   Q    Do you understand -- what was the -- what was
21 the purpose of this summary at the beginning with the
22 bullets underneath it?
23   A    Basically for inpatient required -- requiring
24 treatment in an inpatient facility.
25   Q    I'm asking a bad question.  Was this purpose

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1:18-cv-01101-SEM-DJQ    #181-13    Filed: 07/08/24    Page 23 of 64
The Deposition of NORINE ASHLEY, taken on October 05, 2021
82..85

Page 82

1    line, was this to provide an executive summary of sorts
2    for the narrative in the report?
3        A    Yes.
4        Q    Okay.  And so the two lines in this, I'll just
5    call it an executive summary, are that "the severity of
6    this inmate's mental illness demands a structure
7    treatment in an inpatient facility that can offer
8    consents in specialized care."  Do you see that?
9        A    Yes.
10       Q    And the next line is, "The Logan Correctional
11   Center.  It's not equipped to provide the psychiatric
12   care and environment that this individual needs."  Do
13   you see that?
14       A    Yes.
15       Q    Did you understand that -- well, did you agree
16   with this assessment?
17       A    I do.
18       Q    Okay.  And why is that?
19       A    In general, persons who are severely mentally
20   ill should be -- my personal and clinical opinion is
21   that they should be in a psychiatric facility, not
22   prison, period, and that is a position that I've held
23   ever since I've been a practicing psychologist in
24   general.  The problem being, of course, that IDOC is
25   only required to do what we can with those persons who

Page 83

1    are charged and placed in our care.  We don't make the
2    decision on how the judge decides to place these
3    individuals.  The judge has the ability to place them in
4    DHS, but that's their choice to send them to prison
5    instead.
6        Q    What do you mean by that, that the judge has
7    the ability to place an individual in DHS.  Are you
8    referring to an assessment that they're not guilty by
9    reason of insanity?
10       A    Yes.
11       Q    Okay.  Did you agree with this assessment
12   about Ms. Rusher in particular, that she -- the Logan
13   Correctional Center was not equipped to provide the
14   psychiatric care that Ms. Rusher needed?
15       A    Yes.
16       Q    Okay.  Were you surprised when you learned
17   that DHS would not be taking Ms. Rusher?
18       A    I was not.  No.
19       Q    Why not?
20       A    Just in terms of the -- having -- as I said, I
21   did an internship in DHS for my psychology licensure,
22   and knowing that the State of Illinois had closed
23   multiple psychiatric facilities, I was aware of the fact
24   that DHS did not have the number of psychiatric beds
25   that they should have had in order to accept all of the

Page 84

1    patients from DOC that required that level of care.
2        Q    I want to show you what I'll mark as Exhibit
3    4.  Bear with me one minute.  This is March 25, 2014,
4    e-mail from director Hinton to you, and it is Bates
5    marked, stamped by PL Rusher v. Rauner, 28802 through
6    28805.  All right.  I want to have you -- I'm assuming,
7    to just start off, Dr. Ashley, that you don't remember
8    receiving this e-mail; is that right?
9        (EXHIBIT 4 MARKED FOR IDENTIFICATION)
10       A    Do I, by memory, remember seeing it?  Yeah.
11   I'm sure I did.
12       Q    But I'm just asking, do you -- well, will
13   patient -- I'm just going to scroll through it, but I'm
14   assuming you don't remember this is an e-mail with an
15   attachment.  You can see there's an attachment says,
16   "DHS consult visit 5-23-2013"?
17       A    Yes.
18       Q    Okay.  And I'm just asking -- well, let me
19   just ask you, do you remember receiving this e-mail?
20       A    Yes.
21       Q    You do remember seeing this e-mail?
22       A    Yes.
23       Q    Okay.  What do you remember about it?
24       A    We were going to be having a -- or either we
25   were going to or we had had a consultation with DHS on

Page 85

1    the care of a patient.  And once we have those
2    consultation calls, there is a record of that call and
3    the consultation that is kept.  So what Dr. Hinton was
4    doing was providing me an example of how those
5    consultations were written up after the calls.
6        Q    Okay.  One moment.  And was that because you
7    had recently come on as administrator and he was
8    providing you just information on how to do this in the
9    future or what -- how the format should go; is that
10   correct?
11       A    Yes.
12       Q    Okay.  All right.  So I apologize.  I just
13   want to make sure the right document.  Returning to this
14   document or this e-mail, do you recall the substance of
15   this consultation in terms of having read it at the
16   time?
17       A    I do not, because this was not a patient at
18   Logan.  This was a Dixon patient, so it was a
19   consultation that Dixon Correctional Center, which is
20   the -- and still is the higher level of care for
21   mentally ill for the male division.  So evidently, Dixon
22   had had a facility tour with DHS, and there were certain
23   parties who attended that, and this was documentation of
24   that visit and consultation and it took place.  So no,
25   this was not have been a patient that Logan would have



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
**502.584.0119 Fax**
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 86

1  had any connection with.
2      Q    Right.  I don't see you on this tour list, so
3  I expected you would not -- you would not have any --
4  had any reason to attend this, right?
5      A    Right.  This was just an example for me to
6  follow when we had a consultation with DHS.
7      Q    Okay.  And that was my next question.  Did you
8  have consultations of DHS where they would have a tour
9  of facility or talked to a particular -- about a
10 particular IDOC prisoner?
11     A    I don't recall on having a tour with DHS, but
12 we did have a series of telephone consultations with DHS
13 on some patients.
14     Q    Okay.  Maybe I'm asking it -- why -- I guess
15 what would be the purpose of sending you this sort of a
16 summary, if you know?
17     A    Again, as a template and an example of how I
18 should complete consultation documentation.
19     Q    I'm assuming from that answer that there were,
20 in fact, consultations with DHS folks that you would
21 need to summarize in your role as an administrator?
22     A    Yes.
23     Q    Okay.  And so it sounds like you do recall
24 consultations of that nature occurring at Logan during
25 your time as an administrator?

Page 87

1      A    Yes.
2      Q    Okay.  How many about would you say -- do you
3  recall occurring with DHS folks?
4      A    Probably no more than five or six.
5      Q    Okay.  And what would be the occasion for
6  consultations of that nature?
7      A    Usually, it would've been in a situation where
8  we had a patient whose care -- or whose needs were such
9  that our current providers needed additional input as
10 far as what we should be doing to best care for that
11 patient.
12     Q    Do you recall any names of any patients who
13 had consults like that, consults about them like that?
14     A    What literally comes to mind were a couple of
15 patients who had severe eating disorders that we
16 definitely need a consultation on.
17     Q    Is dean one of those, D-E-A-N?
18     A    It could have been, yes.
19     Q    Okay.  Anyone else?
20     A    Not that I recall.  No.
21     Q    I want to just give you a chance to read over
22 this real quickly, and I'll have a couple of questions.
23 So it's not detail, I think just familiarize yourself
24 with the basic format, and then I'll ask you some
25 questions.  And obviously, if you need more context, you

Page 88

1  can go back.  So if you want to just, you know, you can
2  skim over it, and then I'll scroll down on the page as
3  you need.  So just let me know when you're ready to move
4  down.
5      A    You can scroll down.  You can scroll.
6      Q    Okay.  You're ready to go down a bit more,
7  Dr. Ashley?
8      A    Yes.
9      Q    Okay.  You just tell me.  I'm waiting on you,
10 so you just tell me when you're ready to move down.
11     A    Your timing was good that time, so...
12     Q    Okay.  Great.
13     A    You can scroll.
14     Q    Okay.  Ready to go down further, Dr. Ashley?
15     A    Yes, you can scroll.
16     Q    And this is the end of the document.  I'll
17 just tell you.
18     A    Okay.  We're good.
19     Q    Okay.  There was a couple of questions I want
20 to ask.  One, I see that they're discussing this
21 patient, Mr. Davilla, right?  Davilla, correct?
22     A    Davilla.
23     Q    Yeah.  And is -- just looking at this and I'm
24 assuming you don't have any personal knowledge of
25 Mr. Davilla?

Page 89

1      A    I do not, but he is well-known throughout DOC
2  system.
3      Q    Okay.  As I don't have any knowledge.  I read
4  this as Mr. Davilla was -- is not eligible to be
5  released until 2037.  Do you see that there?
6      A    Yes.
7      Q    Okay.  So it sounds like to me that this
8  memo's reflecting a transfer or discussions of possibly
9  transferring a DOC inmate to DHS custody who would
10 essentially remain a convicted prisoner or -- he's not
11 being discharged upon release from DOC custody,
12 essentially, not being transferred to DHS upon release
13 from DOC custody, right?
14     A    Yes.
15     Q    So -- and to clean that up, this is a just
16 discussions of transferring of a current prisoner to DHS
17 custody, right?
18     A    Yes.
19     Q    Did you participate in meetings like this with
20 DHS for these similar factors that we discussed for any
21 patient?
22     A    Not to this extent, no.
23     Q    Okay.  You saw at several points that DHS in
24 this -- as reflected in this memorandum, express
25 concerns about the cost of housing someone like



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 90

1  Mr. Davilla?
2      A    Yes.
3      Q    Was that an ex -- a concern that had ever been
4  expressed to you about people who were being discussed
5  for transfer to DHS?
6      A    No.
7      Q    Okay.  You said a few moments ago that it was
8  your understanding that, based on your experience, that
9  DHS had limited capacity based on the closure of
10 different mental health facilities, right?
11     A    Yes.
12     Q    Did you understand that to be part of the
13 reason that the various Logan inmates who were eligible
14 for -- or who were in part of negotiations for transfer
15 were not transferred to DHS?
16     A    No.  I said that, basically, I was not
17 surprised that DHS could not take them all because of
18 those closures.
19     Q    Okay.  And you were not surprised because of
20 your experience with DHS losing capacity as a result of
21 the closures?
22     A    Yes.  In fact, the reason that we have our
23 current Elgin facility, that's using part of DHS Elgin,
24 part that had been closed, that IDOC was able to
25 basically use -- refabricate and use for our higher

Page 91

1  level of care.
2      Q    Okay.  Did you ever learn about -- there are a
3  bunch of other concerns discussed in that exhibit.  So I
4  believe they said they just have a hard time managing
5  Dr. Davilla -- or Mr. Davilla.  Did you see that?
6      A    Yes.
7      Q    Was that a concern that was ever express to
8  you about managing a IDOC inmate who might be
9  transferred to DHS?
10     A    Usually, when we are discussing patients who
11 are going to be civilly committed, they do ask us about
12 -- definitely not to the degree of Mr. Davilla in his
13 self-injury as behaviors, but usually they will ask us
14 about a history of violence with those patients.  And
15 not that they would refuse them, because, of course, by
16 court order, they don't have that option during the
17 civil commitment, but usually they do want to get that
18 history.
19     MR. WEIL:  Okay.  Dr. Ashley, I'm going to take
20 a break here.  It may be time for Ms. Geraghty to
21 ask you some questions, but I'm just going to take a
22 quick break, if we all could, and then we may be
23 close to done here.
24     THE WITNESS:  Okay.
25     MR. WEIL:  Okay.  So just go off the record, if

Page 92

1  we could.
2      COURT REPORTER:  Sure.  Off record.
3      (OFF THE RECORD)
4      COURT REPORTER:  We're back on record.
5  BY MR. WEIL:
6      Q    Dr. Ashley, you'll be happy to learn, I don't
7  have a whole lot more questions for you.  Bridget
8  Geraghty will momentarily.  I want to return to the
9  document we were just reviewing.  This is, again, the
10 Exhibit 4, the discussion of Mr. Davilla.  And towards
11 the beginning -- excuse me, it -- this is on page 803.
12 It talks about placing Mr. Davilla in a nursing home.  Do
13 you see that, about the possibility --
14     A    Yes.
15     Q    -- of doing that?
16     A    Yes.
17     Q    Do you understand what that refers to, given
18 that Mr. Davilla still has until 2037 of serving a
19 sentence?
20     A    In Illinois, and I'm -- I'm not sure if this
21 is specifically what they're referring to, but in
22 Illinois, there have been problems in past that have
23 been well publicized where mental health patients were
24 placed in nursing homes, usually with elderly patients,
25 and who have, in fact, harmed those patients.  So I'm --

Page 93

1  I'm not sure if that's what they're referring to here.
2      Q    Right.
3      A    But certainly that would bring in the legal
4  issues of placing persons who are incarcerated in a
5  nursing home.
6      Q    Okay.  So in terms of -- I understand what
7  you're saying, that there would obviously be practical
8  problems, but was that an option on the table for DHS or
9  -- I'm sorry -- IDOC prisoners to be placed in a nursing
10 home and try -- understanding that a particular prisoner
11 might pose some problems?
12     MR. SHULTZ:  Objection.  Calls for speculation.
13     Go ahead and answer.
14     A    Logan -- and of course this was prior to
15 Ms. Rusher's time, when we had male individuals
16 incarcerated there.  We did, at discharge planning place
17 several patients medically, not per -- from a mental
18 health perspective, but medically into a nursing home
19 upon discharge, and these were individuals who were so
20 physically incapacitated that, you know, they really
21 didn't pose much of a threat of harm to other patients
22 there.
23     Q    I understand what you're saying, Dr. Ashley.
24 The context here is that Dr. -- Mr. Davilla has decades
25 left to serve on a sentence, and so I'm trying to



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 94

1   understand, if you know, why there'd be discussion of
2   placing a current IDOC prisoner in nursing home and
3   whether that was a possibility.
4       A   From the portion that you have highlighted, I
5   think it -- it's pretty clear what they're talking about
6   is because of A, the legal issues that are involved as
7   well as because of the nature of his injuries.  I mean,
8   he would not be someone -- and I -- I believe that DHS
9   here highlighted this because of the nature of his
10  injuries.  Mr. Davilla so severely damages himself that
11  strictly a psychiatric inpatient facility would be very
12  challenged from a medical perspective with dealing with
13  him, so that leaves the other alternative to think about
14  is a nursing home, which typically is more equipped
15  medically to deal with issues.
16      Q   Assuming a prisoner was, I guess, physically
17  able to be in a nursing home where they wouldn't --
18  particularly didn't pose a particular threat to folks,
19  was that an option for transferring out current
20  prisoners in need, to the extent you know?
21      A   Not that I'm aware of, no.
22      Q   Outside of transferring a current prisoner
23  like Mr. Davilla to DHS, was there anywhere else that
24  you're aware of that they could be transferred?
25      A   No.

Page 95

1       Q   Okay.  If Mr. Davilla was hospitalized
2   multiple times -- and I'm talking about a physical, I
3   guess a non-mental health hospital, correct, for various
4   medical issues?
5       A   Yes.
6       Q   Okay.  And during that time, obviously,
7   Mr. Davilla is not in the prison, he's at an outside
8   facility, right?
9       A   Yes.
10      Q   Okay.  And the question I'm asking refers to
11  mental healthcare in an outside facility.  Is there
12  other outside facilities that IDOC prisoners could be
13  transferred to or sent to in the same way for mental
14  healthcare?
15      A   No.
16      Q   Okay.  Is that something that you were told or
17  just -- how do you know that?
18      A   Systemically in general.  We have psychiatric
19  hospitals and we have, you know, medical hospitals.
20  Those are our resources for mentally ill patients.  Other
21  than, you know, stepped down, lower level of care
22  facilities that are more like a residential type
23  setting.
24      Q   We talked about -- briefly about psychiatric
25  wings of general hospitals.  Do you remember that?

Page 96

1       A   Yes.
2       Q   Is that a place that a IDOC prisoner could be
3   transferred to if they were in a crisis -- a mental
4   health crisis?
5       A   No.
6       Q   Do you have an understanding of why not?
7       A   Unless there is a physical component that's
8   involved -- for example, say that patient seriously
9   injured themselves, they're going to be taken to the
10  hospital to deal with the physical injury, and the
11  psychiatric providers in that hospital can, and do on
12  some occasions get involved with their care while they
13  are there, but they are not placed into the hospital
14  psychiatric unit.  No.
15      Q   Is there a reason for that, that you're aware
16  of?
17      A   Not that I'm aware of, no.
18      Q   Okay.  All right.  I believe we're on Exhibit
19  5, and this is an e-mail dated June 30, 2015.  And it is
20  Bates numbered, stamped by PL Rusher v. Rauner,
21  042015219.  I'll share it with you.  All right.  So Dr.
22  Ashley, I'm -- I'm going to scroll through as much of
23  this e-mail as you like.  So let me ask you at the
24  outset whether you recognize this document just as we're
25  starting off here on the first --

Page 97

1       A   Yeah.
2       Q   -- page.  You do recognize it?
3           (EXHIBIT 5 MARKED FOR IDENTIFICATION)
4       A   Yeah.
5       Q   Do you recall what this communication was
6   about?
7       A   I would have to read through it to refresh my
8   memory.
9       Q   Okay.  We can do that.  It's an e-mail from
10  you to Dr. Hinton, right?
11      A   Yes.
12      Q   And the subject is "Inpatient."  Do you see
13  that?
14      A   Yes.
15      Q   And then there's a "Logan Database Study" as
16  an attachment.  Do you see that?
17      A   Yes.
18      Q   Do you have any recollection of what the Logan
19  database study was?
20      A   I could speculate, but no, I -- I won't.  No,
21  I don't recall specifically at this point.
22      Q   All right.  You said you recall this e-mail,
23  and so let's -- let me -- how about we do this?  We'll
24  start -- I believe the way these things should work is
25  you start at the bottom --



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 98

1    A    Yes.
2    Q    -- and work your way up chronologically.  So
3  we're starting on page 219 to 2019.  It's an e-mail from
4  you to Dr. Hinton, right?  Do you see that?
5    A    Yes.
6    Q    It says, "Inpatient."
7    A    Uh-huh.
8    Q    Do you have an understanding of what -- why
9  some names on this table on the June 12 e-mail are in
10  bold and some are not?
11    A    No, I really don't recall why some would have
12  been bold.
13    Q    Okay.  We'll just scroll up now through the
14  e-mail and just let me know when you're ready for me to
15  scroll up.
16    A    Okay.  You could scroll.  You could scroll.
17  Okay.
18    Q    So did you -- were you be able to read that?
19  I'm sorry.
20    A    Yes.  You can scroll.
21    Q    Okay.  So now we're up here at this e-mail on
22  June 30th.
23    A    Okay.
24    Q    So why don't you go ahead?  I can't get it all
25  in one page, but just go ahead and take a minute to read

Page 99

1  it.  I just have a few questions.  Do you want me to
2  move down a bit?
3    A    Okay.  You can stop there.
4    Q    Yeah.
5    A    Okay.
6    Q    Okay.  You said -- so do you remember writing
7  this e-mail?
8    A    I don't specifically remember writing it.  I
9  mean, obviously, I did, but from the content, it seems
10  that I'm addressing quite a few issues or concerns that
11  I was having at the time.
12    Q    Can you tell me more about that?
13    A    Particularly we were talking about issues
14  which -- it looks like this is at the beginning of -- of
15  establishing the form on RTU, having the placement for
16  that.  Looks like I was also addressing the fact that
17  there must have been a request for doing psychological
18  testing, because I mentioned not having access to the
19  assessments as well as the time commitment for a
20  psychologist to complete those.  But then I'm also
21  discussing other challenges, shall we say, problems that
22  I was having, particularly with the female population
23  and the level of mental illness that we were managing at
24  Logan at the time.
25    Q    In your first line there talking to Dr.

Page 100

1  Hinton, you say, "I want to give you the bulk of the
2  findings."  Do you see that?
3    A    Yes.
4    Q    Do you remember what sort of inquiry you were
5  making and what sort of findings you were making?  I
6  read that as referring to some sort of inquiry you were
7  asked to make, but you tell me what -- just to add some
8  context to this.
9    A    At the very bottom of this e-mail chain, it
10  seems that Dr. Hinton was questioning a report that we
11  had submitted to him where there was a difference in
12  maybe the number of persons.  So that's kind of where
13  this thing started.  And I'm not sure if the database
14  study was referring to that or not, that there was a
15  difference in the number of patients that we were
16  showing as seriously mentally ill or not, because he was
17  asking me to take a look at that.
18    Q    Do you remember why he was asking you to take
19  a look at that?
20    A    Usually he requested notes if there was any
21  drastic change in the numbers reported.  Logan, outside
22  of Dixon, was kind of unique in that we had a very high
23  number of individuals who were on the mental health
24  caseload.  At any point in time, as much as 60 percent
25  of the pa -- of the general population was on the mental

Page 101

1  health caseload, and of that 60 percent, probably a good
2  35 to 40 percent of them were in the classification of
3  seriously mentally ill.  Most IDOC facilities had
4  nowhere near that amount of -- of mentally ill patients
5  concentrated in one facility.  So when we did our
6  reports on a monthly basis that would basically state
7  how many patients were on the mental health caseload,
8  how many of those were seriously mentally ill, how many
9  of those were in or should be in the residential
10  treatment unit, if there was a drastic change from month
11  to month in those totals, Dr. Hinton would usually
12  communicate with me and -- and ask me to take a second
13  look at those to explain any what he called
14  irregularities because there was such a drastic shift.
15  And as I was explaining, depending on the number of
16  persons that were either transferred to the minimum
17  female facility, the number of pa -- persons that were
18  discharged or were paroled, that would be typically the
19  difference in those totals.
20    Q    Okay.  And so, if I understand you correctly,
21  you would submit a report about just statistics on
22  mentally ill people at Logan, and Director Hinton, as
23  you understand it, was asking you to explain the reasons
24  for such a high number?
25    A    The difference in the numbers from one month



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1:18-cv-01101-SEM-DJQ   #181-13   Filed: 07/08/24   Page 28 of 64
The Deposition of NORINE ASHLEY, taken on October 05, 2021
102..105

Page 102

1  to another month.

