### IN THE UNITED STATES DISTRICT COURT
### FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | |
|---|---|
| KELLI ANDREWS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Case No. 18-cv-1101 |
| | ) |
| BRUCE RAUNER et al., | ) |
| | ) |
| Defendants. | ) |

### OPINION AND ORDER

**SUE E. MYERSCOUGH, U.S. District Judge:**

This matter is before the Court on the Report and Recommendation (d/e 182) regarding Plaintiff's Motion for Sanctions (d/e 164) entered by U.S. Magistrate Judge Eric I. Long. Objections to the Report and Recommendation were due on or before August 9, 2024.  No timely objections have been filed.  For the reasons stated below, the Court ACCEPTS and ADOPTS the Report and Recommendation (d/e 182) entered by Judge Long and DENIES Plaintiff's Motion for Sanctions (d/e 164).

### I.    BACKGROUND

On March 11, 2018, Plaintiff Kelli Andrews filed this lawsuit. See d/e 1.  On December 11, 2019, Plaintiff filed an Amended

Complaint.  See d/e 76.  Plaintiff is the Administrator of the Estate of Tiffany Ann Rusher ("Rusher").  Id.  Plaintiff alleges that Rusher's mental health deteriorated after she was placed in solitary confinement during a five-year sentence at Logan Correctional Center.  Id.  Plaintiff claims that Defendants Bruce Rauner, State of Illinois, John Baldwin, Jeff Sim, and the Illinois Department of Corrections (IDOC) (collectively, "Defendants") failed to provide the mental health treatment Rusher needed, instead choosing to isolate her.

On April 23, 2023, Plaintiff filed a Motion to Compel State of Illinois Rule 30(b)(6) Testimony.  See d/e 150.  Plaintiff asked the Court to compel Defendant State of Illinois ("Illinois") to produce witnesses with sufficient knowledge to testify on Topics 1, 4, and 5 of Plaintiff's Rule 30(b)(6) Notice.  Id.  Plaintiff argued that the witnesses that Defendant Illinois had previously provided, Dr. Norine Ashley and Dr. Melvin Hinton, had insufficient knowledge and were unprepared to discuss these topics.  Id.

Topics 1, 4, and 5 from Plaintiff's Rule 30(b)(6) Notice are as follows:

1. The policies, procedures, and practices for obtaining hospital level placement for the care and treatment of serious mental illness for inmates in IDOC custody from January 1995 through the relevant time period, and the location in the production of documents that could reasonably be expected to reflect such policies, procedures, and practices. If no such treatment was available, the policies, practices, or procedures that prevented such treatment.

4. The State's consideration given to the transfer of mentally ill persons who were still in the custody of the IDOC, to outside mental health facilities, including those operated by the IDHS, the persons involved in said consideration, communications relating to such consideration, whether any mentally ill persons were so transferred, and if not, why not.

5. The State's consideration given to the transfer of Tiffany Rusher to outside mental health facilities, including those operated by the IDHS, the persons involved in said consideration, communications relating to such consideration, and the reasons she was not so transferred.

See d/e 172, Ex. 1.

On August 15, 2023, Magistrate Judge Long entered an order compelling Defendant Illinois to produce a witness prepared to cover Topics 1, 4, and 5 of Plaintiff's 30(b)(6) Notice. See d/e 160. On September 29, 2023, IDOC defense counsel identified Dr. Luke Fairless as the deponent. On November 2, 2023, Dr. Fairless's deposition took place.

On March 18, 2024, Plaintiff filed this Motion for Sanctions.
See d/e 164.  Plaintiff argues that Defendant Illinois failed to
adequately prepare a 30(b)(6) witness regarding Topics 4 and 5, in
violation of Federal Rule of Civil Procedure 30(b)(6) and the Court's
August 15, 2023 Order.  See id.  On April 22, 2024, Defendants
filed their Response.  See d/e 172.

## II.   LEGAL STANDARD

The district court reviews de novo any part of a magistrate
judge's report and recommendation to which a specific written
objection has been made.  Fed. R. Civ. P. 72(b); 28 U.S.C. §
636(b)(1).  If no objection or only partial objection is made, the
district judge reviews those unobjected portions for clear error.
Johnson v. Zema Sys. Corp., 170 F.3d 734, 739 (7th Cir. 1999)
(also noting that a party who fails to object to the report and
recommendation waives appellate review of the factual and legal
questions).

