# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

KELLI ANDREWS, as Administrator of  )
the Estate of Tiffany Ann Rusher,    )
deceased,                            )
                                       )
               Plaintiff,    )
                                         )
   v.    ) Case No. 18-cv-1101
                                         )
BRUCE RAUNER et al.,                 )
                                         )
             Defendants.    )

## OPINION AND ORDER

**SUE E. MYERSCOUGH, U.S. District Judge:**

This matter is before the Court on Defendants Brian Richardson's, He Yuan's and Wexford Health Sources, Inc.'s ("Defendants") Motion for Summary Judgment (d/e 181), Plaintiff Kelli Andrews' Response (d/e 207), and Defendants' Reply (d/e 215). For the reasons detailed, Defendants' Motion (d/e 181) is DENIED.

## I.    JURISDICTION

This Court has subject matter jurisdiction because Plaintiff's causes of action are brought under the Eighth Amendment to the

United States Constitution pursuant to 42 U.S.C. § 1983; the
Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq. (ADA);
and the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 et seq. See 28
U.S.C. § 1331 ("The district courts shall have original jurisdiction of
all civil actions arising under the Constitution, laws, or treaties of
the United States."). Venue is proper because a substantial part of
the events or omissions giving rise to Plaintiff's claims occurred in
this district. 28 U.S.C. § 1391(b)(2).

## II.    BACKGROUND

The Court draws the following facts from the parties'
statements of undisputed material facts. The Court discusses any
material factual disputes in its analysis.

Tiffany Rusher entered Illinois Department of Corrections
("IDOC") custody in July 2011. See d/e 181, p. 3; d/e 207, p. 7. On
March 12, 2013, Rusher was transferred to Logan Correctional
Center ("Logan"). See d/e 181, p. 4; d/e 207, p. 7. Rusher suffered
from bipolar disorder, post-traumatic stress disorder, borderline
personality disorder, schizoaffective disorder bipolar type, and
antisocial personality disorder. See d/e 207, p. 50; d/e 215, p. 19.

Rusher's mental health diagnoses were serious mental health illnesses, such that she met IDOC's definition of being seriously mentally ill. Id.

Defendant Wexford Health Sources, Inc. is a contractual vendor to IDOC with a contract to provide comprehensive mental health services to inmates within IDOC. See d/e 181, p. 4; d/e 207, p. 7. Defendant Dr. Brian Richardson was a Wexford employee and clinical psychologist who began working at Logan in August 2014 and served as a primary therapist for patients in Logan's inpatient unit. See d/e 181, p. 3; d/e 207, pp. 7, 59; d/e 215, p. 35. Rusher saw Defendant Richardson for the first time on January 23, 2015, and he was her primary therapist beginning around April 2015. See d/e 181, pp. 16-17; d/e 207, pp. 7, 59; d/e 215, p. 35.

Defendant Dr. He Yuan was a Wexford employee and psychiatrist who worked at Logan between 2014 and 2016 and evaluated and provided medication management for patients at Logan. See d/e 181, p. 3; d/e 207, pp. 7, 59; d/e 215, p. 25. Defendant Yuan provided Rusher psychiatric services at Logan starting in late 2014 and was her primary psychiatrist responsible

for her medication management while at Logan. See d/e 181, p. 3; d/e 207, pp. 8, 59; d/e 215, p. 25.

From March 17, 2013 to May 3, 2016, Rusher was placed in either segregation, crisis watch housing, the residential treatment unit housing, and/or the healthcare unit at Logan. See d/e 207, p. 43; d/e 215, p. 7. Crisis watch housing provides crisis treatment level of mental health care for prisoners who present a danger to themselves or others or who require diagnostic assessment and temporary, clinical intervention for stabilization or diagnostic purposes. See d/e 207, p. 41; d/e 215, p. 3. When a prisoner is on constant crisis watch, a security officer is stationed outside of that prisoner's cell and monitors her 24 hours a day, 7 days a week. See d/e 207, p. 41; d/e 215, p. 4.

Rusher spent most of her time at Logan on crisis watch—she spent over 1,000 days on crisis watch in crisis watch housing or crisis watch in the healthcare unit, which has several crisis watch cells, and spent the remaining 52 days in segregation and/or the residential treatment unit housing. See d/e 207, p. 43; d/e 215, p. 7. Based upon her housing unit placement, Rusher was on

constant crisis watch, with the exception of one week, for an 8-month period from September 11, 2015 until her release from Logan on May 3, 2016. See d/e 207, pp. 43-44; d/e 215, pp. 7-8. Dr. Norine Ashley, the IDOC mental health administrator overseeing IDOC's contract with Defendant Wexford, testified that Rusher "spent an inordinate amount of time on crisis watch status." See d/e 207, p. 44; d/e 215, p. 8. Crisis watch conditions for Rusher included placement in an isolation cell, lights constantly on, a safety smock but no clothing, being watched while using the bathroom and showering, and often being prohibited from having a book. See d/e 207, p. 45; d/e 215, pp. 10-11.

From May 2013 to April 2016, Rusher engaged in self-destructive and self-harming behaviors while on crisis watch at Logan, including attempting to hang herself, cutting herself, and ingesting foreign objects. See d/e 181, pp. 11, 12, 14; d/e 207, pp. 7, 50-53; d/e 215, p. 23. IDOC medical records documented those behaviors during Rusher's time in custody. Id.

If Logan prisoners have a serious physical injury, they are taken to a hospital for treatment; however, if a prisoner experiences

a mental health crisis, they are not sent to a hospital psychiatric unit. See d/e 207, p. 56; d/e 215, p. 28. Defendant Wexford and IDOC transferred prisoners who needed a higher level of care for their physical medical conditions to facilities outside of IDOC. Id. When Rusher had physical injuries that Logan could not adequately treat, including after her suicide attempts, she was medically furloughed to a hospital to receive care. Id.

Until IDOC's Elgin Treatment Center was constructed in 2018, IDOC had no inpatient mental health facility. Id. Wexford staff are unable to transfer a patient from IDOC to the Illinois Department of Human Services. See d/e 181, p. 22, d/e 207, p. 7. If IDOC did not approve a transfer of a prisoner to an inpatient facility, Defendant Wexford was responsible for continuing to try different interventions to stabilize the patient and to inform IDOC supervisors about the concern and to advocate for their patient. See d/e 207, p. 61; d/e 215, p. 41.

After conducting a mental health evaluation of Rusher on March 20, 2015, Defendant Richardson stated Rusher needed to "move to Treatment Center (In Patient)." d/e 207, p. 59; d/e 215, p.

35. In an April 4, 2015 report addressed to IDOC, Defendant Richardson identified Rusher as someone whose mental illness was so severe it required a structured treatment and transfer to an inpatient facility that could offer consistent and specialized care and recommended that Rusher be transferred to a forensic inpatient treatment facility. See d/e 207, p. 61; d/e 215, pp. 40-41. On April 10, 2015, Dr. Norine Ashley, Logan's mental health administrator, sent that April 4, 2015 report to Defendant IDOC Central Regional Psychologist Administrator Jeff Sim. Id.

IDOC management informed Defendant Richardson that Rusher could not be transferred out of IDOC. See d/e 181, p. 22 (citing id. at Exh. B, pp. 37-38); d/e 207, p. 7. Defendant Richardson testified that he was "not exactly sure if" the IDOC management who informed him "was [Dr. Ashley], or if it was [IDOC Defendant Dr. Jeff] Sim." d/e 181, Exh. B, p. 38.

In 2015, IDOC enlisted Defendant Wexford's assistance in complying with a requirement in the pending case Rasho v. Jeffreys, CDIL No. 07-1298, for IDOC to provide an inpatient mental health facility to take IDOC inmates. See d/e 181, p. 23 (citing id. at Exh.

I, pp. 114-15); d/e 207, p. 7. In an effort to assist IDOC with locating a facility to provide inpatient mental health services to IDOC inmates, Defendant Wexford's executive vice president directed Wexford staff to reach out to 87 Illinois hospitals in hopes of finding ones who would take IDOC's inmates. See d/e 181, p. 23 and Exh. I, pp. 123, 130; d/e 207, pp. 7, 27. Dr. Norine Ashley, the IDOC mental health administrator overseeing the contract with Defendant Wexford, knew that Logan was not equipped to provide the psychiatric care that Rusher needed and stated that the Illinois Department of Human Services "did not have the number of psychiatric beds that they should have had in order to accept all of the patients from [I]DOC that required that level of [inpatient] care." d/e 207, pp. 58-59; d/e 215, p. 34.

