## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | |
|---|---|
| **KELLI ANDREWS, as Administrator of the Estate of Tiffany Ann Rusher, deceased,** )<br>)<br>)<br>) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 18-cv-1101** |
| ) | |
| **BRUCE RAUNER et al.,** ) | |
| ) | |
| **Defendants.** ) | |

### <u>OPINION AND ORDER</u>

**SUE E. MYERSCOUGH, U.S. District Judge:**

This matter is before the Court on Defendants Bruce Rauner's, the State of Illinois', John Baldwin's, Jeff Sim's, and the Illinois Department of Corrections' ("Defendants") Motion for Summary Judgment (d/e 187) and Memorandum in Support (d/e 188), Plaintiff Kelli Andrews' Response (d/e 208), and Defendants' Reply (d/e 219).

Because there is a genuine issue of material fact as to whether Defendants Rauner, Baldwin, and Sim were deliberately indifferent to Decedent Tiffany Ann Rusher's medical needs, Defendants'

Motion for Summary Judgment (d/e 187) is DENIED on Count I as to Plaintiff's Eighth Amendment claims against Defendants Rauner, Baldwin, and Sim. Because there is a genuine issue of material fact as to whether Defendants State of Illinois and IDOC refused to make reasonable accommodations by reason or because of Rusher's disabilities, Defendants' Motion for Summary Judgment (d/e 187) is DENIED on Counts II and III as to Plaintiff's Americans with Disabilities Act and Rehabilitation Act claims against Defendants State of Illinois and IDOC.

## I.    JURISDICTION

This Court has subject matter jurisdiction because Plaintiff's causes of action are brought under the Eighth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983; the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq. (ADA); and the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 et seq. See 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). Venue is proper because a substantial part of

the events or omissions giving rise to Plaintiff's claims occurred in this district. 28 U.S.C. § 1391(b)(2).

## II.    BACKGROUND

The Court draws the following facts from the parties' statements of undisputed facts. The Court discusses any material factual disputes in its analysis.

Tiffany Ann Rusher entered Illinois Department of Corrections ("IDOC") custody in July 2011. See d/e 188, pp. 4-5; d/e 208, p. 9. On March 12, 2013, Rusher was transferred to Logan Correctional Center ("Logan"). See d/e 188, p. 5; d/e 208, p. 9. Rusher suffered from bipolar disorder, post-traumatic stress disorder, borderline personality disorder, schizoaffective disorder bipolar type, and antisocial personality disorder. See d/e 208, p. 27; d/e 219, p. 18.

Defendant Bruce Rauner served as Governor of Illinois from 2015 to 2019, Defendant John Baldwin served as Acting IDOC Director from August 2015 to May 2019, and Defendant Jeff Sim served as IDOC Central Regional Psychologist Administrator from January 16, 2014, until February 15, 2017. See d/e 188, pp. 2-3, d/e 208, p. 9.

Defendant Wexford Health Sources, Inc. was contractually required to provide medical care to IDOC prisoners. See d/e 208, p. 35; d/e 219, p. 34. Defendant Dr. Brian Richardson was a Wexford employee and Rusher's primary therapist at Logan beginning around April 2015. See d/e 208, p. 36; d/e 219, p. 35-36. Defendant IDOC has Administrative Directives, which are Department-wide policies and procedures, and Institutional Directives, which are facility-specific policies and procedures, including programs and services on mental health and suicide prevention. d/e 188, p. 4; d/e 208, pp. 13-14.

From March 17, 2013 to May 3, 2016, Rusher was placed in either segregation, crisis watch housing, the residential treatment unit housing, and/or the healthcare unit at Logan. See d/e 208, p. 22; d/e 219, p. 7. Rusher spent over 1,000 days on crisis watch in crisis watch housing or crisis watch in the healthcare unit, which has several crisis watch cells, and spent the remaining 52 days in segregation and/or the residential treatment unit housing. See d/e 208, p. 22; d/e 219, pp. 7-8. Based upon her housing unit placement, Rusher was on constant crisis watch, with the exception

of one week, for an 8-month period from September 11, 2015 until her release from Logan on May 3, 2016. <u>See</u> d/e 208, p. 22; d/e 219, p. 8. Conditions of crisis watch included isolation, lights constantly on, and a safety smock but no clothing. <u>See</u> d/e 208, pp. 23; d/e 219, p. 10.

From May 2013 to April 2016, Rusher engaged in repeated acts of self-harm while incarcerated, including attempting to hang herself, cutting herself, and ingesting foreign objects. <u>See</u> d/e 208, pp. 28-31; d/e 219, p. 22. IDOC medical records documented those behaviors during Rusher's time in custody. <u>Id.</u> At Logan, Rusher received medications, therapy, and group activity, as well as other treatment by medical and mental health professionals, in response to her diagnosed mental disorders. <u>See</u> d/e 188, p. 5; d/e 208, pp. 16-17.

In an April 4, 2015 report, Defendant Richardson identified Rusher as someone whose mental illness was so severe it required a structured treatment and transfer to an inpatient facility that could offer consistent and specialized care and recommended that Rusher be transferred to a forensic inpatient treatment facility. d/e 208, pp.

36-37; d/e 219, p. 38. On April 10, 2015, Dr. Norine Ashley,
Logan's mental health administrator, sent that April 4, 2015 report
to Defendant Sim. Id.

Rusher was incarcerated in IDOC until her sentence ended on
May 3, 2016. See d/e 188, pp. 4-5; d/e 208, pp. 9, 39; d/e 208, pp.
42-43. On May 3, 2016, Rusher was transferred from IDOC custody
and civilly committed to Andrew McFarland Mental Health Center,
an Illinois Department of Human Services facility, where she
received inpatient treatment. See d/e 208, p. 39; d/e 219, p. 43.

Unrelated to this case, Plaintiff filed a complaint before this
Court relating to Rusher's detention at the Sangamon County Jail
in Andrews v. Sangamon County, Central District of Illinois,
Springfield Division, Case No. 18-1100, which settled in 2022. That
complaint alleged that Rusher was accused of battery while a
patient at McFarland, arrested, and taken to the Sangamon County
Jail. While there, Rusher committed suicide and died on March 30,
2017.

On March 11, 2018, Plaintiff Kelli Andrews, as administrator
of the late Rusher's estate, filed the original Complaint in this Court

(d/e 1). On December 11, 2019, Plaintiff filed a First Amended Complaint naming Defendants, as well as Defendant Richardson, Defendant Yuan, and Wexford Health Services ("the Wexford Defendants"). See d/e 76.

In Count I, Plaintiff alleged that Defendants Rauner, Baldwin, and Sim in their individual capacities—as well as the Wexford Defendants—violated the Eighth Amendment to the United States Constitution by "repeated[ly] plac[ing] [][Rusher] in solitary" and demonstrating "deliberate indifference to [Rusher's] medical needs." Id. at pp. 15-16.

