E-FILED
Wednesday, 31 December, 2025 04:51:10 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 1

## Page 1

```
         U.S. DISTRICT COURT FOR THE
         CENTRAL DISTRICT OF ILLINOIS

KELLI ANDREWS as           )
Administrator of the Estate)
of Tiffany Ann Rusher,     )
deceased,                  )
                           )
              Plaintiff,   )
                           )
     VS.                   ) No. 18-CV-1101
                           )
BRUCE RAUNER, STATE OF     )
ILLINOIS, JOHN R. BALDWIN, )
JEFF SIM, HE YUAN, BRIAN   )
RICHARDSON, ILLINOIS       )
DEPARTMENT OF CORRECTIONS and)
WEXFORD HEALTH SOURCES, INC.,)
                           )
              Defendants.  )
```

             DEPOSITION OF KELLI ANDREWS
                  APPEARING REMOTELY
                   MARCH 22, 2022
                     11:15 a.m.

REPORTED BY:
LORRAINE MCCREIGHT
CSR NO. 084-003070
APPEARING REMOTELY FROM PEORIA COUNTY, ILLINOIS

## Page 2

REMOTE APPEARANCES:

    BRIDGET GERAGHTY, ESQ.
    UPTOWN PEOPLE'S LAW CENTER
    4413 North Sheridan
    Chicago, IL 60640
    bridget@uplcchicago.org
    for Plaintiff;

    ROBERT B. SHULTZ, ESQ.
    ASSISTANT ILLINOIS ATTORNEY GENERAL
    201 West Pointe Drive
    Suite 7
    Swansea, IL 62226
    Robert.Shultz@ilag.gov
    for Defendants Bruce Rauner, State of Illinois, John R. Baldwin, Jeff Sim and Illinois Department of Corrections;

    JOSEPH N. RUPCICH, ESQ.
    CASSIDAY SCHADE, LLP
    3100 Montvale Drive
    Springfield, IL 62704
    jrupcich@cassiday.com
    for Defendants Brian Richardson, Dr. He Yuan and Wexford Health Sources, Inc.;

    JACK McCORMACK, ESQ.
    WIEDNER & MCAULIFFE, LTD.
    101 S. Hanley
    Suite 1450
    St. Louis, MO 63105
    jamccormack@wmlaw.com
    for certain defendants;

## Page 3

I N D E X

WITNESS                                              PAGE

KELLI ANDREWS
    Examination By Mr. Rupcich .................4
    Cross By Mr. Shultz ......................170
    Cross By Ms. Geraghty ....................178
    Redirect By Mr. Rupcich ..................182


E X H I B I T S

NUMBER                                             MARKED
                                                   FOR ID
Deposition Exhibit
    No. 1 .....................................  23

## Page 4

                    KELLI ANDREWS
                being first duly sworn,
                was examined and testified
                     as follows:
                 DIRECT EXAMINATION
BY MR. RUPCICH:
    Q.  Could you state and spell your name?
    A.  Kelli, with an I, Andrews.
A-N-D-R-E-W-S.
    Q.  Ma'am, have you ever been deposed before?
    A.  Yes.
    Q.  How many times?
    A.  Only once.
    Q.  When?
    A.  It was -- I can't think if it was last year or the year before. It was in Springfield. It was around the end of March, I do believe, but don't quote me on that.
    Q.  That's all right. Is that the only deposition you have ever given?
    A.  Yes.
    Q.  I'll run through the ground rules again very quickly. I know you just heard them.

| | | |
|---|---|---|
| 1 | Q. | Was she ever expelled from school? |
| 2 | A. | No. |
| 3 | Q. | She dropped out of school? |
| 4 | A. | Yes, sir. |
| 5 | Q. | At what age? |
| 6 | A. | I do believe it was right after she was emancipated at 17. |
| 8 | Q. | How did she go about becoming emancipated? |
| 10 | A. | She had had some -- how can I say this? It wasn't serious offenses, but it was just little things. |

There were so many children in DeWitt County at that time, so the cops were just -- you know, anything that happened that involved the kids that were causing problems, they would fine them. And it was all like two or three petty offenses, but it kind of added up. And the District Attorney at the time came to me and said she's got six months before she's 18. Do you want to emancipate her? We couldn't keep her in school. She wouldn't listen to the Probation Officer. She was very headstrong.