2      Q   Reading this e-mail to Dr. Hinton, it doesn't
3  look like your -- that the concern was some sort of a
4  clerical error more, why is it happening on the ground;
5  is that right?

6      A   Right.  And then it was not a clerical error,
7  it would've been a difference in the number of patients
8  that we were reporting on.

9      Q   Okay.  And so essentially why were so many
10 people mentally ill at the Logan?  Is that the summary?

11     A   An example would be, okay, in June, I reported
12 that we had 750 patients on the mental health caseload,
13 and in July, I report that we're down to 525.  Yeah.
14 He's going to question that drastic of a change in the
15 reporting number.  So that's more similar to what he was
16 questioning.

17     Q   Turning to the first bullet here, it says,
18 "One of the major concerns and challenges."  Do you see
19 that?  What --

20     A   Yes.

21     Q   Okay.  What -- well, you know what?  Let me
22 get to the bottom real quick, because that might be the
23 best.  It says, "These are the primary concerns and
24 challenges."  Do you see that?

25     A   Yes.

Page 103

1      Q   And what are you talking -- like what is being
2  challenged?  Is it your ability to provide mental
3  healthcare or something else?

4      A   The ability to provide mental healthcare.

5      Q   Okay.  And appropriate mental healthcare for
6  the -- people under your care, right?

7      A   Yes.

8      Q   Okay.  And so the bullets you have, the
9  numbered paragraphs you've listed here sort of detail
10 the challenges to providing mental healthcare to
11 patients at Logan, right?

12     Q   Okay.  And so the first concern you express is
13     Q   Okay.  And so the first concern you express is
14 the lack of adequate space to provide services; is that
15 right?

16     A   Yes.

17     Q   Can you explain what you're referring to
18 there?

19     A   Logan basically was challenged to have places
20 to do individual therapy.  I mean, we had -- our mental
21 health staff grew, as I stated, exponentially.  The
22 majority of what mental health staff do with our
23 patients is on a one-to-one basis, and we did not have
24 the office space available for a lot of that to take
25 place.  We also provided a lot of group services, but

Page 104

1  again, it was a challenge in finding space that was
2  available to provide those groups.  And so, really,
3  space was a huge problem that we had at Logan for the
4  amount of services that we needed to provide.  Now, at
5  some point, and it looks like I'm referring to this
6  here, there was additional construction that was done at
7  Logan to help address some of those concerns.  There was
8  an additional housing unit that was created in a space
9  that used to be a part of our visitors' centers to
10 create additional cells for crisis placement, and also,
11 that was where we housed our patients who we determined
12 were pre inpatient level of care.  So that did give us
13 some space.  We also had construction on an existing
14 housing unit that we turned into the RTU specifically.
15 So we had two wings of a housing unit that were greatly
16 updated to accommodate the RTU.  But still, just because
17 the sheer number of patients that we have on the mental
18 health caseload at Logan, even with those enhancements,
19 it was still a challenge to have the necessary space to
20 do treatment.  And at this point in time, those spaces
21 did not exist.

22     Q   As I understand it, none of the -- what you
23 just talked about had to do with the Elgin facility; is
24 that right?  This was all stuff happening at Logan
25 itself?

Page 105

1      A   This is Logan itself.  That's correct.

2      Q   And so then this -- the construction you're
3  talking about didn't have to do with providing an
4  inpatient level of care, it had providing a residential
5  treatment unit level of care; is that right?

6      A   Yes.

7      Q   And in terms of spaces -- well, you know, Ms.
8  Geraghty, I think, was going to show you a couple of
9  floor plans, but essentially, Logan just wasn't set up to
10 provide, to tap -- to provide settings for a lot of
11 mental healthcare you wanted to provide to occur; is
12 that right?

13     A   That is correct.

14     Q   Number 4 here head deals with staffing levels.
15 Do you see that?

16     A   Yes.

17     Q   What was the problem with staffing levels that
18 you were writing about?

19     A   We were supposed to have, I'm thinking 25, if
20 I'm remembering correctly, and we would have to refer
21 back to some of the -- the settlement agreement with
22 Rasho.  And I believe the number was 25 that had been
23 established for mental health professionals, and that
24 was not counting the number of psychologists and
25 psychiatrists that were deemed to be necessary for Logan



Kentuckiana Reporters                          502.589.2273 Phone
30 South Wacker Drive, 22nd Floor                502.584.0119 Fax
Chicago, Illinois 60606               schedule@kentuckianareporters.com
                                       www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 106

1  with the number of patients that we had.  I don't
2  believe during the -- that I can recall during the time
3  that I was there that we ever met that number of having
4  that mini mental health professionals at any one period
5  of time.  We came close a couple of times, but then, for
6  various reasons, we would lose quite a few staff.
7  Sometimes at one point in time.  We actually had --
8  because of Illinois budgeting problems, we benefited
9  from gaining a lot of mental health professionals who
10  had been working in the community, who were without a
11  job because those places were shut down, because the
12  state was not paying their fees.  So we benefited from
13  that.  But once things started loosening up again, we
14  also lost those staff.  They returned back to providing
15  services back out in the community and left corrections.
16  So like I said, never at any point in time have we been
17  fully staffed at Logan.
18      Q    I'll represent to you that the settlement in
19  Rasho occurred in May of 2016.  And so this e-mail is
20  from June of 2015.  Would that information -- do you
21  have an understanding -- you talked about the standing
22  -- the staffing level was pursuant -- you said, "The
23  staffing level we're supposed to have pursuant to the
24  Rasho settlement," but before that, do you have an
25  understanding of what the concerns were with staffing

Page 107

1  levels?
2      A    Even then, before that level that was set by
3  Rasho, we still did not have adequate staffing for the
4  number of patients that we had at Logan.
5      Q    How did you measure adequate staffing?  What
6  staffing was adequate?
7      A    For the requirements that IDOC wanted us to
8  fulfill in terms of mental healthcare, individual
9  contacts, treatment planning, treatment team meetings,
10  crisis care.  Obviously the larger your patient
11  caseload, the more mental health providers you need.
12  Logan's caseload was always much larger than the number
13  of providers we had to adequately care for them.
14      Q    Do you -- you're referring in this paragraph 4
15  to some very practical concerns.  I mean, they -- the --
16  it's essentially a very practical concern about managing
17  female population.  Do you see that?
18      A    Uh-huh.
19      Q    I guess my question about staffing levels was
20  more referring to metrics.  You were -- part of your
21  responsibility involved overseeing the contract with
22  Wexford, right?
23      A    Yes.
24      Q    Was there a level of staffing in the contract
25  called for that wasn't being provided for for whatever

Page 108

1  reason?
2      A    I don't recall.  Again, even with that, I -- I
3  do not recall Wexford ever having -- Logan ever having
4  the full compliment of staff that were contracted for.
5      Q    Did -- and just to revisit your role and
6  oversight of the Wexford contract, was part of your role
7  to concern yourself with a level of staffing called for
8  in the contract versus the level of staffing that you
9  had on the ground at Logan?
10      A    Yeah.  Only in the sense that I report those
11  staffing deficits through DLC so that Chief Hinton and
12  central office were always aware of the need for having
13  those positions filled.
14      Q    And were the positions filled, to the best of
15  your recollection, during this time that were called for
16  in the contract?
17      A    No.
18      Q    Okay.  And did that prevent -- did that hinder
19  the provision of mental healthcare to prisoners at
20  Logan?
21      A    Yes, it did.
22      Q    Okay.  Were there additionally levels of
23  staffing called for in administrative directives?  Or
24  similar -- I'm sorry, Dr. Ashley, just -- didn't get my
25  whole question out, which I paused on, so I broke the

Page 109

1  rule, you didn't.  Did administrative directives or
2  anything else coming out of IDOC in terms of regulations
3  -- I don't know exactly what they'd be called, but was
4  there anything in sort of coming from IDOC about the
5  level of staffing that you'd be provided, either a hard
6  number or some sort of algorithm based on the level of,
7  you know, care you saw yourself needing?
8      A    Not with them an administrative directive.
9  Those typically did not deal with actual number of
10  staffing required.  That would have been some place
11  within the contract that DOC signed with Wexford.
12      Q    Okay.  Who did you inform -- just speaking
13  about the deficient level of staffing under the
14  contract?  Can you talk about that a little more?
15      A    What is your question?
16      Q    In what ways was it deficient?
17      A    In that the number of staff that I report --
18  okay, we send out a report that is called contract
19  monitoring.  And in that contract monitoring, it list
20  the number of staff that we are supposed to have at the
21  facility.  So on a monthly basis, we send in that report
22  to the central office reporting that this is what DLC in
23  Wexford agreed that we should have, this is what we
24  currently have, and this is what we still don't have.  So
25  we did report that information to the central office,



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckiana22reporters.com
www.kentuckianareporters.com

Page 110

1  and of course Chief Hinton, was privy to that.
2      Q      The next question I had, you may have already
3  answered.  Who would you express that concern to, the
4  lower-level staff and then call for in the contract?
5      A      You mean in terms of who those reports went
6  to?
7      Q      Sure.  Or any other way that you would express
8  that concern?
9      A      Well, obviously the report steps, pretty cut
10 and dry.  That was there.  But I would also discuss this
11 with my regional, you know, reporting on the
12 difficulties of providing services or the challenges of
13 providing the services with the lack of full staffing.
14     Q      Okay.  Did the lack of full staffing, during
15 this time, affect your ability to provide the pre-
16 inpatient level of care that we were talking about
17 earlier?
18     A      It did not.  And I say that only because we
19 would pull resources from outpatient and other areas to
20 make sure that those that were in that pre-inpatient
21 received the care that was outlined for them to get.  So
22 basically borrowing from Peter to pay Paul.
23     Q      Okay.  So the inpatient folks or pre-inpatient
24 people would receive care, but others would not who
25 needed it?

Page 111

1      A      Others would receive it but perhaps not in the
2  frequency that they should have, because the staff -- we
3  would pull staff to focus on those who were the most
4  critically ill.
5      Q      Did the contract -- did -- well, was it
6  contemplated that IDOC should be able to provide an
7  inpatient level of care at this time, before the --
8  before Elgin opened is --
9          MS. HAYES:  Calls for speculation.
10     Q      Was there an inpatient, if you know?
11     A      That, I don't know.
12     Q      Okay.  If the contract had been fully staffed,
13 would it have been possible to provide an inpatient
14 level of care at Logan?
15         MR. SHULTZ:  Objection.  Calls for speculation.
16         MS. HAYES:  Join.
17         MR. SHULTZ:  Go ahead and -- go ahead and -- go
18 ahead and answer that, Doctor.
19     A      I would say, if we had the full staffing
20 level, as well as, I document here this -- the lack of
21 space.  If we had the space in the staff, we could
22 provide that level of care, because understand that the
23 staff that we hired at Logan were no different than the
24 staff the DHS hired within the psychiatric hospital in
25 terms of education and skill level and what they're able

Page 112

1  to do.  It's just a matter of bringing into play that
2  this is a prison versus being in a hospital setting, and
3  that there are particular guidelines that we have to
4  follow up because it is a prison, and then the operation
5  of that prison.
6  BY MR. WEIL:
7      Q      So part -- it sounds like what you're saying
8  -- part of the reason was that the space made it harder
9  to provide an inpatient level of care, and part of the
10 reason was that there wasn't a -- that the contractually
11 called for staffing level made it harder to provide an
12 inpatient level care; is that right?
13     A      Yes.
14     Q      Okay.  Very quickly referring to 6 here.  Can
15 you talk a bit about what you're discussing in paragraph
16 6?
17     A      Having those who are mentally ill,
18 particularly the seriously mentally ill, in a prison
19 setting with security staff who have not -- for the most
20 part, many of them have not been exposed to the level of
21 severity that we were dealing with.  In fact, in some
22 cases, even the mental health professionals have not
23 been exposed to that level of severity.  But certainly,
24 getting security staff who could be more intensively
25 trained to work with these folks instead of -- as they

Page 113

1  -- and -- and how they engage with them in comparison to
2  how they would normally engage with someone who does not
3  have mental health issues: Things that they could say,
4  the way they would communicate with patients versus the
5  more direct authoritarian way that they normally engage
6  with individuals who are incarcerated, as well as just
7  providing them with preliminary knowledge of things to
8  look for when working with this population.  By the time
9  I left Logan, we did have some staff who were --
10 security staff who were particularly good working with
11 this population who knew how to engage with the
12 population better, and how not to escalate when a
13 patient was decompensating, how to deal with that
14 better.  But that certainly required, you know, a long,
15 ongoing effort to get those staffs trained and then
16 being able to have those staff assigned specifically to
17 the mental health RTU.
18     Q      You said some of those staff came in before
19 you left, and that was in March of '21, right?
20     A      Yes.
21     Q      Do you -- when did those staff come in, the
22 staff who were more appropriate?
23     A      It was constantly over -- you know, going on
24 because we were -- Logan security staff was very
25 understaffed as well.  So there was a constant influx of



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1:18-cv-01101-SEM-DJQ   # 181-13   Filed: 07/08/24   Page 31 of 64
The Deposition of NORINE ASHLEY, taken on October 05, 2021
114..117

Page 114

1  new correctional officers that were coming into Logan,
2  and unfortunately too, at the same time, there was also
3  pretty much a constant outflow of officers as well.  For
4  example, we would get correctional officers in training,
5  the new ones who would come in, some who would be
6  exceptionally good and -- because they had perhaps
7  experience with mentally ill and mental illness in their
8  own lives, so it wasn't new to them.  But we also had
9  the challenge in that, because of -- dealing with
10 this population, it was not uncommon for security staff
11 that, once they became certified and had the
12 opportunity, they would also rapidly transfer out of
13 Logan and go to another facility as well.  So kind of
14 just the luck of the draw that we did end up with some
15 who were really good with working with this population.
16 It wasn't that we specifically requested security staff
17 to come to Logan or that they had to have certain
18 qualifications to come to Logan, as they do have to go
19 to Elgin, but it was just, again, just random look at
20 the draw that we ended up getting some good ones to work
21 with this population.
22     Q    You said two things there.  One, it sounds
23 like one thing you're referring to is a high rate of
24 turnover rate among staff?
25     A    Security staff, yes.

Page 115

1      Q    Security staff.  And the other, I think you
2  said, if I understood you correctly, was that -- it was
3  also just there was a load level of staffing for
4  security?
5      A    Yes.
6      Q    How did that affect the provision of mental
7  healthcare at Logan during this time?
8      A    Well, the impact that that could have on our
9  mental health population is that, at any particular
10 point in time, we could have security staff who were
11 assigned to the RTU who were working a double shift.  My
12 preference was that those persons not be assigned to the
13 mental health unit.  That was not always possible.
14 Again, just because of the -- the level of security
15 staffing at that particular time, because my concern was
16 that they're tired, they're not going to be as alert and
17 attentive to that population, and I think those security
18 working with them needed to be pretty fresh and
19 attentive.
20     Q    Did the low level of staffing make it harder
21 to let mentally ill folks require supervision at their
22 cells?
23     A    No.  No.  I don't recall that -- well -- there
24 were times when they were not able to do certain
25 activities because of lack of security staff, yes.  So

Page 116

1  I'll change that, yes.
2      Q    One of the things you referred to earlier, and
3  just to understand why I was asking, you talked about
4  someone and say in inpatient level of care, there being
5  a big difference in that you could walk in and out of
6  your room and you can sort of being milieu with other
7  people.  Do you remember talking about that?
8      A    Yes.
9      Q    And I guess the question that I had in mind
10 was whether a low level of security staff made it harder
11 to provide that sort of milieu environment for someone
12 who is seriously mentally ill.
13     A    No.  Because one thing -- even though we had
14 the low level of security, the facility always made sure
15 that the mental health units were fully staffed with
16 security, with the number that were needed.
17     Q    Okay.  And so, when you talk about proper
18 security staff being a problem here, you're referring to
19 their -- just their training; is that right?
20     A    Yes.
21     Q    And as I understand it -- well, maybe you can
22 help me out here.  It's -- what I understand you saying
23 is that an improperly trained security staff might not
24 be able to distinguish between a mental health problem
25 versus a disciplinary problem.  And obviously I'm

Page 117

1  paraphrasing you, but is that -- was that one of the
2  concerns that you had?
3      A    That it -- was such a -- that is a concern, as
4  well as just if that staff is working a second shift,
5  could be exhausted.  There may be signs, behaviors that
6  the mental health populate -- the patients might exhibit
7  that -- I think we lost him again.  Oh, there he is.
8      MR. SHULTZ:  I'm still here.
9      A    Okay.  There may be things that the security
10 staff might miss that can perhaps tip us off if a person
11 is self-harming or is not acting as they normally do,
12 that they change their behavior, the level of agitation,
13 things that I just felt could be missed if we had staff
14 working there who were working a second eight hours.
15     Q    In terms of distinguishing between a
16 disciplinary issue and a mental health issue, why would
17 that be a problem?
18     A    Because one of the things that happens with --
19 depending on what the particular discipline issue is, is
20 placing patients in what we call restrictive housing
21 status.  Now, where -- once that happens, then they're
22 going to have even less amount of movement and access to
23 the day room at that time.  Now, as a result of Rasho,
24 that's changed drastically, but at that time, that
25 wasn't in place.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 118

1    Q   Let me show you what --

2    MR. WEIL:  I think we're on Exhibit 6; is that

3  right?

4    COURT REPORTER:  Yes.

5  BY MR. WEIL:

6    Q   Okay.  So this is an e-mail, March 27,2015

7  from Dr. Ashley to Dr. Sim.  It's Bates-stamped Stamped

8  by PL. Rusher v. Rauner, 040318 to 040320.  So just

9  bear with me one minute.  Okay.  All right.  Dr. Ashley,

10  I just -- you know, you've had a slew of exhibits

11  throughout, and you -- here's another e-mail from you to

12  Dr. Sim.  Can you see it okay?

13    (EXHIBIT 6 MARKED FOR IDENTIFICATION)

14    A   Yes.

15    Q   Okay.  Here's my question.  It has a list down

16  here -- and I -- again, I'm happy to scroll through e-

17  mail as much as you need.  But folks -- can you see we

18  talked about some folks being in bold.  Do you see that?

19    A   Yeah.

20    Q   Can you talk about why these table list were

21  prepared?

22    A   I don't know the exact reason, but -- and --

23  and of course it may have had something to do with, you

24  know, the ongoing look at getting certain patients into

25  DHS, those that talks in negotiations.  But we were

Page 119

1  requested to send in a list of those who were in what we

2  considered to need an inpatient level of care on a

3  fairly regular basis.

4    Q   Okay.  Let's see here.  I just have this --

5  I'm interested in this little line here.

6    A   Uh-huh.

7    Q   The -- on March 27th, you're saying, "FYI, the

8  bold names are in seg."

9    A   Now we know why the names were bolded.

10    Q   Well, that's -- that addresses a question.

11  Does that refresh your recollection as to why certain

12  names will be placed in bold on these charts?

13    A   Yes.

14    Q   Okay.  And they were bolded why?

15    A   These were the persons who were placed in

16  segregation, now we call it restrictive housing, at the

17  time that I prepared that list.

18    Q   Okay.  And that would be a disciplinary as

19  opposed to a medical placement?

20    A   Yes.

21    Q   Okay.  And is there a reason that the names

22  were being bold with -- that they were being identified

23  in that way on these charts?

24    A   The only thing that I can think of this data

25  was requested for us to indicate which ones were placed

Page 120

1  in as seg at the time.

2    Q   Okay.  And in terms of the placement of seg,

3  that was what you were -- we were talking about earlier

4  about guards placing mentally ill folks in seg as a

5  disciplinary matter for acts that they undertook?

6    A   Yes.

7    Q   Okay.  Just one moment, and I may be done

8  here, Dr. Ashley.  The -- I'll go back to Exhibit 5 real

9  quickly.  So this is back with your June 30th e-mail in

10  talking about proper security staff.  So this e-mail is

11  written June 30, 2015, and the -- as I understand it

12  from our discussion today, Logan became an all-female

13  facility about two years before that, 2000 -- summer

14  2013 or spring of 2013; is that right?

15    A   Yes.

16    Q   Is there a reason that this -- had this been a

17  concern?  Well, when it became an all-female facility,

18  it developed the mental health caseload that it had as

19  of 2015 more or less, right?

20    A   Pretty much so.  Yes.

21    Q   Is there a reason that this problem with

22  proper security staff hadn't been fixed over those two

23  years?

24    MR. SHULTZ:  Objection.  Calls for speculation.

25  Go ahead and answer.

Page 121

1    MR. SALSBURY:  Join.

2    A   When the females were brought to Logan, there

3  was pretty much so -- a pretty large accidents of

4  security staff from Logan who did not wish to work with

5  the female population.  There was quite a bit of a --

6  what I call a brain drain in that we had higher level

7  security staff who had been in -- working in the LC for

8  years, so they had a lot of experience, who left because

9  he chose not to work with female population.  So it --

10  we already had issues with having incomplete compliment

11  of security at Logan, but bringing the female

12  population, they are just kind of exacerbated that, and

13  that they were quite a few who really just did not want

14  to work with this population.

15  BY MR. WEIL:

16    Q   Got it.  And I think the other problems you

17  mentioned, and please correct me if I'm wrong, were the

18  turnover on the overall level of staffing that you

19  observed?