Plaintiff seeks sanctions pursuant to the Federal Rules of Civil
Procedure 37 and the Court's inherent power to issue sanctions.

Rule 37(b)(2)(A) provides that:

If a party or a party's officer, director, or managing agent—
or a witness designated under Rule 30(b)(6) or 31(a)(4)—
fails to obey an order to provide or permit discovery,
including an order under Rule 26(f), 35, or 37(a), the court
where the action is pending may issue further just orders.
They may include the following:

> (i) directing that the matters embraced in the order
> or other designated facts be taken as established for
> purposes of the action, as the prevailing party claims;
> (ii) prohibiting the disobedient party from supporting
> or opposing designated claims or defenses, or from
> introducing designated matters in evidence;
> (iii) striking pleadings in whole or in part;
> (iv) staying further proceedings until the order is
> obeyed;
> (v) dismissing the action or proceeding in whole or in
> part;
> (vi) rendering a default judgment against the
> disobedient party; or
> (vii) treating as contempt of court the failure to obey
> any order except an order to submit to a physical or
> mental examination.

Fed. R. Civ. P. 37(b)(2)(A).

Rule 37(c)(1) also provides that:

If a party fails to provide information or identify a witness
as required by Rule 26(a) or (e), the party is not allowed to
use that information or witness to supply evidence on a
motion, at a hearing, or at a trial, unless the failure was
substantially justified or is harmless. In addition to or
instead of this sanction, the court, on motion and after
giving an opportunity to be heard:
(A) may order payment of the reasonable expenses,
including attorney's fees, caused by the failure;
(B) may inform the jury of the party's failure; and
(C) may impose other appropriate sanctions, including any
of the orders listed in Rule 37(b)(2)(A)(i)—(vi).

Fed. R. Civ. P. 37(c)(1).

Rule 37 sanctions are appropriate where a party displays "willfulness, bad faith, or fault." Am. Nat'l Bank and Tr. Co. v. Equitable Life Assurance Soc'y, 406 F.3d 867, 878 (7th Cir. 2005) (citing Langley v. Union Elec. Co., 107 F.3d 510, 514 (7th Cir. 1997)). Bad faith includes "intentional or reckless disregard of a party's obligations to comply with a court order." Marrocco v. General Motors Corp., 966 F.2d 220, 224 (7th Cir. 1992). Fault, on the other hand, pertains to "the reasonableness of the conduct or lack thereof, which eventually culminates in the violation." Langley, 107 F.3d at 514. Whether to award sanctions under Rule 37 is a matter for the court's discretion. In re Golant (Golant v. Levy), 239 F.3d 931, 937 (7th Cir. 2001). In awarding sanctions under Rule 37, courts are not required to choose the least severe sanction available, but "'the sanction selected must be one that a reasonable jurist, apprised of all the circumstances, would have chosen as proportionate to the infraction.'" Id. (quoting Salgado v. Gen. Motors Corp., 150 F.3d 735, 739 n.5 (7th Cir. 1998)). Factors to be considered by the Court include "the gravity of the misconduct, the

prejudice if any to the defendant, and whether the suit has any possible merit." Bolt v. Loy, 227 F.3d 854, 856 (7th Cir. 2000).

Additionally, courts have an inherent power "to fashion an appropriate sanction for conduct which abuses the judicial process." Chambers v. NASCO, Inc., 501 U.S. 32, 44–45 (1991); SEC v. First Choice Mgt. Serv., Inc., 678 F.3d 538, 543 (7th Cir. 2012). "Sanctions meted out pursuant to the court's inherent power are appropriate where the offender has willfully abused the judicial process or otherwise conducted litigation in bad faith." Salmeron v. Enter. Recovery Sys., Inc., 579 F.3d 787, 793 (7th Cir. 2009).

### III.   ANALYSIS

After reviewing the record, the Report and Recommendation, and the parties' motions and memoranda, as well as the applicable law, the Court finds no clear error in Magistrate Judge Long's Report and Recommendation (d/e 182).