On September 24, 2015, a multidisciplinary meeting about Rusher convened including Defendant Richardson, Defendant Yuan and other members of the mental health and medical staff to discuss Rusher's plan of care. See d/e 181, p. 24; d/e 207, p. 7. Staff held additional multidisciplinary meetings about Rusher, including on October 22 and 29, November 12, 19, and 25, and

December 3 and 10, 2015 and on January 7 and 21, February 4 and 18, March 17 and 31, and April 14, 2016. <u>See</u> d/e 181, pp. 27-34; d/e 207, pp. 7, 35, 37.

All attendees at the December 3, 2015 multidisciplinary meeting about Rusher, including Defendant Richardson and Defendant Yuan, agreed that a transfer to an Illinois Department of Human Services hospital for inpatient treatment "would be in [] Rusher's best interest." <u>See</u> d/e 181, p. 29; d/e 207, pp. 7, 62; d/e 207, p. 43. On December 15, 2015, staff held a "Grand Rounds Case Conference" on Rusher that was attended by mental health staff, Chief of Mental Health Melvin Hinton, and representatives from at least ten other correctional facilities. <u>See</u> d/e 181, p. 30; d/e 207, p. 7. At the January 21, 2016 multidisciplinary meeting about Rusher, which included Defendant Richardson and Defendant Yuan, Defendant Richardson noted that, rather than remove Rusher from constant crisis watch, "it was a 'sold conclusion' she would remain on constant crisis watch." d/e 207, pp. 62-63; d/e 215, p. 44.

Rusher was never transferred to an inpatient facility during her time at Logan. See d/e 207, p. 62; d/e 215, pp. 43-44. IDOC upper management told Defendant Richardson and Defendant Yuan that the only way for Rusher to be transferred to an inpatient facility would be for her to reach her release date and then commit her to a hospital. See d/e 207, p. 63; d/e 215, p. 44.

On May 3, 2016, Rusher's sentence at Logan ended and she was transferred from IDOC custody and civilly committed to Andrew McFarland Mental Health Center, an Illinois Department of Human Services facility, where she received inpatient treatment. See d/e 181, p. 35; d/e 207, pp. 7, 63; d/e 215, pp. 44-45. Neither party asserts that any Wexford, IDOC, or other personnel at any point attempted to obtain Rusher's voluntary admission to McFarland Mental Health Center or a similar facility.

Unrelated to this case, Plaintiff filed a complaint before this Court relating to Rusher's detention at the Sangamon County Jail in Andrews v. Sangamon County, Central District of Illinois, Springfield Division, Case No. 18-1100, which settled in 2022. That complaint alleged that Rusher was accused of battery while a

patient at McFarland, arrested, and taken to the Sangamon County Jail. While there, Rusher committed suicide and died on March 30, 2017.

On March 11, 2018, Plaintiff Kelli Andrews, as administrator of the late Rusher's estate, filed the original Complaint in this Court (d/e 1). On December 11, 2019, Plaintiff filed a First Amended Complaint naming the Wexford Defendants as well as Bruce Rauner, the State of Illinois, John Baldwin, and Jeff Sim (d/e 76).

In Count I, Plaintiff alleged that Defendants Yuan, Richardson and Wexford—as well as Defendants Rauner, Baldwin, and Sim— violated the Eighth Amendment to the United States Constitution by "repeated[ly] plac[ing] [][Rusher] in solitary" and demonstrating "deliberate indifference to [Rusher's] medical needs." Id. at pp. 15-16.

In Counts II and III, Plaintiff named the State of Illinois as the sole defendant. Id. at pp. 17-21.

In Count IV, Plaintiff alleged that the Wexford Defendants committed medical negligence when they "failed to take reasonable

steps to ensure that [] Rusher received adequate medical and mental healthcare." <u>Id.</u> at p. 21.

On July 8, 2024, the Wexford Defendants filed a Motion for Summary Judgment (d/e 181). On December 20, 2024, Plaintiff filed her Response (d/e 207). On February 3, 2025, the Wexford Defendants filed their Reply (d/e 215).

### III.   LEGAL STANDARD

Summary judgment is proper if the movant shows that no genuine dispute exists as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if a reasonable trier of fact could find in favor of the nonmoving party. <u>Carroll v. Lynch</u>, 698 F.3d 561, 564 (7th Cir. 2012).

When ruling on a motion for summary judgment, the Court must construe facts in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. <u>Woodruff v. Mason</u>, 542 F.3d 545, 550 (7th Cir. 2008). "At summary judgment, 'a court may not make credibility determinations, weigh the evidence, or decide which inferences to

draw from the facts; these are jobs for a factfinder.'" <u>Paz v.</u>
<u>Wauconda Healthcare & Rehab. Ctr., LLC</u>, 464 F.3d 659, 664 (7th
Cir. 2006) (internal citations omitted).

The movant bears the initial responsibility of informing the
Court of the basis for the motion and identifying the evidence the
movant believes demonstrates the absence of any genuine dispute
of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986);
<u>see</u> <u>also</u> <u>Modrowski v. Pigatto</u>, 712 F.3d 1166, 1168 (7th Cir. 2013)
(explaining that Rule 56 "imposes an initial burden of production on
the party moving for summary judgment to inform the district court
why a trial is not necessary" (internal citation omitted)). After the
moving party does so, the nonmoving party must then go beyond
the pleadings and "set forth specific facts showing that there is a
genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S.
242, 255 (1986) (quotation and footnotes omitted).

## IV.   ANALYSIS

**A. Defendants' Motion for Summary Judgment is Denied as
to Plaintiff's Eighth Amendment Claims Against
Defendants Yuan and Richardson in Count I of the First
Amended Complaint.**

**i.    Legal Precedent**

The Eighth Amendment prohibits punishments that are incompatible with "evolving standards of decency that mark the progress of a maturing society." Trop v. Dulles, 356 U.S. 86, 101 (1958). "The Eighth Amendment safeguards the prisoner against a lack of medical care that may result in pain and suffering which no one suggests would serve any penological purpose." Arnett v. Webster, 658 F.3d 742, 750 (7th Cir. 2011) (internal quotations and footnote omitted). "Prison officials violate the Constitution if they are deliberately indifferent to prisoners' serious medical needs." Id. (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)); Rodriguez v. Plymouth Ambulance Serv., 577 F.3d 816, 828 (7th Cir. 2009) ("Deliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution."); Walker v. Benjamin, 293 F.3d 1030, 1036–37 (7th Cir. 2002) (noting that the Eighth Amendment applies to the states through the Fourteenth Amendment).

The deliberate indifference standard requires an inmate to clear a high threshold in order to maintain a claim for cruel and unusual punishment under the Eighth Amendment. See Dunigan

ex rel. Nyman v. Winnebago Cnty., 165 F.3d 587, 590 (7th Cir. 1999). "In order to prevail on a deliberate indifference claim, a plaintiff must show (1) that his condition was 'objectively, sufficiently serious' and (2) that the 'prison officials acted with a sufficiently culpable state of mind.'" Lee v. Young, 533 F.3d 505, 509 (7th Cir. 2008) (quoting Greeno v. Daley, 414 F.3d 645, 652 (7th Cir. 2005)).

"A medical condition is serious if it 'has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention.'" Lee, 533 F.3d at 509 (quoting Greeno, 414 F.3d at 653).

"With respect to the culpable state of mind, negligence or even gross negligence is not enough; the conduct must be reckless in the criminal sense." Id. In Farmer v. Brennan, 511 U.S. 825, 836–37 (1994), the Supreme Court held "that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be

drawn that a substantial risk of harm exists, and he must also draw the inference." Id. "In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Id. at 844.

Whether a prisoner's "care evidences deliberate indifference to serious medical needs" depends on "the totality of an inmate's medical care." Petties v. Carter, 836 F.3d 722, 728 (7th Cir. 2016), as amended (Aug. 25, 2016). The Seventh Circuit has found deliberate indifference occurs:

> where the official knows of and disregards an excessive risk to inmate health or safety or where the official is both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he ... draw[s] the inference. A jury can infer deliberate indifference on the basis of a physician's treatment decision when the decision is so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment.

Duckworth v. Ahmad, 532 F.3d 675, 679 (7th Cir. 2008) (internal quotations and citations omitted).