In Count II, Plaintiff alleged that, despite Rusher's "known and obvious" disabilities including "her severe mental illness, her repeated attempts to self-harm, and her classification among a handful of prisoners so mentally ill that they could not receive proper care within the IDOC," Defendants State of Illinois and IDOC failed to reasonably accommodate [Rusher's] disability by failing to provide her with access to human contact, rehabilitation opportunities, group therapy, and adequate mental health treatment." Id. at pp. 17-19.

In Count III, Plaintiff alleged that, by placing Rusher "in solitary confinement and depriving her from access to appropriate services, programs, and activities, including education, programming, recreation, exercise and mental health services," Defendants State of Illinois and IDOC "discriminated against her on the basis of her disability in violation of the Rehabilitation Act." Id. at pp. 19-20.

In Count IV, Plaintiff named the Wexford Defendants as the sole defendants. Id. at p. 21.

On August 30, 2024, Defendants filed a Motion for Summary Judgment (d/e 187) and a Memorandum in Support (d/e 188). On December 20, 2024, Plaintiff filed her Response (d/e 208) and on March 21, 2025, Defendants filed their Reply (d/e 219).

### III.   LEGAL STANDARD

Summary judgment is proper if the movant shows that no genuine dispute exists as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if a reasonable trier of fact

could find in favor of the nonmoving party. <u>Carroll v. Lynch</u>, 698 F.3d 561, 564 (7th Cir. 2012).

When ruling on a motion for summary judgment, the Court must construe facts in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. <u>Woodruff v. Mason</u>, 542 F.3d 545, 550 (7th Cir. 2008). "At summary judgment, 'a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder.'" <u>Paz v. Wauconda Healthcare & Rehab. Ctr., LLC</u>, 464 F.3d 659, 664 (7th Cir. 2006) (internal citations omitted).

The movant bears the initial responsibility of informing the Court of the basis for the motion and identifying the evidence the movant believes demonstrates the absence of any genuine dispute of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>see</u> <u>also</u> <u>Modrowski v. Pigatto</u>, 712 F.3d 1166, 1168 (7th Cir. 2013) (explaining that Rule 56 "imposes an initial burden of production on the party moving for summary judgment to inform the district court why a trial is not necessary" (internal citation omitted)). After the

moving party does so, the nonmoving party must then go beyond
the pleadings and "set forth specific facts showing that there is a
genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S.
242, 255 (1986) (quotation and footnotes omitted).

## IV.   ANALYSIS

### A. Defendants' Motion for Summary Judgment is Denied as to Plaintiff's Eighth Amendment Claims Against Defendants Rauner, Baldwin, and Sim in Count I of the First Amended Complaint.

### i.   Legal Precedent

"The Eighth Amendment safeguards the prisoner against a
lack of medical care that may result in pain and suffering which no
one suggests would serve any penological purpose." Arnett v.
Webster, 658 F.3d 742, 750 (7th Cir. 2011) (internal quotations and
footnote omitted). "Prison officials violate the Constitution if they
are deliberately indifferent to prisoners' serious medical needs." Id.
(citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)); Rodriguez v.
Plymouth Ambulance Serv., 577 F.3d 816, 828 (7th Cir. 2009)
("Deliberate indifference to serious medical needs of a prisoner
constitutes the unnecessary and wanton infliction of pain forbidden
by the Constitution."); Walker v. Benjamin, 293 F.3d 1030, 1036–37

(7th Cir. 2002) (noting that the Eighth Amendment applies to the states through the Fourteenth Amendment).

The deliberate indifference standard requires a prisoner to clear a high threshold in order to maintain a claim for cruel and unusual punishment under the Eighth Amendment. Dunigan ex rel. Nyman v. Winnebago Cnty., 165 F.3d 587, 590 (7th Cir. 1999). "In order to prevail on a deliberate indifference claim, a plaintiff must show (1) that his condition was 'objectively, sufficiently serious' and (2) that the 'prison officials acted with a sufficiently culpable state of mind.'" Lee v. Young, 533 F.3d 505, 509 (7th Cir. 2008) (quoting Greeno v. Daley, 414 F.3d 645, 652 (7th Cir. 2005)).

"A medical condition is serious if it 'has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention.'" Lee, 533 F.3d at 509 (quoting Greeno, 414 F.3d at 653).

"With respect to the culpable state of mind, negligence or even gross negligence is not enough; the conduct must be reckless in the criminal sense." Id. In Farmer v. Brennan, 511 U.S. 825, 836–37 (1994), the Supreme Court held "that a prison official cannot be

found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." Id.

To succeed on an Eighth Amendment deliberate indifference claim, "a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right." Gentry v. Duckworth, 65 F.3d 555, 561 (7th Cir. 1995). Section 1983 "[l]iability depends on each defendant's knowledge and actions, not on the knowledge or actions of persons they supervise," such that "public employees are responsible for their own misdeeds but not for anyone else's." Burks v. Raemisch, 555 F.3d 592, 594-96 (7th Cir. 2009).

"Prison officials may satisfy the personal responsibility requirement of section 1983 if the conduct causing the constitutional deprivation occurs at the official's direction or with his or her knowledge and consent." Williams v. Shah, 927 F.3d 476,

482 (7th Cir. 2019). The official "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." <u>Gentry</u>, 65 F.3d at 561 (quoting <u>Jones v. City of Chicago</u>, 856 F.2d 985, 992 (7th Cir.1988)).

However, a nonmedical prison "administrator [is] entitled to defer to the judgment of jail health professionals so long as he [or she] did not ignore" the prisoner. <u>Berry v. Peterman</u>, 604 F.3d 435, 440 (7th Cir. 2010). "The only exception to this rule is that nonmedical officers may be found deliberately indifferent if 'they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner.'" <u>King v. Kramer</u>, 680 F.3d 1013, 1018 (7th Cir. 2012) (quoting <u>Hayes v. Snyder</u>, 546 F.3d 516, 527 (7th Cir. 2008)). In <u>King</u>, the Seventh Circuit noted that the two prison officer defendants who first responded to a seizing prisoner "were not trained to assess whether an inmate is genuinely experiencing seizures, and so they lacked the capacity to judge whether [the nurse defendant] made an inappropriate diagnosis." <u>Id.</u>

Additionally, the Seventh Circuit in <u>Burks</u> found that

notification by letter did not render public officials liable under

Section 1983:

> Public officials do not have a free-floating obligation to put things to rights, disregarding rules (such as time limits) along the way. Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job. The division of labor is important not only to bureaucratic organization but also to efficient performance of tasks; people who stay within their roles can get more work done, more effectively, and cannot be hit with damages under § 1983 for not being ombudsmen. [The] view that everyone who knows about a prisoner's problem must pay damages implies that [a prisoner] could write letters to the Governor of Wisconsin and 999 other public officials, demand that every one of those 1,000 officials drop everything he or she is doing in order to investigate a single prisoner's claims, and then collect damages from all 1,000 recipients if the letter-writing campaign does not lead to better medical care. That can't be right. The Governor, and for that matter the Superintendent of Prisons and the Warden of each prison, is entitled to relegate to the prison's medical staff the provision of good medical care.