So in hindsight I wish I would not have

done it, but at the time I thought I would be helping her and not harming her. And --

Q. What was your understanding of what allowing her to be emancipated at 17 would accomplish?

A. Well, in DeWitt County you have to be 16 with parents permission to get a job in some places. So I figured if she was emancipated, then she would -- if she wanted to work at Wallace, she could go ahead and do that. That never happened. She didn't want to get a job.

Q. So, you agreed to her emancipation so she could get a job?

A. Yes, sir. At Wallace you have to -- where my mom worked, RR Donnelly, used to be named Wallace, you had to be 18. She asked them if she was emancipated if they would hire her. If she could prove that, then yes. So, we talked about it. She only had 16 -- or not 16, six months before her 18th birthday to go anyway, so --

Q. And at this point she was on probation and had dropped out of high school?

A. Much to my dismay, yes.

Q. And she was unemployed?
A. Yes.
Q. When she became emancipated, did she move out?
A. No, she did not. No, no, huh-uh. She didn't move out until she was 18.
Q. At the time she became emancipated, was she having problems with alcohol?
A. When I see a problem -- I mean, she drank once a week. It had gotten a little bit more than that. And I was trying -- between me, the teachers, and the probation officers, we were trying to get help for my daughter.

She had bipolar, and she just -- she had it set that she knew what she wanted to do. She wanted to do what she wanted to do.
Q. Who diagnosed her as bipolar?
A. I do believe that was when she was in Lerna.
Q. She was there for six days and was diagnosed as bipolar?
A. The first night they had problems with her and then it kind of calmed down. And we ended up having to go get her because she ran out

of cigarettes, because this was a smoking facility but only at certain times.

Q. I need you to focus on my question though.

They diagnosed her at Lerna in the six days she was there with bipolar disorder?
A. Yes. That is the only time my daughter was diagnosed.
Q. All right. Was that diagnosis confirmed by Dr. Patel?
A. He agreed with it.
Q. He agreed with it?
A. Yes.
Q. But he did not prescribe her any medication for bipolar disorder?
A. Not until she was 18, no.
Q. Did he tell you he couldn't prescribe her medication for bipolar --
A. No.
Q. -- disorder until she was 18?
A. No, sir. That would have come from my daughter. She flat out told him she wasn't going to take it.
Q. ==So at the time she was 16 years old, you==

Page 41

1  understood that she had a diagnosis of bipolar
2  disorder?
3      A.   Uh-huh.
4      Q.   You understood she wasn't taking
5  medication?
6      A.   Yes.
7      Q.   Prior to going to prison in 2011, do you
8  know how many criminal convictions Tiffany had?
9           MS. GERAGHTY:  Object to foundation.
10          THE WITNESS:  For felonies or
11 misdemeanors?
12 BY MR. RUPCICH:
13     Q.   Well, let's start with misdemeanors.
14     A.   I do believe she had two misdemeanors.
15     Q.   When was the first one and what was it?
16          MS. GERAGHTY:  Object to foundation.
17          THE WITNESS:  That would be at 13.
18 It was for a $1.75 at IGA.
19 BY MR. RUPCICH:
20     Q.   Shoplifting?
21     A.   Yes.
22     Q.   And the second misdemeanor conviction?
23     A.   Her grandmother had passed away, and she
24 was walking through the yard and someone called

Page 42

1  the cops on her.
2      Q.   How old --
3      A.   She was 14 or 15.
4      Q.   Trespassing?
5      A.   Unfortunately, yes. We tried to get it
6  dropped because it was her grandmother's house.
7      Q.   Who made the complaint?
8      A.   Her own aunt.
9      Q.   Her aunt made the complaint?
10     A.   Yes, sir.
11     Q.   Is there a problem between the two of
12 them?
13     A.   Not that I know of.
14     Q.   Okay.
15     A.   That was a shock to everyone when the
16 cops told us who called.
17     Q.   Any other misdemeanor convictions prior
18 to going to prison?
19     A.   It seemed to me like there might have
20 been one, but I don't -- I can't recall.
21     Q.   Okay.  Felonies?
22     A.   No.
23     Q.   No felony convictions?
24     A.   Not that I'm aware of. I think they were