20    A   Yes.

21    MR. WEIL:  Okay.  Dr. Ashley, I don't have any

22  more questions for you at the moment.  I believe my

23  colleague, Bridget Geraghty does so --

24    THE WITNESS:  Okay.

25    MR. WEIL:  For stipulation, Bridget, you can



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 122

1  take it away.
2      MS. GERAGHTY:  Can we take like a five-minute
3  break?
4      MR. WEIL:  Absolutely.
5      MS. HAYES:  So you want to come back at like
6  1:40?
7      MS. GERAGHTY:  Perfect.
8      MS. HAYES:  All right.  Okay.  Sounds good.
9      MR. WEIL:  Okay.
10     COURT REPORTER:  Off record.
11     (OFF THE RECORD)
12     COURT REPORTER:  We are back on record.
13     MS. GERAGHTY:  Good afternoon, Dr. Ashley.
14     THE WITNESS:  Hi.
15         EXAMINATION
16 BY MS. GERAGHTY:
17     Q  My name is Bridget Geraghty.  I'm also
18 representing the Plaintiff, and I'm just going to have
19 some questions for you about the photos that you already
20 reviewed with maybe one or two other things related to
21 the space at Logan.  So I think that we had left off
22 with Exhibit 6, which would make this first item Exhibit
23 7.  Share my screen here.  So I will represent to you
24 that this is what we received in discovery as a diagram
25 of building 14, or housing unit 14.  I don't know what

Page 123

1  you would prefer to call it.  It is out-of-date, but
2  does this look like a pretty accurate representation of
3  what building 14 would've been in maybe 2014 or 2015?
4      (EXHIBIT 7 MARKED FOR IDENTIFICATION)
5      A  Yes.
6      Q  Now, I know that you had just discussed some
7  construction that happened.  Do you know when that
8  happened?
9      A  That was happening -- I believe it was in
10 2017.
11     Q  Okay.  And then the construction would've
12 affected this building that we're looking at the diagram
13 of, right?
14     A  Yes.
15     Q  Okay.  So the space and this kind of big blank
16 space in the middle here, is that where the gym was
17 before?
18     A  Yes, it was the gym there.  There was also
19 some culinary classes that took place there.
20     Q  And then is it fair to say the gym sort of
21 split in half and they used half of it as a gym and half
22 to do the construction?
23     A  Yes.
24     Q  Okay.  So then the other space that you were
25 talking about, was that in building 41?

Page 124

1      A  Yes.
2      Q  And that's the space that you said used to be,
3  like, a visitor center?
4      A  Yes.
5      Q  So I'll go to what I'll call Exhibit 8 --
6  Actually, let's skip to this one -- which is a set of
7  photos that are Bates stamped from document number
8  006853 all the way through 6905.
9      (EXHIBIT 8 MARKED FOR IDENTIFICATION)
10     MR. SHULTZ:  Bridget, what was the Bates stamp
11 of Exhibit 7?
12     MS. GERAGHTY:  I apologize, that was 5108.
13     MR. SHULTZ:  Thank you.
14 BY MS. GERAGHTY:
15     Q  So this group of photos starts with 6853
16 through 6856.  I'm just going to ask you to take a look
17 at these.  Do they all look like the current gym space
18 in building 14?
19     A  Yes.
20     Q  So what treatment spaces were created by
21 converting half of this gym into treatment spaces?
22     A  In the back of the gym area, there are four
23 group treatment rooms.  Also to the right of that area
24 where the culinary arts area was, we also have a series
25 of offices where we run tele-psych clinics, and there's

Page 125

1  also a group room there as well on that side.
2      Q  Okay.  So I'm going to take you down to 6894
3  through 6900, still in this exhibit.  So looking at
4  6894, 95, 96, 97, 98, 99, 900, 901 -- just through 900.
5  Do those look like the treatment spaces that were
6  created by the renovation?
7      A  Yes.
8      Q  So in 900 is -- are those doors to, like, the
9  tele-psych areas?
10     A  Yes.
11     Q  And the tele-psych areas are like confidential
12 sort of cubicles, you might call them, with a video
13 connection?
14     A  That's correct.
15     Q  So that allows the individuals in custody to
16 meet with their psychiatrist via video?
17     A  Yes.
18     Q  Are those rooms used for any other purpose?
19     A  When they're used for tele-psych, they can be
20 used by the MHP for individual assessments.
21     Q  Okay.  So it's just like another confidential
22 setting where and MHP could meet with someone.
23     A  Right.
24     Q  And is this at 899, is that, like, a hallway
25 outside of those tele-psych cubicles?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1:18-cv-01101-SEM-DJQ # 181-13 Filed: 07/08/24 Page 34 of 64
The Deposition of NORINE ASHLEY, taken on October 05, 2021
126..129

Page 126

1   A   Yeah.
2   Q   Looking at 6898, are you able to say what this
3  is?  It looks like a --
4   A   That would be -- looks like inside one of
5  those tele-psych rooms.
6   Q   I don't know if you're able to tell what 6897
7  is.
8   A   No, I really can't tell what that is.
9   Q   Fair enough.  What about 6896?
10  A   That's the hallway in-between the group rooms.
11  Q   So that means that, on each side of that
12 hallway, the doors are doors to group rooms?
13  A   Yes.
14  Q   And then 6895 and 94, are those group rooms?
15  A   Yes.
16  Q   So going back up to 6857, which is here, and
17 then going through 6859, do you recognize this as the
18 day room for the north wing of unit 14?
19  A   Either the north wing or the east wing.
20  Q   Okay.  And then, if I showed you 684 --
21 actually 6885 and 68.  Sorry, 6892, does this look like
22 the day room for east wing?
23  A   Yes.
24  Q   Okay.  And this is -- 6893, is this also the
25 day room for east wing?

Page 127

1   A   Looks like it, yes.
2   Q   Okay.  So then going back up to 6857, where we
3  just were before, does that help you tell whether this
4  is north wing or east wing?
5   A   Yeah.
6   Q   So this --
7   A   That would be north wing, yes.
8   Q   6857, 6858, and 6859 are north wing then,
9  right?
10  A   Yes.
11  Q   Is the north wing currently in use?
12  A   I don't believe it is in use.  The majority of
13 those cells are not in service because of plumbing
14 issues.
15  Q   Do you know when that wing was taken out of
16 use, or when they stopped housing people there?
17  A   Oh gosh.  I can't tell you what year it was,
18 because when the women first came to Logan, that wing
19 was fully occupied.  It was just overtime that it went
20 out of service.
21  Q   I'm going to show you what I'll call Exhibit
22 9, which is the housing unit history that we received in
23 discovery.  I'll represent that to you.  And it's two
24 pages of that at IDOC 00470924710.  Dr. Ashley, are you
25 familiar with how to read a chart like this?

Page 128

1      (EXHIBIT 9 MARKED FOR IDENTIFICATION)
2   A   Yes.
3   Q   Okay.  And I hope that you can help us out,
4  because it's a little bit confusing.  If you were to
5  look, say at this line here that says,
6      "LOG:LOG:14:N:14."  And I'll make that a little
7      bit bigger so that it's easier to see.  Does the LOG
8      stand for Logan?
9   A   Yes.
10  Q   And then is 14 the building number?
11  A   Yes.
12  Q   And then is N north wing?
13  A   Yes.
14  Q   And 14, would that be the cell number then?
15  A   Yes.
16  Q   Okay.  So if I'm understanding this correctly,
17 then the first two sections of these designations are
18 the building or the facility name.
19  A   Uh-huh.
20      The third portion is the building.
21  A   Yeah.
22      The fifth portion would be the section of the
23 building.
24  A   Yes.
25  Q   And then the portion after that is the number

Page 129

1  of the cell.
2   A   Correct.
3   Q   Okay.  So in a number of these entries it says
4  "furloughed."  Is that just referring to a time when she
5  would've been sent out of Logan for some reason?
6   A   Where do you see -- where it says furloughed
7  and the zeros, yes, she would've been sent out of Logan.
8   Q   So that would be like to a hospital or just
9  something outside of the facility?
10  A   Or it could have been well sheets being
11 changed from one housing unit to another location.  So
12 if she would -- furloughed -- yeah.  Furloughed would be
13 sent out, but there are times above that, like the --
14 just a regular LOGOUOU, changing from maybe one cell to
15 another.  They indicate zero whenever they're taken out
16 of that location.
17  Q   Okay.  So the OUOUOU on this -- let's see,
18 one, two, three, four, five, six, seven, eighth line
19 down, that would've been just a movement in her location
20 somewhere?
21  A   Yeah.
22  Q   Looking at -- well, actually, we'll come back
23 to that probably.  So I think that was Exhibit 9, was
24 the housing list.  I'll go back to Exhibit 8, which is
25 these photos.  Going down to 6860 to 6872, I will scroll

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 130

1  through these for you.  Do these look like the cells in
2  the north wing?
3      A    Yes.
4      Q    Okay.  I want to make sure I've gone through
5  all of them before I let you to confirm that.  Okay.  So
6  now we -- I've scrolled through all of them.  They all
7  look like they were cells in the north wing?
8      A    Yes.
9      Q    From what you can tell from the photos, do
10 these structurally look the same as they would've been
11 in 2015 or 2016?
12     A    Yes.
13     Q    Maybe the beds are arranged differently, but
14 they all look like the same size and shape?  Same with
15 those?
16     A    Yes.
17     Q    Looking at 6873 to 6875, does this look like
18 the showers in the north wing?
19     A    Yes.
20     Q    Okay.  And then 6876 to 77, is this the view
21 looking down the hallway in the north wing?
22     A    Yes.
23     Q    And so from the position that you're -- you
24 will be standing and looking at this photo, is that
25 where the dayroom is?

Page 131

1      A    Yes.
2      Q    And moving on now to 6878 to 6883, let me
3  scroll through these.  Do these look like the cells in
4  east wing?
5      A    Yes.
6      Q    And I understand the cells in east wing maybe
7  were converted to the pregnancy wing.  Is that what they
8  are now?
9      A    Yes.
10     Q    But were they the pregnancy wing back in 2014,
11 2015, 2016?
12     A    No.
13     Q    Do you know if there was some renovation of
14 that area before it was made into the pregnancy wing?
15     A    There were some changes that they made in
16 terms of, like, cosmetically painting.  The cell doors
17 were removed.  Just furnishings were brought into the
18 dayroom as well as, I believe, exercise equipment for
19 them.  There was also the women and family services.  One
20 of their supervisors had an office that was created out
21 of one of those cells.
22     Q    Okay.  So -- but aside from those changes, you
23 -- nothing structural happened?  Like the cell sizes are
24 the same, the layout is mostly the same?
25     A    Yes.

Page 132

1      Q    So looking at 6884, is that like the view down
2  the hallway of the east wing?
3      A    Yes.
4      Q    And then I think we talked about these photos
5  already at 6885.  Or, no, we didn't, actually.  Sorry.
6  6886, 87, 88, 89, and 90, 91, do those look like the
7  showers in the east wing?
8      A    Yes.
9      Q    So -- but is it accurate to say there were no
10 showers in the individual cells?  These showers would've
11 been used by everyone on that wing?
12     A    Yes.
13     Q    And is that the same in north wing as well?
14 The showers that we looked at there, they would be used
15 by everyone on that wing?
16     A    Yes.
17     Q    And then these are the photos we looked at
18 before of the north -- the east wing dayrooms.  We can
19 skip over those.  And then these are the treatment
20 spaces that we already looked at.  So looking now at
21 6901 to 6905, does this look like the -- look like the
22 yard for building 14?
23     A    Yes.
24     Q    And is this 6905, is that the door to the
25 yard?

Page 133

1      A    I really can't tell.
2      Q    Fair enough.  But 6904, 3, 2, and 1 are all
3  the actual outdoor yard space, right?
4      A    Yes.
5      Q    And I think that finishes up that exhibit, and
6  we can switch to what I will call Exhibit 10, which is
7  going to be Bates 6906 through 6939.  So looking at 6906
8  through 6920, and I'll scroll through these.  That's 21.
9  So we've looked at 6906 through 6920.  Do these look
10 like the crisis cells in the healthcare or medical
11 building and the area immediately outside those crisis
12 cells?
13          (EXHIBIT 10 MARKED FOR IDENTIFICATION)
14     A    Yes.
15     Q    In -- by 2014, 2015, and 2016, were there
16 crisis cells at Logan other than in the medical
17 building?
18     A    That was pretty much it, except that we did
19 use the cells -- the single cells on 14 if we needed to.
20     Q    So that would be --
21     A    And that would have been 14 north because it
22 had all single cells.
23     Q    So would that mean, like, if you had more than
24 three people who needed to be in a crisis cell...?
25     A    They would be placed on north wing, yes.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

1:18-cv-01101-SEM-DJQ   #181-13   Filed: 07/08/24   Page 36 of 64
The Deposition of NORINE ASHLEY, taken on October 05, 2021
134..137

Page 134

1    Q    And in the medical building, there are just
2  these three, right?
3    A    It's those three, but then there are also two
4  isolation cells that we would use on occasion.  So if we
5  had someone who was just about ready to come off watch
6  and we needed a crisis cell for another patient, we
7  would allow them to go in that isolation cell.  We
8  typically didn't like to use that because it had a
9  shower in there that was enclosed and was a blind spot.
10   Q    Was that the only difference between the
11 isolation rooms and the crisis rooms?
12   A    Yes.
13   Q    From looking at these photos of the crisis
14 rooms that were just taken recently, have the crisis
15 rooms changed substantially from what you can see for --
16 from these photos compared to what they were in 2014,
17 2015, and 2016?
18   A    No.
19   Q    So the structure and all the elements in them
20 are the same?
21   A    Yes.
22   Q    Looking at 6912 and 6913, is that a typical
23 bed in one of the crisis cells?
24   A    Yes.
25   Q    So was sort of like a cement or cinder-block

Page 135

1  base with a foam mattress on top; is that accurate?
2    A    Yes.
3    Q    These little, like, indentations with handles
4  on the side, are those used for restraints?
5    A    Yes.
6    Q    Do you know why there are -- well, do you know
7  how many are on each side?
8    A    It's either three or four, one of the two.
9    Q    Do you know what form of restraints are used
10 at Logan?
11   A    Logan uses a restraint that is attached via
12 Velcro.  We had to -- when -- when the females came to
13 Logan, we had to find a different type of restraint
14 because, obviously, the size differential between the
15 male and female population, plus we had to adapt the
16 restraints so that we could be gender-specific to how we
17 utilize restraints.  Males would go into four-point
18 restraints.  Basically, both legs would be restrained
19 separately.  With the females, we made sure that we had
20 the legs closed so they -- you know, tried to protect
21 their modesty as best we could.
22   Q    All right.  So a woman in one of these crisis
23 cells, if she was put in restraints, it would be a
24 three-point restraint to a bed like this?
25   A    Yes.

Page 136

1    Q    All right.  So looking at 6916 and 17, are
2  these the doors to crisis cells?  Looks like crisis room
3  2, it says?
4    A    Yes.
5    Q    And then in 6917, there's a little opening
6  here.  Is that the chuck-hole?
7    A    Yes.
8    Q    What is that used for?
9    A    We use that to pass in their meals when
10 they're being fed.
11   Q    Is there any other use for that, like
12 medication?
13   A    It could be used to pass medication.  Security
14 can use it to secure them.  Say if the room is -- if
15 it's somebody who's in there that is a security concern,
16 they can also use that to restrain them before they open
17 the door.
18   Q    Can you describe what that procedure would be?
19   A    Basically, they would ask the individual to
20 turn backwards to the cell and to have their hands
21 sticking out through that chuck-hole so that they could
22 apply handcuffs.
23   Q    Before opening the door?
24   A    Right.
25   Q    Got it.  So 6918 is just another view of that,

Page 137

1  it looks like, right?
2    A    Yes.
3    Q    And 6919, I'll zoom a little bit, does this
4  look like the outside of where those crisis cells are?
5    A    Yes.
6    Q    And then I see that there is this sign posted
7  on the wall that says, "Do not engage watches in
8  conversation, question/concerns, contact mental health."
9  Do you know if that sign was -- how long that sign has
10 been posted there?
11   A    No, I don't.
12   Q    Do you remember if it was there during the
13 time when Tiffany Rusher was there, which would have
14 been like 2015, 2016?
15   A    I'm not sure.
16   Q    I think this is where we left off, 6921.  Does
17 this look like something else that's in the medical
18 building, another set of doors?
19   A    Yes.
20   Q    Do you know where in the medical building this
21 is?
22   A    I know it's close to the nurses -- to the
23 infirmary desk.  It might be right of -- either right or
24 left of the showers in healthcare.
25   Q    All right.  And then looking at 6922 and 23.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1:18-cv-01101-SEM-DJQ  # 181-13  Filed: 07/08/24  Page 37 of 64
The Deposition of NORINE ASHLEY, taken on October 05, 2021
138..141

Page 138

1    Do these show -- or what do they show?
2        A    That's the nurses' station for the infirmary.
3        Q    And this is a view, like, looking from the
4    hallway towards the nurses station?
5        A    Yes.
6        Q    For both of these photos?  So that's --
7        A    Yes.
8        Q    Yeah.  22 and 23.  Looking at 24, do you know
9    what this a view of?
10       A    This is a view in the hallway of the
11   healthcare that leads to the infirmary rooms.
12       Q    So are the infirmary rooms, like, down at the
13   end of the hallway in this photo?
14       A    Yes.
15       Q    And then to the right in this photo, is that
16   where the showers are?
17       A    Yes.
18       Q    I'm looking at 6925, do you know if these are
19   crisis or isolation rooms or where this is?
20       A    I think -- I can't see the sign, so I really
21   can't say.  One might be a isolation room, the one for
22   this way.
23       Q    Like the one --
24       A    That one.
25       Q    -- with a room in front of it?

Page 139

1        A    Yeah.
2        Q    Okay.
3        A    Yeah.
4        Q    But in general, this is a photo of that area.
5    It's just hard to see which room is which, right?
6        A    Right.
7        Q    So looking at 6926, 27, 28, 29, 30, 31, 32,
8    33, 34, 35, so stopping there at 6935, are those all
9    photos of the isolation rooms?
10       A    Yes.  Looks like it, yes.
11       Q    And then specifically within that group is
12   6928.  Is that the shower that you mentioned earlier?
13       A    Yes.
14       Q    So that'd be a blind spot where somebody
15   outside of the cell wouldn't be able to see the person
16   inside the shower?
17       A    That is correct.
18       Q    Looking at 6936 through 39.  It's 36, 37, 38,
19   and 39.  Do those look like the showers in that area?
20       A    Yes.
21       Q    So these would be like the showers that we saw
22   on that photo to the right earlier, like in the hallway,
23   across from the crisis cells?
24       A    Yes.
25       Q    So who used these showers?

Page 140

1        A    Anyone that was currently being housed in
2    healthcare.  So all the infirmary patients would use
3    that shower.  The ones that were in crisis would also
4    use that shower.
5        Q    Do you have an idea of what the maximum
6    capacity of people would be who are housed in that unit
7    at any time?
8        A    I don't recall.
9        Q    Would it be fewer than 20?
10       A    Yes.
11       Q    Fewer than 10?
12       A    I think it's close around 10:00, maybe a
13   little more.
14       Q    Okay.  Fair enough.  All right.  And I'm going
15   to take us to what I will call -- I think we're at
16   Exhibit 11.
17            (EXHIBIT 11 MARKED FOR IDENTIFICATION)
18   COURT REPORTER:  Yes.
19       Q    It should be 6940 through 6978.  So looking at
20   this first group, which is 6940 through 46, does this
21   look like there's kind of a little waiting area or lobby
22   to the right of the entrance of the medical building?
23       A    Yes.
24       Q    Then 45 and 46 are the bathroom in that area?
25       A    Yes.