The Court further finds sanctions are not warranted under Rule 37 or the Court's inherent power. The Court's August 15, 2023 Order granting Plaintiff's Motion to Compel ordered Defendants to present one or more witnesses for deposition on

Topics 1, 4, and 5. See d/e 160. As it related to Topics 4 and 5, the Court noted: "Surely, someone within the [Illinois] knew whether any consideration was given to transferring Ms. Rusher to an outside mental health facility. She either was given consideration or she was not." Id. at p. 6. The Court further noted: "[Illinois] failed to prepare Dr. Hinton sufficiently. He was unable to answer whether any consideration was given to transferring Ms. Rusher, nor was he able to identify anyone who would have been involved in the decision to transfer Ms. Rusher." Id. at p. 7. Upon review of Dr. Fairless's testimony, the Court agrees with Magistrate Judge Long's analysis and finds that Dr. Fairless adequately testified regarding Topics 4 and 5 during his deposition. See d/e 182, pp. 4–6.

While Dr. Fairless's answers may have been unsatisfactory to Plaintiff, Defendants fulfilled their Rule 30(b)(6) duty. Rule 30(b)(6) requires a designee to "testify about information known or reasonably available to the organization." Fed. R. Civ. P. 30(b)(6). Entities have a duty to "make a conscientious good-faith endeavor to designate the persons having knowledge of the matters sought by [the discovering party] and to prepare those persons in order that

they can answer fully, completely, unevasively, the questions posed by [the discovering party] as to the relevant subject matters." <u>Trs. of Chi. Reg'l Council of Carpenters Pension Fund v. Drive Constr., Inc.</u>, No. 1:19-cv-2965, 2023 WL 415542, at *2 (N.D. Ill. 2023) (internal citation omitted).  Dr. Fairless testified that he spent almost 16 hours preparing for the deposition, reviewing previous deposition testimony and thousands of pages of medical records. <u>See</u> d/e 164, Ex. 7, 9:4–14, 13:3–15; 55:12–16; 66:10–20; 66:24–25; 67:1–4.

Moreover, Rule 30(b)(6) witnesses need not be perfect, so long as they are "educated and gain the requested knowledge to the extent that it is reasonably available to the entity." <u>Drive Constr.</u>, 2023 WL 415542, at *2 (internal citation omitted).  Here, Plaintiff argues that Dr. Fairless was unable to answer questions concerning: how many patients were considered for transfer, who was involved in the negotiations between Illinois Department of Health Services (IDHS) and IDOC and when those negotiations occurred, why IDHS ultimately refused to accept IDOC patients, the level of care available at IDHS facilities compared to IDOC facilities, and whether any attempts to transfer to an IDHS facility were made

on behalf of prisoners at Logan Correctional Center.  <u>See</u> d/e 164, p. 4.

However, Dr. Fairless did provide answers during his deposition testimony that were consistent with Defendants' Rule 30(b)(6) duty and the Court's August 15, 2023 Order.  The Court highlights several excerpts of Dr. Fairless's testimony demonstrating his compliance:

> Q: Okay. And during this period from 2013 to 2016, did the state consider transferring IDOC prisoners to any other facilities other than DHS facilities?
>
> A: No.

d/e 164, Ex. 7, p. 40:20–23.

***

> Q: Okay. Okay. Was Tiffany Rusher considered for transfer to an IDHS facility?
>
> A: No.

d/e 164, Ex. 7, p. 48:17–19.

***

> Q: Okay and we talked about there being patients who were considered for transfer to IDHS facilities in Topic 4; is that right?
>
> A: I believe we talked about the consideration, yes.

Q: Okay. But Tifany was not one of those people considered, is that right?

A: State doesn't know specifically. There were no referrals—formal referrals made during that time frame to the Department of Human Service. As far as considerations for all of those, given that—at that time in question, we probably had over 40,000 people in custody. You know, it would be impossible to know the exact considerations of every person.

d/e 164, Ex. 7, p. 49:5–18.

***

Q: We talked earlier about the conversations between the Department of Corrections, the Department of Human Services; is that right?

A: We did speak about that.

Q: And what was the communication from the Department of Human Services in those conversations?

A: Yeah. I can't speak on behalf of the DHS department, but our department—Department of Corrections' understanding was that they were operationally not able to fully handle and treat the individuals that may have been recommended for that level of care in one of their facilities.

d/e 164, Ex. 7, p. 50:2–13.

***

Q: Sure. So you're—Is it your understanding that the Department of Human Services was rejecting the designated patients that were being proposed or rejecting taking any Department of Corrections' prisoners?