To establish deliberate indifference, a plaintiff must show "'something approaching a total unconcern for his welfare in the

face of serious risks.'" <u>Collins v. Seeman</u>, 462 F.3d 757, 762 (7th Cir. 2006) (quoting <u>Duane v. Lane</u>, 959 F.2d 673, 677 (7th Cir. 1992)). However, "[t]hat the prisoner received some treatment does not foreclose his deliberate indifference claim if the treatment received was so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate his condition." <u>Arnett</u>, 658 F.3d at 751 (internal citations and quotations omitted). Also, a prisoner "can establish deliberate indifference by showing that medical personnel persisted with a course of treatment they knew to be ineffective." <u>Goodloe v. Sood</u>, 947 F.3d 1026, 1031 (7th Cir. 2020); <u>see also</u> <u>Greeno v. Daley</u>, 414 F.3d 645, 655 (7th Cir. 2005).

### ii.    A Jury Could Find Defendant Richardson and Defendant Yuan were Deliberately Indifferent to Rusher's Serious Medical Needs.

Defendants do not dispute that Rusher suffered from objectively serious medical conditions but argue in their Motion for Summary Judgment that no jury could find Defendants Richardson or Yuan deliberately indifferent because "no jury could find the voluminous treatment and meticulous attention [Defendants] Richardson and [] Yuan paid to Rusher reflected the absence of professional judgment." <u>See</u> d/e 181, p. 37.

First, Defendants assert that "the sheer volume of encounters Rusher had with Defendant Yuan and Defendant Richardson belies any claim she was denied mental health treatment." Id. Defendants cite that Defendant Yuan saw Rusher for consultation and medication management approximately 60 times between April 2013 and March 31, 2016, often weekly, and that Defendant Richardson saw Rusher for myriad forms of therapy at approximately 100 clinical consultations between January 23, 2015 and April 30, 2016, also often weekly. Id. at 37-38. Defendants note that Defendant Richardson's notes on his encounters with Rusher "are detailed, thorough, and reflect a mental health professional's thought process in working with an exceedingly difficult patient, determined not to survive her incarceration." Id. at p. 38. Defendants cite Boykin v. Fischer, 2019 U.S. Dist. LEXIS 199197 at *55-56 (N.D. Ill.) in support of their argument that Defendant Yuan's "constant assessment and adjustment to Rusher's medication regimes" demonstrate "the exercise of professional judgment." Id. at d/e 38.

Plaintiff, in response, asserts "that the Seventh Circuit has repeatedly confirmed that the provision of <u>some care</u> does <u>not</u> evidence lack of deliberate indifference." d/e 207, pp. 74-75 (citing <u>Petties v. Carter</u>, 836 F.3d 722, 730–31 (7th Cir. 2016)) (emphasis added by Plaintiff). Plaintiff also distinguishes <u>Boykin</u> on the grounds that Rusher received treatment "distinctly different and comparably worse than what she should have received, either at Logan or an inpatient mental health facility where she should have been transferred." d/e 207, p. 75.

The Court finds <u>Boykin</u> distinguishable. Here, Plaintiff's Eighth Amendment claim is not "based on a preference for one medication over another," as in <u>Boykin</u>, but instead on Defendants' "fail[ure] to transfer [Rusher] out of Logan to a facility where she could receive care for her serious mental health condition" and "repeated placement of [Rusher] in solitary constituted the infliction of cruel and unusual punishment." <u>Boykin v. Fischer</u>, 2019 U.S. Dist. LEXIS 199197 at *18 (N.D. Ill.); <u>see also</u> d/e 76, p. 16. Further, neither party argues that the treatment Defendants provided Rusher and the treatment she sought were "virtually

identical and offer[ed] the same programs, services, and level of medical and mental health care" like those in <u>Boykin</u>. <u>Boykin v. Fischer</u>, 2019 U.S. Dist. LEXIS 199197 at *16 (N.D. Ill.). Given these differing circumstances, the Court agrees with Plaintiff that <u>Boykin</u> does not inform this case.

The volume, detailed documentation, and frequency of encounters between Rusher and Defendants Yuan and Richardson do not preclude a reasonable jury "look[ing] at the totality of an inmate's medical care" from finding that Defendants Yuan's and Richardson's treatment decisions were "so far afield of accepted professional standards as to raise the inference that [they were] not actually based on a medical judgment." <u>Petties v. Carter</u>, 836 F.3d 722, 728 (7th Cir. 2016), <u>as amended</u> (Aug. 25, 2016); <u>Duckworth v. Ahmad</u>, 532 F.3d 675, 679 (7th Cir. 2008). Defendants Yuan's and Richardson's treatment decisions also included placing Rusher on an extended stay on constant watch and recommending her for transfer to outpatient care a single time. <u>See</u> d/e 207, pp. 43-44, 61; d/e 215, pp. 7-8, 40-41. There is a genuine dispute of material fact as to whether Defendants Yuan and Richardson placing Rusher

on an extended stay on constant watch and recommending her for transfer to outpatient care a single time—even alongside the volume, detailed documentation, and frequency of their encounters with Rusher—constituted their deliberate indifference to Rusher's serious medical needs.

Second, Defendants argue that the record reflects Defendants Yuan and Richardson "delivered a comprehensive treatment plan to Rusher" that they "constantly reviewed and adjusted" and that included: eye-movement desensitization and reprocessing therapy, group therapy, individual therapy, dog therapy, music therapy, cognitive behavioral therapy, psychiatry sessions, and "substantial out-of-cell time." d/e 181, p. 41.

Plaintiff responds that Defendants' "laundry list of treatment plans is misleading." d/e 207, p. 76. "Eye movement desensitization and reprocessing therapy" was "tried once," "dog therapy was taken away as a punishment for self-harm incidents," and "group therapy and socialization activities were suspended for the months Defendants placed her on constant crisis watch, contrary to the standard of care." Id.; see also d/e 181, Exh. B, p. 31. Plaintiff adds

that Defendants Yuan's and Richardson's individual clinical consultations with Rusher "were sporadic and brief, without the 'meaningful talking psychotherapy' required by [National Commission on Correctional Health Care] standards, and often occurring at the door of her cell." d/e 207, p. 76.

Defendants' Reply counters that "there is no evidence Defendants 'punished' Rusher for acts of self-harm." d/e 215, p. 48. Defendants cite Defendant Richardson's note—from an April 14, 2016 Enhanced Treatment Multidisciplinary Staffing meeting to discuss Rusher's actions—as "lay[ing] out detailed rationale for pausing Rusher's group therapy: safety, not punishment." Id.; see also d/e 207, Exh. 7, pp. 28-31.

Defendant Richardson testified that his team tried eye movement desensitization and reprocessing therapy "once." d/e 181, Exh. B, p. 31. The April 14, 2016 Enhanced Treatment Multidisciplinary Staffing meeting notes signed by Defendant Richardson describe Rusher's recent suicide attempts and gestures: On April 6, 2016, Rusher was "angry and raving in her cell for hours," "punched the wall in her cell," and "swallowed a spork" that

"got stuck in her throat" such that she was transferred to the hospital to have it removed. d/e 207, Exh. 7, p. 28. On April 13, 2016, "Rusher swallowed a commissary toothbrush while in the shower." Id.

The notes state that Defendant "Richardson confirmed that due to recent problems with [] Rusher passing contraband, she would not be allowed to attend groups at this time, and probably for the rest of her stay at Logan (19 days)." Id. at p. 29. The notes also state that "group therapy is suspended at this time for" Rusher and that she "may participate" in the dog therapy program "when she goes a week without hurting herself." Id. at p. 31.

Defendants Yuan's and Richardson's treatment plan for Rusher including seven types of therapy, psychiatry sessions, and "substantial" out-of-cell time does not preclude a reasonable jury "look[ing] at the totality of an inmate's medical care" from finding that Defendants Yuan's and Richardson's treatment decisions were "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." Petties v. Carter, 836 F.3d 722, 728 (7th Cir. 2016), as amended

(Aug. 25, 2016); <u>Duckworth v. Ahmad</u>, 532 F.3d 675, 679 (7th Cir. 2008). Those treatment decisions also included placing Rusher on an extended stay on constant watch and recommending her for transfer to outpatient care a single time. <u>See</u> d/e 207, pp. 43-44, 61; d/e 215, pp. 7-8, 40-41.

There is a genuine dispute of material fact as to whether Defendants Yuan and Richardson placing Rusher on an extended stay on constant watch and recommending her for transfer to outpatient care a single time—even alongside the types of therapy, psychiatry sessions, and out-of-cell time they also provided Rusher—constituted their deliberate indifference to Rusher's serious medical needs, possibly by withholding certain therapies to punish her.