<u>Burks</u>, 555 F.3d at 595.

### ii.   Defendants Rauner, Baldwin, and Sim are Not Entitled to Summary Judgment on Plaintiff's Deliberate Indifference Claims.

Plaintiff asserts, and Defendants do not dispute, that Rusher

had a serious medical condition. <u>See</u> d/e 188, p. 10; <u>see also</u> d/e

208, p. 46.

Defendants argue that Plaintiff can cite no evidence "to demonstrate that any of these Defendants was personally involved in the care or treatment of [] Rusher," noting that Rusher's direct care "was handled by the medical and mental health professionals at Logan." d/e 188, pp. 9, 11. Further, each named Defendant "held a high-level administrative position during the relevant period" and was, therefore, "entitled to rely on the professional judgment of those who did provide [] Rusher's direct care" and "cannot be found liable for actions or inactions simply on the basis of the administrative position each held." Id. at pp. 10, 11.

Plaintiff argues in her Response that she has presented considerable evidence that all three individual Defendants knew well the "risk of harm to [] Rusher's mental health resulting from" their actions, yet "turned a blind eye or persisted…in refusing to provide effective treatment of [] Rusher's undisputedly deteriorating condition for years." d/e 208, p. 55; see also Gentry v. Duckworth, 65 F.3d 555, 561 (7th Cir. 1995) (quoting Jones v. City of Chicago, 856 F.2d 985, 992 (7th Cir.1988)).

The Court now addresses the parties' arguments as to each individual Defendant in turn.

### a. A Reasonable Jury Could Find Defendant Rauner was Deliberately Indifferent to Rusher's Serious Medical Needs.

Defendants argue that Defendant Rauner, as Governor of Illinois, was "not in a position to be," nor was he actually, personally involved in providing Rusher's mental health care or making decisions regarding her mental health treatment. d/e 188, pp. 7, 10-11.

Plaintiff argues that "disputed facts exist as to whether Defendant Rauner was personally involved in—and recklessly disregarded—[] Rusher's mental healthcare." d/e 208, p. 60. Plaintiff cites to Defendant Rauner commenting on the general state of mental health care at IDOC and to his office's interactions with IDOC on prison mental health care. Id. at pp. 60-61. Specifically, Plaintiff argues that "[e]arly in his tenure as Governor, Defendant Rauner toured a number of corrections facilities around Illinois," "which included Logan." d/e 208, pp. 10, 42 (citing d/e 188, Exh. B; Exh. C, p. 17). Plaintiff also cites the two instances during her

deposition when she testified that Rusher's friend, Dick Lechner,

told Plaintiff that he had spoken to Defendant Rauner about

Rusher:

> A:...I am not sure what spurred [Lechner] to go to the Governor's office, but I do know that he did go a couple of times, and talk[ed] to him about what was going on.
> Q. Talked to who?
> A. The Governor at the time.
> Q. The actual Governor?
> A. Yes, sir, the actual Governor.
> Q. Do you know who the Governor was?
> A. Oh, my [goodness], was it Rauner? I'm not sure. I think I turned around and voted for him again. I know his last name began with an R.
> Q. Okay.
> A. I do know that.
> Q. Mr. [Lechner] told you he spoke with Governor Rauner?
> [Objection by counsel]
> THE WITNESS: Yes, sir.
> BY [COUNSEL FOR WEXFORD]:
> Q. Did he tell you what Governor Rauner said?
> A. No.
>
> ...
>
> Q. You said that he told you that he spoke to Governor Rauner?
> A. He went to Mr. Rauner's office on more than one occasion, yes.
> Q. Did he ever tell you that he spoke personally to Governor Rauner?
> A. At one time, yes, but then the other times I don't know who he talked to. But he was up there on multiple occasion[s]. He did not discuss whatever he discussed with

us at any time. We tried to get him to tell us once
everything happened at the hospital and he would not.
Q. So, you are not aware of what he discussed with
Governor Rauner or Governor Rauner's office?
A. The only thing that he did say was Tiffany's conditions
and the things that she had been through. Other than
that, he did not. He just would not -- he was a very private
person. He would not discuss it because he knew about
the open cases, so he said no.

d/e 208, Exh. K, pp. 4, 43.

Construing all facts and drawing all reasonable inferences in
Plaintiff's favor, Defendant Rauner knew about the dire state of
mental health care in IDOC and at Logan, received Rusher's
personal friend Lechner in the Governor's office, and heard directly
from Lechner about Rusher's "conditions and the things that she
had been through." Id. A rational juror could find that Lechner's
report could not possibly have depicted Rusher's treatment as
positive, which undermined Defendant Rauner's entitlement as
Governor "to relegate to the prison's medical staff the provision of
good medical care" to Rusher and gave Defendant Rauner "a reason
to believe (or actual knowledge) that prison doctors or their
assistants [we]re mistreating (or not treating)" Rusher. Burks v.
Raemisch, 555 F.3d 592, 595 (7th Cir. 2009); Hayes v. Snyder, 546

F.3d 516, 527 (7th Cir. 2008). Therefore, there is a genuine issue of material fact as to whether Defendant Rauner was deliberately indifferent to Rusher's serious medical needs and violated the Eighth Amendment under Section 1983.

### b. A Reasonable Jury Could Find Defendant Baldwin was Deliberately Indifferent to Rusher's Serious Medical Needs.

Defendants argue that Defendant Baldwin, as IDOC Director, was "not in a position to be," nor was he actually, personally involved in providing Rusher's mental health care or making decisions regarding her mental health treatment. d/e 188, pp. 7, 10-11.

Plaintiff argues that a reasonable jury could find Defendant Baldwin "was involved in [] Rusher's mental healthcare through his actions, deliberate inactions, and active involvement in IDOC practices and procedures related to mental health treatment that directly affected [] Rusher's care" and that he "recklessly disregarded [] Rusher's care." d/e 208, p. 59. Plaintiff cites to several instances of Defendant Baldwin's knowledge of mental health care treatment concerns at prisons like Logan and IDOC

generally and his handling of his roles and responsibilities, including that he "was the only person in [IDOC] authorized by state law to have prisoners transferred, namely to the Illinois Department of Human Services." Id. at pp. 59-60, see also ILCS 730 ILCS 5/3-8-5.

Plaintiff reasons that "IDOC specifically identified [] Rusher—among other prisoners—on a special list of individuals who needed inpatient care" while Defendant Baldwin served as IDOC director, such that he "knew [] Rusher was one of the prisoners whose severe mental illness was not being treated." d/e 208, p. 60. Plaintiff cites in support the portion of Defendant Baldwin's deposition where he reviewed a spreadsheet list produced in this litigation that Plaintiff's counsel described as being titled "Bates 5109-5116," listing the phrase "2013 through 2016 INPT list," and including "Rusher's name...as an inpatient crisis unit [prisoner]." Id. at pp. 41, 60; see also d/e 190, pp. 69-71.