Page 43

1  all high end misdemeanors.
2      Q.   Was she frequently arrested when she was
3  a child?
4           MS. GERAGHTY:  Object to form.
5           THE WITNESS:  No.
6  BY MR. RUPCICH:
7      Q.   Did you ever have to bail her out?
8      A.   Oh, no. Huh-uh, no.
9      Q.   Did you ever visit her in DeWitt County
10 jail?
11     A.   Yes, I did.
12     Q.   How many times was she in the DeWitt
13 County jail?
14     A.   I know of four times.
15     Q.   Why was she in DeWitt County jail?
16     A.   For the things that I mentioned. Because
17 once they picked her up, they would just take her
18 to the jail.
19     Q.   That covers a trespassing and a
20 shoplifting.  Must have been two other times she
21 was in DeWitt County jail. You said four times
22 she was in DeWitt County.
23          Why else would she have been in there?
24     A.   See, it all ran together because she

Page 44

1  was -- I think the last two were her not
2  completing her probation, so it was -- what do
3  you call it?
4      Q.   Probation violations?
5      A.   Yes.
6      Q.   Okay.
7      A.   But they revoked -- I think the last two
8  was a revocation of her probation.
9      Q.   Was Tiffany ever violent with any family
10 member?
11     A.   I think she tried to hit my mom once, but
12 other than that, no.
13     Q.   Okay.
14     A.   She was mouthy.
15     Q.   She tried to hit your mom. And you are
16 referring to --
17     A.   It was either she tried to hit her or
18 push her. I cannot remember exactly which.
19     Q.   Were you there?
20     A.   I was downstairs, yes. She came in after
21 midnight.
22     Q.   Was she intoxicated?
23     A.   The cops had dropped her off, yes.
24     Q.   The cops had dropped her off?

| | | 69 | | | 71 |
|---|---|---|---|---|---|

Page 69:

1  A. Twenty.
2  Q. Okay.
3  A. Up until then, no.
4  Q. As of the time she became emancipated,
5  she was 16 and a half or was it 17 and a half?
6  I'm sorry.
7  A. Seventeen and a half.
8  Q. As of that time she became emancipated,
9  she was on probation, right?
10 A. Yes, supervision, yes.
11 Q. She had been diagnosed with bipolar?
12 A. Yes. And in counseling. She did go --
13 not on a regular basis, but she did go.
14 Q. She was not taking any medication for her
15 bipolar?
16 A. No. We talked about that.
17 Q. Right.
18 A. She refused.
19 Q. She used alcohol?
20 A. Yes.
21 Q. She had multiple criminal convictions,
22 correct?
23 A. Yes.
24 Q. She had made false allegations of sexual

Page 70:

1  assault against an individual?
2  A. Yes.
3  Q. She had left the house, causing you to
4  call the police to try to track her down?
5  A. Yes.
6  Q. Okay.
7  A. My daughter was diagnosed being immature
8  by two year emotionally. So, that did cause --
9  even though by all rights she was let's say 17,
10 she was actually acting more like a 13 or 14 year
11 old.
12 Q. So, at the time that you agreed to her
13 emancipation, developmentally what you are
14 telling me is instead of a 17 year old she was
15 more like a 15 or 15 and a half year old?
16 A. I spent two and a half hours in the
17 courtroom with the Judge, Steven Peters, who is
18 no longer among the living. And we felt that
19 because she -- I mean, she didn't leave the
20 house. It's not like she moved out. He thought
21 that it would be a good idea. You know, no one
22 else could get through to her. She was very,
23 very, very hardheaded, very stubborn. And the
24 principals had talked to her, the counselors had

Page 71:

1  talked to her, the cops had talked to her, the
2  Judge had talked to her, the probation officer.
3  And at some point you have to even -- she wasn't
4  diagnosed with mental retardation, she was just
5  immature for her age. So --
6  Q. Is it your position you discussed with
7  the Judge this emancipation?
8  A. The Judge and the District Attorney who
9  approached me, her lawyer, and her probation
10 officers were sitting in there.
11 Q. Is it your belief that they were all in
12 favor of this emancipation? Is that the
13 impression that you got?
14 A. They are the ones that approached me.
15 Q. The Judge, the prosecutor, the probation
16 officer?
17 A. Not the Judge. The District Attorney
18 approached me, Matthew Fenton. She only had six
19 months before she -- not even six months. It was
20 more like five and a half months before she was
21 18.
22 Q. Okay.
23 A. Had it been a year or more before her
24 18th birthday, it would never have happened.