Page 141

1        Q    Do you know if this room here, did it have a
2    door that closed?
3        A    Yes, it does have a closing door.
4        Q    Do you know what this room is used for?
5        A    That's the waiting area, so if healthcare
6    calls over a housing unit for those patients who have
7    call -- have signed up for sick call, they would sit
8    there until they are called to see a provider.
9        Q    Do you know if it's used for any other
10   purposes?
11       A    No.
12       Q    You don't know, or it's not used for anything
13   else?
14       A    It's not.  At least while I was there, it was
15   not used for any other purpose.
16       Q    Okay.  Looking at 6947 through 58, scroll
17   through these.  These all look like other photos from
18   the other side of the medical building?
19       A    Yes.
20       Q    And what types of things are on that side of
21   the building?
22       A    You have various offices for providers,
23   chronic clinic providers, the nurse's station for the
24   medical director nurse practitioner, x-ray.  Those are
25   on the -- and there was a treatment room as well.  So



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 142

1 that's on that side of Healthcare.
2      Q     And then I think you just mentioned a nurse's
3 station.  Is --
4      A     That's it.
5      Q     -- 69 -- is 6959 is the nurse's station?
6      A     Yes.
7      Q     Okay.  And then 6960 is just another view of
8 that same nurse's station, right?
9      A     Yes.
10     Q     Is that, like, the main nurse's station for
11 the medical building?
12     A     Yes.
13     Q     Looking at 6961, 6962, and 6963, can you tell
14 us what's in these photos?
15     A     That looks like the other hallway on the other
16 side of the nurse's station.
17     Q     Okay.  So --
18     A     Or it's -- it's -- it's kind of confusing
19 because the other hallway with the infirmary rooms kind
20 of looks the same, but I think this is on the other side
21 of the nurse's station.
22     Q     So when you're coming into the medical unit,
23 would this be the hallway that's to the left?
24     A     It would be to the left.  Yes.
25     Q     So looking at 6962, we can see there's like a

Page 143

1 wheelchair here in the photo.  And then if you go a
2 little bit further down the hall, there's a little part
3 -- portion sticking out right here.  Would that be the
4 infirmary near nurse's station?
5      A     Yes.
6      Q     So then these rooms over here --
7      A     So this -- this would -- yes.  That would be
8 the crisis -- the cells to the left on this photo.  So
9 yeah, that's the infirmary wing.
10     Q     And the crisis cells are sort of obscured by
11 that fan that's there, right?
12     A     Yes.
13     Q     So looking now at -- there's two photos that
14 show kind of the same thing here, 6964 and 6965.  So
15 let's just look at 6965.  Does this look like an
16 accurate diagram of the current layout of the medical
17 building?
18     A     Yes.
19     Q     Are there any differences between how it's
20 laid out in this diagram and how it was laid out during
21 the time Ms. Rusher was there from 2014 to 2016?
22     A     No.
23     Q     So structurally, everything's the same.
24     A     Yes.
25     Q     So I want to ask you, this diagram has that

Page 144

1 nurse's station where you're talking about, it's labeled
2 the infirmary nurse desk.  How is that nurse's station
3 different from the main nurse's station that we saw
4 earlier?
5      A     Basically, the nurse that's seated in that
6 station, their responsibility is to monitor and provide,
7 you know, medication passes care for all of the patients
8 that are in the crisis area and that are actually housed
9 in the infirmary, whereas the general nurse's station,
10 they are -- they are taking care of the sick call that's
11 coming through, providing assistance to the medical
12 director and the nurse practitioner.  They also run some
13 of the chronic clinics.
14     Q     So that'd be like clinics for diabetes or
15 asthma or other chronic conditions?
16     A     Yes.
17     Q     Did you have an office in this building?
18     A     I used to.  At one point I had an office in
19 that building.
20     Q     When did you have an office there?
21     A     I had an office there when the male population
22 was there, and when the women came, my office moved down
23 to Housing Unit 14.
24     Q     Okay.  So that's the building that we were
25 looking at earlier, right?

Page 145

1      A     Yes.
2      Q     Photos we were looking at earlier.  Did you
3 see your office in any of those photos?
4      A     Yes, I did.  One of the chronic clinic offices
5 is now taking the place of where my office used to be in
6 Healthcare.
7      Q     Okay.  So I guess I wasn't clear in my
8 question.  When we were looking at the photos of Housing
9 Unit 14, did you see your office in any of those?
10     A     No.
11     Q     Let me go back to Exhibit 7.  Are you able to
12 see where your office was in Unit 14?  I know this
13 diagram is not up-to-date, so...
14     A     My office was where you see the number 3, it
15 was in that area.  So if you --
16     Q     So --
17     A     -- well, there are several 3s.  Okay.  So if
18 you come to the right --
19     Q     Okay.
20     A     -- and go -- come back towards you, that 3,
21 that's the area where my office was.
22     Q     Okay.  So it would be sort of between the
23 north wing and the west wing --
24     A     Yes.
25     Q     -- on the west side of the building?  And it

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1:18-cv-01101-SEM-DJQ    #181-13    Filed: 07/08/24    Page 39 of 64
The Deposition of NORINE ASHLEY, taken on October 05, 2021
146..149

Page 146

```
1   looks like there --
2        A    Actually, yes.  That is correct.
3        Q    Yeah.  There are sort of three 3s there, so
4   your office is where the middle 3 is?
5        A    Yes.
6        Q    All right.  Going back to what we were looking
7   at before the medical building, which is at 6965, are
8   these rooms in the sort of section that jots out where
9   one of them is labeled supply room.  Are there other
10  rooms over here that are offices or conference rooms?
11       A    That's storage for Healthcare.
12       Q    All of these rooms are storage?
13       A    Pretty much so.  Yes.
14       Q    All right.  Going down to 6966 through 6971.
15  Scroll through these.
16       A    You know what?  I'm sorry, that's incorrect.
17  That area that I said was storage, that's probably the
18  administrative offices for Healthcare.
19       Q    Okay.  So this area that jots out or one of
20  them is labeled supply room, some of these --
21       A    Right.
22       Q    -- are offices?
23       A    Yes.
24       Q    Thank you for correcting that.  Going back
25  down to the ones I was just showing you, which is 66
```

Page 147

```
1   through 71, does this look like the view from the
2   infirmary nurse's desk?
3        A    Yes.
4        Q    And so then these doors that you can see here
5   in 6970, the doors that have the little red labels on
6   them, are those either crisis or isolation cells?
7        A    Yes.
8        Q    6972, is that a view down the hallway from the
9   nurse's station?
10       A    Yes.
11       Q    And that's from the infirmary nurse's station,
12  not the main nurse's station, right?
13       A    Yes.
14       Q    Looking at 6973, is this -- does this look
15  like the outdoor area kind of near the medical building?
16       A    That's -- actually, it looks like it is the
17  out or door area from building 41.
18       Q    Where is building 41 in relation to the
19  medical building?
20       A    It's literally right across the walkway.
21       Q    So is the building that we see in 6973, is
22  that building 41?
23       A    Yes.
24       Q    So this green area sort of across from the
25  medical building then?
```

Page 148

```
1        A    Yes.
2        Q    Do you know what 6974 and 75 are of?
3        A    Okay.  74 is just outside of Healthcare.  75
4   you could see the back entrance to Healthcare.
5        Q    Okay.  So, like, where this bush is, and
6   there's a door on either side of it.  Is that the back
7   entrance to Healthcare?
8        A    No.  It's the building to the left with the
9   overhang.  Yeah.
10       Q    Okay.  So where these flowers are?
11       A    Yes.
12       Q    There's an overhang, and that's the back
13  entrance to Healthcare?
14       A    Yes.
15       Q    Do you know what this building is here where
16  the bush is?
17       A    That is a gymnasium, or it should be a
18  gymnasium.
19       Q    And then, looking at 6976, 77, and 78, what
20  are these of?
21       A    That is all dietary.
22       Q    So is that where most of the folks in general
23  population would eat their meals?
24       A    Yes.
25       Q    But I think you said the folks in the medical
```

Page 149

```
1   building got their meals through the chuck-holes; is
2   that right?
3        A    If they're on a crisis watch, yes.  But
4   otherwise, those who are in the infirmary, if they're
5   able to ambulate, yes, they are allowed -- nope.  Let me
6   change that.  No, they are not allowed.  They get their
7   meals brought to them in Healthcare.
8        MS. GERAGHTY:  And I think that may be all the
9   questions that I have for you.
10       THE WITNESS:  Okay.
11       MR. SHULTZ:  Rachel, do you have any questions?
12       MS. HAYES:  I do.  Before I get started, is
13  everyone good?  Okay.
14       MS. GERAGHTY:  Yes.
15            CROSS EXAMINATION
16  BY MS. HAYES:
17       Q    Hi, Dr. Ashley.  My name is Rachel Hayes.  I'm
18  one of the attorneys for the Wexford defendants.  Thank
19  you for your time.  I promise we'll get you out of here
20  soon.  I have --
21       A    That's okay.
22       Q    -- a few questions for you.  Were the Wexford
23  employees, meaning Wexford mental health treaters, able
24  to authorize a change in a facility for the inmates?
25       MR. WEIL:  Object to form.
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1:18-cv-01101-SEM-DJQ   # 181-13   Filed: 07/08/24   Page 40 of 64
The Deposition of NORINE ASHLEY, taken on October 05, 2021
150..153

Page 150

```
 1        MS. HAYES:  What's your wrong with the form,
 2   Steve?
 3        MR. WEIL:  Calls for speculation.
 4   BY MS. HAYES:
 5   Q    All right.  Dr. Ashley, to your knowledge,
 6   based upon your position within IDOC, are Wexford doc --
 7   mental health providers able to authorize a transfer to
 8   a different facility?
 9   A    No.
10   Q    Okay.  And then again, to your knowledge,
11   based upon your position within IDOC, are Wexford mental
12   health providers able to authorize a transfer from IDOC
13   to DHS?
14        MR. WEIL:  Object to form.
15        MS. HAYES:  What's wrong with the form?
16        MR. WEIL:  Same objection.
17        MS. HAYES:  Okay.
18   BY MS. HAYES:
19   Q    You can go ahead and answer Dr. Ashley.
20        MR. SHULTZ:  Go and -- go ahead and answer, Dr.
21   Ashley.
22   A    No.
23   Q    Okay.  And earlier you were asked about the
24   Dr. Richardson report in which he -- do you recall --
25   the summary in which he made the referral to a DHS
```

Page 151

```
 1   facility.  Do you recall that document?
 2   A    Yes.
 3   Q    Okay.  And I think you said -- stated that you
 4   agreed that Logan was not equipped.  Do -- you recall
 5   that, correct?
 6   A    Yes.
 7   Q    Okay.  When you -- would you agree though that
 8   the doctors were equipped, but that there possibly were
 9   better environments?
10   A    Yes.  And I believe I did say that, that
11   there's no difference between the caliber of staff that
12   Logan had than the caliber of staff in DHS.
13   Q    Is it also true that there was still some
14   benefit that Ms. Rusher was receiving as far as the
15   treatment she received at Logan?
16   A    Yes.
17   Q    Okay.  And then, finally, in regards to your
18   testimony about the staffing issues with the Wexford
19   employees, were you aware of what actions Wexford was
20   taking to hire additional staff?
21   A    I was told pretty regularly when I would
22   inquire that Wexford was actively recruiting.
23   Q    Okay.  And were you a part of the
24   communication that occurred between IDOC and Wexford
25   regarding the recruiting they were doing and the steps
```

Page 152

```
 1   they were taking?
 2   A    No.  That would've been at Chief Hinton's
 3   level.
 4   Q    And would you agree that staff turnover is a
 5   fact of life --
 6        MR. WEIL:  Object to form.
 7   Q    -- at any job?
 8        MR. WEIL:  Object to form.
 9        MR. SHULTZ:  Go ahead Answer, Dr. Ashley.
10   A    Yeah.  That's -- it is a fact of life.
11        MS. HAYES:  That's all the questions I have.
12   Thank you.
13        THE WITNESS:  You're welcome.
14        MR. SHULTZ:  Brent, do you have any questions?
15        MR. SALSBURY:  I don't have any questions.  No.
16        MR. SHULTZ:  I don't have any questions at this
17   point either.  Steve, do you have any follow-up?
18        MR. WEIL:  I do not.  Bridget, based on it, I'm
19   assuming you don't either?
20        MS. GERAGHTY:  No.
21        MR. SHULTZ:  Dr. Ashley, the last question is
22   from me.  You have the right to review the
23   transcript.  You can't change any of your substantive
24   answers, but you can just review for grammatical
25   errors, you know, small changes like that.  I
```

Page 153

```
 1   personally have had connection problems today, but I
 2   think your connections have been pretty solid and
 3   that Chloe's been able to get down all of your
 4   answers pretty clearly.  So I would recommend that
 5   you waive your right to review, but you do have the
 6   ability to review if you want.
 7        THE WITNESS:  I'll waive.
 8        MR. WEIL:  You don't want to read this thing?
 9        THE WITNESS:  No.
10        MR. WEIL:  Dr. Ashley, thanks.  Thanks very
11   much for your time.  I appreciate it --
12        COURT REPORTER:  We're off record.
13        (DEPOSITION CONCLUDED AT 3:28 P.M.)
14
15
16
17
18
19
20
21
22
23
24
25
```

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 154

```
1              CERTIFICATE OF REPORTER

2           COMMONWEALTH OF KENTUCKY AT LARGE

3

4    I do hereby certify that the witness in the foregoing

5    transcript was taken on the date, and at the time and

6    place set out on the Stipulation page hereof, by me

7    after first being duly sworn to testify the truth, the

8    whole truth, and nothing but the truth; and that the

9    said matter was recorded by me and then reduced to

10   typewritten form under my direction, and constitutes a

11   true record of the transcript as taken, all to the best

12   of my skill and ability. I certify that I am not a

13   relative or employee of either counsel and that I am in

14   no way interested financially, directly or indirectly,

15   in this action.