A. So it sounds like it's a question of rejecting a specific patient versus just sort of a—a general no?

Q: That's right.

A: My understanding is it would've been more general.

Q: Okay.

A: Department's understanding is more general.

d/e 164, Ex. 7, p. 50:19–25, p. 51:1–6.

***

Q: How were you able to determine if individuals within IDOC custody were considered for transfer to DHS facilities?

A: Yeah. So I—you'll have to forgive me. I don't remember the exhibit document. But essentially, I would summarize them as clinical summary as an example from a handful of individuals from Logan Correctional Center as they started to develop and delineate that level of care. You know, those types of things were communicated that X number of individuals at these sites may be appropriate for a higher level of care and so those folks would've been considered. However, I'm not aware of a formal referral of, you know, a specific individual until the time frame of sometime in 2018.

Q: How would you—or is it able—are you able to become aware of an individual patient's referral or how would you gain that information?

A: Most likely, any official referral would be contained in some document or another within the medical record. Given that just the—the medical record of this patient alone that—that I had to review was over 2,000 pages and

they said during that time frame—I don't have the exact population, but we had over 40,000 individuals in custody. There would be millions of pages that you'd have to review and that's if it's in the formal record. There are times that there are certain treatment interventions and things that providers, whether they represent the whole treatment team or just an individual provider's opinion, maybe considered informally in peer supervision and talks with other providers that may not be reflected in any kind of formal record.

d/e 164, Ex. 7, p. 59:4–25; p. 60:1–15.

\*\*\*

Q: Earlier, you—with regard to Topic 5, again this is 2013 to 2016, you were asked whether the state or DOC specifically gave any consideration to transferring Ms. Rusher to an outside mental health facility. Do you recall testifying about that?

A: So I recall the state's, you know, official opinion, but I don't know that we defined consideration.

d/e 164, Ex. 7, p. 61:24–25, p. 62:1–5.

\*\*\*

Q: Sure. So if someone is recommended for transfer to an inpatient treatment facility by their treatment team, what is the next step for a potential transfer?

A: Yeah. So the—the steps for a potential transfer at that time—and you—and you brought up the document, general provisions 04-04-100, at least, vaguely outline that. So we'd have to have consensus within the facility. So different members of the treatment team, they, themselves, may not, you know, agree. A psychiatrist and a psychologist may have different thoughts on—on what

someone needs or the you know, duration or frequency of services. And then the mental health authority, who in that case at that time, I believe, would've been Dr. Norine Ashley, sort of hold that authority, that final decision at the facility level. And then that is brought up to a level above them. So like the position I'm in, like a regional psychologist, would review that decision. And then above them, the Chief of Mental Health, which at that time, and still is, Dr. Melvin Hinton, would take that consideration.

d/e 164, Ex. 7, p. 63:21–25, p. 64:1–17.

Furthermore, Dr. Fairless expressed his confusion regarding Plaintiff's use of "consideration" several times during the deposition and Plaintiff never provided an explicit definition.

A: Would you define considering?

Q: Sure. So we've mentioned that there were conversations between the Department of Corrections and the—and between DHS about potentially transferring Department of Corrections' prisoners to DHS facilities; is that right?

d/e 164, Ex. 7, p. 44:3–9; see also id. at p. 61:24–62:9.

The Court finds that Defendant Illinois complied with the Court's August 14, 2023 Order. While Dr. Fairless may not have provided the amount of detail or the specific answers that Plaintiff sought, Dr. Fairless answered Plaintiff's questions with information known or reasonably available to Defendant Illinois. Defendants did not display "willfulness, bad faith, or fault" in appointing Dr.

Fairless as a Rule 30(b)(6) witness.  <u>Am. Nat'l Bank</u>, 406 F.3d at 878.  As a result, the Court, in its discretion, refuses to impose sanctions on Defendants under Rule 37 or the Court's inherent power.

## IV.   CONCLUSION

For the reasons stated, the Report and Recommendation of United States Magistrate Judge Eric I. Long (d/e [182]) is ACCEPTED and ADOPTED.  Plaintiff's Motion for Sanctions (d/e [164]) is DENIED.

**IT IS SO ORDERED.**
**ENTERED:  August 13, 2024.**
**FOR THE COURT:**

*/s/ Sue E. Myerscough*
**SUE E. MYERSCOUGH**
**UNITED STATES DISTRICT JUDGE**