Finally, Defendants argue that Defendants Yuan and Richardson exercised professional judgment because they "were constant participants in weekly multidisciplinary" meetings about Rusher that "always included discussion of Rusher's treatment and response and solicited conversation among medical, mental health, and security staff about how to best manage Rusher." d/e 181, p.

41. Defendants also note that "Rusher was discussed" at a "Grand Rounds Case Conference" on December 15, 2015 "that included top statewide mental health officials and mental health staff from other prisons." Id. Defendants note that Defendant Richardson "recommend[ed] Rusher's transfer to an in[-]patient [Illinois Department of Human Services] facility in April 2015," that his "recommendation to transfer Rusher to [the Illinois Department of Human Services] was discussed at [a] multidisciplinary [meeting] with IDOC staff," and that "there is no evidence in the record that would support that [Defendants] Richardson or [] Yuan or any Wexford employee had the ability to actually transfer Rusher to" the Illinois Department of Human Services. Id. at p. 42.

Defendants cite to Plaintiff's expert Dr. Terry Kupers' Expert Report, which states that "[m]ental health staff in I.D.O.C. made a concerted effort to provide [] Rusher with safe management and with mental health treatment" and "created treatment plans and provided counseling or therapy sessions, seemingly as often as they could, given the number of clinical staff available, institutional policies and realities, and the times [] Rusher had to be in isolation

and on watch." Id. at pp. 41-42 (citing id. at Exh. F, p. 77).
Defendants also cite Sinn v. Lemmon, 911 F.3d 412, 423-24 (7th
Cir. 2018) as "holding that no reasonable juror could infer
deliberate indifference where prison officials took sensible steps to
address unsafe prison conditions." d/e 215, pp. 42-43.

Plaintiff responds that the fact that Defendant Richardson
submitted "one recommendation to IDOC staff, in April 2015, and
had one discussion at a multidisciplinary [meeting], in December
2015, where he (and Defendant Yuan) noted that a transfer to [an
Illinois Department of Human Services] hospital for inpatient
treatment 'would be in [] Rusher's best interest,'" "fail[s] to resolve
any material dispute about whether Defendants responded
'reasonably to the risk' of [] Rusher's decompensation or showed the
requisite level of concern for her well-being." d/e 207, p. 74 (citing
Farmer v. Brennan, 511 U.S. 825, 844 (1994)) (emphasis added by
Plaintiff).

Plaintiff contests Defendants' characterization of Kupers'
testimony as incomplete, citing his further statements that "I don't
believe that they made a vigorous enough effort to institute the

treatment that [] Rusher required." d/e 207, p. 76 (citing d/e 181, Exh. F, p. 7). Plaintiff also contests Defendants' characterization of Sinn, citing its holding as "that the plaintiff raised a triable issue of fact as to whether the prison unit manager had subjective knowledge of the substantial risk of harm because he was aware of the general patterns of gang violence at the prison" and arguing that "[h]ere, too, there is a triable issue of fact because Defendants Richardson and Yuan had knowledge of [] Rusher's mental health treatment as well as the broader patterns of inadequate mental health treatment available at Logan." d/e 207, p. 75.

The Court first notes that Plaintiff does not assert that Defendants violated the Eighth Amendment by failing to unilaterally transfer Rusher out of IDOC for treatment. Plaintiff alleges in the First Amended Complaint that these Defendants, along with the government defendants, "failed to transfer [Rusher] out of Logan to a facility where she could receive care for her serious mental health condition. Instead, they allowed her to remain isolated in solitary confinement." d/e 76, p. 16.

The fact that Defendants Yuan and Richardson participated in weekly meetings about Rusher that always included discussion of her treatment and how to best manage her, and recommended her for transfer to outpatient care and discussed it a single time when they did not have the ability to unilaterally transfer Rusher for treatment, does not preclude a reasonable jury "look[ing] at the totality of an inmate's medical care" from finding that Defendants Yuan's and Richardson's treatment decisions were "so far afield of accepted professional standards as to raise the inference that [they were] not actually based on a medical judgment." Petties v. Carter, 836 F.3d 722, 728 (7th Cir. 2016), as amended (Aug. 25, 2016); Duckworth v. Ahmad, 532 F.3d 675, 679 (7th Cir. 2008). There is a genuine dispute of material fact as to whether Defendants Yuan and Richardson placing Rusher on an extended stay on constant watch—even alongside recommending her for transfer to outpatient care a single time and organizing meetings where they discussed Rusher's treatment—constituted their deliberate indifference to Rusher's serious medical needs.

In <u>Petties v. Carter</u>, 836 F.3d 722, 731 (7th Cir. 2016), <u>as</u> <u>amended</u> (Aug. 25, 2016), the Seventh Circuit noted that "[w]hen a doctor says he did not realize his treatment decisions (or lack thereof) could cause serious harm to a plaintiff, a jury is entitled to weigh that explanation against certain clues that the doctor <u>did</u> know" including "evidence that the patient repeatedly complained of enduring pain with no modifications in care" and "inexplicable delays or departures from common medical standards, or of course, the doctor's own testimony that indicates knowledge of necessary treatment he failed to provide." <u>Id.</u> (emphasis in original).

A reasonable jury could find from the evidence in the record "certain clues that the [Defendants] did know" their "treatment decisions (or lack thereof) could cause serious harm to" Rusher. <u>Id.</u> For example, Rusher reported to a social worker on September 17, 2015, that she wanted off constant crisis watch and that "it[']s making me worse" and on November 20, 2015 "recall[ed] doing worse when she was moved to Logan." d/e 207, Exh. 7, pp. 25, 60. As discussed <u>infra</u>, Plaintiff's expert Dr. Terry Kupers' Expert Report outlined "areas where mental health treatment was grossly

inadequate" relative to the National Commission on Correctional Health Care standards of care. d/e 207, Exh. 16, pp. 17-19. Defendant Richardson testified that, in the fall of 2015, Rusher "was so suicidal all the time" and "treatments seemed to be so ineffective," and Defendant Yuan wrote in his September 17, 2015 medical notes that Rusher had "made many serious suicidal attempt[s] and [was] getting more and more frequent and lethal [in her] suicidal behavior." d/e 181, Exh. B, p. 17; Exh. H (104), p. 5.

The Court also notes Defendants' argument in their Reply that "[c]ases finding a question of fact based on professionals pursuing a course of treatment known to be ineffective without exercising professional judgment bear no resemblance to [Rusher's] case." d/e 215, pp. 45-46. Defendants contrast Rusher's case with Greeno v. Daley, 414 F.3d 645, 655 (7th Cir. 2005), in which a defendant doctor initially noted that a prisoner plaintiff's severe heartburn and vomiting could possibly be an ulcer or reflux disorder, but the prisoner was only given antacids that worsened his condition—"a treatment that was not changed for over a year in the face of worsening symptoms." Id.; see also d/e 215, pp. 45-46. Rusher's

suicidal ideations were no secret, and Rusher "regularly came off crisis watch" and was "placed back on crisis watch" "[b]efore her extended stay on constant watch." d/e 215, p. 46. But given Defendants' comments in their medical notes outlined earlier, a reasonable jury could very well find that "medical personnel persisted with a course of treatment they knew to be ineffective." Goodloe v. Sood, 947 F.3d 1026, 1031 (7th Cir. 2020).

Defendants' Reply also cites the testimony of Dr. Melvin Hinton, IDOC's 30(b)(6) corporate representative, that the Illinois Department of Human Services would not take IDOC patients and IDOC had no offsite location to transfer IDOC patients until it constructed its own inpatient facility in 2017. See d/e 215, p. 48; see also d/e 181, Exh. D, pp. 140-41, 160-61. Therefore, Defendants argue that "[t]he 'adequacy' of Defendants['] advocacy for [Rusher to] transfer [to the Illinois Department of Human Services] could not have impacted the result, which collapses causation," citing Dean v. Wexford, 18 F.4th 214, 243-44 (7th Cir. 2021). See d/e 215, p. 48. But even assuming that IDOC was categorically unable to transfer Rusher out of Logan during her time

there, Defendants' argument assumes that the only measure of adequacy of Defendants' advocacy would be successful transfer. Plaintiff also alleges that Defendants failed to "develop an inpatient treatment capacity within the IDOC's facilities during the time [] Rusher was incarcerated." d/e 207, p. 81. Defendants advocating for Rusher's transfer could very well have impacted the result of "develop[ing] an inpatient treatment capacity within the IDOC's facilities" for Rusher if external transfer was unavailable. Id.