When asked whether the document looked familiar to him, Defendant Baldwin replied in full, "[n]o," and when asked whether he would ever have been provided with an inpatient list like it, he

replied in full, "[a]t this time, I do not ever recall seeing an inpatient list." Id. at pp. 72-73. Defendant Baldwin also testified that IDOC "tracked inpatient level of care…when the Elgin project started to form" and "may have done that earlier." Id. at p. 78.

Construing all facts and drawing all reasonable inferences in Plaintiff's favor, Defendant Baldwin knew about the state of mental health care in IDOC and prisons like Logan and that Rusher's name was on the "2013 through 2016 [inpatient] list" identifying her as an inpatient crisis unit prisoner and a candidate for transfer out of IDOC. That does not equate to an unsubstantiated prisoner letter in flagging the potential appropriateness of Rusher's care, such that a rational juror could find Defendant Baldwin did not reasonably think he was "relegat[ing] to the prison's medical staff the provision of good medical care" to Rusher because he had "a reason to believe (or actual knowledge) that prison doctors or their assistants [we]re mistreating (or not treating)" Rusher. Burks v. Raemisch, 555 F.3d 592, 594-96 (7th Cir. 2009); Hayes v. Snyder, 546 F.3d 516, 527 (7th Cir. 2008). Therefore, there is a genuine issue of material fact as to whether Defendant Baldwin was deliberately indifferent to

Rusher's serious medical needs and violated the Eighth Amendment under Section 1983.

### c.  A Reasonable Jury Could Find Defendant Sim was Deliberately Indifferent to Rusher's Serious Medical Needs.

Defendants argue that while Defendant Sim is a medical professional, he did not provide Rusher or any individual in custody with any direct patient care while serving as IDOC Central Regional Psychologist Administrator and "relied upon the medical and mental health professionals at Logan to exercise their professional judgment in providing appropriate mental health care to" Rusher as he was entitled to do. d/e 188, pp. 8, 11.

Defendants acknowledge that Defendant Sim participated "in several multidisciplinary meetings during which individuals from medical, mental health, security, and/or programming met to discuss [] Rusher and ensure that she was receiving the care that she needed." Id. at p. 11 (citing id. at Exh. E, pp. 5-6). Defendants dispute that Defendant Sim's participation made him "aware of [] Rusher's serious medical need" on the grounds that it "clearly constituted an effort to prevent harm from coming to [] Rusher, and

precludes liability from attaching to him." d/e 188, p. 11.

Defendants cite in support <u>Farmer v. Brennan</u>, 511 U.S. 825, 844

(1994), in which the Justices outlined how prison officials who

responded reasonably to a known risk may avoid liability:

> [P]rison officials who actually knew of a substantial risk to
> inmate health or safety may be found free from liability if
> they responded reasonably to the risk, even if the harm
> ultimately was not averted. A prison official's duty under
> the Eighth Amendment is to ensure " 'reasonable safety,' "
> a standard that incorporates due regard for prison
> officials' "unenviable task of keeping dangerous men in
> safe custody under humane conditions." Whether one puts
> it in terms of duty or deliberate indifference, prison
> officials who act reasonably cannot be found liable under
> the Cruel and Unusual Punishments Clause.

<u>Id.</u>

Plaintiff argues that Defendant Sim "knew about the dire state

of [] Rusher's mental health, and a reasonable jury could find that

he recklessly ignored repeated recommendations and requests for []

Rusher to be transferred to an appropriate inpatient facility when

Logan [] unquestionably could not provide her adequate treatment"

for at least three reasons. d/e 208, p. 58.

First, Plaintiff argues in her Response that "Defendant Sim

ignored" Defendant Richardson's recommendation that Rusher

needed to be transferred to an inpatient facility because Logan was "not equipped to provide the psychiatric care [in an] environment that [Rusher] need[ed]." Id., see also id. at 39, id. at Exh. 13, pp. 8, 11-12. Plaintiff cites to the absence of any documentation indicating that Defendant Sim "took a single step to respond to this blunt and serious assessment or do anything to facilitate [] Rusher's transfer for proper treatment" after he learned of Defendant Richardson's recommendation in April 2015. Id. Defendants argue in their Reply that Plaintiff's assertions lack citations to supporting testimony. See d/e 219, p. 59.

Plaintiff's Additional Material Fact 82, which Defendants do not dispute, states in its entirety:

> On April 10, 2015, Defendant Sim and Dr. [Melvin] Hinton, Chief of Mental Health for the IDOC, received an email from Dr. [Norine] Ashley[, Logan's mental health administrator,] with [Defendant] Richardson's clinical case summary report stating that Logan [] "is not equipped to provide the psychiatric care [in an] environment that [Rusher] needs" and that "[] Rusher is recommended [for] a forensic inpatient treatment facility.

d/e 208, p. 39; see also d/e 219, p. 44. Construing all facts and drawing all reasonable inferences in Plaintiff's favor, Defendant Sim knew from Dr. Ashley's email that Logan was "not equipped to

provide the psychiatric care [in an] environment that [Rusher] need[ed]" and that Rusher had been "recommended [for] a forensic inpatient treatment facility." d/e 208, p. 39; see also d/e 219, p. 44. A reasonable jury could find that Defendant Sim knew that Rusher was not yet in such a facility and was not receiving the care she needed as of that time—such that he had "a reason to believe (or actual knowledge) that prison doctors or their assistants [we]re mistreating (or not treating)" Rusher. Hayes v. Snyder, 546 F.3d 516, 527 (7th Cir. 2008).

Second, Plaintiff argues that Defendant Sim "took no steps to procure [Rusher] adequate treatment" after he evaluated Rusher in July 2015 following one of her suicide attempts and "concluded '[Logan] need[ed] additional psychiatric treatment hours to assure adequate treatment in a timely manner.'" d/e 208, p. 58, see also id. at 39, id. at Exh. 13, pp. 18-19, id. at Exh. 16, p. 5. Defendant Sim stated during his deposition that his evaluation of Rusher constituted his only "meaningful interaction with [] Rusher," that IDOC Mental Health Chief Dr. Melvin Hinton asked him to perform the evaluation, and that it was his understanding that Dr. Hinton

asked him to perform the evaluation because "occasionally when Dr. Hinton wants somebody from outside the facility who possibly has more [of] an objective view to evaluate the situation, he would call one of us...mean[ing] the regional [staff], to do [it]." d/e 190, pp. 17-18.