Page 72:

1  Even the Judge actually said that.
2  Q. Did Tiffany have a drug problem at any
3  point?
4  A. Not then.
5  Q. At any point?
6     MR. RUPCICH: Object to form,
7  foundation.
8     THE WITNESS: Eighteen to 19 or 18
9  to 20 is when I was aware.
10 BY MR. RUPCICH:
11 Q. What drugs?
12    MS. GERAGHTY: Object to foundation,
13 relevance.
14    THE WITNESS: She told me her dad
15 got her high with crack.
16 BY MR. RUPCICH:
17 Q. So, she told you she used crack?
18 A. Yes.
19 Q. Any other pills, drugs, anything?
20 A. No.
21 Q. Do you believe she was addicted to crack
22 cocaine?
23    MS. GERAGHTY: Objection,
24 foundation.

Page 93

```
 1    Q.   My question is do you recall saying that
 2   to the mental health provider at one of the
 3   meetings?
 4    A.   I don't recall at the meeting. I know it
 5   was in a phone conversation.
 6    Q.   It states: Mom expressed outrage that
 7   such accusations could cause an innocent person
 8   to go to prison for decades.
 9         Did you say that?
10    A.   No.
11    Q.   You don't believe you communicated that
12   to Dr. Richardson?
13    A.   Not in that way, no.
14    Q.   How did you?
15    A.   An innocent person? I mean, any of the
16   time that she -- one of her accusations could
17   have sent someone to jail. Yes, there was a
18   discrepancy back then. Yes, we were all
19   concerned that this is what would happen.
20    Q.   Okay.
21    A.   And we tried talking to Tiffany about it.
22   It wasn't until the two girls that she were
23   friends with and hung around with that this
24   actually started happening, when she started
```

Page 94

```
 1   doing, you know, the accusations when she was
 2   older. When that happened is when it finally
 3   clicked with Tiffany that, oh, crap, if I say
 4   this, it's going to send somebody to prison
 5   innocently. So, that's what I was getting at
 6   whenever we were talking about that.
 7    Q.   So, would it not be true that the police
 8   were being called every weekend to come to the
 9   house for things that Tiffany or her
10   schizophrenic brother would do? Is that not true
11   that that was happening?
12    A.   They didn't get called for Tiffany.
13    Q.   Were they coming every weekend?
14    A.   It was mainly for Josh.
15    Q.   Mainly for Josh, but sometimes for
16   Tiffany?
17    A.   I think there was only once for Tiffany.
18    Q.   Which one was that?
19    A.   She tried to climb out my mom's window.
20   She wanted to leave.
21    Q.   Okay.
22    A.   I'm sorry, but no.
23    Q.   And you called the police?
24    A.   They were already there for Josh. Them
```

Page 95

```
 1   two butted heads all of the time. They were
 2   always arguing.
 3    Q.   Do you know what Tiffany's mental health
 4   diagnoses were?
 5         You mentioned bipolar.
 6    A.   Yes, when she went into prison was
 7   bipolar disorder.
 8    Q.   Is that it?
 9    A.   Yes, sir.
10    Q.   This record states: Mom discussed
11   inmate's stay at the Pavilion in Champaign and
12   indicated they noticed her chameleon nature when
13   she was --
14    A.   They didn't call it that. They said that
15   when she was with a group of people she wanted to
16   fit in. And she picked up this habit -- I called
17   it a habit -- from being in Hamilton in
18   Bloomington. She -- Hamilton School had a lot of
19   troubled children. And from the age of threeish
20   to the age of 16 off and on is where she went to
21   school. And she picked up a lot of bad habits
22   from there. But the one thing I noticed was in
23   order for her to fit in, if one of her friends
24   had been, let's say -- I am just hypothetically
```

Page 96

```
 1   speaking, if one of her friends had had a cat
 2   that died, all of a sudden Tiffany had a cat that
 3   died.
 4         Do you understand what I am saying?
 5    Q.   I do. Do you remember my question?
 6    A.   Yes, I do.
 7    Q.   What was it?
 8    A.   That we had discussed this and that it
 9   started around the Pavilion time.
10    Q.   Are you familiar with the term chameleon
11   with respect to --
12    A.   Yes.
13    Q.   -- what you are talking about with
14   Tiffany?
15    A.   Yes. They didn't call it that, but yes.
16    Q.   So, you don't dispute using the word
17   chameleon in describing Tiffany's behavior?
18    A.   I think it's a little crass, but if that
19   is what the psychologists call it, then if it's
20   an official diagnosis --
21    Q.   I am not asking what the psychologists
22   call it. I am asking you.
23    A.   That is a term that the doctors at the
24   Pavilion called it.
```