16

17

18

19    /s/ Chloe Gilbert

20

21

22   CHLOE GILBERT

23   COURT REPORTER/NOTARY

24   MY COMMISSION EXPIRES: 07/12/2025

25   SUBMITTED ON:  10/26/2021
```



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**Exhibits**

**Exhibit 1_
Ashley** 66:3
72:22 73:12

**Exhibit 2_
Ashley** 72:19
73:3,6 76:3

**Exhibit 3_
Ashley** 78:6,
12,14

**Exhibit 4_
Ashley** 84:2,3,
9 92:10

**Exhibit 5_
Ashley** 96:18,
19 97:3 120:8

**Exhibit 6_
Ashley** 118:2,
13 122:22

**Exhibit 7_
Ashley** 122:22,
23 123:4
124:11 145:11

**Exhibit 8_
Ashley** 124:5,9
129:24

**Exhibit 9_
Ashley** 127:21,
22 128:1
129:23

**Exhibit 10_
Ashley** 133:6,
13

**Exhibit 11_
Ashley** 140:16,
17

**0**

**00470924710**
127:24

**006853** 124:8

**029108** 73:9

**029136** 73:5

**02918** 73:4

**040318** 118:8

**040320** 118:8

**040803** 78:8

**040819** 78:8

**042015219**
96:21

**1**

**1** 66:3 72:22
73:12 133:2

**10** 66:1 67:19
72:18 78:7
133:6,13
140:11

**108** 73:8

**10:00** 140:12

**10:02** 7:6

**10:58** 42:3

**11** 140:16,17

**11:05** 41:24

**12** 98:9

**14** 122:25 123:3
124:18 126:18
128:10,14
132:22 133:19,
21 144:23
145:9,12

**15th** 7:5

**17** 136:1

**18-cv-1101-
sem-ths** 7:12

**1999** 12:20

**1:40** 122:6

**2**

**2** 72:19 73:3,6
76:3 133:2
136:3

**20** 37:10,14,15
140:9

**2000** 120:13

**2003** 12:13
13:3,24,25

**2007** 12:5 13:3,
25 14:2,13
16:16

**2013** 14:14
15:11,13,16
16:5,16,25
18:15 33:17
34:1,7 79:25
120:14

**2014** 66:1
67:20 69:15
72:18 84:3
123:3 131:10
133:15 134:16
143:21

**2015** 73:11
78:7 79:19
96:19 106:20
120:11,19
123:3 130:11
131:11 133:15
134:17 137:14

**2016** 29:12
38:17 106:19
130:11 131:11
133:15 134:17
137:14 143:21

**2017** 123:10

**2018** 53:6,13
80:8

**2019** 98:3

**2021** 7:6 18:18

**2037** 89:5
92:18

**21** 7:6 12:8
113:19 133:8

**219** 98:3

**22** 138:8

**23** 137:25 138:8

**24** 138:8

**25** 84:3 105:19,
22

**27** 139:7

**27,2015** 118:6

**27th** 119:7

**28** 139:7

**28802** 84:5

**28805** 84:6

**29** 139:7

**3**

**3** 78:6,12,14
133:2 145:14,
20 146:4

**30** 96:19 120:11
139:7

**30th** 98:22
120:9

**31** 139:7

**32** 139:7

**33** 139:8

**34** 139:8

**35** 101:2 139:8

**36** 139:18

**37** 139:18

**38** 139:18

**39** 139:18,19

**3:28** 153:13

**3s** 145:17 146:3

**4**

**4** 84:3,9 92:10
105:14 107:14

**40** 101:2

**40813** 79:10
81:17

**41** 123:25
147:17,18,22

**45** 140:24

**46** 140:20,24

**5**

**5** 96:19 97:3
120:8

**5-23-2013**
84:16

**5108** 124:12

**525** 102:13

**58** 141:16

**6**

**6** 112:14,16
118:2,13
122:22

**60** 100:24 101:1

**66** 146:25

**68** 126:21

**684** 126:20

**6853** 124:15

**6856** 124:16

**6857** 126:16
127:2,8

**6858** 127:8

**6859** 126:17
127:8

**6860** 129:25

**6872** 129:25

**6873** 130:17

**6875** 130:17

**6876** 130:20

**6878** 131:2

**6883** 131:2

**6884** 132:1

**6885** 126:21
132:5

**6886** 132:6

**6892** 126:21

**6893** 126:24

**6894** 125:2,4



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

6895 126:14
6896 126:9
6897 126:6
6898 126:2
69 142:5
6900 125:3
6901 132:21
6904 133:2
6905 124:8
  132:21,24
6906 133:7,9
6912 134:22
6913 134:22
6916 136:1
6917 136:5
6918 136:25
6919 137:3
6920 133:8,9
6921 137:16
6922 137:25
6925 138:18
6926 139:7
6928 139:12
6935 139:8
6936 139:18
6939 133:7
6940 140:19,20
6947 141:16
6959 142:5
6960 142:7
6961 142:13
6962 142:13,25
6963 142:13
6964 143:14
6965 143:14,15
  146:7
6966 146:14

6970 147:5
6971 146:14
6972 147:8
6973 147:14,21
6974 148:2
6976 148:19
6978 140:19

———————

**7**

7 122:23 123:4
  124:11 145:11
71 147:1
74 148:3
75 148:2,3
750 102:12
77 130:20
  148:19
78 148:19

———————

**8**

8 124:5,9
  129:24
803 92:11
87 132:6
88 132:6
89 132:6
899 125:24

———————

**9**

9 73:11 127:22
  128:1 129:23
90 132:6
900 125:4,8
901 125:4
91 132:6
94 126:14
95 12:21 125:4

96 12:21 125:4
97 125:4
98 125:4
99 12:20 125:4
9th 78:21,24

———————

**A**

a.m. 7:6
ability 18:3
  46:23 50:23
  83:3,7 103:2,4
  110:15 153:6
absolutely
  25:11 52:9
  122:4
accept 83:25
accepted 12:5
access 99:18
  117:22
accidents
  121:3
accommodate
  104:16
accommodati
on 43:11
accurate 123:2
  132:9 135:1
  143:16
acting 117:11
actions 151:19
actively
  151:22
activities
  44:14 51:6 54:5
  55:10 115:25
activity 21:20
  55:19 56:6,8,19
  58:13
acts 120:5
actual 28:24
  69:5 109:9
  133:3

adapt 135:15
add 100:7
added 66:7
addition 21:10,
  11 76:20
additional
  87:9 104:6,8,10
  151:20
additionally
  108:22
address 26:19
  104:7
addressed
  26:16
addresses
  119:10
addressing
  99:10,16
adequate
  38:25 103:14
  107:3,5,6
adequately
  107:13
administra
  61:20
administrative
  23:22 24:6,10,
  18 26:6 72:10
  108:23 109:1,8
  146:18
administrator
  17:11,18 18:12
  19:24 21:1
  29:16 30:4
  36:21 37:21
  38:16 61:10,20,
  22 85:7 86:21,
  25
adults 46:4
advance 18:4,
  7
affect 110:15
  115:6
affected
  123:12

affirm 8:21
afternoon
  122:13
agitation
  117:12
agree 8:11
  82:15 83:11
  151:7 152:4
agreed 23:13
  109:23 151:4
agreement
  105:21
ahead 8:15
  58:2 75:4,14
  93:13 98:24,25
  111:17,18
  120:25 150:19,
  20 152:9
alert 115:16
algorithm
  109:6
all-female
  120:12,17
allowed 55:9
  71:14 149:5,6
alternative
  94:13
ambulate
  149:5
amount 34:25
  35:2 37:4 42:18
  51:5 54:7 55:14
  58:6 101:4
  104:4 117:22
analog 46:1
  47:7,8
Andrews 7:9
anniversary
  15:15
announcemen
ts 19:9
annual 15:15
answering
  22:2
answers 10:24

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

11:1 152:24
153:4

**anymore**
20:14

**Apache** 13:6,9

**apologies**
78:11

**apologize** 66:5
85:12 124:12

**appearance**
7:13

**appearing** 8:1,
3,6

**applied** 17:12

**apply** 136:22

**appointments**
45:18,21

**approaching**
36:6

**April** 53:6,12
66:1 67:19
72:18 73:11
78:7,21,24
79:19

**archived** 60:19

**archives** 60:19

**area** 51:12
124:22,23,24
131:14 133:11
139:4,19
140:21,24
141:5 144:8
145:15,21
146:17,19
147:15,17,24

**areas** 23:12,23
24:4 110:19
125:9,11

**Arizona** 13:5,
10,24

**arranged**
130:13

**art** 56:21

**arts** 124:24

**Ashley** 7:8 8:8,

10,12,19 9:3,
18,25 10:5 36:3
41:21 42:15,25
43:13 52:22
53:4 66:2 67:7,
20,21,25 73:22
75:5,15,24 78:9
79:11 84:7
88:7,14 91:19
92:6 93:23
96:22 108:24
118:7,9 120:8
121:21 122:13
127:24 149:17
150:5,19,21
152:9,21
153:10

**Ashley's** 72:25

**asks** 10:24

**assess** 81:6

**assessing**
16:20 24:9
36:12

**assessment**
32:14,15,20,21,
25 33:5,6,9
34:5,10 68:25
69:1,2 77:13
80:1,7 81:6,7
82:16 83:8,11

**assessments**
99:19 125:20

**assigned**
44:12 62:9
113:16 115:11,
12

**assist** 78:25

**assistance**
48:7 76:15
144:11

**assistant** 12:6
20:8,17

**assistants**
16:15

**assume** 10:11
11:16 17:2
63:16 77:21

**assuming**
36:19 84:6,14

86:19 88:24
94:16 152:19

**asthma** 144:15

**astute** 35:25

**attached** 73:20
77:6 135:11

**attachment**
66:1 68:1,7
84:15 97:16

**attachments**
73:18,23 78:17,
18

**attempts** 37:5

**attend** 27:25
28:2,17 55:20
86:4

**attended** 12:10
85:23

**attending**
7:14,16,18,20

**attention** 19:9

**attentive**
115:17,19

**attorney** 7:24
28:22,23

**attorneys**
149:18

**audio** 52:8

**audit** 21:11
23:20 25:15

**audits** 19:20

**authoritarian**
113:5

**authorize**
149:24 150:7,
12

**autopsy** 29:4
30:16,19

**availability**
56:23

**aware** 35:25
36:2 59:7 62:18
83:23 94:21,24
96:15,17
108:12 151:19

— — — — —

**B**

**bachelor's**
12:18,20,23

**back** 13:10
14:2,5 27:17
41:14,24 42:5
47:14 50:9
52:8,20 55:15,
17 67:5 77:17
80:3 88:1 92:4
105:21 106:14,
15 120:8,9
122:5,12
124:22 126:16
127:2 129:22,
24 131:10
145:11,20
146:6,24 148:4,
6,12

**background**
12:1

**backtrack**
52:23

**backup** 28:19
29:15 31:12
36:18 44:17
72:16

**backwards**
136:20

**bad** 50:2 65:8
81:25

**ballpark** 37:9
70:9 75:1

**bare** 72:12

**bars** 55:3

**base** 135:1

**based** 62:7
90:8,9 109:6
150:6,11
152:18

**basic** 87:24

**basically**
14:21 16:11,19,
22 17:2 23:25
24:23 35:7 48:3
49:15 55:12
56:5 61:1 69:23

72:7 77:12
80:22 81:2,23
90:16,25 101:6
103:19 110:22
135:18 136:19
144:5

**basis** 21:5
23:10 25:7
28:10,17 44:11
45:2 47:2,18
51:6 56:15
57:19 101:6
103:23 109:21
119:3

**Bates** 65:21,23
67:16,18 78:7
79:10 84:4
96:20 124:7,10
133:7

**Bates-stamped** 118:7

**bathroom**
140:24

**bear** 84:3 118:9

**bearing** 68:4

**bed** 134:23
135:24

**beds** 83:24
130:13

**begin** 8:25
23:15 42:6

**beginning**
15:22 81:21
92:11 99:14

**begins** 79:10

**behalf** 7:17,19,
23 8:1,5

**behavior**
117:12

**behavioral**
13:9 16:14

**behaviors**
41:10 91:13
117:5

**belabor** 10:15

**believed** 65:6



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**benefit** 18:6
57:7 59:13,17
65:11 151:14

**benefited**
106:8,12

**benefits** 18:2

**bi-month**
23:17

**bi-monthly**
21:10 22:10

**big** 12:25 116:5
123:15

**bigger** 128:7

**bio** 64:23

**bio-
psychosocial**
64:23

**bit** 12:9 27:7
46:20 49:4
51:14 52:23
80:20 88:6 99:2
112:15 121:5
128:4,7 137:3
143:2

**blank** 123:15

**blind** 134:9
139:14

**blue** 63:5

**bold** 98:10,12
118:18 119:8,
12,22

**bolded** 119:9,
14

**books** 41:2

**borrowing**
110:22

**bottom** 97:25
100:9 102:22

**boundary**
26:11,14

**brain** 121:6

**brakes** 12:25

**Brandon** 7:19
8:16 40:7 52:6
67:9,16

**break** 11:19,22
41:19 43:10,14
91:20,22 122:3

**breaks** 13:2

**Brent** 8:5,18
152:14

**bridge** 19:5

**Bridget** 7:17
42:16,24 92:7
121:23,25
122:17 124:10
152:18

**briefly** 95:24

**bring** 93:3

**bringing** 19:8
112:1 121:11

**broad** 64:20

**broke** 108:25

**brought** 17:9
34:3 41:14
55:15 121:2
131:17 149:7

**Bruce** 7:9

**budgeting**
106:8

**buffer** 26:3

**building**
122:25 123:3,
12,25 124:18
128:10,18,20,
23 132:22
133:11,17
134:1 137:18,
20 140:22
141:18,21
142:11 143:17
144:17,19,24
145:25 146:7
147:15,17,18,
19,21,22,25
148:8,15 149:1

**bulk** 100:1

**bullet** 102:17

**bullets** 81:22
103:8

**bunch** 73:18

91:3

**bush** 148:5,16

---

**C**

**caliber** 151:11,
12

**call** 26:7,11
47:23 48:23
61:9 63:6 64:23
82:5 85:2 110:4
117:20 119:16
121:6 123:1
124:5 125:12
127:21 133:6
140:15 141:7
144:10

**called** 28:13
48:2 79:22
101:13 107:25
108:7,15,23
109:3,18
112:11 141:8

**calls** 9:11,14
85:2,5 93:12
111:9,15
120:24 141:6
150:3

**CAO** 13:8

**capabilities**
49:1

**capable** 46:5

**capacity** 19:13
35:13 90:9,20
140:6

**Carbon** 7:21

**care** 15:6
16:21,22 17:6
20:4 25:2 28:15
35:1 36:2 38:3,
5,17,23 39:11
41:1 43:15,17,
18,19,21,23,24
44:2,4,6,7,8,9,
18,22 45:4,9,
11,13,17 46:10,
12,18,19 47:5,
8,16,19 48:12,
18,22,25 49:17
50:10,15,21,23

51:19,21,22
52:1,2,3,4
53:18,22 54:7,
9,10,11,15,21,
24 57:6,16
58:18 59:13,17
60:9 62:14
65:16 66:19
68:20 69:10
71:23 72:4
77:14 82:8,12
83:1,14 84:1
85:1,20 87:8,10
91:1 95:21
96:12 103:6
104:12 105:4,5
107:10,13
109:7 110:16,
21,24 111:7,14,
22 112:9,12
116:4 119:2
144:7,10

**career** 18:7

**careful** 10:23

**carried** 19:19

**case** 7:11 9:5
29:6 30:10
31:15 42:17
59:12 60:9 61:3
64:6,7,21 65:3

**caseload**
100:24 101:1,7
102:12 104:18
107:11,12
120:18

**cases** 112:22

**Cassiday** 8:3

**category** 47:6

**cell** 55:17 56:3,
4 57:12,20,23,
25 58:4,10,13,
15 128:14
129:1,14
131:16,23
133:24 134:6,7
136:20 139:15

**cells** 57:17
104:10 115:22
127:13 130:1,7
131:3,6,21

**132:10 133:10,
12,16,19,22
134:4,23
135:23 136:2
137:4 139:23
143:8,10 147:6**

**cement** 134:25

**center** 12:4,7
17:5 20:9 46:13
48:19 53:3 55:2
64:14 82:11
83:13 85:19
124:3

**centers** 104:9

**central** 7:10
21:6 27:14
108:12 109:22,
25

**certified**
114:11

**chain** 26:21
79:6,7 80:12
100:9

**challenge**
104:1,19 114:9

**challenged**
94:12 103:2,19

**challenges**
64:25 99:21
102:18,24
103:10 110:12

**chance** 11:4
87:21

**change** 16:6,
24 17:25 62:24
100:21 101:10
102:14 116:1
117:12 149:6,
24 152:23

**changed** 15:24
17:16,19 18:3
117:24 129:11
134:15

**changing**
129:14

**chaplaincy**
20:20

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

charged 36:1
83:1

charges 29:3

chart 127:25

charts 119:12,
23

check-in 27:12

Chicago 7:16,
18 13:15,22
55:2 64:14

chief 22:16
27:22 59:8
72:7,13 73:25
81:4 108:11
110:1 152:2

Chloe 7:4

Chloe's 153:3

choice 83:4

chose 121:9

Christian 48:2

chronic 141:23
144:13,15
145:4

chronologicall
y 98:2

chuck-hole
136:6,21

chuck-holes
149:1

cinder-block
134:25

civil 34:13
39:19 91:17

civilian 44:23
45:25 47:7,8,
15,20

civilly 39:1
91:11

clarification
11:16 19:16
40:6 50:19

clarified 25:17
40:4

clarify 28:19

clarifying 22:3

classes 123:19

classification
101:2

clean 89:15

clear 11:9,12,
13 50:7 94:5
145:7

clerical 102:4,
6

cli 69:7

clinic 141:23
145:4

clinical 12:3,18
13:6,8,21 16:8,
10,12,13 20:19
65:15 69:7
77:13 81:6,7
82:20

clinics 124:25
144:13,14

close 91:23
106:5 137:22
140:12

closed 17:7
83:22 90:24
135:20 141:2

closely 44:25

closest 24:22
25:7

closing 141:3

closure 90:9

closures
90:18,21

co-counsel
42:17

colleague
121:23

college 12:10

combination
68:16

combining
17:8

comfortable

36:6

command
26:22 79:6,7
80:12

comment 77:2

comments
36:8 77:16

commit 39:1

commitment
34:13 39:20
91:17 99:19

committed
47:11 91:11

communicate
101:12 113:4

communicatio
n 97:5 151:24

community
47:14 106:10,
15

compare 69:9

compared
134:16

comparison
113:1

compile 62:6

complaint
28:25 30:9
31:3,12,15,17,
18,21 32:12,25

complaints
35:21

complete
12:15 23:11
42:12 86:18
99:20

completed
12:19 23:21
32:20 39:20,22,
24 64:10 81:1

completely
54:20

compliance
23:10 24:9

complied 24:7

compliment
108:4 121:10

complying
36:13

component
96:7

components
18:25 54:23

computer 9:7

concentrated
101:5

concern 26:20
90:3 91:7 102:3
103:13 107:16
108:7 110:3,8
115:15 117:3
120:17 136:15

concerns 26:2
29:7 36:5 89:25
91:3 99:10
102:18,23
104:7 106:25
107:15 117:2

CONCLUDED
153:13

conditions
144:15

conduct 22:10

conducted
29:4

conducting
36:14

conference
9:11,14 61:8
146:10

confidential
125:11,21

confine 75:20

confirm 73:2
130:5

confusing
128:4 142:18

conjunction
69:17 72:8 77:5

connect 52:7

connection
86:1 125:13
153:1

connections
153:2

consents 82:8

considered
44:3 119:2

consisted 19:8

consistent
29:12

constant
113:25 114:3

constantly
113:23

construction
104:6,13 105:2
123:7,11,22

consult 84:16

consultation
68:17 84:25
85:2,3,15,19,24
86:6,18 87:16

consultations
85:5 86:8,12,
20,24 87:6

consulted
19:3

consults 87:13

contact 49:13,
23 51:17 54:2
56:14 64:4
80:11 137:8

contacted
79:5

contacts 49:24
51:10 107:9

contemplated
111:6

content 99:9

contest 11:20

context 11:11
87:25 93:24
100:8



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

continue 51:2

contract
14:10,17,20
15:1,2,5,6,10,
17 17:19,22,24
18:23 20:2
21:4,18,19
26:15 36:10,13
107:21,24
108:6,8,16
109:11,14,18,
19 110:4 111:5,
12

contracted
14:21,22 108:4

contractually
112:10

controlled
45:6 51:16

convened 7:7

conversation
10:21 60:13
137:8

conversations
59:5

converted
131:7

converting
124:21

convicted
89:10

coordinator
24:3

corollary
11:15

correct 12:11
14:3 26:23 28:5
30:7,20 32:6
40:12 46:14,16
50:24 51:24
58:13 60:3
62:16 65:13,18
66:19 71:9 81:6
85:10 88:21
95:3 105:1,13
121:17 125:14
129:2 139:17
146:2 151:5

corrected
25:17

correcting
146:24

correction
44:24

correctional
12:4,7 17:5
20:9 41:11 51:9
56:22 82:10
83:13 85:19
114:1,4

corrections
12:4 14:6,9,23
80:24 81:2
106:15

correctly
33:25 101:20
105:20 115:2
128:16

cosmetically
131:16

cost 89:25

counsel 7:12
42:8,21 67:18
75:19

counselors
16:11,13

counting
105:24

couple 10:9,16
35:6,24 42:15
87:14,22 88:19
105:8 106:5

court 7:3,5,10
8:8,11,15,19,25
10:17,25 39:1
41:8 42:3,5
52:12,20 66:22
67:5 72:21 73:1
91:16 92:2,4
118:4 122:10,
12 140:18
153:12

cover 22:18

covered 23:22
27:8

covering
23:12

create 104:10

created 104:8
124:20 125:6
131:20

crisis 16:22
21:8 22:21
23:19,20,24
35:3,16 37:4
44:4,5,20
45:10,13 47:6,
8,16,19 48:13
96:3,4 104:10
107:10 133:10,
11,16,24 134:6,
11,13,14,23
135:22 136:2
137:4 138:19
139:23 140:3
143:8,10 144:8
147:6 149:3

critically 111:4

CROSS 149:15

cubicles
125:12,25

culinary
123:19 124:24

current 60:18
62:19 65:1 87:9
89:16 90:23
94:2,19,22
124:17 143:16

custody 35:18
44:1 62:20
89:9,11,13,17
125:15

cut 53:20 110:9

—————

D

D-E-A-N 87:17

daily 56:15

damages
94:10

data 22:19
23:1,4 81:3
119:24

covering
23:12

database
97:15,19
100:13

date 15:15,16
34:9 70:9,11,12

dated 17:21
66:1 67:19
72:17 73:11
74:8 78:7 96:19

dates 29:25

Davilla 88:21,
22,25 89:4 90:1
91:5,12 92:10,
12,18 93:24
94:10,23 95:1,7

day 7:5 25:7
55:18 56:11,17
57:24 58:5,9
63:5 117:23
126:18,22,25

day-to- 25:6

day-to-day
16:17 19:15
21:24 36:2 51:6

dayroom
130:25 131:18

dayrooms
132:18

days 31:10

deadline 61:4

deal 94:15
96:10 109:9
113:13

dealing 94:12
112:21 114:9

deals 105:14

dean 87:17

decades 93:24

December
12:5 14:13

decided 69:23