In sum, a reasonable jury could consider the facts in the record and find that Defendants Yuan's and Richardson's treatment decisions concerning Rusher were "so far afield of accepted professional standards as to raise the inference that [they were] not actually based on a medical judgment," such that Defendants Yuan and Richardson were "deliberately indifferent to [Rusher's] serious medical needs." Duckworth v. Ahmad, 532 F.3d 675, 679 (7th Cir. 2008); Arnett v. Webster, 658 F.3d 742, 750 (7th Cir. 2011) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)) (internal quotations and footnote omitted). Therefore, Defendants' Motion for Summary

Judgment (d/e 181) on Count I as to Defendants Yuan and

Richardson is DENIED.

### B. Defendants' Motion for Summary Judgment is Denied as to Plaintiff's Eighth Amendment Claim Against Defendant Wexford in Count I of the First Amended Complaint.

### i. Legal Precedent

Section 1983 allows suit against any "person who, under color

of any statute ... of any State ... subjects, or causes to be subjected,

any citizen of the United States ... to the deprivation of any rights,

privileges, or immunities secured by the Constitution and laws." 42

U.S.C. § 1983. A plaintiff must demonstrate that "(1) he was

deprived of a right secured by the Constitution or laws of the United

States; and (2) the deprivation was visited upon him by a person or

persons acting under color of state law." First Midwest Bank

Guardian of Est. of LaPorta v. City of Chicago, 988 F.3d 978, 986

(7th Cir. 2021).

The Supreme Court has deemed "persons to whom [Section]

1983 applies" to include municipalities and the Seventh Circuit

Court of Appeals "treat[s] private corporations acting under color of

state law as municipalities." Monell v. Dep't of Soc. Servs. of City of

New York, 436 U.S. 658, 690 (1978); Dean v. Wexford Health

Sources, Inc., 18 F.4th 214, 235 (7th Cir. 2021).

To prevail on a Section 1983 claim against a municipality

under Monell, a plaintiff must first challenge conduct attributable

to the municipality and caused by a governmental policy or custom

in the form of: "(1) an express policy that causes a constitutional

deprivation when enforced; (2) a widespread practice that is so

permanent and well-settled that it constitutes a custom or practice;

or (3) an allegation that the constitutional injury was caused by a

person with final policymaking authority." First Midwest Bank

Guardian of Est. of LaPorta v. City of Chicago, 988 F.3d 978, 986

(7th Cir. 2021) (quoting Spiegel v. McClintic, 916 F.3d 611, 617 (7th

Cir. 2019) (internal citation marks omitted).

Next, a plaintiff must demonstrate that the policy or custom

confirms municipal fault—that the action facially violated a federal

right or "was taken with 'deliberate indifference'" to the plaintiff's

constitutional rights, such that "it was obvious that the

municipality's action would lead to constitutional violations and

that the municipality consciously disregarded those consequences."

Id. at 987. Lastly, the plaintiff must establish a "direct causal link" that the municipality's action was the "moving force" powering the constitutional injury. Id.

### ii. A Reasonable Jury Could Find Defendant Wexford Maintained an Unconstitutional Policy Regarding Sending Patients Offsite for Mental Health Services.

Defendants argue that Plaintiff alleges that Defendant "Wexford violated the Eighth Amendment by not providing a means by which Rusher could be transferred out of IDOC to an inpatient mental health center," a theory that "is not supported by (1) the contract's plain language, (2) the parties' understanding and performance of the contract, or (3) Illinois law." d/e 181, p. 44. Defendants cite to IDOC and Defendant Wexford agreeing that transferring IDOC inmates for offsite mental health services was not one of Defendant Wexford's responsibilities in its relationship with IDOC and to Illinois law granting only IDOC the ability to move an inmate out of IDOC custody and into an Illinois Department of Human Services facility. Id. at pp. 45-46.

The Court first notes that Plaintiff does not even assert that Defendants violated the Eighth Amendment by failing to unilaterally transfer Rusher out of IDOC. Plaintiff alleges in the First Amended

Complaint that these Defendants, along with the government defendants, "failed to transfer [Rusher] out of Logan to a facility where she could receive care for her serious mental health condition. Instead, they allowed her to remain isolated in solitary confinement." d/e 76, p. 16. Plaintiff further specifies her Eighth Amendment municipality claim in her Response: that Defendant Wexford's "policies and widespread practices did not allow for the level of care [] Rusher required and encouraged long-term crisis watch instead of appropriate mental health treatment, in violation of the Eighth Amendment." d/e 207, pp. 78-79.

Defendants' remaining arguments concern Defendant Wexford's contract with IDOC. Section 2 of the contract between Defendant Wexford and IDOC, titled "Description Of Supplies And Services," states that "[v]endor [Defendant Wexford] is to arrange and provide for services on-site and as necessary off-site at local hospitals, outpatient facilities and consultative physician offices," and concludes, "[i]t is the intent of Agency for all offenders to receive adequate and cost effective health care services regardless of place of assignment or disciplinary status." d/e 207, Exh. 3, p. 23.

Section 2.2.3 of the contract between Defendant Wexford and IDOC, titled "Comprehensive Medical Program," states that "[v]endor [Defendant Wexford] shall make arrangements with medical and mental health provider(s) to provide said services including...outpatient facilities and consultative physician offices, only when such services cannot be safely, adequately and cost-effectively delivered on-site at the correctional centers." d/e 207, Exh. 3, p. 25. Section 2.2.4 of the contract, titled "Comprehensive Mental Health Program," states that "[v]endor [Defendant Wexford] shall deliver effective and efficient mental health services on-site to offenders determined to be mentally or emotionally disturbed, due to a chronic mental illness of situational stress." Id. at 31.

Defendants first argue that the contract between IDOC and Defendant Wexford explicitly states it creates no rights enforceable by third parties, citing Knuth v. Wexford Health Sources, Inc., 2016 U.S. Dist. LEXIS 200410, *11-12 (N.D. Ill.). See d/e 181, pp. 44-45. The Court notes that the Knute plaintiff brought a state law breach of contract claim against Defendant Wexford, which Plaintiff does not, so Knute does not apply here.

Defendants argue further that, unlike the "Comprehensive Medical Program" section of the contract, the "Comprehensive Mental Health Program" section "includes no description of provision of offsite services." d/e 181, p. 45; see also d/e 207, Exh. 3, pp. 23, 25, 31.

However, Plaintiff does not bring a contract claim seeking to enforce rights under the contract between Defendant Wexford and IDOC. Even assuming that Defendant Wexford did comply with the terms of its contract with IDOC, Defendants do not indicate why such compliance "demonstrates the absence of any genuine dispute of material fact" as to whether Defendant Wexford's actions supported "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority" as summary judgment on a Monell claim would require. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago, 988 F.3d 978, 986 (7th Cir. 2021)

(quoting <u>Spiegel v. McClintic</u>, 916 F.3d 611, 617 (7th Cir. 2019) (internal citation marks omitted).

Plaintiff notes that when Rusher suffered physical injuries that medical staff at Logan "could not adequately treat," "she was medically furloughed out to receive care," and "[n]othing in [Defendant] Wexford's contract prevented it from facilitating mental health treatment outside of the prison." d/e 207, p. 79-80.

"A contract must be interpreted as a whole." <u>Beanstalk Grp., Inc. v. AM Gen. Corp.</u>, 283 F.3d 856, 860 (7th Cir. 2002). Section 2.2.3 of the contract between Defendant Wexford and IDOC states that Defendant Wexford "shall make arrangements with medical <u>and mental health provider(s)</u> to provide...outpatient facilities and consultative physician offices, only when such services cannot be safely, adequately and cost-effectively delivered on-site at the correctional centers." <u>See</u> d/e 207, Exh. 3, pp. 23, 25, 31 (emphasis added). Rusher's IDOC medical records reflect Defendant Wexford performing its duties under the contract as to non-mental health care: on September 16, 2015, Rusher was "sent to the hospital after choking on a 5 inch piece of celery," and on April 6, 2016, "she was

transferred to St. John's hospital" after she "swallowed a 'spork' with the handle down, [] it got stuck in her throat, partially blocking her airway" and "was not able to be removed by nursing staff." d/e 207, Exh. 7, pp. 25, 30.