A reasonable jury could determine that Defendant Sim's experience having a "meaningful interaction with" Rusher, most likely while she was on crisis watch, itself gave him "a reason to believe (or actual knowledge) that prison doctors or their assistants [we]re mistreating (or not treating)" her—especially when Defendant Sim understood he was asked to evaluate Rusher because he was "somebody from outside the facility who possibly has more [of] an objective view to evaluate the situation," as compared to someone from inside Logan perhaps accustomed to Rusher's frequent crisis watch placement. d/e 190, pp. 17-18. A rational juror could find that the act of evaluating Rusher and her conditions following her suicide attempt, producing a report citing the need for additional resources, and then failing to follow up on whether she received those needed resources constituted "facilitat[ing], approv[ing],

condon[ing], or turn[ing] a blind eye" to unconstitutional conduct.
Gentry v. Duckworth, 65 F.3d 555, 561 (7th Cir. 1995) (quoting
Jones v. City of Chicago, 856 F.2d 985, 992 (7th Cir.1988)).

Third, Plaintiff argues that Defendant Sim, "a member of a
multidisciplinary committee that met to discuss [] Rusher's mental
health treatment," "chose not to rely on the medical judgment of []
Rusher's providers—including apparently his own professional
opinion—when he failed to take any steps to advocate for or
facilitate her transfer to an inpatient facility" after "Defendant Sim,
along with other attendees, agreed" at a December 2015 committee
meeting at which Rusher was present that transferring her to an
Illinois Department of Human Services hospital for inpatient care
"would be in [] Rusher's best interest." d/e 208, pp. 58-59, see also
id. at Exh. 13, pp. 6-7. A reasonable jury could find that Defendant
Sim's participating in the conference on Rusher, seeing Rusher for a
second time, and agreeing with medical officials that Rusher was
best served getting care beyond what they provided gave Defendant
Sim "a reason to believe (or actual knowledge) that prison doctors or
their assistants [we]re mistreating (or not treating)" Rusher. King v.

Kramer, 680 F.3d 1013, 1018 (7th Cir. 2012) (quoting Hayes v.

Snyder, 546 F.3d 516, 527 (7th Cir. 2008)). Further, a rational juror

could find that Defendant Sim, by then failing to follow up on

whether Rusher received those needed resources, "facilitate[d] it,

approve[d] it, condone[d] it, or turn[ed] a blind eye," such that he

"was personally responsible for the deprivation of a constitutional

right" and could not reasonably think he was "relegat[ing] to the

prison's medical staff the provision of good medical care" to Rusher.

Gentry v. Duckworth, 65 F.3d 555, 561 (7th Cir. 1995); Burks v.

Raemisch, 555 F.3d 592, 594-96 (7th Cir. 2009). In other words,

there is a genuine issue of material fact as to whether Defendant

Sim did not "respond[] reasonably to the risk" that Rusher was

receiving inadequate mental health care. Farmer v. Brennan, 511

U.S. 825, 844 (1994).

    In sum, a reasonable jury could consider the facts in the

record and conclude that Defendants Rauner, Baldwin, and Sim

were deliberately indifferent to Rusher's serious medical needs in

violation of the Eighth Amendment. Therefore, Defendants' Motion

for Summary Judgment (d/e 187) is DENIED on Count I as to

Plaintiff's Eighth Amendment claims against Defendants Rauner,
Baldwin, and Sim.

### B. Defendants Rauner, Baldwin, and Sim Are Not Entitled to Summary Judgment on Qualified Immunity.

Qualified immunity insulates public employees from liability
for money damages if "their conduct does not violate clearly
established statutory or constitutional rights of which a reasonable
person would have known." Van den Bosch v. Raemisch, 658 F.3d
778, 786 (7th Cir. 2011) (citing Pearson v. Callahan, 555 U.S 223,
231 (2009)). In evaluating a qualified immunity defense, this Court
asks two questions: whether "the facts that a plaintiff has alleged
make out a violation of a constitutional right," and, if so, "whether
the right at issue was clearly established at the time of defendant's
alleged misconduct." See id. (cleaned up).

This Court must "approach the qualified-immunity inquiry by
treating as true the evidence-supported facts and inferences
favoring" Plaintiff. Balsewicz v. Pawlyk, 963 F.3d 650, 657 (7th Cir.
2020) (citing Orlowski v. Milwaukee Cnty., 872 F.3d 417, 421–22
(7th Cir. 2017)). A clearly established right is one that "is
sufficiently clear that any reasonable official would understand that

his or her actions violate that right, meaning that existing precedent must have placed the statutory or constitutional question beyond debate." Zimmerman v. Doran, 807 F.3d 178, 182 (7th Cir. 2015) (citing Mullenix v. Luna, 577 U.S. 7, 12 (2015)).

Defendants argue that Defendants Rauner, Baldwin, and Sim "were not personally aware of [Rusher] or her mental health status and treatment," "did not actually provide any direct care to [] Rusher and could not have known that they might be liable for violating her constitutional rights." d/e 188, p. 13. Defendants argue that Defendants Rauner, Baldwin, and Sim took steps "[o]n a broad, administrative level…to continuously improve the overall mental health treatment provided by the IDOC, negating any claim of deliberate indifference." Id.

Plaintiff argues in her Response that, under the first prong requiring the Court to consider whether Plaintiff's alleged facts make out a violation of a constitutional right, taking the facts in the light most favorable to her "at the very least show[s] a genuine dispute [whether] Defendants Sim, Baldwin, and Rauner violated [] Rusher's constitutional right to receive treatment for her serious

mental illness while in custody." d/e 208, p. 62. Under the second prong requiring the Court to consider whether the right at issue was clearly established at the time of Defendants' alleged misconduct, Plaintiff argues, "the Seventh Circuit has clearly established that prisoners have a constitutional right to receive treatment for their serious mental health conditions and to be free from deliberate indifference to their risk of suicide." Id. (citing Paine v. Cason, 678 F.3d 500 (7th Cir. 2012); Miranda v. County of Lake, 900 F.3d 335, 349 (7th Cir. 2018)).

Plaintiff cites Estate of Clark v. Walker, 865 F.3d 544 (7th Cir. 2017), where the Seventh Circuit noted that the decedent "Clark's estate is not suing supervisory officials who did not know about Clark's risk. The estate contends that [intake staff defendants Officer] Walker and [Nurse] Kuehn actually knew Clark's risk and disregarded it." Id. at 552 (emphasis in original). The Seventh Circuit affirmed a denial of summary judgment for defendants Kuehn and Walker on the basis of qualified immunity. Id. at 553.

The Court finds that the facts of this case, construed in Plaintiff's favor, do not permit an award of summary judgment on

qualified immunity. As discussed earlier, a reasonable jury could consider the facts in the record and conclude that Defendants Rauner, Baldwin, or Sim were deliberately indifferent to Rusher's serious medical needs in violation of the Eighth Amendment. In other words, a rational juror could find that Defendants Rauner, Baldwin, and Sim were not mere "supervisory officials who did not know about" Rusher's risk, but that they "actually knew [Rusher's] risk and disregarded it." Id. at 552.