| | | 97 | | | 99 |
|---|---|---|---|---|---|
| 1 | Q. Okay. | | 1 | Q. Do you remember meeting with Tiffany on |
| 2 | A. Is how they described it. Like she | | 2 | March 25 of 2016 -- I'm sorry, this is a phone |
| 3 | wanted to fit in so she would change her -- | | 3 | call with Dr. Richardson on March 25, 2016. |
| 4 | Q. Okay. | | 4 | A. It was around then. |
| 5 | A. You know, she just wanted to fit in. So, | | 5 | Q. And that's the call that you said you had |
| 6 | that's how they described it to me. | | 6 | initiated? |
| 7 | Q. All right. So, then it would be accurate | | 7 | A. Yes. |
| 8 | for -- where this note says you discussed her | | 8 | Q. And you wanted to point out the |
| 9 | stay at the Pavilion in Champaign and indicated | | 9 | allegation of Tiffany being paid for sex by her |
| 10 | they noted her chameleon nature when she was with | | 10 | grandfather didn't make sense, right? That's |
| 11 | groups, correct? | | 11 | what we are talking about? |
| 12 | A. Correct, yes, that's what they called it. | | 12 | A. It was worded a little different, but |
| 13 | Q. Okay. Was she ever diagnosed with ADHD? | | 13 | yes, it didn't make any sense to me because of |
| 14 | A. No, she was not. | | 14 | the age that -- I mean, it was -- it just didn't |
| 15 | Q. Okay. So, to the extent the note says | | 15 | make sense because he was never -- it's not like |
| 16 | you recalled her being diagnosed with ADHD, | | 16 | he came over to my mom's. So if this did |
| 17 | psychological immaturity and learning | | 17 | happen -- and this is what I told the doctor. If |
| 18 | disability -- | | 18 | this happened, that means that she had to have |
| 19 | A. No, that is not what I said. | | 19 | went to his house. Do you see what I am saying? |
| 20 | Q. What did you say? | | 20 | Therefore, I would never have known. So, it |
| 21 | A. I said exactly what the Pavilion told me. | | 21 | doesn't make sense. |
| 22 | They said that they noted her -- like whenever | | 22 | Q. This states that you told Dr. Richardson |
| 23 | she was in a group of people she would say | | 23 | Josh and Tiffany lived with their father until |
| 24 | something kind of like -- you know, she would | | 24 | the inmate was 11 years old. |