decides 83:2

decision 83:2

decompensati
ng 113:13

deemed
105:25

defendants
7:20,23 8:2
149:18

defense 42:8,
21

deficient
109:13,16

deficits 108:11

degree 12:2
13:21 91:12

demands 82:6

demographic
64:22,24

department
14:6,8,23 15:22
17:6,12 19:6,7,
10,11 20:19,22,
23 21:9 22:14
27:9,16 39:4,5
40:4,9,14,19,24
72:8,14 76:17

departments
20:18,22 27:11,
18 59:10

depending
55:15 101:15
117:19

deponent
7:20,23

deposed 10:6,
8

deposition 7:8
9:7 10:12,19
28:20 30:18
34:15,21 53:17
72:23 79:12
153:13

describe 17:17
27:7 43:16 49:4
80:20 136:18

describing
29:16 51:3
53:15

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1:18-cv-01101-SEM-DJQ #181-13 Filed: 07/08/24 Page 48 of 64
The Deposition of NORINE ASHLEY, taken on October 15, 2021
161

designation 16:13

designations 128:17

desirability 71:21

desk 137:23 144:2 147:2

desktop 9:7

detail 12:9 27:7 87:23 103:9

detailed 21:10

determine 71:20

determined 65:10 70:13 72:4 104:11

determines 72:8

developed 120:18

device 9:6

DHS 39:1,9,11, 15,25 40:10,11 41:1,5 47:12 51:23 54:12 55:3 58:21,22 59:6,9,21 61:15 62:20 63:1,6,23 64:5,9,12 69:18 70:4 71:15,21 74:4 77:9,12,17 78:25 83:4,7, 17,21,24 84:16, 25 85:22 86:6, 8,11,12,20 87:3 89:9,12,16,20, 23 90:5,9,15, 17,20,23 91:9 93:8 94:8,23 111:24 118:25 150:13,25 151:12

diabetes 144:14

diagnoses 63:23 65:1

diagnostic 48:1

diagram 122:24 123:12 143:16,20,25 145:13

dietary 55:11 148:21

differ 51:21 54:9

difference 21:19 51:7 52:3 53:17 54:7 55:8 100:11,15 101:19,25 102:7 116:5 134:10 151:11

differences 143:19

differential 135:14

differently 130:13

difficult 41:11

difficulties 52:7 110:12

difficulty 77:1

direct 9:1 16:21 24:20 113:5

directed 24:9

direction 27:21

directive 24:6 26:6 62:13 72:10 109:8

directives 23:22 24:10 27:13 108:23 109:1

directly 20:23 26:13 64:13,15

director 13:8 25:1,2,3,5,7,19 59:19,21,24 62:6,9 64:15 68:17 69:5

78:1,3 84:4 101:22 141:24 144:12

directors 24:25 25:5,9,21 59:9

disagree 81:15

disagreed 77:13 81:13

discharge 31:23,25 32:7, 8,11,25 38:24 39:11 93:16,19

discharged 89:11 101:18

disciplinary 116:25 117:16 119:18 120:5

discipline 26:15 117:19

discovery 122:24 127:23

discuss 25:18 110:10

discussed 67:21 73:25 78:21 79:7 80:12 89:20 90:4 91:3 123:6

discussing 43:14 88:20 91:10 99:21 112:15

discussion 61:14 63:19 69:4 92:10 94:1 120:12

discussions 59:11 63:25 64:2,11 72:3,6 89:8,16

disorders 87:15

distinguish 116:24

distinguishes 46:17

distinguishing 38:7 117:15

District 7:10

division 7:11 85:21

Dixon 85:18, 19,21 100:22

DLC 13:11 15:16 108:11 109:22

doc 19:16 21:13 24:7,10 26:6 27:9 32:18 41:16 48:17 63:22 70:25 71:4 74:3 84:1 89:1,9,11,13 109:11 150:6

doctor 13:16 21:17 111:18

doctoral 16:8

doctorate 12:2,13

doctors 151:8

document 9:16,20 24:7 28:21 30:13 31:6,22 33:3 65:19 71:19 72:17 73:22 74:7 80:3 85:13,14 88:16 92:9 96:24 111:20 124:7 151:1

documentatio n 21:11,12 23:18 85:23 86:18

documents 9:13 24:1 30:21,24 31:20 32:13 34:11

doe 50:9

door 57:17,21 132:24 136:17, 23 141:2,3 147:17 148:6

doors 56:3 125:8 126:12 131:16 136:2 137:18 147:4,5

double 115:11

drain 121:6

drastic 100:21 101:10,14 102:14

drastically 117:24

draw 114:14,20

dry 110:10

DSI 67:17

dual 26:11

duration 22:22

duties 21:23 22:2

Dwight 17:5,7, 8 33:22

_____

E

e- 67:22 73:17 118:16

e-mail 60:12, 14,16,18 61:7 65:23,25 67:19 68:3,6 73:23 76:2 78:6,9,18, 21,25 79:18 80:17 84:4,8, 14,19,21 85:14 96:19,23 97:9, 22 98:3,9,14,21 99:7 100:9 102:2 106:19 118:6,11 120:9, 10

earlier 72:23 73:25 79:7,21 80:12 110:17 116:2 120:3 139:12,22 144:4,25 145:2 150:23

easier 128:7



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**east** 126:19,22,
25 127:4 131:4,
6 132:2,7,18

**easy** 9:21

**eat** 148:23

**eating** 87:15

**editing** 76:8

**edits** 80:19

**educate** 42:14

**education**
12:15,16,17
111:25

**educational**
12:1

**effort** 113:15

**eighth** 129:18

**elderly** 92:24

**Electronic**
40:18

**electronically**
76:23

**elements**
134:19

**Elgin** 28:15,18
29:21 30:1
41:15 48:16,25
49:2,11,21,22
50:5,10,16,22
51:5 53:3,10
54:13 90:23
104:23 111:8
114:19

**eligible** 89:4
90:13

**Ella** 8:10

**emergency**
38:3,4

**eminently**
47:10

**employed**
14:9,22

**employees**
149:23 151:19

**employer**

16:24

**employment**
14:12 26:12

**enclosed**
134:9

**encountered**
36:19

**end** 25:22
40:17 67:11
76:4 88:16
114:14 138:13

**ended** 41:15
114:20

**endurance**
11:20

**engage** 49:15
113:1,2,5,11
137:7

**engagement**
25:6 47:1

**enhancement
s** 104:18

**enjoy** 55:14

**enrolling**
19:10

**ensure** 17:23

**entailed** 49:12

**entails** 49:22
54:2

**enter** 56:1 57:2

**entered** 79:24

**entire** 14:15,18
19:23

**entrance**
140:22 148:4,7,
13

**entries** 129:3

**environment**
45:6 51:8 54:25
82:12 116:11

**environments**
151:9

**equally** 37:3

**equipment**
131:18

**equipped**
82:11 83:13
94:14 151:4,8

**equivalent**
46:9

**error** 102:4,6

**errors** 80:24
152:25

**escalate**
113:12

**escapes** 62:25

**ESI** 65:24

**essentially**
41:14 43:25
89:10,12 102:9
105:9 107:16

**established**
31:15 45:4
105:23

**establishing**
99:15

**estimate** 11:7
74:24

**et al** 7:9

**evaluation**
31:7

**evening** 28:23

**eventually**
13:7

**everything's**
143:23

**evidently**
85:21

**exacerbated**
121:12

**exact** 118:22

**EXAMINATIO
N** 9:1 122:15
149:15

**Excel** 68:8,19

**exceptionally**
114:6

**excuse** 92:11

**executive**
82:1,5

**exercise**
131:18

**exhausted**
117:5

**exhi** 65:22

**exhibit** 52:24
65:20 66:3 67:8
72:19,22 73:3,
6,12 76:3 78:6,
12,14 84:2,9
91:3 92:10
96:18 97:3
117:6 118:2,13
120:8 122:22
123:4 124:5,9,
11 125:3
127:21 128:1
129:23,24
133:5,6,13
140:16,17
145:11

**exhibits**
118:10

**exist** 29:22
30:5 104:21

**existing**
104:13

**exit** 56:1

**expanding**
15:22

**expect** 68:2
71:18

**expected**
55:17 86:3

**experience**
48:15 90:8,20
114:7 121:8

**explain** 11:25
53:19 61:5
101:13,23
103:17

**explained**
53:20

**explaining**

101:15

**explore** 40:24

**exploring**
39:3,5

**exponentially**
103:21

**exposed**
112:20,23

**express** 89:24
91:7 103:13
110:3,7

**expressed**
90:4

**extent** 89:22
94:20

**external** 37:6

**extremely**
34:25

———————

**F**

———————

**facilitate** 42:16

**facilitating**
64:16

**facilities** 83:23
90:10 95:12,22
101:3

**facility** 12:8
14:25 17:1,2,5
28:15 29:21
33:15,22 39:9
40:11 41:14,15
43:20 46:22
48:16 49:11,22
51:9,24 53:10
55:15 56:22
64:13 81:24
82:7,21 85:22
86:9 90:23
94:11 95:8,11
101:5,17
104:23 109:21
114:13 116:14
120:13,17
128:18 129:9
149:24 150:8
151:1

**fact** 8:12 15:2

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of NORINE ASHLEY, taken on October 15, 2021

59:14 64:9,14
83:23 86:20
90:22 92:25
99:16 112:21
152:5,10

**factors** 89:20

**facts** 43:15

**fair** 123:20
126:9 133:2
140:14

**fairly** 10:10
12:24 44:25
57:18 119:3

**familiar** 73:23
127:25

**familiarize**
87:23

**families** 46:6

**family** 38:25
131:19

**fan** 143:11

**fed** 136:10

**federal** 23:12

**feel** 36:6

**fees** 106:12

**fell** 54:20

**felt** 59:12 60:8
117:13

**female** 15:24
17:2,4,8 33:15
34:1 99:22
101:17 107:17
121:5,9,11
135:15

**females** 33:23
37:22 121:2
135:12,19

**fewer** 140:9,11

**figure** 71:22

**file** 60:18 76:24

**files** 28:22
30:8,15,22

**filing** 28:24

**filled** 56:12
108:13,14

**finally** 151:17

**find** 135:13

**finding** 104:1

**findings** 100:2,
5

**fine** 52:10
72:24

**finishes** 133:5

**firm** 26:11

**fitness** 63:2

**five-minute**
41:19 122:2

**fixed** 120:22

**floor** 105:9

**flow** 81:1

**flowers** 148:10

**foam** 135:1

**focus** 111:3

**focused** 47:5

**folks** 39:22,24
58:21 62:21
64:4,12 65:14
79:5 86:20 87:3
94:18 110:23
112:25 115:21
118:17,18
120:4 148:22,
25

**follow** 72:15
86:6 112:4

**follow-up**
152:17

**food** 35:5

**foreign** 35:4

**form** 75:20
99:15 135:9
149:25 150:1,
14,15 152:6,8

**format** 85:9
87:24

**found** 25:15

63:4,7

**four-point**
135:17

**free** 56:6

**freedom** 51:15
55:21 58:6

**frequency**
22:21,23 45:3
51:17 111:2

**frequent**
49:12,22,25
54:2 56:14

**frequently**
21:21 44:10
46:3

**fresh** 10:10
115:18

**front** 138:25

**frozen** 52:16
53:16

**fulfill** 107:8

**full** 8:9 108:4
110:13,14
111:19

**fully** 47:23
106:17 111:12
116:15 127:19

**function** 35:13

**functions** 20:3

**furloughed**
129:4,6,12

**furnishings**
131:17

**future** 85:9

**fuzzed** 40:17

**FYI** 119:7

———————

**G**

**gaining** 106:9

**gather** 62:14

**gathered**
65:24

**gathering**
28:3,4 77:8
81:3

**gave** 50:22

**gender-
specific**
135:16

**general** 23:23
25:12 35:21
41:9 43:22
44:15 45:20
49:2 51:13 68:4
82:19,24 95:18,
25 100:25
139:4 144:9
148:22

**General's** 7:24

**generally**
29:18

**Geraghty** 7:17
8:13 42:16
91:20 92:8
105:8 121:23
122:2,7,13,16,
17 124:12,14
149:8,14
152:20

**Gilbert** 7:4

**give** 8:21 70:11
87:21 100:1
104:12

**giving** 48:8
50:3

**Glen** 7:21

**global** 50:21

**good** 9:3 37:11
40:6 42:2
88:11,18 101:1
113:10 114:6,
15,20 122:8,13
149:13

**gosh** 12:20
23:1 127:17

**graduated**
12:13 13:22

**grammatical**
152:24

**Great** 41:23,25
42:1 43:3,6
88:12

**greatly** 104:15

**green** 147:24

**grew** 103:21

**ground** 102:4
108:9

**group** 16:21
44:14 46:2,7,25
47:2 48:4,8
51:5 55:19 58:3
69:2 103:25
124:15,23
125:1 126:10,
12,14 139:11
140:20

**groups** 47:4
49:14 51:11
54:5 104:2

**guard** 57:14,17

**guards** 120:4

**guess** 22:10
38:7 45:19 49:8
51:25 52:24
71:4 76:10
86:14 94:16
95:3 107:19
116:9 145:7

**guidance**
25:20

**guidelines**
21:13 64:20
72:9 112:3

**guilty** 83:8

**gym** 56:10
123:16,18,20,
21 124:17,21,
22

**gymnasium**
148:17,18

———————

**H**

**half** 123:21
124:21

**hall** 143:2

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

hallway 125:24
126:10,12
130:21 132:2
138:4,10,13
139:22 142:15,
19,23 147:8

hand 8:20

handcuffs
136:22

handles 135:3

hands 136:20

happen 27:14
45:11

happened
25:24 53:23
123:7,8 131:23

happening
16:4 102:4
104:24 123:9

happy 78:19
92:6 118:16

hard 9:21 91:4
109:5 139:5

harder 112:8,
11 115:20
116:10

harm 93:21

harmed 92:25

harmful 58:17

Hayes 8:1 43:5
111:9,16 122:5,
8 149:12,16,17
150:1,4,15,17,
18 152:11

head 20:23
105:14

heads 27:9,16

health 8:2 13:9
14:23 15:20,23
16:2,9,14,19,22
17:3,6,21 19:6,
11 20:19 22:15,
16 23:9,23
24:24 26:24
27:3,4,22,23
32:19 35:4,20
36:4,18,20

43:20 44:10
45:1 46:13
48:7,18 49:15
51:17 54:4 55:2
56:10 59:8,21,
24 63:24 64:14,
15,25 65:15
68:18 69:5
72:11 80:1,7
90:10 92:23
93:18 95:3 96:4
100:23 101:1,7
102:12 103:21,
22 104:18
105:23 106:4,9
107:11 112:22
113:3,17 115:9,
13 116:15,24
117:6,16
120:18 137:8
149:23 150:7,
12

healthcare
15:5,19 17:4
38:2,8 57:6
95:11,14 103:3,
4,5,10 105:11
107:8 108:19
115:7 133:10
137:24 138:11
140:2 141:5
142:1 145:6
146:11,18
148:3,4,7,13
149:7

hear 52:8

heavily 41:8
47:5

held 19:7,14
22:21 82:22

helpful 10:3
53:21

helps 10:4

high 34:25
100:22 101:24
114:23

higher 17:3
18:5 28:15
43:24 48:12
65:16 85:20
90:25 121:6

highest 68:21,
25 71:20

highlighted
94:4,9

hinder 108:18

Hinton 22:16
60:2,20 61:18,
19,21 62:1
65:25 67:20
69:15,19 76:9
77:12 81:4 84:4
85:3 97:10 98:4
100:1,10
101:11,22
102:2 108:11
110:1

Hinton's 27:22
72:7,14 152:2

hire 151:20

hired 16:7,8,9,
18 17:21 24:20
111:23,24

hiring 15:23
16:14

history 12:3
32:19 64:24,25
91:14,18
127:22

Hold 73:9

home 46:7
48:5 92:12
93:5,10,18
94:2,14,17

homeless 48:3

homes 46:2
92:24

honest 29:24

hope 76:4
128:3

hoping 42:21

horrible 29:24

hospital 35:6
39:11 45:5
46:15,21 47:3,
11,13 48:14
55:1,21,25
56:11,13 95:3

96:10,11,13
111:24 112:2
129:8

hospitalizatio
n 37:25 38:10
45:10

hospitalizatio
ns 37:6

hospitalized
95:1

hospitals
95:19,25

hour 41:18

hours 117:14

housed 34:1
104:11 140:1,6
144:8

housing 23:3,
5,6,7 25:4
89:25 104:8,14,
15 117:20
119:16 122:25
127:16,22
129:11,24
141:6 144:23
145:8

huge 55:6
104:3

—————

I

idea 77:24
140:5

IDENTIFICATI
ON 66:3 73:6
78:14 84:9 97:3
118:13 123:4
124:9 128:1
133:13 140:17

identified
38:21 119:22

identify 7:12

IDOC 7:20,23
15:22 16:25
17:16,24 18:1,
4,7 19:12 23:12
26:12 27:15
29:11,19,23

32:5,8 33:10
34:1 38:15
39:4,12,15 41:5
48:21 50:22
58:20 59:8,25
62:19 70:3,14
71:11,15 72:7,
22 78:4 82:24
86:10 90:24
91:8 93:9 94:2
95:12 96:2
101:3 107:7
109:2,4 111:6
127:24 150:6,
11,12 151:24

IDOC's 53:2

IDOCS 26:24

ill 23:4 34:24
37:3 38:22 46:4
66:18 82:20
85:21 95:20
100:16 101:3,4,
8,22 102:10
111:4 112:17,
18 114:7
115:21 116:12
120:4

Illinois 7:11,21
8:4 13:11,14,23
14:2,22 83:22
92:20,22 106:8

illness 36:24
37:16 63:4
71:25 82:6
99:23 114:7

immediately
133:11

imminent
48:13

impact 55:7
115:8

impart 36:13

important 57:5

imports 49:23

improperly
116:23

improvement
23:20 24:3



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**in-between** 126:10

**Inaudible** 60:20 62:14

**incapacitated** 93:20

**incarcerated** 14:24 51:15 58:25 93:4,16 113:6

**include** 20:19 27:24 64:22

**included** 16:20 65:2 66:13

**incomplete** 121:10

**incorrect** 146:16

**increase** 51:10

**increased** 16:1

**increases** 16:3

**indentations** 135:3

**independent** 34:20

**independently** 46:6

**individual** 16:21 24:22 27:10,18 47:3,5 82:12 83:7 103:20 107:8 125:20 132:10 136:19

**individuals** 14:24 35:18 36:8 44:1 46:7 73:19 83:3 93:15,19 100:23 113:6 125:15

**Industrial** 48:2

**infirmary** 137:23 138:2, 11,12 140:2 142:19 143:4,9

**144:**2,9 147:2, 11 149:4

**influx** 113:25

**inform** 109:12

**information** 27:17,19 61:4, 6,9 62:5,15 64:17,22 66:14 70:20 74:13,19 75:12 77:11,15 79:4 85:8 106:20 109:25

**ingested** 35:4

**initiated** 26:14

**injured** 96:9

**injuries** 94:7, 10

**injurious** 37:5

**injury** 38:9 96:10

**inmate** 55:6,12 89:9 91:8

**inmate's** 82:6

**inmates** 90:13 149:24

**inordinate** 35:2 37:3

**inpa** 45:17

**inpatient** 28:14 38:17,23 39:12 43:15,18 44:3, 8,9,20 45:9 46:11,17 48:22 50:10,23 51:19, 21 52:1,4 53:18,24 54:1, 10,11,12,15,23 55:21 56:15,24 57:2,6 58:6,18 59:13,17 60:8 61:2 62:8 66:7, 16,19 68:7,20 71:23 72:3 77:14 81:23,24 82:7 94:11 97:12 98:6 104:12 105:4 110:16,23

**111:**7,10,13 112:9,12 116:4 119:2

**input** 87:9

**inquire** 35:20 151:22

**inquiry** 100:4,6

**insanity** 83:9

**inside** 126:4 139:16

**instance** 42:22

**institution** 13:13

**instruct** 75:21

**instructions** 24:2 72:15

**intake** 79:23

**intakes** 16:21

**intense** 45:5 46:25

**intensity** 46:19

**intensively** 112:24

**interacting** 35:14

**interaction** 35:9 46:24 51:6 56:12

**interested** 23:3 119:5

**interference** 40:18

**internship** 55:2 83:21

**interrupt** 50:13 51:1 58:2

**interruption** 52:22

**intervention** 45:14

**introduce** 52:24

**introduced** 9:4

**introducing** 66:6

**involved** 56:19 59:10 64:1 72:2 94:6 96:8,12 107:21

**irregularities** 101:14

**isolated** 57:10

**isolation** 134:4,7,11 138:19,21 139:9 147:6

**issue** 25:15 51:18 64:5 117:16,19

**issues** 26:19 46:8 63:24 80:23 93:4 94:6,15 95:4 99:10,13 113:3 121:10 127:14 151:18

**item** 122:22

**itemize** 23:15

___

**J**

**January** 16:5, 16

**job** 14:5,7 15:19 16:17 18:22 19:1 26:1 48:9 106:11 152:7

**jobs** 26:1

**jog** 52:25 72:25

**Join** 111:16 121:1

**jots** 146:8,19

**judge** 83:2,3,6

**July** 102:13

**June** 14:13 15:14,15,16 18:15 96:19 98:9,22 102:11 106:20 120:9,

**11**

___

**K**

**keeping** 41:5

**Kelli** 7:8

**key** 51:18

**kind** 13:20 19:5 27:11 40:15 56:6 100:12,22 114:13 121:12 123:15 140:21 142:18,19 143:14 147:15

**knew** 113:11

**knowing** 83:22

**knowledge** 47:18 48:14 59:14 62:19,23 88:24 89:3 113:7 150:5,10

___

**L**

**labeled** 144:1 146:9,20

**labels** 147:5

**lack** 103:14 110:13,14 111:20 115:25

**laid** 143:20

**laptop** 9:7,9, 11,14

**large** 28:3 121:3

**larger** 107:10, 12

**lasted** 15:10 74:20,24,25 75:6

**lasting** 74:14

**lasts** 47:16

**latest** 76:5

**lawsuit** 16:1 40:22 41:7

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

lawyer 10:11

lawyers 42:18

laymen 45:16

layout 131:24
143:16

LC 121:7

leads 138:11

learn 60:6 70:2,
19 91:2 92:6

learned 60:5,
12 61:18 70:6,
10 83:16

leave 57:2,16

leaves 94:13

left 13:10 29:11
30:5 32:5 93:25
106:15 113:9,
19 121:8
122:21 137:16,
24 142:23,24
143:8 148:8

legal 59:9
70:25 72:8 93:3
94:6

legally 71:5

legs 135:18,20

leisure 20:20

lev 54:7

level 16:8,9
17:3 28:15
37:13,16 38:17,
23 43:15,17,18,
21,23,24 44:2,
3,4,6,8,9 45:4,
9,10,13 46:9,
11,18,23,25
47:1,4,8,16,19
48:12,18,22,24
50:10,15,23
51:19,21 52:1,
2,3,4 53:17,18,
22 54:9,10,11,
14,15,21,24
55:20 57:6,16
58:18 59:13,17
60:8 63:3 65:16
66:19 68:20

71:23,24 72:3
77:14 84:1
85:20 91:1
95:21 99:23
104:12 105:4,5
106:22,23
107:2,24 108:7,
8 109:5,6,13
110:16 111:7,
14,20,22,25
112:9,11,12,20,