Conversely, Defendant Wexford's medical staff repeatedly placed Rusher on crisis watch, culminating in an extended stay, and multiple Wexford employees did not utilize or recommend a different course of such treatment. See, e.g., d/e 207, pp. 43-44, Exh. 7 at pp. 7, 33-34, 37, 40, 54-55; see also Estate of Regan v. Baldwin et al., 2022 WL 20663133, at *8 (C.D. Ill. Nov. 21, 2022). "Institutional liability can be proven in a number of ways, including but not limited to repeated actions," and "[t]here is no magic number of injuries that must occur before a defendant's failure to act can be considered deliberately indifferent." Howell v. Wexford Health Sources, Inc., 987 F.3d 647, 654 (7th Cir. 2021). Therefore, a reasonable jury could find that Defendant Wexford had "a widespread practice that is so permanent and well-settled that it constitutes a custom or practice" of relying on crisis watch to manage psychiatric emergencies as required to establish Defendant

Wexford's deliberate indifference to Rusher's serious medical needs violating her Eighth Amendment rights. See First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago, 988 F.3d 978, 986 (7th Cir. 2021), see also Estate of Regan v. Baldwin et al., 2022 WL 20663133, at *8 (C.D. Ill. Nov. 21, 2022).

Next the Court considers whether Defendant Wexford's action "was taken with 'deliberate indifference'" to Rusher's constitutional rights—such that "it was obvious that the municipality's action would lead to constitutional violations and that the municipality consciously disregarded those consequences"—and that it was the "moving force" powering the constitutional injury. See First Midwest Bank, 988 F.3d at 986 (7th Cir. 2021). Defendants argue that since Defendant "Wexford had no duty or ability to transfer Rusher offsite it is unclear how Plaintiff would prove it deliberately indifferent." d/e 181, p. 48. Defendants cite to the fact that "when notified that IDOC was looking for a solution for offsite inpatient mental health treatment for its inmates, [Defendant] Wexford attempted to help…contact each of the 87 hospitals in Illinois with inpatient

mental health capability to find space for IDOC inmates" in August
2015. Id.; see also id. at Exh. I, p. 30.

Plaintiff argues she "presented substantial evidence of
Wexford's conscious disregard to [] Rusher's significant mental
health needs, directly resulting in her undisputed deterioration
while in confinement." d/e 207, p. 80. Plaintiff argues that "a jury
can weigh whether [Defendant Wexford's] single, ultimately
fruitless, outreach in August 2015"—to help contact hospitals with
inpatient mental health capability to find space for IDOC inmates,
"but not specifically [] Rusher"—"proves that [Defendant] Wexford
did not consciously disregard its duty to adequately advocate for []
Rusher's transfer." Id. at 80-81.

As the Court found earlier, a reasonable jury could consider
the facts in the record and find that Defendants Yuan's and
Richardson's treatment decisions concerning Rusher were "so far
afield of accepted professional standards as to raise the inference
that [they were] not actually based on a medical judgment," such
that Defendants Yuan and Richardson were "deliberately indifferent
to [Rusher's] serious medical needs." Duckworth v. Ahmad, 532

F.3d 675, 679 (7th Cir. 2008); Arnett v. Webster, 658 F.3d 742, 750 (7th Cir. 2011) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)) (internal quotations and footnote omitted).

Defendant Wexford's contract with IDOC, and its transfer of patients out for physical medical care but not mental medical care, indicates sufficient evidence of Defendant Wexford's obligation to provide mental health services and treatment at a professionally accepted standard. See d/e 207, p. 56; d/e 215, p. 28; see also Est. of Regan v. Baldwin, No. 1:17-CV-01059-JEH, 2022 WL 20663133, at *8 (C.D. Ill. Nov. 21, 2022). Plaintiff's expert Dr. Terry Kupers testified that the "over-utilization of solitary confinement as a means of keeping [] Rusher safe or as a means of punishing her rule-breaking behaviors" demonstrated how Rusher's "mental health treatment was grossly inadequate" pursuant to the National Commission on Correctional Health Care standards "reflect[ing] a national consensus on what the standard of care in the community requires as adapted to the correctional environment." d/e 207, Exh. 16, pp. 6-7, 17-18; see also d/e 181, Exh. F, p. 66. This constitutes sufficient evidence of what policies were not but should have been

in place to satisfy that standard of care. See Est. of Regan v. Baldwin, No. 1:17-CV-01059-JEH, 2022 WL 20663133, at *9 (C.D. Ill. Nov. 21, 2022). Further, Kupers' Expert Report stated that "[t]o a reasonable degree of medical certainty, the time [] Rusher spent in solitary confinement, including the time she was on 'observation' or 'watch,' made her mental illness worse and her prognosis more grave." d/e 207, Exh. 16, p. 21. This constitutes sufficient evidence directly linking Defendant Wexford's actions to Rusher's specific outcome—being placed on an extended stay on constant watch and recommended for transfer to outpatient care a single time. See Est. of Regan v. Baldwin, No. 1:17-CV-01059-JEH, 2022 WL 20663133, at *9 (C.D. Ill. Nov. 21, 2022).

In sum, the Court finds that a reasonable jury could determine a "genuine dispute of material fact" as to whether Defendant Wexford's actions supported "a widespread practice that is so permanent and well-settled that it constitutes a custom or practice," were "taken with 'deliberate indifference,'" and were the "moving force" powering the constitutional injury. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also First Midwest Bank

Guardian of Est. of LaPorta v. City of Chicago, 988 F.3d 978, 986

(7th Cir. 2021) (quoting Spiegel v. McClintic, 916 F.3d 611, 617 (7th

Cir. 2019) (internal citation marks omitted). Therefore, Defendants'

Motion for Summary Judgment (d/e 181) on Count I as to

Defendant Wexford is DENIED.

### C. Defendants are Not Entitled to Good-Faith Immunity on Count I at the Summary Judgment Stage.

The Seventh Circuit has found that "a private party that acts

under color of law for purposes of section 1983 may defend on the

ground that it proceeded in good faith." Janus v. Am. Fed'n of State,

Cnty. & Mun. Emps., Council 31; AFL-CIO, 942 F.3d 352, 364 (7th

Cir. 2019). Notably, "a good-faith defense in section 1983 actions

when the defendant reasonably relies on established law…is not, we

stress, a simple 'mistake of law' defense." Id. at 366. Further, "the

good-faith defense to section 1983 liability is narrow," as a party

must "successfully claim to have relied substantially and in good

faith on both a state statute and unambiguous Supreme Court

precedent validating that statute." Id. at 367.

Defendants argue that they deserve good-faith immunity from

damages pursuant to Janus and cite to Section 3-8-5 of the Unified

Code of Corrections ("Section 3-8-5"), which states:

> (a) The Department shall cause inquiry and examination at periodic intervals to ascertain whether any person committed to it may be subject to involuntary admission, as defined in Section 1-119 of the Mental Health and Developmental Disabilities Code, or meets the standard for judicial admission as defined in Section 4-500 of the Mental Health and Developmental Disabilities Code, or is an intoxicated person or a person with a substance use disorder as defined in the Substance Use Disorder Act. The Department may provide special psychiatric or psychological or other counseling or treatment to such persons in a separate institution within the Department, or the Director of the Department of Corrections may transfer such persons other than intoxicated persons or persons with substance use disorders to the Department of Human Services for observation, diagnosis and treatment, subject to the approval of the Secretary of the Department of Human Services, for a period of not more than 6 months, if the person consents in writing to the transfer. The person shall be advised of his right not to consent, and if he does not consent, such transfer may be effected only by commitment under paragraphs (c) and (d) of this Section.

d/e 181, p. 49; see also 730 ILCS 5/3-8-5(a).

Defendants state that Section 3-8-5 empowers only IDOC to transfer an inmate to the Illinois Department of Human Services, that no mechanism exists for Defendant Wexford to transfer an inmate to the Illinois Department of Human Services or any other offsite facility, and that Defendant Richardson, Defendant Yuan,

and Rusher's other mental health providers documented and communicated to IDOC their belief that Rusher could benefit from transfer to an Illinois Department of Human Services facility. See d/e 181, p. 49. Defendants also argue that "Rusher received copious treatment that reflected the exercise of professional judgment of her providers" and "satisfie[d] the Eighth Amendment," which entitles an inmate not "to any particular treatment or to the best care possible," but "only to reasonable measures to [address] a substantial risk of serious harm." Id. at pp. 49, 50 (citing Forbes v. Edgar, 112 F.3d 262, 267 (1997)).