Further, Rusher's right to treatment for her serious mental illness and protection from herself while in custody was clearly established before her transfer to Logan in 2013. See id. at 551 ("Clark's right to be free from deliberate indifference to his risk of suicide while he was in custody was clearly established at the time of his death in 2012."); Paine v. Cason, 678 F.3d 500, 504 (7th Cir. 2012) (affirming denial of qualified immunity on failure to provide care to detainee with bipolar disorder while detainee was in custody; "Eilman alternated between calm and manic conduct, sometimes chatting amiably while sometimes screaming, chanting rap lyrics, smearing menstrual blood on the cell's walls, and taking

off her clothes."); <u>Miranda v. County of Lake</u>, 900 F.3d 335, 349 (7th Cir. 2018) ("We repeatedly have recognized a jail or prison official's failure to protect an inmate from self-harm as one way of establishing deliberate indifference to a serious medical need .... The obligation to intervene covers self-destructive behaviors up to and including suicide."). Therefore, Defendants Rauner, Baldwin, and Sim are not entitled to summary judgment on the defense of qualified immunity.

**C. Defendants' Motion for Summary Judgment is Denied as to Plaintiff's Americans with Disabilities Act and Rehabilitation Act Claims Against the State of Illinois in Counts II and III of the First Amended Complaint.**

**i. Legal Precedent**

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Title II of the ADA applies to state prisons. <u>Pa. Dep't of Corr. v. Yeskey</u>, 524 U.S. 206, 210 (1998). "Modern prisons provide inmates with many recreational 'activities,'

medical 'services,' and educational and vocational 'programs,' all of which at least theoretically 'benefit' the prisoners (and any of which disabled prisoners could be 'excluded from participation in'). Id.

The Rehabilitation Act similarly provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a). Defendants do not dispute that state prisons receive federal funds. Other than some minor differences not relevant here, the ADA and the Rehabilitation Act are coextensive. CTL ex rel. Trebatoski v. Ashland Sch. Dist., 743 F.3d 524, 528 (7th Cir. 2014); see also Washington v. Ind. High Sch. Athletic Ass'n, Inc., 181 F.3d 840, 846 n.6 (7th Cir. 1999) (noting that the chief differences between the ADA and the Rehabilitation Act are that the Rehabilitation Act only applies to entities that receive federal funding and requires that the exclusion be solely by reason of disability). Moreover, "precedent under one statute typically applies

to the other." <u>Washington</u>, 181 F.3d at 846 n.6. The parties treat the ADA and the Rehabilitation Act claims together.

To state a claim under the ADA and the Rehabilitation Act, Plaintiff must allege that (1) Rusher is a qualified person with a disability, (2) the Defendants excluded Rusher from participating in or denied her the benefits of a public entity's services, programs, or activities or otherwise discriminated against her, and (3) the exclusion, denial, or discrimination was by reason of or because of her disability. <u>See</u> <u>Wagoner v. Lemmon</u>, 778 F.3d 586, 592 (7th Cir. 2015) (identifying separately the elements for an ADA and Rehabilitation Act claim but describing the elements as "functionally identical"). If Rusher is successful, "the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for any alleged adverse action toward the plaintiff." <u>Novak v. Bd. of Trs. of S. Illinois Univ.</u>, 777 F.3d 966, 974 (7th Cir. 2015).

"The ADA imposes a duty to provide reasonable accommodations to disabled persons." <u>Hildreth v. Butler</u>, 960 F.3d 420, 430–31 (7th Cir. 2020). "Refusing to make reasonable

accommodations [under the ADA] is tantamount to denying access." Jaros v. Illinois Dep't of Corr., 684 F.3d 667, 672 (7th Cir. 2012). While the Rehabilitation Act does not expressly require accommodation, "the Supreme Court has located a duty to accommodate in the statute generally." Id. (citing Wis. Cmty. Serv. v. City of Milwaukee, 465 F.3d 737, 746 (7th Cir.2006)).

In Jaros v. Illinois Department of Corrections, 684 F.3d 667 (7th Cir. 2012), the Seventh Circuit "dispense[d] with the ADA and the thorny question of sovereign immunity" and just considered the claim under the Rehabilitation Act because the plaintiff could only have one recovery. Id. at 672. The "thorny question of sovereign immunity" alludes to the fact that Title II of the ADA abrogates state sovereign immunity only for conduct that actually violates the Constitution. United States v. Georgia, 546 U.S. 151, 159 (2006); see, e.g., Cunningham v. Falmier, No. 17-cv-126-SMY, 2017 WL 1212067, at *4 (S.D. Ill. Apr. 3, 2017) (because the denial of telephone privileges did not independently violate the Constitution, the plaintiff could not pursue a claim for damages against the state under the ADA). Sovereign immunity does not bar a Rehabilitation

Act claim because Illinois waived its immunity from suits for damages under the Rehabilitation Act as a condition of receiving federal funds. <u>Jaros</u>, 684 F.3d at 672 n.5.

The Seventh Circuit has also found that when the ADA applies in the prison setting, "the type of accommodation that will be enough to satisfy the statute's reasonableness requirement must be judged in light of the overall institutional requirements." <u>Love v. Westville Corr. Ctr.</u>, 103 F.3d 558, 561 (7th Cir. 1996). "Security concerns, safety concerns, and administrative exigencies would all be important considerations to take into account." <u>Id.</u> "The question is not whether other modifications could have been made...but whether the accommodations made were reasonable." <u>Hildreth v. Butler</u>, 960 F.3d 420, 431 (7th Cir. 2020).

The "services, programs, or activities" covered by the ADA include medical services, such that a prisoner plaintiff "could plead a plausible claim under the ADA if he pleaded that Defendants deprived [him] of access to medical services that were available to other inmates." <u>Est. of Crandall v. Godinez</u>, No. 14-CV-1401, 2015

WL 1539017, at *6 (C.D. Ill. Mar. 31, 2015) (citing <u>United States v.</u> <u>Georgia</u>, 546 U.S. 151, 157 (2006)).

### ii. Defendants State of Illinois and IDOC are Not Entitled to Summary Judgment on Plaintiff's Americans with Disabilities Act and Rehabilitation Act Claims.

### a. A Reasonable Jury Could Find Defendants State of Illinois and IDOC Did Not Provide Rusher Reasonable Accommodations.

Defendants argue that, contrary to Plaintiff's allegations, the record establishes that Defendant "IDOC maintains Administrative Directives and Institutional Directives concerning programs and services for mental health, and suicide prevention, including steps to take after a suicide to mitigate the risk of future completed suicides." d/e 188, p. 15. Defendants argue that "Rusher's records reflect she was provided with medications, therapy and group activity to address her diagnosed mental disorders, as well as other treatment by medical and mental health professionals. Defendants made reasonable accommodations for" Rusher. <u>Id.</u> at pp. 15-16.

As this Court addressed in its prior Opinion (d/e 28) denying Defendants' Motion to Dismiss Plaintiff's ADA and Rehabilitation Act claims, Defendants' cited cases involved complaints that only

alleged inadequate medical treatment and did not allege

discrimination or a failure to make a reasonable accommodation.