| | | 98 | | | 100 |
|---|---|---|---|---|---|
| 1 | change like chameleonish. Not that she was a | | 1 | A. Tiffany lived with me, and then for a |
| 2 | chameleon. It's just that that was how her | | 2 | brief moment in time at 11 she wanted to stay |
| 3 | behavior was, and she was a little immature for | | 3 | with Grandma Marge, so I let her. However, she |
| 4 | her age. That is what they said. I mean, I have | | 4 | was always over at my house. We live six blocks |
| 5 | the paperwork at home somewhere. | | 5 | away from each other. So, it wasn't really like |
| 6 | Q. But not ADHD or learning disability? | | 6 | my daughter moved completely lock, stock and |
| 7 | A. No. | | 7 | barrel over to her Grandma Marge's. She had a |
| 8 | Q. Okay. So, to the extent this note says | | 8 | room there and a room at my mom's, and she lived |
| 9 | that you said that, that would be wrong? | | 9 | between the two. For God's sakes, we were only |
| 10 | A. She didn't have ADHD, so why would I even | | 10 | six blocks away. |
| 11 | say that? | | 11 | Q. It states: Josh refuses to talk about |
| 12 | Q. It states: Mom expressed that she gets | | 12 | what happened and wants to put it all in the past |
| 13 | uncomfortable with crowds and appears to indicate | | 13 | and does not want Tiffany around. |
| 14 | she has a certain amount of social anxiety and | | 14 | Did you say that? |
| 15 | discomfort with the diversity of the population | | 15 | A. No. |
| 16 | in prison. | | 16 | Q. Okay. States that you reported Josh lost |
| 17 | A. What? Excuse -- no, no. | | 17 | his ability to father children because his father |
| 18 | Q. Okay. You don't recall Tiffany ever | | 18 | kicked him repeatedly in the groin and inmate |
| 19 | having social anxiety? | | 19 | witnessed this abuse. |
| 20 | A. No. She was a very social young girl. | | 20 | Did you say that? |
| 21 | Q. Okay. | | 21 | A. That actually was brought up between me |
| 22 | A. She was always wanting to be hanging | | 22 | and Tiffany because we talked about it, and yes. |
| 23 | around with her friends and go places. I mean, | | 23 | Q. Was it brought up between you and |
| 24 | albeit it was the park, but -- | | 24 | Dr. Richardson? |

```
                                                  113                                                   115
 1   A.   Oh, for fuck's sake, no, no.                    1   Q.   Okay.
 2   Q.   You have got to speak --                        2   A.   And I am like, but my daughter doesn't
 3   A.   Pardon me.                                      3 lie all of the time.
 4   Q.   You have got to speak up.  Oh, for fuck's       4   Q.   You stated:  You wonder how a family is
 5 sake no I think is what you said.                      5 supposed to cope with such a child.  She could
 6   A.   That is exactly what I said.                    6 have put several people in prison for a long
 7   Q.   States that you stated:  We all know            7 time.
 8 Tiffany tells stories.  And I don't know why she       8        Did you say that?
 9 does this.  We know the real story and we want to      9   A.   I did not say it like that.  I said, had
10 call her on it, but she gets upset and gets           10 she put someone in prison -- of course, when this
11 violent when she is confronted on her lying.          11 was happening it was very stressful for all of
12        Did you say that?                              12 us.
13   A.   It wasn't said in present text, it was         13   Q.   Continues:  Mom reports Richard and Zack
14 past tense, as in before she went to prison.          14 the younger brothers, don't want to relive the
15   Q.   Continues:  Mom states Tiffany is a            15 past and they have moved on.  However, they are
16 habitual liar and she lies all of the time.  It's     16 both justifiably afraid that their sister could
17 what she does.                                        17 make unfounded accusations of them.
18        Did you say that?                              18   A.   That was the second sentence that I
19   A.   No.  I said she was diagnosed with             19 had problems -- that's not what I said.
20 compulsive lying.                                     20        I said back then everyone was concerned
21   Q.   Who diagnosed her with compulsive lying?      21 that one of their friends were going to
22   A.   Oh, that would have been the Pavilion.         22 inadvertently be sent there and it would be
23   Q.   Have you ever obtained records from            23 innocent, because she -- until those girls got --
24 Pavilion?                                             24 had what happened to them -- and they also got in

                                                  114                                                   116
 1   A.   They sent me a printout.  I don't know if       1 trouble for it, they were on probation for a
 2 I still have it, but it listed all of that.            2 while.  Before that happened, there was a
 3 That's why I am repeating that.                        3 concern.
 4   Q.   ==She was diagnosed as a compulsive liar==      4   Q.   Okay.
 5 ==while at the Pavilion?==                             5   A.   After that, not so much except for the
 6   A.   Which is kind of weird.  And I did              6 one incident with Richard's friend.
 7 question --                                            7        And I'm sorry, and I even told the
 8   Q.   Is that yes though?                             8 doctor, my kids held a grudge for a couple of
 9   A.   Yes, yes.  And I did try to question them      9 years on that because it was serious.
10 about that.  And they -- I never got any answers,     10        Do I think that my daughter was going to
11 because she wasn't there but a couple of days.        11 get out of prison -- and I even told him this, I
12   Q.   So, when you state that she is a habitual     12 don't think that she is like that anymore.
13 liar, you are not referencing your own opinion,       13   Q.   Why didn't you think she was?
14 you are reference in the opinion of the Pavilion?     14   A.   Because.  She was addicted to crack back
15   A.   Yes, and I told him that.                      15 then and she was partying a lot.
16   Q.   Oh.                                            16   Q.   Hold on.  She had made accusations
17   A.   Yes.                                           17 against people of sexual misconduct --
18   Q.   And when it states she lies all of the         18   A.   Not --
19 time, it's what she does, that's not your             19   Q.   -- before she was using crack.
20 opinion, that's the Pavilion's opinion?               20   A.   Yes.
21   A.   I went over there, and this is what they      21   Q.   All right.  So, why would you think she
22 said?                                                 22 wouldn't do it again?
23   Q.   So, that's a yes?                              23        MS. GERAGHTY:  Objection,
24   A.   Yes.                                           24 foundation, form, relevance.
```