23 115:3,14,20
116:4,10,14
117:12 119:2
121:6,18 152:3

levels 43:19
44:18,22 45:12,
17 48:15 49:16
54:6 56:18
105:14,17
107:1,19
108:22

licensed 16:10
47:23 69:7

licensure
16:12 83:21

life 45:22
152:5,10

limited 90:9

Lincoln 12:7
17:9 20:9,16,17
33:21,23

lines 55:11
79:23 82:4

list 60:7 61:2,
21 62:2,4,6,10,
13,15 67:25
69:9,14 86:2
109:19 118:15,
20 119:1,17
129:24

listed 19:18
103:9

literally 38:6
87:14 147:20

live 45:8 48:11

lived 48:8

lives 114:8

living 46:5

load 115:3

lobby 140:21

LOC 66:16
68:7,20

located 76:16

locating 77:3

location 7:14
48:17,21
129:11,16,19

locked 46:22
51:16 55:17
56:3 57:9,12
58:15

LOG 128:7

LOG:LOG:14:
N:14 128:6

Logan 12:4
13:11 14:15
15:21 16:20
17:2,10 18:14
19:5,7,24 20:4,
13 21:1 25:16
26:4,25 29:17
33:11,12,14,19
34:1,4 35:13
37:11,12,19
42:10 54:25
62:24 65:16
70:24 78:2
79:24 82:10
83:12 85:18,25
86:24 90:13
93:14 97:15,18
99:24 100:21
101:22 102:10
103:11,19
104:3,7,18,24
105:1,9,25
106:17 107:4
108:3,9,20
111:14,23
113:9,24 114:1,
13,17,18 115:7
120:12 121:2,4,
11 122:21
127:18 128:8
129:5,7 133:16
135:10,11,13
151:4,12,15

Logan's
107:12

LOGOUOU
129:14

long 18:17 23:6
47:15 73:16
74:17,20 75:8,
10 113:14
137:9

looked 71:17
72:17 73:13
74:7 132:14,17,
20 133:9

loosening
106:13

lose 106:6

losing 90:20

lost 106:14
117:7

lot 9:17 35:1
36:19 41:10
55:4 92:7
103:24,25
105:10 106:9
121:8

Lots 23:1

Louis 7:25 8:7

low 115:20
116:10,14

lower 95:21

lower-level
110:4

lowest 68:21,
25

LPCS 16:12

LSWS 16:11

luck 114:14

_____

M

made 33:10
37:5 63:11
112:8,11
116:10,14
131:14,15
135:19 150:25

mail 67:23
73:18 118:17

main 23:2
142:10 144:3
147:12

maintenance
34:25

major 12:19
54:23 102:18

majority 21:25
103:22 127:12

make 10:16
11:2,7,13,17,23
24:6 31:13 50:7
70:14,15 72:19
76:12 80:24
81:2 83:1 85:13
100:7 110:20
115:20 122:22
128:6 130:4

making 21:12
68:25 69:1,22
81:7 100:5

male 12:7
15:24 17:1
33:15 85:21
93:15 135:15
144:21

Males 135:17

manage 17:21
37:13

management
22:15

manager 24:3,
21,23,25 25:13

managers
24:19 26:18
28:4

managing
91:4,8 99:23
107:16

manual 72:13

March 12:8
15:14 18:18
20:6 33:17,25
34:6 84:3
113:19 118:6
119:7



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

mark 65:19
78:6 84:2

marked 66:3
73:6 78:14
84:5,9 97:3
118:13 123:4
124:9 128:1
133:13 140:17

MARS 76:15
77:4,21

master's 12:18

masters 12:19,
24 16:9

matter 7:8
112:1 120:5

mattress
135:1

maximum
140:5

Mcfarland
31:24,25 32:4,
25 46:13 48:18
49:9,11

meal 55:13,14

meals 136:9
148:23 149:1,7

meaning 30:4
36:12 38:18
149:23

means 10:21
15:3,4,7 41:12
43:16 54:16
126:11

meant 39:13
51:3 67:22

measure 107:5

medical 24:5
65:6 76:15
77:15 94:12
95:4,19 119:19
133:10,16
134:1 137:17,
20 140:22
141:18,24
142:11,22
143:16 144:11
146:7 147:15,
19,25 148:25

medically
93:17,18 94:15

medication
136:12,13
144:7

meet 125:16,22

meeting 27:15,
16,19,20 60:13

meetings 19:8,
14 27:6,8,11,
24,25 28:7,12,
16 35:16 89:19
107:9

memo's 89:8

memorandum
89:24

memory 52:25
60:11 84:10
97:8

men's 20:10

mental 14:23
15:5,20,23
16:2,9,19,22
17:3,4,6,21
19:5,11 20:19
22:15,16 23:9,
23 24:24 26:24
27:3,22,23
32:19 35:4
36:4,18,20
37:16 38:8
43:20 44:10
45:1 46:13
48:7,18 49:15
51:17 54:4 55:2
56:10 57:5
59:8,21,24
63:3,24 64:14,
15,24 65:2,15
68:18 69:5 70:4
71:25 72:11
80:1,7 82:6
90:10 92:23
93:17 95:11,13
96:3 99:23
100:23,25
101:7 102:12
103:2,4,5,10,
20,22 104:17
105:11,23
106:4,9 107:8,

11 108:19
112:22 113:3,
17 114:7 115:6,
9,13 116:15,24
117:6,16
120:18 137:8
149:23 150:7,
11

mentally 23:4
34:24 37:3
38:22 46:4
66:18 82:19
85:21 95:20
100:16 101:3,4,
8,22 102:10
112:17,18
114:7 115:21
116:12 120:4

mentally-ill
41:4

mentioned
22:9 23:17
24:14 27:6
28:18 29:22
33:14 39:14
47:7 58:20
99:18 121:17
139:12 142:2

met 106:3

metrics 107:20

MHP 125:20,22

middle 123:16
146:4

might've 66:11

milieu 49:2
116:6,11

mimic 49:8,18
51:8 53:23
54:17,19

mimicked
48:24

mimicking
54:18

mind 18:9
19:17 52:15
68:4 87:14
116:9

mini 106:4

minimum
44:11 72:12
101:16

minute 18:8
52:10 67:10
84:3 98:25
118:9

mirror 44:22,
25

mirrors 45:15

missed 117:13

missing 40:3
54:22

Missouri 7:25
8:7

mode 67:1

modesty
135:21

moment 66:23
80:17 85:6
120:7 121:22

momentarily
92:8

moments 90:7

Monday 76:5

monitor 17:23
22:23,24 23:2,
13 41:11 144:6

monitored
55:12

monitoring
19:13 21:16
28:7 109:19

month 27:15
74:25 101:10,
11,25 102:1

monthly 19:7
21:5 22:9,11
27:6,11,19,25
101:6 109:21

morning 9:3

Mountain 13:6

move 88:3,10
99:2

moved 144:22

movement
49:1 55:8,23
117:22 129:19

moving 58:21
59:6 131:2

multiple 20:18
49:14 83:23
95:2

___

N

named 29:7

names 62:10
87:12 98:9
119:8,9,12,21

narrative 81:8
82:2

nature 35:22
49:3 86:24 87:6
94:7,9

needed 16:23
25:17 26:16
27:23 28:15
48:7,11 58:18
61:1 62:2
63:13,16 64:18,
19 65:6,10,16
68:21 77:14
79:5 83:14 87:9
104:4 110:25
115:18 116:16
133:19,24
134:6

needing 80:18
109:7

negotiation
63:14 69:25

negotiations
59:7,15,18,20
63:12 69:20
74:3,9,13,17
75:12 77:9
78:25 90:14
118:25

neighborhood
47:13

night 30:22

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**non-mental**
95:3

**Norine** 7:8
8:10,12

**north** 126:18,
19 127:4,7,8,11
128:12 130:2,7,
18,21 132:13,
18 133:21,25
145:23

**note** 66:6

**notes** 69:9
100:20

**number** 7:11
16:15 18:2 21:7
23:4 24:5 37:2,
8,11,12 38:23
56:1 57:21
63:17 65:21
67:16 73:7 78:7
83:24 100:12,
15,23 101:15,
17,24 102:7,15
104:17 105:14,
22,24 106:1,3
107:4,12 109:6,
9,17,20 116:16
124:7 128:10,
14,25 129:3
145:14

**numbered**
96:20 103:9

**numbers**
65:24 100:21
101:25

**numerous**
37:5

**nurse** 141:24
144:2,5,12

**nurse's** 141:23
142:2,5,8,10,
16,21 143:4
144:1,2,3,9
147:2,9,11,12

**nurses** 137:22
138:4

**nurses'** 138:2

**nursing** 92:12,
24 93:5,9,18

94:2,14,17

—————————

**O**

**object** 40:2,3
149:25 150:14
152:6,8

**objection**
42:23 75:3,13
93:12 111:15
120:24 150:16

**objections**
43:5,7 75:20

**objects** 35:4,5
38:4

**obscured**
143:10

**observed**
121:19

**occasion**
35:19 87:5
134:4

**occasions**
35:6 96:12

**occupied**
127:19

**occur** 105:11

**occurred** 16:3
33:16 34:6 59:4
106:19 151:24

**occurring**
86:24 87:3

**October** 7:6

**offer** 80:19
82:7

**offered** 49:15

**offering** 65:7

**office** 7:24
20:21 21:6
27:14,22
103:24 108:12
109:22,25
131:20 144:17,
18,20,21,22
145:3,5,9,12,
14,21 146:4

**officer** 56:4

**officers** 114:1,
3,4

**offices** 124:25
141:22 145:4
146:10,18,22

**omissions**
80:25

**one-to-one**
103:23

**ongoing**
113:15 118:24

**online** 30:1

**open** 136:16

**opened** 48:16
50:6,16 53:6,
10,12 111:8

**opening** 41:15
136:5,23

**operation**
112:4

**operational**
72:12

**operations**
19:4,6,9

**opinion** 65:15
82:20

**opportunities**
44:13 51:11

**opportunity**
114:12

**opposed** 41:5
119:19

**option** 91:16
93:8 94:19

**order** 41:3
68:21 83:25
91:16

**originally** 12:4

**OUOUOU**
129:17

**out-of-date**
123:1

**outdoor** 133:3

147:15

**outflow** 114:3

**outlined** 22:19
26:10 110:21

**outpatient**
25:2,24 26:2
43:21 44:19
45:2,12,17 56:5
110:19

**outset** 96:24

**overhang**
148:9,12

**oversaw** 25:6

**oversee** 17:12,
22

**overseeing**
17:19 18:23
20:2 21:3,18,19
27:3 107:21

**oversight**
20:13,18 22:5
24:13 36:10
108:6

**overtime**
127:19

**overview**
72:17

—————————

**P**

**P-I-A-P** 28:13

**P.L.** 73:4

**P.M.** 153:13

**pa** 100:25
101:17

**pages** 127:24

**painting**
131:16

**paper** 32:9
76:24

**papers** 32:11
34:13

**paragraph**
107:14 112:15

**paragraphs**
103:9

**paraphrasing**
117:1

**paroled** 101:18

**part** 18:22 36:9
40:21 41:6
47:22,25 55:3
56:9 63:13,18,
25 65:22 70:24
72:15 74:3
77:4,8,9 81:10
90:12,14,23,24
104:9 107:20
108:6 112:7,8,
9,20 143:2
151:23

**participate**
19:2 47:4 51:11
56:5 69:3 89:19

**participated**
9:10 48:8

**participating**
24:14,16

**parties** 8:11
85:23

**pass** 136:9,13

**passed** 27:23
61:9

**passes** 144:7

**past** 30:18
92:22

**patient** 36:18
39:8 46:22
51:10 52:1 54:5
55:5,7 57:7
58:6 62:25
63:7,25 64:9,16
76:21 84:13
85:1,17,18,25
87:8,11 88:21
89:21 96:8
107:10 113:13
134:6

**patient's** 30:2
51:11

**patients** 17:7
21:7,8,12,21,22



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1:18-cv-01101-SEM-DJQ   #181-13   Filed: 07/08/24   Page 56 of 64
The Deposition of NORINE ASHLEY, taken on October 15, 2021
169

22:20 23:5
32:18 35:24
36:5,20 37:2
38:21 39:6
40:23,25 41:4,
9,13 43:20,21,
24 44:9 45:7
47:2 48:7,10
51:12 56:1,17
57:21 59:12,16
60:8,10 61:2,15
62:7 63:18,22
69:10 77:14,15
84:1 86:13
87:12,15 91:10,
14 92:23,24,25
93:17,21 95:20
100:15 101:4,7
102:7,12
103:11,23
104:11,17
106:1 107:4
113:4 117:6,20
118:24 140:2
141:6 144:7

**Paul** 110:22

**pause** 52:5
66:22

**paused** 108:25

**pay** 110:22

**paying** 106:12

**PDF** 76:24

**pending** 7:9
11:22

**pension** 18:3

**people** 16:18
27:3 37:15,24
38:25 39:20
40:10 57:10,15
58:21 59:6
65:10 69:8 90:4
101:22 102:10
103:6 110:24
116:7 127:16
133:24 140:6

**perceive** 36:1

**percent** 100:24
101:1,2

**Perfect** 73:1

122:7

**Perfectly** 40:6

**perform** 26:9

**performing**
20:2

**period** 14:11
24:1 37:20
39:3,13 41:1
45:14 47:13
74:13 75:11
82:22 106:4

**person** 10:23,
24 51:15 65:8
117:10 139:15

**personal** 35:9
82:20 88:24

**personally**
22:6 39:5 40:5
47:25 153:1

**persons** 48:11
51:14 55:5 72:4
82:19,25 93:4
100:12 101:16,
17 115:12
119:15

**perspective**
93:18 94:12

**Peter** 110:22

**petition** 39:1

**Phd** 12:24
13:12

**photo** 130:24
138:13,15
139:4,22 143:1,
8

**photographs**
31:1,4

**photos** 32:12
42:10,25 43:1
122:19 124:7,
15 129:25
130:9 132:4,17
134:13,16
138:6 139:9
141:17 142:14
143:13 145:2,3,
8

**physical** 38:7,
8,9,10 95:2
96:7,10

**physically**
93:20 94:16

**PIAP** 28:13

**pick** 10:4

**pictures** 30:25

**PL** 78:8 84:5
96:20 118:8

**place** 30:1
46:13 49:9 56:9
59:8 83:2,3,7
85:24 93:16
96:2 103:25
109:10 117:25
123:19 145:5

**placement**
99:15 104:10
119:19 120:2

**places** 103:19
106:11

**placing** 63:3
92:12 93:4 94:2
117:20 120:4

**Plain** 57:8

**Plaintiff** 7:16,
18 8:14 9:5
122:18

**plan** 19:14
28:7,12 105:9

**planning** 93:16
107:9

**plans** 28:11

**play** 112:1

**plumbing**
127:13

**point** 16:14
20:21 23:16
25:3,10 28:18
29:5 30:3 46:5
48:10 57:22
64:11 97:21
100:24 104:5,
20 106:7,16
115:10 144:18
152:17

**points** 89:23

**policies** 19:11,
16 23:23,24

**policy** 21:22
22:3

**popped** 66:23

**populate** 117:6

**population**
15:24 17:4,8,9
43:22 44:16
51:13 99:22
100:25 107:17
113:8,11,12
114:10,15,21
115:9,17 121:5,
9,12,14 135:15
144:21 148:23

**populations**
48:5

**portion** 48:6
94:4 128:20,22,
25 143:3

**pose** 93:11,21
94:18

**position** 13:10
17:13 82:22
130:23 150:6,
11

**positions** 18:5
108:13,14

**possibility**
92:13 94:3

**possibly** 79:14
89:8 151:8

**post-
doctorate** 13:5

**postdated**
32:8

**posted** 137:6,
10

**practical** 18:2
48:15 93:7
107:15,16

**practice** 68:4,
11

**practicing**

82:23

**practicum**
47:23 48:1

**practitioner**
45:20 141:24
144:12

**pre** 28:14 60:8
104:12

**pre-** 51:18,20
110:15

**pre-inpatient**
44:2 48:23
49:5,7 50:14
52:2,3 53:17,22
54:9 57:16
110:20,23

**prefer** 123:1

**preference**
115:12

**pregnancy**
131:7,10,14

**preliminary**
113:7

**preparation**
34:14,20 59:11
79:12

**prepare** 22:13
28:20 59:16
62:2,13 65:5
68:11,12,13

**prepared** 21:5
22:5 33:4 68:2
79:17,18,19,24
80:7,17 118:21
119:17

**preparing**
10:12 22:9
61:12 62:4 74:3
79:3 80:10,13

**prescriptions**
45:20

**presented**
9:13

**pretty** 18:6
26:11 45:15
56:7 76:22 94:5
110:9 114:3



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

115:18 120:20
121:3 123:2
133:18 146:13
151:21 153:2,4

**prevent** 108:18

**prevention/
intervention**
23:25

**primarily**
21:25 24:22
45:2 69:6

**primary**
102:23

**prior** 40:3
47:23 62:17
93:14

**priority** 71:20

**prison** 20:10
48:24 49:3
55:4,5,10 56:2,
7,24 57:8,9
82:22 83:4 95:7
112:2,4,5,18

**prisoner**
29:19,23 86:10
89:10,16 93:10
94:2,16,22 96:2

**prisoners** 34:1
57:15 62:20
70:4 74:4 93:9
94:20 95:12
108:19

**privy** 74:18
110:1

**problem** 25:25
38:10 76:11
82:24 104:3
105:17 116:18,
24,25 117:17
120:21

**problems** 43:4
92:22 93:8,11
99:21 106:8
121:16 153:1

**procedure**
10:12 21:22
72:13 136:18

**procedures**

19:11 26:5

**PROCEEDING
S** 7:1

**process** 26:18
59:3 76:22

**produced**
42:13 43:1
72:13

**production**
42:9 65:25
67:17

**professional**
12:1 13:15,23
16:11,12 56:10

**professionally**
13:4

**professionals**
15:23 16:9 65:6
105:23 106:4,9
112:22

**program** 13:7

**programming**
49:21

**programs** 12:6
20:8

**progress**
69:22

**project** 76:16
77:4,21

**promise**
149:19

**promoted** 13:8

**promotion**
12:6

**prompted**
29:22

**promulgated**
24:11

**proof** 76:11

**proper** 116:17
120:10,22

**protect** 135:20

**provide** 14:23
15:5 24:20
25:20 27:12

35:1 36:2 48:12
50:10,15,22,23
54:21 59:12
60:7 61:1,4
62:10 65:17,22
72:3,9 74:1,12
75:11 77:8
82:1,11 83:13
103:2,4,14
104:2,4 105:10,
11 110:15
111:6,13,22
112:9,11
116:11 144:6

**provided**
16:19,23 20:4
44:7,13,18
46:13 49:9,25
51:7 69:14 81:9
103:25 107:25
109:5

**provider**
15:19,21 17:3
45:3 49:13 54:3
76:12 80:24
141:8

**providers**
44:10 49:16
56:18 62:14
65:15 68:18
69:6 87:9 96:11
107:11,13
141:22,23
150:7,12

**providing**
16:21 17:23
27:3 48:17,21
52:2 54:4 57:5
60:9 76:20,21
85:4,8 103:10
105:3,4 106:14
110:12,13
113:7 144:11

**provision**
108:19 115:6

**psych** 17:18
24:21 29:4
61:19,20,22
65:8

**psychi** 47:2

**psychiatric**
45:5,9 46:15,21

47:3,11 49:13,
24 54:3,25
56:16 58:6
82:11,21 83:14,
23,24 94:11
95:18,24 96:11,
14 111:24

**psychiatrist**
44:12 45:19
49:23 125:16

**psychiatrists**
56:14 105:25

**psychiatry**
23:25

**psychological**
19:23 30:16,19
32:20 55:7 57:7
99:17

**psychologicall
y** 58:17

**psychologist**
14:10,17,20
15:10,17 16:8
17:11 18:12
20:25 30:4
37:21 38:16
44:12 45:19
47:22 49:14
54:3 56:16
61:10 62:10
64:21 69:7
82:23 99:20

**psychologists**
19:23 29:16
36:21 105:24

**psychology**
12:3,18 13:15,
17,21,24 18:11
24:17 83:21

**Psyd** 13:14

**publicized**
92:23

**pull** 67:8
110:19 111:3

**pulled** 53:2
67:12,17

**purpose** 27:8
35:23 78:24
81:17,21,25

86:15 125:18
141:15

**purposes** 35:4
141:10

**pursuant**
63:12 74:13
75:12 106:22,
23

**put** 51:12 64:18
135:23

---

**Q**

**qualifications**
114:18

**qualify** 38:22

**quality** 23:20
24:2,8,9 77:18

**quarterly**
23:10

**question** 9:5
11:10,15,22
17:14 22:8,11
25:23 50:3
68:10 70:24
81:25 86:7
95:10 102:14
107:19 108:25
109:15 110:2
116:9 118:15
119:10 145:8
152:21

**question/
concerns**
137:8

**questioning**
100:10 102:16

**questions**
10:13,25 11:1,
4,10 19:4,16
21:24 22:2 26:4
36:17 42:7,15,
18,19 87:22,25
88:19 91:21
92:7 99:1
121:22 122:19
149:9,11,22
152:11,14,15,
16



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

quick 41:18
72:21 91:22
102:22

quickly 29:15
30:8 31:13 42:7
44:17 72:16
73:17 78:16
87:22 112:14
120:9

**R**

Rachel 7:22
8:1 149:11,17

raise 8:20

raised 25:16

raises 28:18

random 114:19

randomly 24:4

rank 69:10

ranking 69:14
71:17,19

rankings
71:22

rapidly 114:12

Rasho 16:1
40:22 41:7
105:22 106:19,
24 107:3
117:23

rate 114:23,24

ratio 22:23,24
23:2

Rauner 7:9
73:4 78:8 84:5
96:20 118:8

read 9:13,21,
22,23 31:3 53:3
66:2 76:11 80:6
85:15 87:21
89:3 97:7
98:18,25 100:6
127:25 153:8

Reading 102:2

ready 88:3,6,
10,14 98:14

134:5

real 30:8 31:12
42:7 44:17
72:21 73:17
87:22 102:22
120:8

reason 18:9
45:13 63:17
70:17 81:10
83:9 86:4
90:13,22 96:15
108:1 112:8,10
118:22 119:21
120:16,21
129:5

reasons 18:2
101:23 106:6

recall 29:9
34:9,19,23
66:12 69:23
70:8,16 75:10
77:16 81:14
85:14 86:11,23
87:3,12,20
97:5,21,22
98:11 106:2
108:2,3 115:23
140:8 150:24
151:1,4

receive 23:7
54:8 70:19
77:11 110:24
111:1

received 23:9
33:21 63:5,6
64:20 79:4
110:21 122:24
127:22 151:15

receiving
74:19 84:8,19
151:14

recent 42:9

recently 12:5
18:19 42:13
85:7 134:14

recognize
96:24 97:2
126:17

recognized
44:23

recollection
11:6 29:13 53:9
59:1 61:11
66:10 72:25
74:10,16,20
97:18 108:15
119:11

recommend
153:4

record 7:3,13
8:9 20:20 42:3,
4,5 52:13,19,20
67:3,4,5 76:17,
24 85:2 91:25
92:2,3,4
122:10,11,12
153:12

recorded
10:17

recording
21:20

records 24:5
75:18,23,25
76:15,21 77:2,8

recreationally
56:20

recruiting
151:22,25

red 147:5

Reed 55:2

refabricate
90:25

refer 44:7
54:12 105:20

referral 150:25

referred 30:12
116:2

referring
37:19,20 38:14
39:15 50:5,12
66:11 76:19
77:25 78:1 83:8
92:21 93:1
100:6,14
103:17 104:5
107:14,20
112:14 114:23
116:18 129:4

refers 15:1
73:15 77:21
92:17 95:10

reflected
89:24

reflecting 89:8

refresh 53:9
97:7 119:11

refuse 91:15

regard 37:7

regional 61:10,
20,22 110:11

regular 47:12
57:18 119:3
129:14

regularly
151:21

regulations
109:2

related 23:24