Plaintiff responds that Defendants do not satisfy the narrow good-faith defense to section 1983 liability because "they do not argue they relied substantially and in good faith on [Section 3-8-5 of the Unified Code of Corrections] and unambiguous Supreme Court precedent validating that statute when they made treatment decisions for [] Rusher." d/e 207, p. 82.

This Court agrees with Plaintiff at this stage. A "good faith" defense might exist for reliance on a valid law later declared invalid, but that situation does not apply here. See Andrews v. Cnty. of

Sangamon, No. 18-CV-1100, 2021 WL 3733142, at *4 (C.D. Ill. July

1, 2021); see also Mooney v. Ill. Educ. Assoc., 327 F.Supp. 690

(C.D. Ill. 2019) (good faith defense applied to unions' collection of

fees before U.S. Supreme Court's decision in Janus), affirmed by

Mooney v. IEA, 942 F.3d 368 (2019). Defendants cite no

unambiguous Supreme Court precedent validating Section 3-8-5,

and the parties do not dispute that Section 3-8-5 is and has been

good law at all times relevant.

Furthermore, even assuming that Defendants "relied

substantially and in good faith on" Section 3-8-5 and supporting

Supreme Court precedent, Plaintiff's arguments under Section 1983

do not assert that Defendants violated the Eighth Amendment by

complying with Section 3-8-5 and failing to unilaterally transfer

Rusher out of IDOC. Plaintiff alleges in the First Amended

Complaint that these Defendants, along with the government official

defendants, "failed to transfer [Rusher] out of Logan to a facility

where she could receive care for her serious mental health

condition. Instead, they allowed her to remain isolated in solitary

confinement." d/e 76, p. 16. Plaintiff further alleges that

"Defendants' repeated placement of [Rusher] in solitary constituted the infliction of cruel and unusual punishment" and their "deliberate indifference to [Rusher]'s medical needs violated [Rusher]'s rights to be free from cruel and unusual punishment," both in violation of the Eighth Amendment. Id. Plaintiff's Response specifically argues that Defendants failed to "adequately advocate for [] Rusher's transfer to an inpatient mental health facility" or "develop an inpatient treatment capacity within the IDOC's facilities during the time [] Rusher was incarcerated" with policies and widespread practices that "did not allow for the level of care [] Rusher required and encouraged long-term crisis watch instead of appropriate mental health treatment, in violation of the Eighth Amendment." d/e 207, pp. 7, 78-79, 81.

In sum, this case does not concern a scenario, as in Janus, where "[u]ntil [a change in the law] said otherwise, [Defendants] had a legal right" to act as they did "as long as [they] complied with state law and the line of [prior Supreme Court] cases." Janus, 942 F.3d at 366. Therefore, Defendants are not entitled to a good-faith finding as to damages on Count I at this stage.

### D. Defendants' Motion for Summary Judgment is Denied as to Plaintiff's Medical Negligence Claim Against the Wexford Defendants in Count IV of the First Amended Complaint.

#### i.    Legal Precedent

To file a medical malpractice claim under Illinois law, "[t]he general rule is that expert testimony is required to establish" "the standard of care applicable to [the medical provider], to identify the unskilled or negligent manner in which [the medical provider] deviated from that standard, and show a causal connection between that deviation and the injuries sustained." Donald v. Wexford Health Sources, Inc., 982 F.3d 451, 461 (7th Cir. 2020) (internal citations omitted). There is an exception, however—expert testimony is not necessary if "the physician's negligence is so grossly apparent or the treatment so common as to be within the everyday knowledge of a layperson." Davis v. Kayira, 938 F.3d 910, 916 (7th Cir. 2019) (internal citations omitted).

Section 2-622(b) of the Illinois Code of Civil Procedure governs healing art malpractice pleadings and typically requires that "a separate certificate and written report shall be filed as to each defendant who has been named in the complaint[.]" 735 ILCS 5/2-

622(b). However, Illinois courts have held that a single report can satisfy Section 2-622 so long as the report: (1) is broad enough to cover multiple defendants; (2) adequately discusses the deficiencies in the medical care rendered by each defendant; and (3) contains the reasons in support of the health professional's conclusion that a reasonable and meritorious cause exists for the filing of the action as against each of the defendants. See Brito v. Wexford Health Sources, Inc., 2015 U.S. Dist. LEXIS 39045, *11 (citing Mueller v. N. Suburban Clinic, Ltd., 299 Ill. App. 3d 568, 573 (1998)); see also Sherrod v. Lingle, 223 F.3d 605, 614 (7th Cir. 2000).

The Section 2-622 requirements are to be liberally construed and are not intended to create insurmountable pleading hurdles. See Mueller, 299 Ill. App. 3d at 573 (noting that while the affidavit and report requirements "do not rise to the level of substantive elements of a claim for medical malpractice, neither should they be viewed as empty formalism"); see also Hull v. S. Ill. Hosp. Servs., 356 Ill. App. 3d 300, 305 (2005) (noting that the statute "is a tool to reduce frivolous lawsuits by requiring a minimum amount of merit, not a likelihood of success").

In <u>Mueller</u>, the plaintiff did not file separate reports as to each of the named physician-defendants, the names of all but one of which were never mentioned other than in an introductory sentence in each report. <u>See</u> <u>Mueller</u>, 299 Ill. App. 3d at 577. The Illinois First District Court of Appeals dismissed upon finding that "we have no idea which of the physician-defendants actually prescribed aspirin for the plaintiff, which of them were involved in treating her for pericarditis, or when each of them began treating the plaintiff." <u>Id.</u>

In <u>Brito v. Wexford Health Sources, Inc.</u>, 2015 U.S. Dist. LEXIS 39045 (C.D. Ill. Sept. 30, 1998), this Court considered a motion to dismiss state law claims against Defendant Wexford and several defendant nurses on the ground that plaintiff failed to file a sufficient written report as required by Section 2-622. <u>See</u> <u>id.</u> at *2. The report in <u>Brito</u> noted that the nurse defendants should have but did not recognize the classic symptoms of colon cancer or provide skilled nursing care, criticized the treatment plaintiff received in light of her symptoms, and described the nurses and doctors as "oblivious to what should have been obvious to any

neophyte health care student." Id. at *13-14. This Court found the report sufficient, as the report was broad enough to cover the defendant doctor named in the report and the nurse defendants and discussed the appropriate standard of care, how the nurse defendants failed to meet that standard of care, and stated the reasons for the plaintiff's expert's conclusion that a reasonable and meritorious cause of action existed. Id. As relevant here, this Court also found that "the fact that the written report refers to 'nursing staff' rather than each individual nurse by name does not change this conclusion":

> The report identifies the course of treatment and the failures of the nursing staff as a whole during the course of [the plaintiff's] treatment. Under the circumstances of this case, where the treatment extended over a nearly two-year period and involved many members of the nursing staff, the Court finds the report sufficient even though it refers to the nursing staff as a whole and not to each nurse by name.

Id. at *12.

## ii. Plaintiff Has Disclosed Expert Testimony on Breach of the Standard of Care as Required To Bring a Medical Negligence Claim.

Defendants argue that Plaintiff, through her expert, Dr. Terry Kupers, does not provide standard of care testimony to sustain her

medical negligence claim against Defendant Yuan or Defendant
Richardson. See d/e 181, p. 50. Defendants argue that "Kupers'
only mention of the standard of care" is his statement in his Expert
Report that "[t]he standard of care in the medical community
requires that before seclusion or restraint is instituted all other less
restrictive measures must be tried and deemed a failure, and then a
physician must first examine the patient and write an order for the
seclusion or restraint, and then examine the patient and re-write
the order in a matter of a few hours." Id.; see also id. at Exh. F, pp.
78-79. Defendants also note that Kupers' statement continues, "in
correctional settings, too often, as in [] Rusher's case, custody staff
consign prisoners to solitary confinement as punishment for rule
infractions, or the solitary confinement is rationalized as 'suicide
observation' or 'watch,' as is the case in the I.D.O.C." Id. at pp. 50-
51; see also id. at Exh. F, p. 79.