See In re Estate of Crandall v. Godinez, No. 14-cv-1401, 2015 WL

1539017 (C.D. Ill. Mar. 31, 2015); Bryant v. Madigan, 84 F.3d 246

(7th Cir. 1996); see also d/e 28, pp. 12-13.

Plaintiff argues in her Response that Defendant IDOC

transferred crisis watch prisoners out for serious physical health

care, but "refused to make that accommodation in regard to her (or

any other prisoner's) mental healthcare, even though the

circumstances were dire and IDOC facilities were insufficient." d/e

208, p. 48. Plaintiff cites to Defendant IDOC's contract with

Wexford Health "to arrange and provide for services on-site and as

necessary off-site at local hospitals, outpatient facilities and

consultative physician offices" "[u]nder the direction of the IDOC

Medical Director and the IDOC Chief of Mental Health Services." Id.,

see also id. at Exh. 3, p. 23. Plaintiff also cites to the fact that

Defendant IDOC transferred crisis watch prisoners—including

Rusher after serious suicide attempts—offsite to treat their physical

injuries. Id., see also id. at Exh. 2, p. 2, id. at Exh. 10, p. 6. A

reasonable jury could find from these facts that Defendant IDOC

"[r]efus[ed] to make reasonable accommodations" for Rusher's

disabilities by failing to transfer Rusher off-site for emergency

mental health care, as it transferred crisis watch prisoners off-site

for emergency physical health care. Jaros v. Illinois Dep't of Corr.,

684 F.3d 667, 672 (7th Cir. 2012).

Plaintiff then argues that Defendant "IDOC failed to provide

[Rusher] with access to meaningful human contact, rehabilitation

opportunities, group therapy, and other health treatment" and

"prevented [] Rusher from engaging in nearly any form of recreation

while on crisis watch." d/e 208, p. 48. Plaintiff asserts that

Defendant IDOC "often denied" Rusher the "two hours of

unstructured out-of-cell time" that "IDOC policy provide[d] that

crisis-watch prisoners should have." Id. at p. 49.

Plaintiff cites the December 24, 2013 IDOC Memorandum

provision on "Out-of-Cell Time," which states, in relevant part:

> Effective December 21, 2013 offenders who have been on
> crisis watch for 30 days or longer will receive one hour of
> unstructured out-of-cell activity daily - absent exigent
> circumstances and as determined by the facility mental
> health team. (See Exhibit 23). Time out-of-cell for showers
> will not count towards this the required one hour. By

> January 24, 2014, out-of-cell time will increase to two hours of unstructured out-of-cell activity daily for those offenders who have been on crisis watch for a period of ten days or longer, absent exigent circumstances and as determined by the facility mental health team.

See d/e 208, Exh. 3, p. 19 (Bates 23). Plaintiff cites April 8, 2016 notes signed by Defendant Richardson directing that Rusher "Remain on Constant Watch. Suspend [out of cell time] until Monday, 4/11/16, only one [out of cell time] in [A.M.] shift per day after that, and only when behavior is appropriate and safe." Id. at Exh. 7, p. 7 (Bates 3235). Plaintiff cites April 14, 2016 notes signed by Defendant Richardson stating that "Rusher may have [out of cell time] on [A.M.] shift, up to 60 minutes (per staff availability). Rusher may go outdoors weather permitting. [Out of cell time] may be suspended if her behavior raises concerns about safety. Rusher to be handcuffed during [out of cell time]." Id. at Exh. 7, p. 31 (Bates 003850). Plaintiff cites to her Exhibit 7 at Bates 3837, 3957, and 4016, but those pages do not appear to be included in the exhibit. Plaintiff cites to January 20, 2016 notes signed by Defendant Richardson that Rusher was told "she would not have to wait for a [lieutenant] for" out of cell time and that Rusher "wanted

[out of cell time] specified in the posted notes, and this was accommodated. Further relaxation of restrictions can be allowed when [Rusher] proves again that she does not want to kill herself." Id. at Exh. 7, p. 50 (Bates 4039).

Plaintiff also asserts that Defendant "IDOC frequently denied [] Rusher access to various group therapies, including group sessions for anxiety and depression management, relaxation, music, and animal therapy." d/e 208, p. 49. Plaintiff cites to April 14, 2016 notes signed by Defendant Richardson stating that after a self-harm incident, group therapy was suspended for Rusher and dog therapy could be resumed "when she goes a week without hurting herself." Id. at Exh. 9, p. 18 (Bates 003850). Plaintiff cites to July 29, 2015 notes stating that it is "[n]ot appropriate [for Rusher] to attend group [therapy] today due to watch status and instability over the past few weeks." Id. at p. 4 (Bates 000373). Plaintiff cites to August 30 and 31, 2015 notes stating that Rusher "[c]ould not attend group [therapy, including Enhanced Treatment Depression Group] because on constant watch." Id. at pp. 2, 7, 41 (Bates 000275, 1292 and 002327).

Plaintiff cites to October 22, 2015 notes signed by Defendant

Richardson stating that:

> Trauma Therapy Contraindicated. It was discussed how
> trauma therapy is not indicated at this time due to []
> Rusher's ongoing crisis watch status and intense
> suicidality. It was discussed how [] Rusher told Dr. Peek
> this past week (referred to in the Psych Autopsy) that
> thinking about her trauma made her more suicidal. The
> general frustration was discussed amongst many MHP's
> that [Rusher]'s "game-playing" makes it difficult to
> understand who her authentic self is at times. It was
> pointed out that when [] Rusher would talk about her
> trauma, the games seemed to stop and she became,
> briefly, authentic. It was determined that trauma therapy
> would not be pursued. It could be discussed again only if
> [] Rusher asked for this type of therapy[.]

Id. at p. 38 (Bates 004233). Plaintiff cites to December 15, 2015

notes signed by Defendant Richardson stating that:

> One of the most promising interventions has been []
> Rusher participating in the PAWS Program with [] Mooney.
> Ever since she began the dog program, which in her case
> has been to spend 30 minutes with the dogs, [] Mooney
> and [Defendant] Richardson, she has developed a more
> stable desire to live. She can only see the dog if she goes a
> week without self-abuse or suicidal actions. This has been
> a strong incentive, which has helped to promote rational
> hope, increase her enthusiasm, and increase her capacity
> for goal directed activity.

Id. at p. 33 (Bates 004102).

Plaintiff cites to January 27, 2016 notes stating that Rusher "states she would like to be approved for more groups - she just has one group on Monday with [a behavioral health technician]. [A mental health practitioner] pointed out it is hard for groups to be arranged with her on Constant Watch." Id. at p. 23 (Bates 004024). Plaintiff cites to February 17, 2016 notes stating that "[d]ue to [Rusher's] assaultive behavior from Monday evening, it was determined that she would not be allowed to go to group [therapy]." Id. at p. 12 (Bates 003352). Plaintiff cites to April 17, 2016 notes stating that Rusher "reported feeling like she is being punished for wanting to harm herself" and that "her enhanced treatment groups were 'taken away' because she punched [a] wall." Id. at p. 9 (Bates 003209).