71:24 122:20

relation 147:18

relayed 62:5
77:17

release 89:11,
12

released 56:3
89:5

remain 89:10

remember
15:13 16:3
29:24 33:15
58:22 60:15,22,
23,25 67:22
68:3 70:6 71:19
84:7,10,14,19,
21,23 95:25
99:6,8 100:4,18
116:7 137:12

remembering
29:25 105:20

removed
131:17

renovation
125:6 131:13

repeat 40:15
49:6 68:5

report 20:23
22:4 23:11
66:8,10,12
67:22 77:5
80:25 81:18
82:2 100:10
101:21 102:13
108:10 109:17,
18,21,25 110:9
150:24

reported
100:21 102:11

reporter 7:3,5
8:8,11,15,19,25
10:17,25 42:3,5
52:12,20 66:22
67:5 72:21 73:1
92:2,4 118:4
122:10,12
140:18 153:12

reporting 21:8
22:1 102:8,15
109:22 110:11

reports 19:19
21:5 22:4,9,11,
12,14,18,22,24
66:13 69:24
73:20 80:11
81:5,12 101:6
110:5

repositor 81:3

represent 9:4
72:22 106:18
122:23 127:23

representation
123:2

representing
7:15 122:18

request 40:21
61:21 63:10,11
99:17

requested
60:7 63:17 74:1
100:20 114:16
119:1,25

requests
10:16


Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**require** 38:10 43:24 76:3 115:21

**required** 15:25 17:10 22:23 24:7 28:1 35:5 37:5,25 59:11 72:11 81:23 82:25 84:1 109:10 113:14

**requirements** 16:1 32:19 107:7

**requires** 27:9 45:13

**requiring** 81:23

**reside** 43:22, 25

**residential** 25:1 28:11 43:23 44:19 45:4,24 46:9,18 47:1 95:22 101:9 105:4

**resources** 95:20 110:19

**respect** 20:3 26:14

**response** 41:7

**responsibility** 107:21 144:6

**responsible** 20:18

**restrain** 136:16

**restrained** 135:18

**restraint** 135:11,13,24

**restraints** 35:3 135:4,9,16,17, 18,23

**restricted** 25:10 56:8

**restriction** 46:20

**restrictive** 23:3,5,6,7 25:4 117:20 119:16

**result** 40:22 90:20 117:23

**return** 47:14 76:12 80:11,23 92:8

**returned** 106:14

**returning** 20:25 43:13 53:15 63:6 85:13

**review** 22:10 23:17 24:4,5 30:21 31:9,17, 20 32:2,13,22 34:13 152:22, 24 153:5,6

**reviewed** 28:23,24 29:4 30:9,13,16 31:6,11,14,15, 16,18 32:9,21, 24 33:3 34:12 42:25 78:10 79:11,14 80:22 122:20

**reviewing** 24:1 81:5,11 92:9

**reviews** 24:8

**revisit** 108:5

**Richardson** 8:6 31:8 33:4 34:6 150:24

**River** 13:9

**role** 15:17,18, 19 17:3,16,19, 22 18:15,17,18 20:7,13,25 22:5 24:18 25:12 29:16 36:10,19, 20 37:20 38:16 68:24 79:2 80:10,16,20 86:21 108:5,6

**roles** 21:2 35:12

**room** 55:18 57:3,24 58:5,9 116:6 117:23 125:1 126:18, 22,25 136:2,14 138:21,25 139:5 141:1,4, 25 146:9,20

**rooms** 56:2 124:23 125:18 126:5,10,12,14 134:11,14,15 138:11,12,19 139:9 142:19 143:6 146:8,10, 12

**roughly** 60:15

**rounds** 36:14

**RTU** 43:23 99:15 104:14, 16 113:17 115:11

**rule** 109:1

**rules** 10:11 42:20

**rumor** 77:23

**run** 22:15 48:4 55:11 72:7 124:25 144:12

**runs** 73:5

**Rusher** 29:5,7, 9,11,18,23 30:19 31:6,23, 25 32:4 33:10, 18 34:19,24 35:10,11,14,16 36:17,23 38:14 58:25 64:9 70:23 71:11 73:4 78:8 79:10,12,24 80:7 81:16 83:12,14,17 84:5 96:20 118:8 137:13 143:21 151:14

**Rusher's** 32:21 53:25 93:15

## S

**Sadly** 36:25

**safety** 41:11

**Saint** 7:24 8:6

**Salsbury** 8:5, 18 43:7 121:1 152:15

**scan** 76:24

**scanner** 76:16 77:3

**Schade** 8:3

**schedule** 55:16,19 56:12 58:9

**scheduled** 58:3,12

**School** 13:15, 22,23

**Schwarzlose** 7:22 52:5,11,15 66:25

**screen** 9:19 10:4 53:1 67:1 78:11 122:23

**scroll** 73:17,21 78:16,19 84:13 88:2,5,13,15 96:22 98:13,15, 16,20 118:16 129:25 131:3 133:8 141:16 146:15

**scrolled** 130:6

**seated** 144:5

**section** 27:12 128:22 146:8

**sections** 128:17

**secure** 136:14

**security** 19:7 25:16,25 26:4 49:3 55:13 56:4 112:19,24 113:10,24

114:10,16,25 115:1,4,10,14, 17,25 116:10, 14,16,18,23 117:9 120:10, 22 121:4,7,11 136:13,15

**seg** 119:8 120:1,2,4

**segregation** 119:16

**select** 24:5

**self-** 37:4

**self-harm** 35:2

**self-harming** 41:10 117:11

**self-injured** 38:2

**self-injury** 91:13

**send** 22:12 38:3 40:25 41:4 67:18 76:24 83:4 109:18,21 119:1

**sending** 28:14 63:23 76:23 81:3 86:15

**sense** 10:22 11:2,7,13,17,23 62:21 81:7 108:10

**senses** 54:20

**sentence** 39:7 40:10 64:10 67:21 76:14 77:19 92:19 93:25

**sentences** 39:21,23,24 62:21

**separate** 43:25 44:15 51:13

**separated** 48:5

**separately** 135:19



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

series 24:19,25
25:4 86:12
124:24

serve 39:7,10
61:16 93:25

served 62:7

service 46:12
127:13,20

services 13:9
14:24 16:20,22
17:23 20:20
22:15,17 23:6
24:21 25:4,5,7,
13,19 27:4,22
36:4 48:2 49:8
62:6,8 68:17
69:5 72:9
103:14,25
104:4 106:15
110:12,13
131:19

serving 92:18

session 27:12

set 21:14 32:12
105:9 107:2
124:6 137:18

setting 45:6
46:7 48:5 51:16
53:24 54:1
55:1,22,25
56:24 57:2 62:8
70:12 95:23
112:2,19
125:22

settings
105:10

settlement
23:14 105:21
106:18,24

severe 87:15

severely 34:24
37:2 38:22 41:4
82:19 94:10

severity 36:24
37:13,25 40:23
71:25 82:5
112:21,23

shape 77:20

130:14

share 9:19
10:5 27:18,19
53:1 67:1 96:21
122:23

shared 9:20
78:11

sheer 77:1
104:17

sheets 129:10

shelter 48:4

shift 76:5
101:14 115:11
117:4

short 54:20

shortly 15:21

show 9:16,18
52:23 65:19
72:19 79:13
84:2 105:8
118:1 127:21
138:1 143:14

showed
126:20

shower 134:9
139:12,16
140:3,4

showers
130:18 132:7,
10,14 137:24
138:16 139:19,
21,25

showing
100:16 146:25

Shultz 7:19
8:16 40:2 42:2,
23 53:16,20
66:23 67:10,14
73:7,10 75:3,13
93:12 111:15,
17 117:8
120:24 124:10,
13 149:11
150:20 152:9,
14,16,21

shut 106:11

sick 35:7 141:7

144:10

SID 13:16

side 19:7 125:1
126:11 135:4,7
141:18,20
142:1,16,20
145:25 148:6

sign 137:6,9
138:20

signed 109:11
141:7

signs 117:5

Sim 61:23 62:1
76:9 118:7,12

similar 46:8
48:4 78:9 89:20
102:15 108:24

simple 57:8

simpler 9:17
52:25

simply 15:1

single 133:19,
22

sit 19:12 35:15
141:7

site 25:5,7,13,
18 62:5,8 68:17
69:4

sitting 28:6
71:13

situation 48:13
87:7

situations
47:24

sizable 37:12

size 9:23 37:11
130:14 135:14

sizes 131:23

sketch 11:25

skill 111:25

skills 48:9

skim 88:2

skip 124:6

132:19

slew 118:10

small 9:23
152:25

SMI 23:4 66:15
68:7

SMIS 68:20

social 16:10,11
64:24

society 45:1,
15

solemnly 8:20

solid 153:2

sort 9:6,16
10:11 11:21
15:18 16:6,17
21:1 26:3 38:9
45:25 58:12
86:15 100:4,5,6
102:3 103:9
109:4,6 116:6,
11 123:20
125:12 134:25
143:10 145:22
146:3,8 147:24

sorts 82:1

sound 53:12

sounds 12:10,
22 17:16 24:8
29:14 42:2
50:19 56:25
61:17 74:25
86:23 89:7
112:7 114:22
122:8

Sources 8:2

space 103:14,
24 104:1,3,8,
13,19 111:21
112:8 122:21
123:15,16,24
124:2,17 133:3

spaces 104:20
105:7 124:20,
21 125:5
132:20

speak 35:20

49:2 55:1

speaking
51:23 109:12

specialized
82:8

specialty
13:19

specific 19:9
23:22 24:6 56:8
60:24

specifically
20:3 60:11
63:15 69:16
75:7 92:21
97:21 99:8
104:14 113:16
114:16 139:11

specifies
72:11

speculate 11:6
97:20

speculation
93:12 111:9,15
120:24 150:3

spend 55:18

spent 22:1
35:2 37:3

split 123:21

sporadic
28:10,16

spot 134:9
139:14

spreadsheet
68:2,8,19

spring 120:14

Springfield
7:11 8:4

stabilization
41:13 47:14

stabilized
48:14

staff 15:25
16:2,6,15 17:22
19:2,6,14,21
21:11 22:2
24:14,17,20,24



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

25:18,20,25
26:1,9,12,13,
16,19,24 27:20,
23 28:1,4 36:7
37:12 46:24
51:17 54:4
56:13 72:11
76:15 103:21,
22 106:6,14
108:4 109:17,
20 110:4 111:2,
3,21,23,24
112:19,24
113:9,10,16,18,
21,22,24
114:10,16,24,
25 115:1,10,25
116:10,18,23
117:4,10,13
120:10,22
121:4,7 151:11,
12,20 152:4

**staffed** 106:17
111:12 116:15

**staffing**
105:14,17
106:22,23,25
107:3,5,6,19,24
108:7,8,11,23
109:5,10,13
110:13,14
111:19 112:11
115:3,15,20
121:18 151:18

**staffs** 113:15

**stamp** 124:10

**stamped** 67:18
73:4 78:7 84:5
96:20 118:7
124:7

**stand** 36:17,23
37:6 128:8

**standard**
72:12

**standing**
106:21 130:24

**start** 14:6
31:17 84:7
97:24,25

**started** 13:11

14:8 15:21
16:4,14 30:5
100:13 106:13
149:12

**starting** 96:25
98:3

**starts** 124:15

**state** 7:13 8:9
17:11,18 18:7
26:12 83:22
101:6 106:12

**state's** 28:21,
23

**stated** 103:21
151:3

**States** 7:10

**stating** 24:3

**station** 138:2,4
141:23 142:3,5,
8,10,16,21
143:4 144:1,2,
3,6,9 147:9,11,
12

**statistical**
21:16

**statistics** 21:9
101:21

**status** 21:7
35:3 44:5 65:2
71:25 117:21

**Stephen** 7:15

**stepped** 95:21

**steps** 110:9
151:25

**Steve** 9:4
150:2 152:17

**sticking**
136:21 143:3

**stipulate** 8:17,
18

**stipulates** 8:14

**stipulation**
42:8,21 121:25

**stop** 99:3

**stopped** 18:10
127:16

**stopping**
139:8

**stops** 10:24

**storage**
146:11,12,17

**strictly** 94:11

**structural**
131:23

**structurally**
130:10 143:23

**structure** 82:6
134:19

**structured**
23:8 55:9

**study** 97:15,19
100:14

**stuff** 26:21
104:24

**subject** 66:15
97:12

**submit** 101:21

**submitted**
21:6 100:11

**substance**
13:7 60:22,24
64:18 85:14

**substantial**
76:22

**substantially**
134:15

**substantive**
152:23

**succession**
12:25

**suicidal** 47:10

**suicide** 23:24
37:5

**summaries**
59:16 60:9
61:12 62:11
63:11,13,16
64:18,19 65:4,
5,9 73:25 74:2

76:8,21 77:5,18
78:13,21,23,24
79:3,5,9 80:14,
17,21,22

**summarize**
86:21

**summarizes**
73:19

**summary**
59:12 61:3
64:22 65:3,7
79:10,11,13,14,
16,17,23 80:2,
4,6 81:13,16,
18,21 82:1,5
86:16 102:10
150:25

**summer**
120:13

**super** 76:16
77:3

**supervise**
26:13

**supervision**
24:20 115:21

**supervisor**
13:6 22:7 24:23

**supervisors**
17:20 131:20

**supervisory**
15:18 19:13

**supply** 146:9,
20

**support** 38:25

**supported**
81:8

**supposed**
23:14 105:19
106:23 109:20

**surprised**
83:16 90:17,19

**surrounding**
42:20 43:16

**swallowed**
38:4

**swear** 8:20

**switch** 133:6

**symptoms**
36:24

**system** 18:3
35:8 39:2 41:12
44:24 55:10
89:2

**Systemically**
95:18

**systems** 39:8,
14,15

———

**T**

**table** 93:8 98:9
118:20

**taking** 10:17
56:9 59:7 61:15
63:22 79:12
83:17 144:10
145:5 151:20
152:1

**talk** 35:11,17
41:3 44:17
56:25 64:17
109:14 112:15
116:17 118:20

**talked** 20:3
21:3 24:15 28:6
86:9 95:24
104:23 106:21
116:3 118:18
132:4

**talking** 10:24
11:2 39:4 43:14
50:14,21 54:12
58:22 63:21
76:8 94:5 95:2
99:13,25 103:1
105:3 110:16
116:7 120:3,10
123:25 144:1

**talks** 69:17,25
92:12 118:25

**tap** 105:10

**tasks** 21:2 26:8

**team** 28:16
35:16 107:9

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

technical 52:6

technician 7:4

technicians 16:15

tele-psych 124:25 125:9, 11,19,25 126:5

telephone 86:12

template 86:17

tenure 15:9 26:25 30:3 37:19

term 15:3,7 26:20 38:17 43:17,18

terms 10:1 12:14 24:9 25:12,24 26:15 27:2 34:25 36:23 44:6,7 46:19 51:18 59:3,5 63:21 69:10 70:12 71:4,17 74:9,19 77:17 80:10,20 83:20 85:15 93:6 105:7 107:8 109:2 110:5 111:25 117:15 120:2 131:16

test 9:17

testified 79:21

testimony 8:21 10:16 40:3 151:18

testing 99:18

that'd 59:24 78:3 139:14 144:14

therapist 36:7

therapists 56:19

therapy 56:21 103:20

there'd 37:15 94:1

thing 13:20 48:9 73:22 100:13 114:23 116:13 119:24 143:14 153:8

things 19:3,18 23:2,13 24:16 25:24 29:17 35:24 38:23 56:20 97:24 106:13 113:3,7 114:22 116:2 117:9,13,18 122:20 141:20

thinking 30:18 105:19

tho 20:6

thought 18:9 77:20

threat 47:10 93:21 94:18

three-point 135:24

thumbnail 11:25

Tiffany 29:7 137:13

time 7:6 10:8 11:20 14:9,15, 18 15:20 19:23 20:20 22:1 29:18,22 32:8 33:21,24 35:2, 8,18 37:4,15, 20,22 38:14,18 39:2,6,10,18 40:10 41:1,2,8 42:11,12,13 45:14 47:13 48:1,10 49:24 50:5 53:24,25 55:14,18 56:11 57:22,23,24 58:5,24 60:2 61:15 62:17 64:8 69:6,24 70:22,23,24 71:10 72:1 74:9

75:11 85:16 86:25 88:11 91:4,20 93:15 95:6 99:11,19, 24 100:24 104:20 106:2,5, 7,16 108:15 110:15 111:7 113:8 114:2 115:7,10,15 117:23,24 119:17 120:1 129:4 137:13 140:7 143:21 149:19 153:11

timeline 12:22

times 10:6,7 13:1 23:9 62:10 95:2 106:5 115:24 129:13

timing 88:11

tip 117:10

tired 115:16

titled 78:17

titles 78:17

today 7:5 71:14 79:21 120:12 153:1

told 47:19 61:8, 12 62:1,12 63:10,12,15 70:13,16 71:2,8 95:16 151:21

top 135:1

topic 24:4

totals 101:11, 19

tour 42:10,24 43:1 85:22 86:2,8,11

tra 70:14

tracking 21:9

trained 112:25 113:15 116:23

training 47:21, 25 48:9 114:4 116:19

transcript 152:23

transfer 30:2 64:12,16 65:11 70:4,15 71:6, 20,21,23 89:8 90:5,14 114:12 150:7,12

transferred 62:20,22,24 65:7,9,11 89:12 90:15 91:9 94:24 95:13 96:3 101:16

transferring 33:14 74:4 89:9,16 94:19, 22

transfers 70:18 71:14

transition 17:1,15

treaters 149:23

treating 44:11 68:17

treatment 19:14 25:1 28:7,11,12,16 35:15 43:23 44:14,19 45:1, 7,24 46:9,18,23 49:21 51:18 53:3 54:8 56:9, 23 81:24 82:7 101:10 104:20 105:5 107:9 124:20,21,23 125:5 132:19 141:25 151:15

trending 19:22

trial 11:5 63:2

Tribe 13:6

true 29:18 37:18 151:13

truth 8:22,23

turn 25:19 26:19 27:17

136:20

turned 104:14

turning 9:18 68:19 102:17

turnover 114:24 121:18 152:4

tweak 80:18

tweaks 76:4,7

type 21:23 46:8 48:9 63:18 69:14 95:22 135:13

types 56:21 141:20

typical 51:15 134:22

typically 26:9 39:10 46:25 47:2,12,16,24 54:6 56:20 64:21 68:15 94:14 101:18 109:9 134:8

typing 10:18

typographical 80:24

---

U

Uh-huh 98:7 107:18 119:6 128:19

unable 54:20

uncommon 114:10

undergraduate 12:14,15,17

underneath 81:22

understaffed 113:25

understand 10:19 11:10,11, 17 15:4 29:6 31:13 33:25

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

39:19 54:14,22
65:4 68:24
74:18 79:2
81:20 82:15
90:12 92:17
93:6,23 94:1
101:20,23
104:22 111:22
116:3,21,22
120:11 131:6

**understanding**
15:7 38:13
40:13,19 54:16,
19 69:13 71:13
90:8 93:10 96:6
98:8 106:21,25
128:16

**understood**
46:11 50:7,8
80:13 115:2

**undertook**
120:5

**unique** 44:24
100:22

**unit** 24:25 25:1,
2,3,5,9,21
26:18 28:11,13
43:23,25 44:13,
15 45:25 46:9,
18 55:16 56:6,
8,16,18 57:22
96:14 101:10
104:8,14,15
105:5 115:13
122:25 126:18
127:22 129:11
140:6 141:6
142:22 144:23
145:9,12

**United** 7:10

**units** 116:15

**unlock** 56:4
57:17,20

**unnecessarily**
50:13 51:2

**unpack** 59:19

**unstructured**
23:8

**unsuccessful**

72:20

**up-to-date**
145:13

**updated** 19:12
104:16

**updates** 70:1

**utilize** 135:17

---

**V**

**variety** 56:23
78:18

**vast** 15:23

**Velcro** 135:12

**verbally** 61:8

**versus** 7:9
54:24 108:8
112:2 113:4
116:25

**video** 7:4,18,
20,24 8:4,6
125:12,16

**videoconferen
ce** 7:7

**view** 130:20
132:1 136:25
138:3,9,10
142:7 147:1,8

**violence** 91:14

**visible** 36:4

**visit** 84:16
85:24

**visiting** 78:2

**visitor** 77:24
124:3

**visitors'** 104:9

**visits** 23:9

**volume** 77:1

---

**W**

**W-E-I-L** 7:15

**wait** 10:23
52:9,13

**waiting** 88:9
140:21 141:5

**waive** 153:5,7

**walk** 21:1
45:16 57:19
116:5

**walkway**
147:20

**wall** 137:7

**wanted** 36:7
40:24 42:6 50:7
61:5 73:1 77:14
105:11 107:7

**ward** 47:11

**warden** 12:6
20:8,17 27:14

**wardens**
27:10,20

**watch** 23:24
35:3,16,19 37:4
44:5 134:5
149:3

**watches** 21:8
22:21,22 137:7

**ways** 51:20
109:16

**web** 72:22

**website** 53:2

**week** 31:19
32:3,23,24
49:25

**weekly** 44:11

**weeks** 10:9

**Weil** 7:15 8:14
9:2,4 40:6,8
41:17,21,23
42:1,6 43:3,6,9,
12 52:9,14,17,
21 66:24 67:2,
6,9,12,15,24
72:21,24 73:3,
9,11,14 75:9,
16,19,22 91:19,
25 92:5 112:6
118:2,5 121:15,
21,25 122:4,9
149:25 150:3,

14,16 152:6,8,
18 153:8,10

**well-known**
89:1

**west** 145:23,25

**Wexford** 8:2
14:9,12,22
15:2,4 16:24
17:15,20,23
18:1,23 19:2,20
21:4,18 24:14,
17,19,24 25:8,
18 26:9,13,21
27:2 36:7,10,13
62:5,8 68:16
79:6 80:12
107:22 108:3,6
109:11,23
149:18,22,23
150:6,11
151:18,19,22,
24

**wha** 74:9

**wheelchair**
143:1

**White** 13:6,9

**who'd** 62:20

**wing** 126:18,
19,22,25 127:4,
7,8,11,15,18
128:12 130:2,7,
18,21 131:4,6,
7,10,14 132:2,
7,11,13,15,18
133:25 143:9
145:23

**wings** 35:17
95:25 104:15

**woman** 29:7
35:7 135:22

**women** 33:22
62:24 63:5
127:18 131:19
144:22

**wording** 60:24

**words** 18:19
26:12

**work** 12:25

13:2 18:1 19:20
24:17 25:9
26:21 39:8
47:24 62:11
97:24 98:2
112:25 114:20
121:4,9,14

**worked** 13:24
24:22 47:22
59:5 64:15

**workers** 16:10,
11

**working** 12:3
13:11 14:6,8
15:21 17:15,25
25:11,13,22
26:9,18 58:20
64:13 76:15
106:10 113:8,
10 114:15
115:11,18
117:4,14 121:7

**works** 9:24
41:21 47:20

**world** 44:23
45:22 46:1
47:15,20

**would've**
12:21 22:1
31:10 32:3
33:5,6,17,23
34:6 68:10
79:5,24 87:7
102:7 123:3,11
129:5,7,19
130:10 132:10
152:2

**writing** 99:6,8
105:18

**written** 85:5
120:11

**wrong** 121:17
150:1,15

---

**X**

**x-ray** 141:24



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

## Y

**yard** 132:22,25
133:3

**year** 20:7 60:17
73:12 74:8,14
75:1,7 127:17

**years** 120:13,
23 121:8

**yesterday**
28:22

**you-all** 65:10

**young** 35:7

**youth** 13:7
46:3

## Z

**zeros** 129:7

**zoom** 9:10,14
137:3

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**KENTUCKIANA**
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com