Plaintiff responds that Kupers "explicitly identified and listed
the National Commission on Correctional Health Care [] standards
upon which he relied." d/e 207, pp. 64-65. Plaintiff references
where Kupers' Expert Report cites to the National Commission on

Correctional Health Care standards, lists several of the standards
on topics including "referral," "housing," and "intervention," and
describes the standards as "reflect[ing] a national consensus on
what the standard of care in the community requires as adapted to
the correctional environment." Id.; see also id. at Exh. 16, pp. 6-7;
see also d/e 181, Exh. F, p. 66. Plaintiff also cites to Kuper's
statements during his deposition that:

> [I]n my opinion, and I believe this is a consensus in the
> field, prisoners are entitled to the same standard of care in
> terms of medical and mental health care as are people in
> the community. And the best reflection or statement of
> what that standard of care is[,] is the standards of the
> National Commission on Correctional Health Care. So I
> take the standards as not mandatory for departments of
> corrections, but a fair and a most accurate expression of
> what the standard of care in the community is.

d/e 207, pp. 64-65; see also d/e 181, Exh. F, p. 28.

Plaintiff cites where Kupers' Expert Report outlines "at least
five areas where mental health treatment was grossly inadequate,"
including referencing the standard of care—what Defendants call
"Kupers' only mention" of it—in finding "[t]here was an over-
utilization of solitary confinement as a means of keeping [] Rusher
safe or as a means of punishing her rule-breaking behaviors." d/e

207, p. 65; see also id. at Exh. 16, pp. 17, 18. Further, Plaintiff alleges that "Defendants had an opportunity to—and did—question [Kupers] about those [National Commission on Correctional Health Care] standards and opinions during his deposition." d/e 207, p. 66.

The Court finds that Plaintiff has disclosed expert testimony on breach of the standard of care. Kupers' deposition includes several references to the relevant National Commission on Correctional Health Care standards of care and how Rusher's treatment at Logan diverged from those standards. Kupers' Expert Report also described what he perceived to be the effects of those divergences, including that "the many months of solitary confinement in an observation/watch cell seem to have worsened [Rusher's] mental illness;" that "Rusher's extended solitary confinement would render what therapy she received ineffective;" and that "[t]o a reasonable degree of medical certainty, the time [] Rusher spent in solitary confinement, including the time she was on "observation" or "watch," made her mental illness worse and her prognosis more grave." d/e 181, Exh. F, pp. 65, 81.

Therefore, a reasonable jury could find that Kupers' testimony, in the form of his deposition testimony and Expert Report, is sufficient to establish "the standard of care applicable to [the medical provider], to identify the unskilled or negligent manner in which [the medical provider] deviated from that standard, and show a causal connection between that deviation and the injuries sustained." Donald v. Wexford Health Sources, Inc., 982 F.3d 451, 461 (7th Cir. 2020) (internal citations omitted).

Defendants also argue that Kupers' Expert Report does not state that Defendant Yuan or Defendant Richardson deviated from any standard of care, mention Defendant Yuan, or criticize Defendant Richardson in the "opinions" section of his report; but instead "relies on [Defendant] Richardson's April 2015 [Illinois Department of Human Services] summary as evidence Rusher should have been transferred to [the Illinois Department of Human Services]" in criticizing "the system [Kupers] says placed Rusher in 'solitary.'" d/e 181, p. 51. Defendants reference Section 2-622(b) of the Illinois Code of Civil Procedure, which requires that "a separate certificate and written report shall be filed as to each defendant who

has been named in the complaint" and which the Seventh Circuit has deemed "a substantive condition of liability" that "applies to malpractice litigation in federal court." See d/e 181, p. 50, d/e 217, p. 50; see also 735 ILCS 5/2-622(b); Young v. United States, 942 F.3d 349, 350 (citing Hahn v. Walsh, 762 F.3d 617 (7th Cir. 2014)). Defendants also cite Alford v. Phipps, 169 Ill. App. 3d 845, 854 (1988), in which the Illinois Supreme Court noted that such written reports "must discuss the conduct or participation of the particular defendant that is being reviewed." Id.; see also d/e 181, p. 50.

Plaintiff concedes that Kupers' Expert Report does not explicitly name Defendant Richardson and Defendant Yuan, but argues that "[t]here is no dispute that Defendant Richardson was [] Rusher's primary clinical psychologist at Logan[,] that Defendant Yuan was her primary psychiatrist," and that "they were the clinicians responsible for [] Rusher's mental healthcare." d/e 207, pp. 67-68 (emphasis added by Plaintiff). For instance, Plaintiff argues, Kupers' statements that "[c]linicians did not spend an adequate amount of time talking to [] Rusher about her despair, her self-destructive and counterproductive behaviors, and related

psychological issues," and that "custody staff consign[ed] [Rusher] to solitary confinement as punishment for rule infractions," referred "to prison staff that includes Defendants Richardson and Yuan." d/e 207, pp. 67-68. As to Defendants' depiction of Kupers as criticizing "the system [Kupers] says placed Rusher in 'solitary,'" Plaintiff responds that "Defendants and their treatment decisions are undoubtedly <u>part</u> of that system, and their actions and inactions contributed to [] Rusher's severe mental health deterioration." <u>Id.</u> at p. 69 (emphasis added by Plaintiff).

The Court finds that Kupers' Expert Report satisfies Section 2-622(b). Unlike the written report in <u>Mueller</u>, the record, here, is clear "which of the physician-defendants actually prescribed [treatments] for the plaintiff, which of them were involved in treating her for [her condition], or when each of them began treating the plaintiff." <u>See</u> <u>Mueller</u>, 299 Ill. App. 3d at 577. Defendants cite, and Plaintiff does not dispute, that Defendant Yuan saw Rusher for consultation and medication management approximately 60 times between April 2013 and March 31, 2016, often weekly, and that Defendant Richardson saw Rusher for myriad forms of therapy at

approximately 100 clinical consultations between January 23, 2015 and April 30, 2016, also often weekly. See d/e 181 at 37-38.

As stated previously, Kupers' Expert Report described what he perceived to be the effects of how Rusher's treatment at Logan diverged from the National Commission on Correctional Health Care standards of care, including that "the many months of solitary confinement in an observation/watch cell seem to have worsened [Rusher's] mental illness;" that "Rusher's extended solitary confinement would render what therapy she received ineffective;" and that "[t]o a reasonable degree of medical certainty, the time [] Rusher spent in solitary confinement, including the time she was on "observation" or "watch," made her mental illness worse and her prognosis more grave." d/e 181, Exh. F, pp. 65, 81. In other words, Kupers' report was broad enough to cover both Defendant Yuan and Defendant Richardson and found "that a reasonable and meritorious cause of action exists." Brito, 2015 U.S. Dist. LEXIS 39045, *13.

Furthermore, as in the Brito written report, the fact that Kupers' written report refers to "clinicians" and "custody staff"

rather than each individual defendant "by name does not change this conclusion." See d/e 207, pp. 67-68; see also Brito, 2015 U.S. Dist. LEXIS 39045, *14. Like the Brito written report, Kupers' report "identifies the course of treatment and the failures of the [medical] staff as a whole during the course of [Rusher's] treatment." Brito, 2015 U.S. Dist. LEXIS 39045, *14; see also d/e 207, Exh. 16, pp. 77, 78. Kupers' report assesses Rusher's treatment over the duration of her incarceration, during which, the parties agree, Defendant Richardson, as her primary therapist, and Defendant Yuan, as her primary psychiatrist, were responsible for her care. See d/e 207, p. 59; see also d/e 215, p. 35. The parties agree that Rusher's treatment extended between at least April 2013 and March 2016—akin to the Brito plaintiff's nearly two-year treatment period—and likewise "involved many members of the [medical] staff," such as the other Enhanced Treatment Multidisciplinary Staffing meeting participants. See Brito, 2015 U.S. Dist. LEXIS 39045, *14; see also d/e 181, pp. 37-38.

Therefore, the Court finds Kupers' written report sufficient to satisfy Section 2-622, as required for medical malpractice claims in

federal court, because the report is broad enough to cover multiple defendants even though the report refers to the Wexford medical staff as a whole and not to Defendant Yuan and Defendant Richardson by name.

## V.     CONCLUSION

For the reasons stated, Defendants' Motion for Summary Judgment (d/e 181) on Count I as to Defendants Yuan, Richardson and Wexford is DENIED. Further, Defendants are not entitled to good-faith immunity on damages on Count I. Plaintiff's expert's written report satisfies 735 ILCS 5/2-622(b), as required for medical malpractice claims in federal court, so Defendants' Motion for Summary Judgment (d/e 181) on Count IV as to Defendants Yuan, Richardson and Wexford is also DENIED.

**IT IS SO ORDERED.**
**ENTERED: September 30, 2025.**
**FOR THE COURT**

/s/ Sue E. Myerscough
**SUE E. MYERSCOUGH**
**UNITED STATES DISTRICT JUDGE**