The Court finds that a reasonable jury could determine from these facts that Defendant IDOC "[r]efus[ed] to make reasonable accommodations" for Rusher's disabilities by not providing Rusher two hours of daily out of cell time and various therapies while she was on crisis watch as it did for other prisoners—including Rusher

on other days. <u>Jaros v. Illinois Dep't of Corr.</u>, 684 F.3d 667, 672
(7th Cir. 2012).

### b. A Reasonable Jury Could Find that Plaintiff was Denied Access to a Program or Activity Because of her Disability.

Defendant argues that "Plaintiff fails to provide any evidence of
the 'services, programs, and activities' that she believes [Rusher]
was denied," and, in the alternative, that Plaintiff "has stated no
facts to show any discrimination on the part of the State of Illinois
or the IDOC." d/e 188, pp. 15-16, 17. Defendant reasons that "[t]he
fact that, while she was on crisis watch, [] Rusher wasn't able to
participate in certain programs in which other inmates participated,
while obviously tangentially related to her mental health, does not
evidence discriminatory action." <u>Id.</u> at p. 16. Defendant argues that
a prisoner "who claims or is found to be a danger to herself or
others clearly cannot participate in a group activity, for example,
unless/until those urges have been placed under control." <u>Id.</u>

Defendant cites to the undisputed fact that "[d]uring her
sentence at Logan, [] Rusher engaged in multiple acts of self-harm
and attempted suicide." <u>Id.</u>, <u>see</u> <u>also</u> d/e 208, p. 9. Defendant
argues that such behavior or expressions "triggers transfer of any

IDOC inmate from their existing housing to crisis watch," citing to IDOC Mental Health Chief Dr. Melvin Hinton's testimony that when a prisoner has "an acute issue that requires more focus, [there is] usually removal from [his or her] current living situation and [he or she is] put into [an] area where [he or she] can be observed better, closer[.]" Id., see also id. at Exh. M, p. 29. Defendants also cite to the Logan Institutional Directives, which state in relevant part that for prisoners on crisis watch, "possession of property shall be at the discretion of the [mental health provider], based on clinical appropriateness," which Defendants argue is "to minimize outside stimuli and to maintain the safety of the inmate." Id., see also id. at Exh. G. at pp. 4476, 4478.

Lastly, Defendants cite to Logan Mental Health Administrator Dr. Norine Ashley's testimony that "there were times when [mentally ill prisoners at Logan] were not able to do certain activities because of lack of security staff." Id. at p. 17, see also id. at Exh. N, p. 115. Defendant argues that "there is nothing in the record that indicates that these restrictions were any different for [] Rusher than they

were for any other person housed in restrictive housing for the same reasons." Id. at 17.

Plaintiff argues in her Response that she "has presented evidence that IDOC responded to [] Rusher's acts of self harm by punishing her...instead of treating them as psychiatric emergencies and providing the requisite medical care" and that Defendant "IDOC would deny [Rusher] access to medical care in response to her suicidal behavior." d/e 208, p. 52. Plaintiff cites Farris v. Kohlrus, 2023 WL 1971143, at *7 (C.D. Ill. Feb. 13, 2023), to argue that Defendant "IDOC must consider safety and security in its policies, but they cannot serve as carteblanche excuses for denial of critical medical services and activities," and that her provided facts indicate that Rusher's treatment for "months on end cannot be excused on account of security concerns, especially given her complicated and severe mental illness." d/e 208, pp. 51-52. Plaintiff also cites another provision of the Logan Institutional Directive, "Housing Assignments for Severely Mentally Ill" Prisoners, which states that prisoners' housing assignments "shall serve both the security needs of Logan and the treatment needs of the offender." Id. (emphasis

added by Plaintiff), <u>see also</u> d/e 188, Exh. J, p. 2. Plaintiff also
argues that Defendant "IDOC cannot use the fact that it may <u>also</u>
discriminate against <u>other</u> severely mentally ill prisoners as a
shield," citing to <u>Golden v. Illinois Department of Corrections</u>, 2016
WL 5373056, at *3 (N.D. Ill. Sept. 26, 2016), which found "services
must be provided on an equal basis to disabled and <u>non-disabled</u>
individuals, whatever the level." <u>Id.</u>, <u>see also</u> d/e 208, p. 52
(emphasis added by Plaintiff).

The Court finds that a reasonable jury could determine from
the facts in the record that Defendants did not transfer Rusher off-
site for emergency mental health care, as it transferred crisis watch
prisoners off-site for emergency physical health care, and did not
provide Rusher two hours of daily out of cell time and various
therapies in crisis watch because of her disability. Since Defendant
IDOC transferred physically ill prisoners out of Logan for treatment
and not mentally ill prisoners, a reasonable jury could find that
disparity was due to the non-physical, mental nature of prisoners'
ailments—in other words, their disabilities. Many of Defendants'
cited notes list reasons related to safety, not Rusher's disabilities,

for why Rusher did not receive certain therapies, such as Rusher's recent "assaultive behavior" and her report "that thinking about her trauma [as required for trauma therapy] made her more suicidal." d/e 208, Exh. 9, p. 38 (Bates 004233); see also id. at p. 12 (Bates 003352). But several other notes describe restricting treatment based on her crisis watch "status" and her ability (or lack thereof) to "go[] a week without hurting herself"—in other words, her disability as manifested through her behaviors and Defendant IDOC's response to them. Id. at p. 4 (Bates 000373), p. 18 (Bates 003850).

In sum, the Court finds that there is a genuine dispute of material fact as to whether Defendants refused to make reasonable accommodations by reason or because of Rusher's disabilities in violation of the ADA and Rehabilitation Act. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also Jaros v. Illinois Dep't of Corr., 684 F.3d 667, 672 (7th Cir. 2012); see also Wagoner v. Lemmon, 778 F.3d 586, 592 (7th Cir. 2015). Therefore, Defendants' Motion for Summary Judgment (d/e 187) is DENIED as to Plaintiff's ADA and Rehabilitation Act claims—Counts II and III of the First Amended Complaint.

## V.    CONCLUSION

For the reasons stated, Defendants' Motion for Summary Judgment (d/e 187) is DENIED on Count I as to Plaintiff's Eighth Amendment claims against Defendants Rauner, Baldwin, and Sim. Defendants' Motion for Summary Judgment (d/e 187) is DENIED on Counts II and III as to Plaintiff's Americans with Disabilities Act and Rehabilitation Act claims against Defendants State of Illinois and IDOC.

**IT IS SO ORDERED.**
**ENTERED: September 30, 2025.**
**FOR THE COURT**

/s/ Sue E. Myerscough
**SUE E. MYERSCOUGH**
**UNITED STATES DISTRICT JUDGE**